No. 09-351C

(Judge Christine Miller)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KELLOGG BROWN & ROOT SERVICES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT-COUNTERCLAIMANT'S OPPOSITION TO
PLAINTIFF-COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS**

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:

ALEX P. HONTOS
Trial Attorney

J. REID PROUTY
Senior  Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tele:  202-305-7586
Fax:  202-514-7969

April 21, 2011                          Attorneys for Defendant

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................... 1

SUMMARY OF ARGUMENT. ..................................................................... 3

ARGUMENT. ............................................................................................... 6

    I.    The Actions Of Terry Hall And Luther Holmes Are Attributable KBR. ............... 6

        A.    A Principal Is Liable For An Agent's Fraudulent Actions That Are Within The Scope Of His Employment And Are Incidentally In The Principal's Interests. ................................................. 6

        B.    Awarding Subcontracts To Tamimi Provided Both Incidental And Direct Benefit To KBR. ..................................... 7

        C.    It Is Appropriate To Attribute The Actions Of Hall And Holmes To KBR. .................................................. 8

    II.    A Cost-Reimbursement Contract Is Tainted By Fraud When There Are Kickbacks Related To Its Subcontracts, Regardless Of The Effectiveness Of The Kickbacks. ............................................... 9

        A.    Fraud In Subcontracting Is Fraud Against The Government's Interests ......................................................... 9

        B.    A Procurement May Be Considered To Be Tainted, And Subject To Remedy Even Without Demonstrable Effects Of A Conflict Of Interest. ...................................................... 10

        C.    The Law Does Not Require A Demonstrable Link Between Kickbacks And Costs. .............................................. 13

    III.    The Government's Anti-Kickback Act Counterclaim Adequately Pleads And States A Claim For Violation Of The Statute. ................................... 15

    IV.    The Special Plea In Fraud States And Adequately Alleges The Elements Of A Defense Brought Pursuant To The Forfeiture Statute. ................ 18

        A.    The Kickback Taint To KBR's Subcontract With Tamimi Supports A Special Plea In Fraud Related To That Contract. ................................. 18

**TABLE OF CONTENTS**

-continued-

| | Page |
|---|---|

1 .    A Special Plea In Fraud May Be Brought When Fraud Infects The Relevant Contract. ........................................... 18

2.    The Counterclaim Pleads The Basis For A Special Plea In Fraud. ................................................................. 21

B.    Hall And Holmes Provide The Specific Intent Necessary For The Special Plea. ............................................................... 22

V.    The False Claims Act Counterclaim States A Valid Claim And Alleges Facts WithThe Particularity Required By RCFC 9(b). ........................................ 22

A.    The Elements Of An FCA Claim. ............................................................. 23

B.    The Payment Of Kickbacks Coupled With The Knowing Submission Of  Claims For Reimbursement Gives Rise To FCA Liability. ........................................................................... 25

1.    The Invoices KBR Submitted Are False Or Fraudulent Because They Include The Cost Of The Kickbacks..................... 26

2.    The Invoices KBR Submitted Are False Or Fraudulent Because They Are The Product Of A Tainted Procurement. ...................... 27

C.    The Government Alleges The Requisite State Of Knowledge Under The FCA ................................................................................. 30

D.    The Government Alleges The Circumstances Of the Fraud With Particularity. ............................................................................. 33

VI.    The Government's Common Law Fraud Counterclaims State And Adequately Plead Claims For Which It Is Entitled Relief. .......................... 35

A.    Illegality In A Subcontract's Award Makes That Subcontract Void *Ab Initio*. ....................................................... 37

B.    The Government's Pleadings Related To Master Agreement 3 Support Rescission And Disgorgement Of Moneys Paid Upon That Subcontract . ................................................. 38

# TABLE OF CONTENTS

-continued-

                                                                        **Page**

C.     The Government's Pleadings Support The Disgorgement
       Of Task Order 59 Fees. ................................................................. 38

VII.   The Affirmative Defense Should Not Be Dismissed. ........................... 39

VIII.  If The Court Is Dissatisfied With The Government's Pleadings, The
       Government Should Be Permitted To Remedy Any Flaws In Them ................... 40

CONCLUSION. ..................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*A.S.M.E. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982)............................................................................ 6

*Ab-Tech Constr., Inc. v. United States*,
    31 Fed. Cl. 429 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995)........................ 19, 23

*Acme Process Equipment Co. v. United States*,
    385 U.S. 138 (1966)............................................................ 8, 9, 25, 26, 36, 38

*American Heritage Bancorp v. United States*,
    61 Fed. Cl. 376 (2004). ...................................................................... 18, 20, 21

*Anderson v. United States*,
    47 Fed. Cl. 438 (2000). ........................................................................... 7

*Atlantic Contracting Co. v. United States*,
    57 Ct. Cl. 185 (1922). ............................................................................. 20

*Baird v. United States*,
    76 Ct. Cl. 599 (1933). ........................................................................ 19, 20

*Brown Constr. Trades v. United States*,
    23 Cl. Ct. 214 (1991). ................................................................... 10, 18, 20

*Burlington Indus., Inc. v. Ellerth*,
    524 U.S. 742 (1998)............................................................................... 6

*Commercial Contractors, Inc. v. United States*,
    154 F.3d 1357 (Fed. Cir. 1998)............................................................ 23, 24

*Continental Mgmt., Inc. v. United States*,
    527 F.2d 613 (Ct. Cl. 1975). ................................................................... 12

*Crocker v. United States*,
    240 U.S. 74 (1916)........................................................... 4, 10, 11, 14, 38

## TABLE OF AUTHORITIES
### -continued-

**Cases**                                                          **Page(s)**

*Daewoo Eng'g & Constr. Co. v. United States,*
    557 F.3d 1332 (Fed. Cir. 2009)................................................. 23, 30

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009)................................................. 33

*First Federal Savings Bank of Hegewisch v. United States,*
    52 Fed. Cl. 774 (2002). ............................................................ 39

*Foman v. Davis,*
    371 U.S. 178 (1962)................................................................ 41

*Fullard v. United States,*
    78 Fed. Cl. 294 (2007). ........................................................... 40

*Godley v. United States,*
    5 F.3d 1473 (Fed. Cir. 1993)...................................... 8, 12, 13, 14, 37

*Godley v. United States,*
    26 Cl. Ct. 1075 (1992). ........................................................... 13

*Harrison v. Westinghouse Savannah River Co.,*
    176 F.3d 776 (4th Cir. 1999). ...................................... 5, 21, 27, 28

*In re BP Lubricants,*
2011 WL 872147 (Fed. Cir. Mar. 15, 2011). ................................ 33

*J.E.T.S., Inc. v. United States,*
    838 F.3d 1196 (Fed. Cir. 1988)................................................. 37

*Jana, Inc. v. United States,*
    41 Fed. Cl. 735 (1998). ........................................................... 40

*Joseph Morton Co. v. United States,*
    757 F.2d 1273 (Fed. Cir. 1985).................................................. 9

# TABLE OF AUTHORITIES
## -continued-

**Cases**                                                                    **Page(s)**

*K & R Eng'g Co. v. United States*,
  616 F.2d 469 (Ct. Cl. 1980). .................................................. 5, 12, 13, 14, 35, 36, 37

*King Auto., Inc. v. Speedy Muffler King, Inc.*,
  667 F.2d 1008 (C.C. P.A. 1981). ........................................................................ 33

*Liquidating Trustee Ester Duval Of KI Liquidation, Inc. v. United States*,
  89 Fed. Cl. 29 (2009)................................................................................18, 23, 24

*Little v. United States*,
  152 F. Supp. 84 (Ct. Cl. 1957). ......................................................................... 20

*Long Island Sav. Bank, FSB v. United States*,
  503 F.3d 1234 (Fed. Cir. 2007)........................................................ 3, 6, 7, 14, 36

*Meyer v. Holley*,
  537 U.S. 280 (2003)................................................................................................ 6

*Morse Diesel Int'l, Inc. v. United States*,
  79 Fed. Cl. 116 (2007). ............................................................................. 9, 16, 28

*Morse Diesel Int'l, Inc. v. United States*,
  74 Fed. Cl. 601 (2007). ................................................................................. 15, 21

*O'Brien Gear & Machine Co. v. United States*,
  591 F.2d 666 (Ct. Cl. 1979). ............................................................................... 20

*Pan-Am. Petroleum and Transp. Co. v. United States*,
  273 U.S. 456 (1927).......................................................................................... 36, 37

*Rex Trailer Co. v. United States*,
  350 U.S. 148 (1956)............................................................................................. 23

# TABLE OF AUTHORITIES
### -continued-

**Cases**                                                                 **Page(s)**

*Scolnick v. United States,*
   331 F.2d 598 (1st Cir. 1964). ............................................................. 28

*Skilling v. United States,*
   130 S. Ct. 2896 (2010). ................................................................ 38

*Supermex, Inc. v. United States,*
   35 Fed. Cl. 29 (1996). .................................................................. 18

*Tamimi Global Co. v. Kellogg Brown & Root, LLC, et al.,*
   No. 11-cv-00585 (S.D. Tex. 2011). ................................................... 2

*Te-Moak Bands of W. Shoshone Indians v. United States,*
   948 F.2d 1258 (Fed. Cir. 1991). ...................................................... 41

*UMC Electronics v. United States,*
   43 Fed. Cl. 776 (1999), *aff'd,* 249 F.3d 1340 (Fed. Cir. 2001). ................. 18, 19, 20

*United States v. Amdahl Corp.,*
   786 F.2d 287 (Fed. Cir. 1986). ...................................................... 5, 37

*United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.,*
   147 F.Supp.2d 39 (D. Mass. 2001). ................................................... 21

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency,*
   929 F.2d 1416 (9th Cir. 1991). ....................................................... 28

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943). ......................................................... 10, 22, 23, 27

*United States ex rel. Pogue v. Am. Healthcorp, Inc.,*
   914 F. Supp. 1507 (M.D. Tenn. 1996). .............................................. 28, 29

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am.,*
   565 F. Supp. 2d 153 (D.D.C. 2008). .................................................. 29

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,*
   No. 04-cv-00042 (E.D. Tex. Feb. 8, 2011). .................................... 1, 6, 16, 41

# TABLE OF AUTHORITIES
## -continued-

**Cases**                                                                                      **Page(s)**

*United States ex rel. Wilson v. Kellogg, Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008). .............................................................. 25

*United States v. CFW Constr. Co., Inc.*,
    649 F. Supp. 616 (D.S.C. 1986), *dismissed on other grounds*, 819 F.2d
    1139 (4th Cir. 1987)............................................................................ 28

*United States v. Davio*,
    136 F. Supp. 423 (E.D. Mich. 1955)............................................... 9, 26

*United States v. Gen. Dynamics Corp.*,
    19 F.3d 770 (2d Cir. 1994)................................................................. 28

*United States v. McLeod*,
    721 F.2d 282 (9th Cir. 1983). ........................................................... 28

*United States v. Mississippi Valley Generating Co.*,
    364 U.S. 520 (1961)................................... 5, 11, 12, 13, 14, 35, 36, 37

*United States v. Neifert-White Co.*,
    390 U.S. 228 (1968).................................................................... 25, 27

*United States v. O'Connell*,
    890 F.2d 563, 569 (1st Cir. 1989)........................................................6

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010). .................................................. 31, 32

*United States v. Vill. of Island Park*,
    888 F. Supp. 419 (E.D.N.Y. 1996). .................................................. 28

*Varljen v. Cleveland Gear Co.*,
    250 F.3d 426 (6th Cir. 2001). ........................................................... 23

*Veridyne Corp. v. United States*,
    83 Fed. Cl. 575 (2008). .............................................. 4, 18, 19, 20, 37

*Young-Montenay, Inc. v. United States*,
    15 F.3d 1040 (Fed. Cir. 1994)................................................. 20, 23, 24

# TABLE OF AUTHORITIES
## -continued-

**Statutes, Regulations, And Legislative Materials**                     **Page(s)**

28 U.S.C. § 2514........................................................................... 4, 5, 18, 20, 21, 39, 40

31 U.S.C. § 3729............................................................................... 23, 25, 30

31 U.S.C. §§ 3729-3732. ....................................................................... 5

41 U.S.C. §§ 51-58.............................................................................4

41 U.S.C. § 53. ................................................................................ 15, 16

41 U.S.C. § 55...............................................................................15, 16, 17

Act of December 23, 1943, 57 Stat. 608.......................................................10

H.R. Rep. No. 99-964 (1985), 1986 U.S.C.C.A.N. 5960. .........................................9

S. Rep. No. 99-345 (1986), 1986 U.S.C.C.A.N. 5266..............................................32

132 Cong. Rec. S16311 (daily ed. Oct. 15, 1986)..............................................17, 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KELLOGG BROWN & ROOT SERVICES,   )
INC.,   )
   )
       Plaintiff,   )
   )
       v.   )  No. 09-351C
   )  (Judge Christine Miller)
THE UNITED STATES,   )
   )
       Defendant.   )

## DEFENDANT-COUNTERCLAIMANT'S OPPOSITION TO PLAINTIFF-COUNTERCLAIM DEFENDANT'S MOTION TO DISMISS

Defendant-Counterclaimant, the United States, respectfully submits this opposition to plaintiff-counterclaim defendant, Kellogg Brown & Root Services, Inc.'s ("KBR's") motion to dismiss. KBR's motion relies upon both a mischaracterization of the Government's fraud claims and a misapplication of the controlling law. For the reasons stated herein, the motion should be denied.

## INTRODUCTION

KBR's motion to dismiss is essentially an attack upon a straw man: a theory of fraud not advocated by the Government here, but one that is, by design, similar to the claims brought in the *qui tam* case of *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, No. 04-cv-00042 (E.D. Tex. Feb. 8, 2011), and which KBR hopes will suffer the same fate. Although we certainly disagree with much of the district court's opinion in *Vavra*, it is, in large part, irrelevant to this case. The Texas district court that provides a more compelling view of this case is the one that actually reviewed the counterclaims, at KBR's insistence, in KBR's efforts to avoid paying Tamimi Global Company ("Tamimi") its arbitration award. That court, as KBR informed this Court through filing its decision, held that the Government's counterclaim reflected KBR's

unclean hands, because "KBR – through its managerial employees [Terry Hall and Luther Holmes] – was accepting . . . kickbacks." *Tamimi Global Co. v. Kellogg Brown & Root, LLC, et al*, No. 11-cv-00585, Slip Op. at 7 (S.D. Tex. 2011).  By law, not only did KBR accept the kickbacks, through Hall and Holmes, but those kickbacks tainted KBR's procurement and administration of Master Agreement 3 between it and Tamimi and Task Order 59 between KBR and the United States.  Countercl. ¶¶ 108, 114-18.[1]  That tainted procurement and administration is the bedrock of our counterclaims and cannot be as breezily wished away as KBR attempts.  To be sure, we allege in our counterclaims, and will prove at trial, that Hall and Holmes were also deeply involved in the award of the Camp Anaconda Work Release to Tamimi, *see* Countercl. ¶¶ 109, 119-21, just as we allege and will prove that higher level KBR employees were aware that there were significant irregularities involving Tamimi's relationship with KBR and yet did nothing about them, *see* Countercl. ¶¶ 123-25.  These facts are pled because of their direct relation to this case, however, they are decidedly not the bases of our counterclaims.  And although they would, of their own right, add further support to our counterclaims, they are unnecessary for their survival.

Our theory, amply supported by our pleadings, is that Hall and Holmes were KBR employees in positions of authority that permitted them to strongly influence the award and administration of dining facility ("DFAC") subcontracts.  Countercl. ¶¶ 108, 109-10, 115-21.  The success or failure of Tamimi in obtaining such subcontracts rested in large part upon the decision-making of the two, who had significant oversight authority over DFAC subcontractors and who were in positions that would allow them to influence awards to Tamimi or other DFAC

---

[1] "Countercl." refers to the Government's Amended Answer and Counterclaims, filed on March 15, 2011.

subcontractors.  *Id.*  Both were receiving kickbacks from Tamimi at the time that they were in their positions of authority with KBR.  Countercl. ¶¶ 114-21.  This is enough to taint KBR's procurement process with fraud, even if there were no "but for" allegation that the kickback was the direct cause of the Tamimi subcontract awards.  And because Hall and Holmes are KBR, for purposes of liability, their actions and knowledge are attributable to the company.  KBR thus knowingly submitted invoices for reimbursement from the United States Treasury, which were paid along with a fee determined by KBR's costs.  Countercl. ¶¶ 108, 118, 122, 137.  As we demonstrate below, ample law supports these conclusions.

SUMMARY OF ARGUMENT

KBR organizes its brief around its false characterizations of the Government's counterclaims.  A better way to address the salient issues is to examine the building blocks of the Government's case and demonstrate how, contrary to KBR's assertions, the counterclaims are adequately pled and convey the causes of action that are advanced in our counterclaims.

The first building block to the Government's case is the fact that the actions and knowledge of Terry Holmes and Luther Hall are attributable to KBR.  This fundamental fact, so obvious to the Texas district court in the Tamimi arbitration enforcement case, rests upon black letter agency law.  To the extent that KBR seeks to avoid this argument through the adverse interests exception to corporate liability, the fraud-tainted actions of Hall and Holmes were at least partially in the interests of KBR (as defined by the courts) and thus support liability against KBR.  *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1249 (Fed. Cir. 2007).

The second building block to the Government's case is the legal principal that the kind of conflict of interest manifested in Hall and Holmes's acceptance of kickbacks from Tamimi while

3

occupying positions of authority able to influence significant contractual decision-making relating to Tamimi, in and of itself, is a harm to the Government, even without specific actions to Tamimi's benefit being attributable to the receipt of the kickbacks. *E.g., Crocker v. United States*, 240 U.S. 74 (1916). KBR's attempts to change a reasonable requirement of the law that there be a causal link between the conflict of interest and the challenged procurement action (that is, that the conflict of interest be able to have some effect upon the procurement) into a requirement that there be direct evidence that a particular kickback caused a particular contract award is simply not supported by the cases cited and is contrary to at least a century of law and public policy.

With these two premises, we may turn to KBR's challenges to our counterclaims and dispatch them readily. Our counterclaim related to the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 51-58, is backed by allegations that support finding that KBR should be strictly liable for the actions of its employees and that it should be held vicariously liable for their actions because, as discussed above, they were the actions of KBR.

In terms of the Special Plea in Fraud, brought pursuant to 28 U.S.C. § 2514, KBR insists upon a cramped reading of the statute, limiting its application to only those cases where there is something facially false about a claim presented to the contracting officer. Though KBR relies upon the Court's decision in *Veridyne Corp. v. United States*, 83 Fed. Cl. 575 (2008), for this premise, it is better to consider *Veridyne* to be limited to its particular facts and to interpret it consistently with numerous other cases brought in this Court, several of which have been affirmed by the Federal Circuit, holding that, when fraud infects the procurement process, a Special Plea in Fraud can be maintained, regardless of whether the subject claim is facially

4

accurate.

Our claims brought under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, are premised upon two types of false claims encompassed by the FCA:  those where the claim for payment is for a false number (here, the falsity is that the requests for money are presumptively inflated by the costs of the kickbacks); and those where the request for payment is upon a contract tainted by fraud.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).  In both instances, because the knowledge of Hall and Holmes is imputed to KBR, it was aware that its claims were false or fraudulent when they were submitted.

And our common law fraud claims are based upon precedent precluding payment of contracts tainted by fraud.  *See United States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961); *K & R Eng'g Co. v. United States*, 616 F.2d 469 (Ct. Cl. 1980).  KBR's defenses to these claims are the discredited notion that the kickbacks must have directly caused the subcontract award in order to make the subcontract subject to disgorgement and an inapt reliance on the case of *United States v. Amdahl Corp.*, which KBR alleges applies *quantum meruit* and *quantum valebant,* and not full disgorgement, to the contract costs incurred here, but which, by its own terms, is not applicable to cases involving fraud.  786 F.2d 387, 395 (Fed. Cir. 1986).

Although KBR seeks to apply its arguments relating to the Special Plea in Fraud to our affirmative defense, that defense does not rest upon the statutory strictures of 28 U.S.C § 2514, and is, instead, premised upon the common law principle that KBR should not be permitted to recover upon its claim when its subcontract is so badly tainted by fraud.

Finally, of course, KBR's insistence that any alleged deficiencies in the Government's pleading require the Court to dismiss the counterclaims with prejudice is neither borne out by the

law nor supported by any persuasive argument.

ARGUMENT

I.   <u>The Actions Of Terry Hall And Luther Holmes Are Attributable KBR</u>

Understandably, KBR wishes to dissociate itself from the misdeeds of its employees Hall

and Holmes by arguing that their actions and knowledge should not be imputed to KBR.  KBR's

position is not supportable by the law.

    A.    A Principal Is Liable For An Agent's Fraudulent Actions That Are Within The
<u>Scope Of His Employment And Are Incidentally In The Principal's Interests</u>

The general rule of principal liability for the fraudulent actions of an agent is that the

principal is liable for the actions of the agent that are within the agent's authority.  *See Meyer v.*

*Holley*, 537 U.S. 280, 285 (2003); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998).

There is an exception to the general rule, only sometimes applied, that the principal is not liable

for actions taken by the agent that are adverse to its interests.  *See Long Island Sav. Bank, FSB v.*

*United States*, 503 F.3d 1234, 1249 (Fed. Cir. 2007) (applying adverse interest test to Special

Plea in Fraud and common law fraud claims).[2]

The adverse interests exception, however, is a narrow one (indeed, until *Long Island*

*Savings Bank*, there was good reason to believe it would not be considered in fraud cases in this

---

[2]   Subsequent to the 1986 amendments to the FCA, this "adverse interests" exception is
not applicable to FCA fraud claims, even if it may be applicable to other fraud claims.  *See*
*United States v. O'Connell*, 890 F.2d 563, 569 (1st Cir. 1989).  KBR relies principally upon
*Vavra*, an unpublished trial court decision in a different circuit, to support its assertion that, to
impute liability under the FCA, the company's agent must be acting for the purpose of
benefitting his employer, and ignores contrary authority.  *See* MTD at 34-35.  Amongst its other
flaws, *Vavra* rests upon precedent that did not survive the 1986 amendments to the Act.  *See*
*O'Connell*, 890 F.2d at 569 n.2 (addressing 5th Circuit cases relied upon in *Vavra*).  To the extent
that *Vavra* discusses corporate knowledge for the Special Plea in Fraud and our common law
claims, the analysis by the Federal Circuit in *Long Island Savings Bank* is controlling.

6

circuit.  *See, e.g.*, *A.S.M.E. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) (declining to apply the exception to antitrust cases even when agent acted completely for his own interests and did not benefit the association); *Anderson v. United States*, 47 Fed. Cl. 438, 448 (2000) (doubtful that adverse interests exception would be applicable)) and there is no reason to apply it to the FCA or AKA.  In any event, the facts in *Long Island Savings Bank* bear out just how narrow the exception is.  In that case, the controlling one in this circuit, the fraudulent actor used his position to hire for the bank a law firm in which he had a secret interest. *See* 503 F.3d at 1239.  This was not considered to be adverse to the agent's employer because the hiring of *a* law firm to provide services to the bank was in the interest of the bank, and, under the adverse interest rule, the fraudulent action had to be *entirely* in the interest of the employee without even incidental benefit to the principal.  *See id*. at 1250.  Notably, the court did not require that the agent's secret interest in the law firm be in the interest of the bank, only that the actions taken in light of that secret be in the interest of the bank.

> B.    Awarding Subcontracts To Tamimi Provided Both
>        Incidental And Direct Benefit To KBR

The actions taken by KBR employees Hall and Holmes, sitting on the board that awarded Master Agreement 3 to Tamimi, advocating for Tamimi, and taking other actions to the benefit of Tamimi, were to the benefit of KBR for the simple reason that, like the law firm in *Long Island Savings Bank*, Tamimi did provide necessary services to KBR – operating DFACs.  *See* Countercl. ¶¶ 109, 116.  And whatever other motivations that Hall and Holmes had, this is enough under the *Long Island Savings Bank* test.  *See* 503 F.3d at 1250.  Additionally, as will be discussed further below, the kickbacks presumptively increased the costs of the services provided

by Tamimi.  Because, as averred in the counterclaim, the increase in base costs was to the benefit

of KBR, which received its fee under the LOGCAP III contract based upon the costs it incurred,

*see* Countercl. ¶¶ 108, 118, 122, the kickbacks, themselves, by leading to presumptively higher

costs thus increasing KBR's profit, were to its benefit.

C.     It Is Appropriate To Attribute The Actions Of Hall And Holmes To KBR

KBR also makes the implicit argument that Hall and Holmes were too insignificant to

have their actions be imputed against KBR.  *See* MTD at 1.[3]   The Supreme Court rejected a

similar argument in *Acme Process Equipment Co. v. United States*, 385 U.S. 138 (1966).  In

*Acme Process*, the Supreme Court held that it was appropriate to hold the corporation liable for

the actions of its non-officer employees because it was the corporation that decided to place them

in the position where they could do wrong.  *See* 385 U.S. at 147 ("Since Acme selected those

agents to carry on its business in the obtaining and performing government contracts, there is no

obvious reason why their conduct in the field should not be considered as Acme's conduct,

particularly where it touches the all-important subject of kickbacks.").  Because Hall and Holmes

were selected by KBR to carry out its business in overseeing the sizable DFAC contracts

awarded under LOGCAP III, and because their actions were not completely adverse to KBR's

interests, their actions and knowledge, particularly on "the all-important subject of kickbacks,"

*id.*, are squarely imputed to KBR.

---

[3]  "MTD__" refers to a page of KBR's "Memorandum Of Points And Authorities In
Support Of Plaintiff's Motion To Dismiss Defendant's Counterclaim."

II.     A Cost-Reimbursement Contract Is Tainted By Fraud When There Are Kickbacks
        Related To Its Subcontracts, Regardless Of The Effectiveness Of The Kickbacks

        KBR premises a significant portion of its brief upon the dubious notion that kickbacks

without a tangible result, a fact contradicted by the counterclaims, which must be viewed in a

light most favorable to the Government upon a motion to dismiss, are not "the stuff" of which

fraud is made.  *See* MTD at 3. This argument, premised largely upon a misreading of *Godley v.*

*United States*, 5 F.3d 1473 (Fed. Cir. 1993), *see* MTD at 20, 30, 32, could not be more wrong, for

it takes the reasonable requirement that kickbacks be related to a contract in order for that

contract to be adversely affected by them and turns it into a requirement that there be proof that

the kickbacks were effective or necessary.  Besides its problematic results, *e.g.*, that a

subcontractor can, with relative impunity, provide all the kickbacks it wants if the Government

cannot later refute a claim that the subcontractor probably would have obtained the contract

anyway, it ignores almost a century of law and public policy to the contrary.

        A.      Fraud In Subcontracting Is Fraud Against The Government's Interests

        The Court made a strong point in the recent status conference by noting that, in a large

cost-reimbursement contract, like LOGCAP III, the primary contractor is, in a sense, acting as the

Government's contracting agent.  Tr. at 27-28.[4]  So it is.  And Congress and the courts have long

made the policy decision that fraud in the subcontracting of a Government contract is as much an

offense against the Government as is fraud in the procurement of the prime contract.  *E.g., Acme*

*Process,* 385 U.S. at 144-45 (kickbacks call into serious question the "reliability" of the

subcontractor, regardless of the cost impact); *Joseph Morton Co. v. United States*, 757 F.2d 1273,

---

        [4] "Tr. __" refers to a page of the transcript of the Court's hearing in this case held on
March 24, 2011.

1278 (Fed. Cir. 1985) (citing *Acme Process* for the proposition that the Government has an interest in being "secure in its confidence in its subcontractors"); *United States v. Davio*, 136 F. Supp. 423, 427 (E.D. Mich. 1955) (kickbacks forbidden because of their tendency to corrupt); *see also id.* at 429 (United States is "real party in interest" in anti-kickback prohibitions).  This is why there is an Anti-Kickback Act.  *See* H.R. Rep. No. 99-964, at 4 (1985), 1986 U.S.C.C.A.N. 5960-61 (quoted by *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 121 (2007)) (Anti-Kickback Act amended, in part, because "[k]ickbacks destroy competition and they foster corruption.").

Moreover, there is a long history of the courts applying the Government's anti-fraud statutes to parties who obtain Federal money through intermediaries (as would plainly be the case in a cost-reimbursement contract, like LOGCAP III).  *E.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (applying statute analogous to the False Claims Act to claims filed with municipalities for projects funded by the United States), *superseded by statute on other grounds by*, Act of December 23, 1943, 57 Stat. 608.  And this is consistent with this Court's grouping kickbacks with the conflict of interest of procurement officials and other similar fraud. *E.g., Brown Constr. Trades v. United States*, 23 Cl. Ct. 214, 215 (1991).

> B.    A Procurement May Be Considered To Be Tainted, And Subject To Remedy Even Without Demonstrable Effects Of A Conflict Of Interest

Remedies for conflicts of interest by persons able to affect the procurement process do not require that the person actually utilize that influence for the benefit of the party providing the bribes or kickbacks.  This would be self-evident in any bid protest before this Court in which it was alleged that a member of a source selection panel had a conflict of interest, and it was

evident to the Supreme Court in the 1916 case of *Crocker v. United States*, 240 U.S. 74 (1916).

In *Crocker*, there was no allegation that the corrupt official, named Machen, actually used his

office to effect a contract award or that any advice he gave was incorrect – the procurement

decision, in fact, was made by the Postmaster General – but because he was in a position to give

advice on the matter, the Supreme Court found that to be enough:

> The secret arrangement whereby Machen was to share in the profits
> was most reprehensible.  Its natural effect, as also its purpose, was
> to secure for the company an inadmissible advantage.  The satchels
> were wanted for the free delivery service, and Machen's relation to
> that service made it probable, if not certain, that his advice
> respecting the reasonableness of the bid, the number of satchels
> required from time to time, and the company's performance of the
> contract, would be sought and given consideration by his superiors
> in the Postoffice Department.  The advertisement for bids, the
> postal regulations (1902 ed. §§ 17 and 70), and the findings leave
> no doubt that he was charged with important duties of that
> character.  Public policy and sound morals forbade that he should
> have any personal interest in the bid or contract lest he might be
> tempted to advance that interest at the expense of the government.
> Under the secret arrangement, which was made before the bid was
> submitted, he had such an interest and therefore was in a position
> where the hope of personal gain was likely to exercise a
> predominant influence and prevent a faithful discharge of his
> public duties, as in fact it did.

240 U.S. at 80.  *Crocker* is firmly in the mainstream.  In the landmark case of *United States v.*

*Mississippi Valley Generating Co.*, 364 U.S. 520 (1961), the Supreme Court found it appropriate

to set aside a contract infected by the taint of a part-time Government consultant's conflict of

interest.  Importantly, the Supreme Court noted that, whether the employee's conflict of interest

actually hurt the Government or whether he actually took any actions to advance the interests of

the contractor, were not relevant to whether the conflict of interest tainted the contract.  *See* 364

U.S. at 562.

11

Incredibly, KBR cites *Mississippi Valley* for the proposition that fraud only existed in that case because, "but for the misconduct 'no contract would have been made.'"  MTD at 31 (quoting *Mississippi Valley*, 364 U.S. at 553).  The fragmentary quotation is accurate, in the sense that those six words appeared in the opinion, but the Supreme Court said nothing of the sort stated in the predicate provided by KBR.  It did not say that, "but for the misconduct" the contract would not have been made, as KBR would have it, but, rather that, but for an agreement in which the consultant participated, no contract would have been made.  *See* 364 U.S. at 553. This fragmentary quotation, placed out of context by KBR, only underscores the point we are making here:  it is the participation of compromised individuals in important contractual decision-making that imbues the contracts with fatal taint, regardless of whether the misconduct directly caused the contractual decision.  Because of the "inherent difficulty in detecting corruption and the need to protect the procurement system, *Mississippi Valley* stands for the proposition that,  when it comes to contracts tainted by a conflict of interest, the concern is more about "what might have happened . . . than with what actually happened."  364 U.S. at 550, 565 (citations and quotation marks omitted) (emphasis added).

In *K & R Engineering Co. v. United States*, the Federal Circuit, relying upon *Mississippi Valley*, made the point even more clear: "[I]t is the potential for injuring the public interest created by a conflict of interest that requires invalidation of the tainted contract.  It therefore is immaterial whether the particular taint has or has not in fact caused the government any financial loss or damage."  616 F.2d 469, 475 (1980); *see also Continental Mgmt., Inc. v. United States*, 527 F.2d 613, 615 (Ct. Cl. 1975) (rejecting plaintiff-counterclaim defendant's contention that the Government should be required to prove "a nexus between [briber's] conduct and specific

monetary harm to the Government"). Notwithstanding KBR's inapposite citation to *Godley*, which we will distinguish presently, KBR can cite no cases holding that fraud – whether the case is brought under the False Claims Act, the Anti-Kickback Act, the Special Plea, or as a common law claim – cannot be proved by taint alone. It need only be proved that there is a causal link between the fraud and the contract.

      C.      <u>The Law Does Not Require A Demonstrable Link Between Kickbacks And Costs</u>

Notwithstanding the ample law supporting the notion that the conflict of interest and corruption (such as that generated by kickbacks) is, in and of itself, the damage to the Government, KBR asserts that *Godley* and other cases support the notion that the Government must plead that the kickbacks had a tangible effect upon subcontract pricing. MTD at 18-20. This is not supportable by these cases, especially in light of the legal terrain discussed above.

In *Godley*, while a subcontractor was providing kickbacks to a Government procurement official, there was no reported connection between the kickbacks and the award of the prime contract. *See* 5 F.3d at 1474. Thus, the Federal Circuit ruled that it was unclear that taint of the prime contract had been established. *See id.* at 1476. The language the court of appeals used was that "the record must show some causal link between the illegality and the contract provisions." *Id*. This does not mean that the illegality had to have directly caused the contract provisions to be what they were (else *Godley* would be contrary to *Mississippi Valley*, *K & R*, and all of the other cases cited in the section above), but that one cannot create a fraud claim out of an illegal act of one party without connection to the contract.

Indeed, the facts of *Godley*, as more fully set forth by the trial court, demonstrate just why the Federal Circuit ruled as it did. As the trial court explained the facts, the corrupt Postal

Service employee who awarded the contract to the Godley brothers awarded the "agreement to lease"[5] several months before the Godleys entered into a contract with the subcontractor that was paying bribes to the Postal Service employee. *Godley v. United States*, 26 Cl. Ct. 1075, 1077-78 (1992), *rev'd*, 5 F.3d 1473 (1993).  Thus, there was no basis to connect the contract award to the illegality of the bribes, and it is not surprising to see reluctance to punish the Godleys for acts possibly unrelated to their contract.  Even so, the Federal Circuit did not order the counterclaim dismissed, because it remained possible that, even without such a direct and temporal connection, there could be a way to, nevertheless, find the contract tainted.  For example, had the corrupt subcontractor secretly prevailed upon the Postal Service employee to issue lease terms that would be to its advantage, that would constitute an example where the subcontract was tainted, just as would the circumstances where the subcontractor knew that it would obtain the subcontract from Godley and paid the employee to ensure the award to lease was awarded to Godley.

*Long Island Savings Bank*, citing *Godley*, applied the case in this limited and appropriate way.  *See* 503 F.3d at 1250.  In short, the Federal Circuit recognized *Godley* as requiring a "causal link between the fraud and the contract."  *Id.*  We could not agree more:  for there to be fraud that affects contractual rights, there must be a causal link between the fraud and the contract, just as there was in *Crocker*, *Mississippi Valley*, and *K & R*.  But just as in those cases, the link is not that, but for the fraud the contract would not have been awarded (a matter never proved in any of these cases), but that the fraud be directly linked to the events required for contract award.

---

[5]  The actual final lease agreement was executed by the Postal Service subsequent to its employee's indictment, 26 Cl. Ct. at 1078, presumably by an official other than the corrupt employee.

14

The kickbacks in this case were directly linked to individuals with tremendous responsibility for KBR's contract awards to Tamimi.  Just as in *Mississippi Valley*, where, but for the existence of the board determining cost of money, no contract would have existed, but for the board selecting contractors to be awarded master agreements, "no contract would have been made."  364 U.S. at 553.[6]  To say, as KBR attempts here, that there was no pled causal link is to ignore the requirements of long-established law.

III.    The Government's Anti-Kickback Act Counterclaim Adequately
        Pleads And States A Claim For Violation Of The Statute

KBR contends that the Government's AKA counterclaim should be dismissed in its entirety.  MTD at 36-39.  Specifically, KBR asserts that the Government pleaded only a knowing violation of the AKA under section 55(a)(1), not a violation of the AKA's strict-liability provision under section 55(a)(2).  MTD at 36.  KBR goes on to argue that, as a matter of law, a corporation cannot be held liable for the acts of its employees under section 55(a)(1).  KBR's factual premise is false, and its legal analysis is wrong.

First, Count II of the Government's counterclaims does not merely allege a violation of section 55(a)(1).  The Government cited section 55, which necessarily encompasses both subsections.  Countercl. ¶ 133.  KBR also misconstrues the Government's prayer for relief, where the Government sought "damages in the amount of double the amount of the kickbacks given to Mr. Hall and Mr. Holmes, plus civil penalties as are allowable by law of $5,500 to $11,000 per violation, post judgment interest, and costs."  Countercl. at 25.  Again, seeking

---

[6]  Of course, even if the Court were to somehow find that Hall and Holmes's participation on the selection board were not sufficient to taint the award of Master Agreement 3, all of the other individual actions the two took to support the award and administration of Work Release 3 add further taint to *that* work release.  Countercl. ¶¶ 109, 111, 119-121.

double the amount of the kickbacks necessarily includes a request for a single amount of the kickbacks.  The complaint plainly states facts and cites the correct statute to allege violations of both section 55(a)(1) and section 55(a)(2).

Next, KBR contends that a prime contractor "cannot be held liable under the AKA for a knowing violation based solely on the acts of its employees because section 55(a)(2) provides for separate no-fault, vicarious liability for contractors whose employees violate the AKA."  MTD at 36.  KBR's legal analysis is inconsistent with the AKA's plain language, the AKA's legislative history, and this Court's decision in *Morse Diesel*.

The AKA prohibits any person from providing, offering to provide, soliciting, or accepting a kickback for the purpose of improperly obtaining or rewarding favorable treatment in connection with a Government contract.  *See* 41 U.S.C. § 53(1)-(2).  The AKA also prohibits any person from directly or indirectly including the amount of a kickback in the contract price charged on a Federal Government prime contract or subcontract.  *See id*. § 53(3).  As quoted above, KBR concedes that a prime contractor is strictly liable for the acts of its employees under section 55(a)(2).  But a prime contractor can also be held vicariously liable under section 55(a)(1) for the conduct of its agents and officers.  By its plain language, section 55(a)(1) entitles the Government to recover a civil penalty from "any person" who knowingly accepts a kickback or submits a kickback-inflated invoice to the Government.  Nowhere does the Act exclude a prime contractor from liability under this subsection.  To the contrary, the Act broadly defines the term "person," to include "a corporation, partnership, business association of any kind, trust, joint-stock company, or individual."  § 52(3).  Indeed, this Court has already recognized that a prime

16

contractor can be held liable under section 55(a)(1). *See Morse Diesel*, 79 Fed. Cl. at 122-23.[7]

Because KBR is a "person" and, as described above in Section I, Hall and Holmes's actions and

knowledge are imputed to KBR, the Complaint adequately states a claim under both section

55(a)(1) and section 55(a)(2).

Although the Court need go no further than the text of the statute to reject KBR's

argument, any ambiguity about a prime contractor's vicarious liability under section 55(a)(1) is

dispelled by the legislative history to the 1986 Amendments to the AKA. The bill's sponsor

explained that section 55(a)(1) "subject[s] not only subcontractors and kickback recipients to

civil liability, *but also prime contractors*, independent sales representatives and others who

knowingly participate in kickback activities." 132 Cong. Rec. S16311 (daily ed. Oct. 15, 1986)

(statement of Sen. Carl Levin) (emphasis added). Indeed, "[section 55(a)(1)] is also intended to

reach companies whose employees engaged in kickbacks, *under the doctrine of respondeat

superior*." *Id*. (emphasis added). Congress therefore intended that a prime contractor could be

held liable — even by principles of vicarious liability — under section 55(a)(1). Senator Levin

then went on to explain that section 55(a)(2), the strict-liability provision, "allows the United

States to recover civilly from any person whose employee, subcontractor or subcontractor

employee violates the law by engaging in kickbacks." *Id*. Thus, section 55(a)(2) provides an

additional "incentive to business entities such as prime contractors and subcontractors to deter

kickback activities within their operations." *Id*. The two subsections are not mutually exclusive.

Section 55(a)(1) requires proof of a prime contractor's intent – whether proven directly or

---

[7] The only contrary authority of which we are aware is the non-binding *Vavra* decision, which concluded that a prime contractor cannot be liable under § 55(a)(1). *Vavra*, Slip Op. at 22-24. For the reasons discussed in this section, the United States respectfully disagrees with the *Vavra* court's analysis and conclusion.

through imputed knowledge.  Whereas section 55(a)(2), and its reduced penalties, does not.  For example, section 55(a)(2) is limited to those situations where the corporation can demonstrate that its employee's knowledge is not imputable, such as where the employee acts outside of the scope of employment.  Count II states a claim against KBR under both section 55(a)(1) and section 55(a)(2).

IV.   **The Special Plea In Fraud States And Adequately Alleges The Elements Of A Defense Brought Pursuant To The Forfeiture Statute**

KBR's challenge to our Special Plea in Fraud, brought pursuant to 28 U.S.C. § 2514, essentially boils down to two arguments:  the first, is the notion that the Special Plea is limited to circumstances where the claim filed with the contracting officer contains some particular misrepresentation regarding the dispute that is the subject of the claim, and that this has not been pled in this case, *see* MTD at 28; KBR's second argument is that the Government has not pled the specific intent required to prevail in a Special Plea in Fraud, *see* MTD at 27.  In the first argument, KBR egregiously oversimplifies the law; in its second argument, it relies upon the discredited notion that nothing done by Hall and Holmes should be considered within KBR's corporate knowledge.  Neither assertion is sustainable.

A.   **The Kickback Taint To KBR's Subcontract With Tamimi Supports A Special Plea In Fraud Related To That Contract**

1 .   **A Special Plea In Fraud May Be Brought When Fraud Infects The Relevant Contract**

Without deigning to cite any of the numerous cases contrary to its position, KBR relies upon this Court's decisions in *Veridyne Corp.*, 83 Fed. Cl. at 575, and *Liquidating Trustee Ester Duval Of KI Liquidation, Inc. v. United States*, 89 Fed. Cl. 29 (2009), for the proposition that

18

only a direct misrepresentation in a claim, itself, can support a Special Plea in Fraud. Numerous

cases in the Court of Federal Claims and its predecessor court hold to the contrary, including

*Brown Construction Trades*, 23 Cl. Ct. at 215 (kickbacks support Special Plea in Fraud). *See*

*also American Heritage Bancorp v. United States*, 61 Fed. Cl. 376, 385-88 (2004); *UMC*

*Electronics v. United States*, 43 Fed. Cl. 776 (1999), *aff'd*, 249 F.3d 1340 (2001); *Supermex, Inc.*

*v. United States*, 35 Fed. Cl. 29 (1996) (extensive discussion); *Ab-Tech Constr., Inc. v. United*

*States*, 31 Fed. Cl. 429 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995) (table). But this is not just a

case where some judges at the Court of Federal Claims hold diametrically opposite views and

one view is right while the other is wrong. For *Veridyne* (upon which the relevant analysis in *KI*

*Liquidation* was based) is a case very much driven by its particular facts. *See Veridyne*, 83 Fed.

Cl. at 587 (Government had cited no cases involving "factual circumstances like those presented"

in *Veridyne*).

In particular, although the Court in *Veridyne* was not persuaded that the Government had

presented a case that made out a Special Plea, it did not dismiss that plea, and suggested that,

were the fraudulent activities to "transcend that level of deceit that amounts to engaging

government personnel in a conflict of interest or affording them some pecuniary gain" the

Government case might support forfeiture. *Id.* at 589. Thus, in different factual circumstances,

the Court in *Veridyne* may have come to very different conclusions regarding the applicability of

the Special Plea.

The legal authority cited by the Court in *Veridyne* for the proposition that the Special Plea

in Fraud did not apply to fraud in contract performance is *Baird v. United States*, 76 Ct. Cl. 599

(1933). In *Baird*, the Court of Claims declined to impose the forfeiture of a claim when the

19

alleged fraud consisted of a subcontractor (which was not the same party that brought the claim, and which may have done so without the knowledge of the prime contractor) placing the sand it dredged in a place other than that specified by the contract.  76 Ct. Cl. 611.  This was too extreme a position for the Court.  The Court did, however, recognize that there were cases, such as those involving contracts contrary to public policy such as involving fraud in the inducement of a contract, where the action could infect the contract such that filing a claim upon the contract might support a forfeiture.  *See* 76 Ct. Cl. at 612.  It simply did not need to address that issue, though there were prior Court of Claims cases which came to that conclusion.  *E.g.*, *Atlantic Contracting Co. v. United States*, 57 Ct. Cl. 185 (1922).

Notably, *Baird* did not hamper the Court of Claims in its decisions of *Little v. United States*, 152 F. Supp. 84 (Ct. Cl. 1957) and *O'Brien Gear & Machine Co. v. United States*, 591 F.2d 666 (Ct. Cl. 1979), which supported the broader reading of section 2514 encompassed in the Court of Federal Claims cases cited above.  Nor did it give the Federal Circuit cause to reverse *Brown Construction Trades* or *UMC Electronics* despite reviewing both cases on appeal (although, admittedly, the Federal Circuit did not address the issue of the extent of section 2514 in either case).  Indeed, in *Young-Montenay, Inc. v. United States*, 15 F.3d 1040 (Fed. Cir. 1994), the Special Plea that formed the basis for the dismissal of plaintiff's lawsuit was not a false document presented with the claim to the contracting officer that would later be brought to Court, but a false document used in an attempt to obtain an early progress payment.  *See* 15 F.3d at 1042.  Whether this false document was sufficient to support a Special Plea was at the heart of the appeal.  *See id.*  Accordingly, without comment, the Federal Circuit sustained, yet again, a Special Plea based upon fraud practiced against the Government that was not practiced in the

claim that was the basis for the lawsuit, but was practiced in the course of the performance of the contract.

Thus, the Court's ruling upon the facts in *Veridyne* need not be inconsistent with the rule of law enunciated by the vast majority of courts that have entertained the issue:  when fraud, such as kickbacks, taints a contract, a claim submitted upon that contract is subject to forfeiture pursuant to section 2514.[8]

2.    The Counterclaim Pleads The Basis For A Special Plea In Fraud

As noted above, a claim tainted by fraud, even if that fraud is not explicitly set forth in plaintiff's claim, forms the basis for a Special Plea in Fraud.  In light of Sections I and II above, our demonstration that the counterclaim has adequately pled the Special Plea is relatively straightforward.  Hall and Holmes, who acted for KBR, took money from Tamimi contemporaneously with a time that they had tremendous responsibility with respect to decisions that would directly affect the award and administration of the DFAC contracts.  Countercl. ¶¶ 108-09, 111, 114-21.  They advocated for Tamimi, and Tamimi prospered.  Countercl. ¶¶ 116-17, 119-21.  Regardless of whether the two might or might not have still argued just as hard for Tamimi but for the kickbacks or whether Tamimi might have, nevertheless, still been awarded the exact same contracts even without their advocacy, the procurement process, as we

_____

[8]  Significantly, this rule of law, that section 2514 applies to claims filed upon fraud-tainted contracts, is consistent with the way that the courts have interpreted "false or fraudulent" claim under the FCA.  *See Am. Heritage*, 61 Fed. Cl. at 387 n.9 (comparing FCA to the Special Plea in Fraud).  As will be discussed at greater length in our section regarding the FCA, below, a claim is false or fraudulent under the FCA, even if it is facially accurate, if it is the product of a contract tainted by fraud or the result of a fraudulent course of conduct.  *E.g., Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999); *Morse Diesel Int'l, Inc. v. United States*, 74 Fed. Cl. 601, 624-25 (2007); *United States ex rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.,* 147 F.Supp.2d 39, 53 (D.Mass.2001).

21

have pled, was corrupted by these actions.  And we have pled (as has KBR) that KBR filed a

claim seeking reimbursement for one of the very subcontracts (Master Agreement 3, Work

Release 3) that was tainted.  Countercl. ¶¶ 108, 118, 122, 137, 140.  This is sufficient to support

an action under section 2514.[9]

B.     Hall And Holmes Provide The Specific Intent Necessary For The Special Plea

So, too, have we pled the specific intent necessary for a Special Plea in Fraud.  For the

actions that made the claim fraudulent were the actions that tainted the contract – that is, the

acceptance of kickbacks by Hall and Holmes, given their roles in the awards of the contract.  And

we have pled facts that support the state of mind necessary to have made their actions taint the

subcontract:  that the two were taking money directly from Shabbir Khan, *see* Countercl. ¶¶ 108,

115-16; that their positions gave them authority over Tamimi subcontracts, *see* Countercl.

¶¶ 108-11, 130; that they played roles in the award and administration of Master Agreement 3

and the Tamimi subcontracts, *see* Countercl. ¶¶ 108-11, 115-17, 119-21, 130; and that they

understood that the Tamimi subcontracts would be subject to cost-reimbursement by the United

States taxpayers, *see* Countercl. ¶¶ 108, 118.  These actions tainted Master Agreement 3 and the

Tamimi subcontracts.  And every action was taken with the knowledge of Hall and Holmes.

Who were KBR.  KBR had the requisite specific intent to defraud the United States when it

---

[9]   Although KBR advances the theory that its lawsuit is only about Change Order 9 to
Work Release 3, and not about the award of the Master Agreement and Work Release, *see* MTD
at 28, this argument ignores the fact that there would be no contract to issue change orders upon
but for the fraudulent award of the Master Agreement, and ignores the compelling law that fraud
in contract award infects all subsequent payments.  *See Marcus*, 317 U.S. at 543-44.  As for
KBR's claims of great cost savings from Change Order 9 compared to the previous contract
terms, they are, to put it mildly, less than impressive given that they were made upon a contract
whose prices were inflated by kickbacks as evident by the fact that such "reduced" prices were
still considered unreasonable by the Government's auditors.

submitted its claim.

V.    The False Claims Act Counterclaim States A Valid Claim And Alleges
      Facts WithThe Particularity Required By RCFC 9(b)

KBR makes three arguments related to the Government's FCA claim.  First, KBR appears
to contend that the payment of kickbacks to its employees by a subcontractor does not make the
invoices that KBR submitted for reimbursement false or fraudulent.  MTD at 18-19.  Second,
KBR contends that the counterclaims fail to allege the requisite fraudulent intent.  MTD at 25-27.
Third, KBR asserts that the FCA claim lacks the particularity required by RCFC 9(b).  MTD at
20-25.  KBR's arguments rest upon a narrow conception of FCA liability that is inconsistent with
the caselaw, the FCA's broad remedial purpose, and the facts alleged in the counterclaims.
Before responding to those arguments, however, we first address the elements of an FCA claim.

A.    The Elements Of An FCA Claim

To state a claim under the FCA, the Government must plead that KBR knowingly
presented a false or fraudulent claim for payment.  *See* 31 U.S.C. § 3729(a); *Commercial
Contractors, Inc. v. United States*, 154 F.3d 1357, 1371 (Fed. Cir. 1998); *KI Liquidation*, 89 Fed.
Cl. at 39.  A contractor knows that a claim it submitted was false if the contractor has actual
knowledge of the falsity of the claim or if it acted in deliberate ignorance or reckless disregard of
the truth or falsity of the claim.  *See* 31 U.S.C. § 3729(b); *Daewoo Eng'g & Constr. Co. v.
United States*, 557 F.3d 1332, 1340 (Fed. Cir. 2009).  "[N]o proof of specific intent to defraud is
required."  31 U.S.C. § 3729(b); *Daewoo*, 557 F.3d at 1340.

With one exception, this formulation of the basic elements of an FCA claim does not
appear to be in dispute.  Specifically, KBR contends that "to state a claim under the FCA, the

Government must allege that . . . [it] suffered damages as a result of the false or fraudulent claim." MTD at 11 (quoting *Young-Montenay*, 15 F.3d at 1043). This is, quite simply, wrong. Proof of damage is not an element of a FCA claim. *See Rex Trailer Co. v. United States*, 350 U.S. 148, 153 n.5 (1956) (citing *Marcus* for the proposition that "there is no requirement, statutory or judicial, that specific damages be shown"); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); *see also Ab-Tech*, 31 Fed. Cl. at 433-35 (rejecting claim for damages but nonetheless awarding FCA statutory penalties), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995) (table). Even KBR's counsel conceded this well-established principle at the March 24, 2011 status conference. *See* Tr. at 26 ("[I]t is possible, of course, that you can have a zero damages false claims act case, absolutely, and there would be a question about whether or not if there is any penalty, it is just the penalty.").

To justify its evolving position on damages, KBR misleadingly quotes the Federal Circuit's decision in *Young-Montenay*. MTD at 11. But the full quotation is as follows:

> In order to recover damages for violation of the False Claims Act, the government must establish that
>
> (1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;
> (2) the claim was false or fraudulent;
> (3) the contractor knew the claim was false or fraudulent; and
> (4) the United States suffered damages as a result of the false or fraudulent claim.

15 F.3d at 1043. Thus, *Young-Montenay* does not say that damages are *required* to state a claim under the FCA. Rather, the court simply noted that "[*i*]*n order to recover damages*," the

Government must establish that it, in fact, "suffered damages as a result of the false or fraudulent claim." *Id*. (emphasis added).  Subsequent Federal Circuit decisions, citing *Young-Montenay*, acknowledge this distinction.  *See, e.g.*, *Commercial Contractors*, 154 F.3d at 1371 ("[T]he Government *is entitled to recover treble damages* under the False Claims Act only if it can demonstrate that it suffered actual damages." (emphasis added)).  As has this Court.  *See, e.g.*, *KI Liquidation*, 89 Fed. Cl. at 39 ("*To recover damages* under the FCA, the Government must establish that it suffered damages as a result of the fraudulent scheme." (emphasis added)).  KBR's additional citation to the Fourth Circuit's decision in *United States ex rel. Wilson v. Kellogg, Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008), for this proposition adds nothing to the argument, because that decision says nothing about damages, much less that they are an element of every FCA claim.

> B.     The Payment Of Kickbacks Coupled With The Knowing Submission Of Claims For Reimbursement Gives Rise To FCA Liability

KBR argues next that the knowing submission of claims tainted by kickbacks do not violate the FCA.  MTD at 18-19.  KBR is wrong because it fails to recognize the legal effects of kickbacks upon contract costs and fails to appreciate the scope of the FCA.

The FCA penalizes both the presentation of a "false or fraudulent claim for payment" and the use of "a false record or statement to get a false or fraudulent claim paid."  31 U.S.C. § 3729(a).  The term "false or fraudulent" is not defined in the FCA, but the Supreme Court has broadly construed the statute to apply to "all fraudulent attempts to cause the Government to pay out sums of money."  *United States v. Neifert-White Co*., 390 U.S. 228, 233 (1968).  Here, the FCA counterclaim has alleged that the invoices submitted by KBR were false or fraudulent both

because they were inflated by kickbacks and because they were submitted upon a kickback-tainted contract.

        1.      **The Invoices KBR Submitted Are False Or Fraudulent**
                **Because They Include The Cost Of The Kickbacks**

The FCA counterclaim alleges facts to show that the invoices KBR submitted for reimbursement were false.  The law has long presumed that the costs of kickbacks are included in the costs of contracts, and KBR's invoices are therefore facially false.  Moreover, the counterclaim alleges that KBR's invoices were, in fact, false because Tamimi's subcontract prices included the cost of the kickbacks.  Countercl. ¶ 118

By operation of law, the cost of a kickback is presumed to be included in the contract cost.  As the Supreme Court noted in *Acme Process*, a subcontractor's bid "will, of course, reflect the amount he contemplates paying as a kickback, and then his inflated bid will be reflected in the prime contractor's bid to the Government."  385 U.S. at 143.  *See also Davio*, 136 F. Supp. at 428.  The drafters of the 1986 amendments to the AKA recognized this point: "Kickback costs are so routinely hidden in contract prices that their inclusion has become a recognized rule of law."  *See* 132 Cong. Rec. S16310 (daily ed. Oct. 15, 1986) (statement of Sen. Carl Levin).  This is a particularly salient concern with a cost-reimbursement contract, because such contracts guarantee that kickback costs will be passed on to the Government when the prime contractor submits its invoices for reimbursement.  *See Acme Process*, 385 U.S. at 143 ("Extra expenditures to get subcontracts *necessarily* add to government costs in cost-plus-a-fixed-fee and other cost reimbursable contracts." (emphasis added)).  Thus, strictly speaking, there is no requirement to allege that an invoice submitted to the Government in fact included the cost of the kickback or

that the kickback inflated the subcontract price because it is legally presumed.  Indeed, KBR's argument would lead to the absurd result that even though the Government essentially finances the kickback when it pays an invoice that includes such costs, the invoice for those costs is not a "false or fraudulent" claim under the FCA.   To establish the falsity of a claim, therefore, it is sufficient to allege that a subcontractor paid kickbacks to the prime contractor.  The allegations here do that.  Countercl. ¶¶ 108, 114-17.

Even though nothing more is required to allege the falsity of an invoice, the counterclaims also allege that "Mr. Hall and Mr. Holmes knew or had reason to know that the kickbacks that they received would lead to inflated contract prices from Tamimi."  Countercl. ¶ 118.  This allegation is not conclusory, and is entitled to belief at this stage in the litigation.

2.    The Invoices KBR Submitted Are False Or Fraudulent Because
      They Are The Product Of A Tainted Procurement

Even assuming that the invoices submitted accurately described the services provided and costs incurred, the Government states a FCA claim for the independent reason that KBR knowingly submitted invoices that were the product of, and tainted by, fraudulent and illegal conduct that struck at the integrity of the procurement system.  The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Neifert-White Co.*, 390 U.S. at 232.  Thus, courts should construe the phrase "false or fraudulent" broadly.  *See Harrison*, 176 F.3d at 788.  Consequently, courts have repeatedly recognized that the FCA extends to claims tainted by fraudulent or illegal conduct, even when the claims submitted are facially accurate.

The Supreme Court has long acknowledged that contractors are liable under the FCA for claims submitted under government contracts tainted by illegal or fraudulent conduct. *See Marcus*, 317 U.S. at 543-45. In finding that each claim submitted under a contract obtained by collusive bidding gave rise to FCA liability, the Supreme Court explained that the taint of the improper conduct necessarily "entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government]. . . . The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal-payment of government money to persons who had caused it to be defrauded." *Id*. at 543-44. This is so even though the contractor had actually performed at the price agreed. *Id*.

After *Marcus*, courts have routinely found contractors liable under the FCA for a wide variety of illegal, improper, or fraudulent actions, even though the claim submitted was not facially false. *See, e.g.*, *Harrison*, 176 F.3d at 788; *United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 772 & 775 (2d Cir. 1994) (inflated cost estimates in subcontract submitted for approval to government); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991) (contract obtained based on false information and fraudulent pricing); *United States v. McLeod*, 721 F.2d 282, 282-84 (9th Cir. 1983) (check cashed by clamant who was not entitled to payment); *Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir. 1964) (check cashed by claimant who was not entitled to payment); *Morse Diesel*, 79 Fed. Cl. at 120-26 (violation of AKA); *United States ex rel. Pogue v. Am. Healthcorp, Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996) (violation of Medicare anti-kickback statute); *United States v. Vill. of Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1996) (fraudulent conduct related to administration of Government block-grant program); *United States v. CFW Constr. Co., Inc.*, 649 F. Supp. 616,

28

618 (D.S.C. 1986) (bid-rigging), *dismissed on other grounds*, 819 F.2d 1139 (4th Cir. 1987). The caselaw makes it plain: a wide range of fraudulent underlying conduct is actionable under the FCA, even if the claim submitted is facially accurate.

Without addressing this bedrock authority, KBR contends that not every violation of a federal statute supports a FCA claim, and that not even every violation of the AKA supports an FCA claim.  MTD at 18.  But the cases cited above do not limit the definition of a false or fraudulent claim to one that violates some other law, meaning KBR's argument necessarily fails.[10]  And, even on its merits, just because not *every* violation of the AKA (or any federal law) is actionable under the FCA, it does not follow that a violation of the AKA (or any federal law) is *never* actionable.  Indeed, the cases where a kickback formed the basis for a FCA violation are "legion."  *See United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am.*, 565 F. Supp. 2d 153, 155 (D.D.C. 2008) (citing examples); *see also Pogue*, 914 F. Supp. at 1509-10.  Rightfully so, given the damage that kickbacks do to the integrity of the procurement process.  At bottom, KBR asks the Court to hold that a contractor who knowingly accepts kickbacks from a subcontractor and then turns around and seeks reimbursement for those costs from the public fisc can escape FCA liability.  That is not the law, nor should it be.

In any event, the Court need not resolve that dubious assertion because, even assuming that an AKA violation does not *per se* create a false claim, the fraudulent course of conduct alleged here creates FCA liability.  The Government alleges that KBR employees – the very same employees who KBR selected and authorized to oversee hundreds of millions of dollars of

---

[10]    The cases KBR cites on pages 18 and 19 of its Motion to Dismiss are also largely distinguishable on their facts in that they did not involve similar allegations of fraudulent conduct, were not brought under the AKA, and did not involve the submission of invoices for reimbursement under a cost-plus award-fee contract like LOGCAP III.

DFAC subcontracts – received kickbacks from a subcontractor they were supposed to be technically qualifying, supervising, and administering.  Countercl. ¶¶ 109, 115-19.  These employees were deeply involved in not only the original award of Master Agreement 3 to Tamimi, but also the award of subsequent Work Releases for specific DFAC facilities like Camp Anaconda.  Countercl. ¶¶ 116-22.  The employees were also responsible for overseeing Tamimi's performance.  Countercl. ¶¶ 109, 113.  This illegal relationship created a conflict of interest and is evidence of actual corruption.  Because KBR is vicariously liable for the knowledge and conduct of these employees, KBR knowingly submitted fraudulent invoices for reimbursement to the Government under a cost-reimbursement contract.  This course of fraudulent conduct is squarely within the scope of the FCA, and the Court should reject KBR's attempt to narrowly re-define the FCA's provisions.

C.      The Government Alleges The Requisite State Of Knowledge Under The FCA

Rule 9(b) of the Rules of the Court of Federal Claims ("RCFC") provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Nonetheless, KBR argues that the FCA counterclaim fails under RCFC 9(b) because it "does not allege the requisite scienter to state a claim for fraud."  MTD at 25.  KBR's argument lacks merit.

Again, a contractor has the intent to violate the FCA if the contractor has actual knowledge of the falsity of the claim or if it acts in deliberate ignorance or reckless disregard of the truth or falsity of the claim.  *See* 31 U.S.C. § 3729(b); *Daewoo*, 557 F.3d at 1340.  "[N]o proof of specific intent to defraud is required."  31 U.S.C. § 3729(b); *Daewoo*, 557 F.3d at 1340.

The Government alleges that Hall and Holmes repeatedly were offered and accepted kickbacks from Khan and Tamimi.  Countercl. ¶¶ 114-15.  These allegations are specific, even

30

describing the amounts of each kickback, the time during which the illegal kickbacks were paid, the circumstances of the payments, and the means by which the kickbacks were paid.  Countercl. ¶¶ 114-15.

The Government also alleges that LOGCAP III was a cost-reimbursement contract and that "Mr. Hall and Mr. Holmes knew, when they accepted their kickbacks from Mr. Khan, that KBR would file vouchers with the United States seeking reimbursement for any Tamimi subcontracts."  Countercl. ¶ 118.  We further allege that Hall and Holmes "knew or had reason to know that the kickbacks that they received would lead to inflated contract prices from Tamimi."  Countercl. ¶ 118.  As we explained in Section I, above, a corporation can act only through its employees and agents.  Under well-established agency principles, Hall and Holmes's knowledge and conduct is imputed to KBR.  This means that KBR had *actual* knowledge of the falsity of its claims, and again, the pleadings make this plain: "KBR knowingly presented and caused to be presented to officers and employees of the United States Government false or fraudulent claims for payment by submitting vouchers for payment for costs associated with Master Agreement 3 and all of the work releases upon it."  Countercl. ¶ 137.  The Government further alleges that "KBR knew that the award of Master Agreement 3 and the work releases upon it, including but not limited to Work Release 3, were tainted by kickbacks given by Mr. Khan to Mr. Hall and Mr. Holmes."  Countercl. ¶ 137.[11]

---

[11]  The very specific allegations about Hall and Holmes distinguish this case from those that rely on collective knowledge, which involves stitching together facially innocent pieces of knowledge, to establish scienter.  *See, e.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010).  We do not, as KBR appears to contend on page 27 of its Motion to Dismiss, allege that the fraud in this case is based upon a collection of unrelated, seemingly innocent facts.  Rather, we allege that specific employees whose acts and knowledge are attributable to KBR under well-established agency principles accepted illegal kickbacks knowing that the kickbacks would lead to inflated costs and that KBR would seek payment from

Although the preceding allegations are the primary bases for our counterclaims, we make additional allegations from which the Court can infer KBR's knowledge that the invoices it submitted were false and fraudulent.  The counterclaims thoroughly describe the attempt of Daniel Petsche, a KBR subcontract administrator responsible for Tamimi subcontracts, to inform his superiors of irregularities related to Tamimi.  Countercl. ¶¶ 119, 124.  In an e-mail message, Petsche described the award to Tamimi of the Anaconda DFAC as "the mother of all DFAC drug deals."  Countercl. ¶ 124.  Petsche wrote that the Anaconda DFAC was "predestined and out of control from the start."  Countercl. ¶ 124.  The Government also alleges that Petsche explained to his superiors that (1) Tamimi's pricing came very close to the internal KBR requisition; (2) he drafted, but refused to sign Work Release 3 because he felt he needed more data to justify the prices; (3) "there is a whole lot more to this story," and (4) that "similar irregularities could be found in other Tamimi subcontracts with KBR."  Countercl. ¶ 124.

The counterclaim alleges that KBR procurement official David Hadcock, who was reviewing the Camp Anaconda procurement files, received this message and forwarded it on to two members of KBR's senior management, William Jonas and Charlie Carr.  Countercl. ¶ 125.  But "[n]either Mr. Hadcock, Mr. Jonas, Mr. Carr, nor any other KBR employee took any action based upon Mr. Petsche's e-mail or the allegations contained therein."  Countercl. ¶ 125.  No KBR employee "ever conveyed Mr. Petsche's concerns (or any of their own) regarding Camp Anaconda and other Tamimi contracts to any representative of the United States Government."  Countercl. ¶ 125.  Despite this e-mail warning, Hadcock, in March 2004, "wrote a memorandum purporting to justify the costs for Master Agreement 3, Work Release 3."  Countercl. ¶ 125.  And

---

the Government under a cost-reimbursement contract.  Countercl. ¶¶ 108, 115-18, 137

"[o]nly after Mr. Hadcock's memorandum was Master Agreement 3, Work Release 3 officially ratified by KBR officials with the authority to do so."  Countercl. ¶ 125.  As Congress and the courts have acknowledged, the FCA's scienter requirement is satisfied by "'ostrich-like' conduct which can occur in large corporations" where "corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates." *Sci. Applications Int'l Corp.*, 626 F.3d at 1274 (quoting S. Rep. No. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272).  The Petsche allegations support a finding that KBR exhibited such "head in the sand" behavior.

The facts in the counterclaims are not merely "generalized allegations rather than specific underlying facts from which [the Court] can reasonably infer the requisite intent."  MTD at 26 (quoting *In re BP Lubricants USA, Inc.*, 2011 WL 873147 (Fed. Cir. Mar. 15, 2011)).  The Government satisfied RCFC 9(b)'s intent standard by alleging facts sufficient to show that KBR submitted invoices that KBR knew were false or, at the very least, acted with deliberate ignorance or reckless disregard of the truth or falsity of KBR's invoices.

D.    The Government Alleges The Circumstances Of the Fraud With Particularity

The cases finding failure to comply with 9(b) are cases containing non-specific or merely implied expressions of the circumstances constituting the fraud.  This is not such a case.   The Court should therefore reject KBR's assertion that the FCA claim lacks the particularity required by RCFC 9(b).  MTD at 20-25.

Rule 9(b) provides, in relevant part, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) requires the Government to "identify the specific who, what, when, where, and how" of the fraud.  *Exergen*

33

*Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009).  And while "Rule 9(b) does not require the pleading of detailed evidentiary matters" the pleadings must contain "explicit rather than implied expression of the circumstances constituting fraud." *King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1010 (C.C. P.A. 1981).  RCFC 9(b) "acts as a safety valve to assure that only viable claims alleging fraud or mistake are allowed to proceed to discovery." *In re BP Lubricants*, 2011 WL 872147 at *2.

The counterclaims contain a detailed, specific description of the fraud.  The Government identifies the names of the individuals involved (the "who") and their roles, specifically KBR employees Hall, Holmes, Petsche, Jonas, Carr, and Hadcock.  Countercl. ¶¶ 108-11, 114-17, 119-20, 123-25.  The Government also describes Khan, Tamimi's chief of operations and vice president.  Countercl. ¶ 113.

The Government describes, in great detail, the fraudulent conduct (the "what"), in particular that Hall and Holmes accepted tens of thousands of dollars in illegal kickbacks from Khan at the same time they were supervising Tamimi's performance and making decisions and recommendations to ensure Tamimi received lucrative DFAC subcontracts.  Countercl. ¶¶ 108, 111, 114-17.  And further describes that KBR submitted invoices that included the costs of kickbacks for reimbursement from the United States Treasury.  Countercl. ¶¶ 118, 122, 137. The Government identifies the time of the fraudulent conduct (the "when") by noting that Khan first offered a kickback in November 2002, and shortly thereafter, Hall and Holmes began to accept payments from Khan.  Countercl. ¶¶ 114-15.  These payments lasted throughout 2003, during which time KBR awarded a Master Agreement to Tamimi (in June 2003), and Tamimi was receiving hundreds of millions of dollars in payments from KBR for DFAC subcontract

work.  Countercl. ¶¶ 115, 117-18, 122.  KBR then billed the United States for these costs.

Countercl. ¶ 118.  The Government also alleges that the kickbacks were paid in Kuwait and Iraq,

and even describes where some of the kickbacks were physically transferred from Khan to KBR

employees, (the "where").  Countercl. ¶¶ 109, 111-15.

Finally, the counterclaims identify the "how": KBR employees accepted kickbacks from a

subcontractor, who then received favorable treatment, including more subcontracts, from KBR.

Countercl. ¶¶ 108, 115-17.  KBR then knowingly submitted invoices that were factually false or

tainted by a fraudulent course of conduct.  Countercl. ¶¶ 108, 118, 122, 130, 137.  In accordance

with LOGCAP III, a cost-reimbursement contract, these invoices were then paid by the United

States Treasury along with a fee determined by subcontract costs.  Countercl. ¶¶ 108, 118, 122.

The allegations are more than sufficient to survive a challenge brought pursuant to RCFC 9(b).

## VI.  The Government's Common Law Fraud Counterclaims State And Adequately Plead Claims For Which It Is Entitled Relief

The first sentence of the section of KBR's motion to dismiss that challenges our common

law claims seeking rescission and disgorgement is a feint:  KBR begins what appears to be the

equitable argument[12] that the scope of the rescission requested is too great compared with the

---

[12]  This is not the only "equitable" argument, brought by KBR, relating to facts outside the record.  KBR also attempts to make legally irrelevant hay from the fact that the United States Army apparently still contracts with Tamimi (and improperly includes documents outside of the complaint to do so in this motion to dismiss).  MTD at 6 n.3.  Legally, of course, it makes no difference to the counterclaims at hand.  *See, e.g., Mississippi Valley*, 354 U.S. at 565 (noting that there is "no room for equitable considerations," even though "the party seeking enforcement appears entirely innocent," when it comes to a contract tainted by a conflict of interest).   More to the point, however, there has been no discussion of the circumstances and knowledge of the Army when it entered its relationships with Tamimi.  What *is* part of the record is that the fraudulent actions involving Hall and Holmes only became knowledge on the civil side of the Department of Justice in November 2010, and were immediately placed under seal.  Although there were other kickbacks from Mr. Khan to another KBR employee, named Mr. Seamans, that were public knowledge earlier, the record does not include (nor should it) a discussion of the

magnitude of the of the kickbacks.  MTD at 28.  Although this is the first sentence in the section,

KBR provides no law or further argument in support of this assertion.  This is because the law is

decidedly not in KBR's favor.  In *K & R*, to give but one of many examples, the Claims Court

rejected allegations that a rescission would be too harsh a remedy for what was argued to be a

relatively petty offense:  the interests of procurement integrity are just too strong.  *See* 616 F.2d

at 474.  Moreover, KBR's argument ignores the magnitude of the misconduct – the corruption of

its head of food services who was making decisions that could affect contracts worth several

hundred million dollars – and instead focuses upon the relatively small amount of money it cost

to corrupt him and his deputy.  If a "hit man" committed murder for only $10, the crime would

be no less significant than if he did so for a larger sum.

The first consequential portion of KBR's motion to dismiss that challenges our common

law claims seeking rescission and disgorgement of Master Agreement 3 and Task Order 59 rests

upon the claimed need for a causal link that the Government allegedly does not meet.  *See* MTD

at 29.  As we have demonstrated in Section II of our brief, above, KBR mischaracterizes the law.

The remainder of this section of KBR's brief appears to be an argument on damages – that KBR

would be entitled to keep some of the money the Government compensated it for its fraudulent

subcontract under theories of *quantum meruit* or *quantum valebant*.  MTD at 30-33.  If KBR is

indeed challenging the amount of money that should be withheld, as opposed to the right of the

Government to be compensated for money paid in a fraudulent contract, then what it effectively

seeks is a limitation upon the damages, rather than a dismissal.  Moreover, the law is well-settled

in favor of the Government's view of damages.

---

scope of the contracts affected or whether they would support the Army's disavowing its
contracts with Tamimi.

A.     Illegality In A Subcontract's Award Makes That Subcontract Void *Ab Initio*

We have demonstrated in Section II of this brief, above, the falsity of KBR's allegation that there is only actionable fraud in a contract award if it can be demonstrated that the kickbacks were the cause of the contract award.  Rather, the law is that the Government possesses the common law right to cancel contracts procured by fraud or conflicts of interest.  *See Mississippi Valley*, 364 U.S. at 563-64; *Acme Process*, 385 U.S. at 147-48; *Pan-Am. Petroleum and Transp. Co. v. United States*, 273 U.S. 456 (1927); *Long Island Savings Bank*, 503 F.3d at 1245; *K & R*, 616 F.2d at 476.  The Federal Circuit and its predecessor have found such contracts to be void *ab initio*.  *See K & R*, 616 F.2d at 477; *see also Godley*, 5 F.3d at 1475; *J.E.T.S., Inc. v. United States*, 838 F.3d 1196, 1200 (Fed. Cir. 1988) (citing *Mississippi Valley*, and *K & R Engineering*).

KBR makes no further argument that the Government has not pled common law fraud, choosing, instead, to rest upon its causation argument.  Inasmuch as the pleadings allege the actions of Hall and Holmes that have tainted the award of Master Agreement 3 (and through it, the award of Task Order 59, as to be discussed further below), there is no remaining argument that the Government has not pled a cause of action for common law fraud.

B.     The Government's Pleadings Related To Master Agreement 3 Support Rescission And Disgorgement Of Moneys Paid Upon That Subcontract

Taxpayer money paid upon a contract that is void *ab initio* as a result of fraud is properly the subject of a disgorgement action.  *See K & R*, 616 F.2d at 476; *Pan-Am. Petroleum*, 273 U.S. at 509-10.  To be sure, a contract that is void *ab initio* for an illegality not amounting to fraud, such as that presented in *United States v. Amdahl Corp.*, might not be subject to complete disgorgement when the Government has received a thing of value from the contractor.  786 F.2d

37

387, 393 (Fed. Cir. 1986); *see also Veridyne*, 83 Fed. Cl. at 585-86.  But *Amdahl* and other cases

holding similarly in this circuit do not involve "fraud and the like," which are subject to complete

disgorgement.  *See Amdahl*, 786 F.2d at 395 n.8 (citing *K & R*); *Veridyne*, 83 Fed. Cl. at 586

(forfeiture not appropriate, unless conflict of interest involved).

KBR, which quaintly refers to the kickbacks here as "gratuities," *e.g.*, MTD at 34, may be

arguing that the kickbacks pled do not reach the same level of fraud as conflicts of interest.  Such

an implication (if this is, indeed, the intent of KBR) would be almost risible because kickbacks

are not only a subset of conflicts of interest, but also present perhaps one of the most potent types

of such a conflict.  *See Skilling v. United States*, 130 S. Ct. 2896, 2932 (2010) (in criminal wire

fraud case, kickbacks described as "no mere failure to disclose conflict of interest").  Here, fraud

imbued Master Agreement 3 from its inception.  It is only proper that it be considered void and

that taxpayer money paid upon it should be disgorged.  Of course, even under *quantum meruit* or

*quantum valebant* theories, the amount to be disgorged is not the same as the amount paid to the

contractor, but the value received by the Government.  In such cases, the amount actually paid is

not presumptively the amount the contract is worth, and it is the contractor's burden to prove the

value of the services provided.  *See Crocker*, 240 U.S. at 81-82.

C.    The Government's Pleadings Support The Disgorgement Of Task Order 59 Fees

As stated in our pleadings, Task Order 59 was issued nearly contemporaneously with the

misconduct that is at issue here.  Counterclaim ¶ 142.  Moreover, from the time the Task Order

was issued until its conclusion, Master Agreement 3 was in effect.  We and KBR have both pled

that costs from Work Release 3 upon Master Agreement 3 were billed to the Government

through Task Order 59.  Countercl. ¶¶ 108, 118, 122; Compl. ¶¶ 16-32, 79-81.

38

If, as in *Acme Process*, the Government is entitled to be "rid" of an entire prime contract that is tainted by kickbacks near the time of its inception – even if that prime contract is a fixed price contract, *see* 385 U.S. at 147-48 – then surely a task order, upon which fraud is regularly practiced through the submission of tainted invoices, is voidable as well.

But we do not overreach here. We recognize that, though Task Order 59 has been infected by the taint of the Master Agreement 3 kickbacks, seeking disgorgement of all funds upon that task order would impact payments to many innocent subcontractors. Accordingly, separate from the funds going to Tamimi from Master Agreement 3 (which are addressed in the earlier count of the counterclaims), we do not seek the return of funds that were spent on innocent contractors or costs not associated with the fraudulent subcontract. Instead, we tailor the remedies sought here to being only the profits (fees) enjoyed by KBR, which is liable for the fraud practiced upon Task Order 59. That Task Order is infected by fraud, and even if it is more remote than the fraud relating only to Master Agreement 3, KBR is not entitled to more than its reasonable costs upon the Task Order, and should certainly not profit from it.

VII.    The Affirmative Defense Should Not Be Dismissed

KBR's motion to dismiss did not address the Government's separately pled affirmative defense. Approximately a week after KBR filed its motion to dismiss, KBR apparently became aware of this discrepancy and filed a notice with the Court, stating that it had intended to contain a challenge to the affirmative defense in its motion to dismiss, but had failed to do so. This notice also reported a conversation between KBR counsel and counsel for the Government on this matter. Although we do not believe that KBR intentionally misrepresented the substance of that conversation, we do note that it was somewhat more complicated than reported. Indeed, the

Government did expect that KBR had intended to cover the ground contained in the Government's affirmative defense when it filed its motion to dismiss.  And, frankly, it does us no particular prejudice to permit it to make this intention explicit to the Court at the later date that it did.

On the other hand, as we noted to KBR counsel in the subject conversation, the premise of the affirmative defense is somewhat different than the statutory elements of a Special Plea in Fraud discussed in KBR's motion to dismiss.  The affirmative defense does not necessarily rest, as was apparently the case in *First Federal Savings Bank of Hegewisch v. United States*, 52 Fed. Cl. 774 (2002), upon the elements of 28 U.S.C. § 2514, but upon the equitable argument that the taint of kickbacks should make KBR's claim unenforceable.  Countercl. ¶ 103.

As demonstrated above, our Special Plea in Fraud meets its statutory requirements and is sufficiently pled to survive KBR's motion to dismiss.  Nevertheless, even if the Special Plea did not survive, the Court would still have a basis for considering the affirmative defense and whether, regardless of any statutory limits regarding the kind of fraud to which § 2514 applied, the taint of KBR's illegality should, nevertheless, preclude recovery.

VIII.   If The Court Is Dissatisfied With The Government's Pleadings, The Government Should Be Permitted To Remedy Any Flaws In Them

Assuming the Court were to grant its motion to dismiss the Government's fraud counterclaims, KBR asks that such a dismissal be with prejudice.  MTD at 39-40.  The Court should deny KBR's extraordinary request, which would forever preclude a Government recovery, because it is unsupported by the law.

40

The remedy for failure to allege fraud with the particularity required by RCFC 9(b) is "an order requiring particularity, not dismissal. Dismissal generally is granted only when a FCA complainant fails to amend following the objection." *Jana, Inc. v. United States*, 41 Fed. Cl. 735, 741 (1998); *see also Fullard v. United States*, 78 Fed. Cl. 294, 301 (2007) ("If a plaintiff fails to meet the requirements of RCFC 9(b), the Court of Federal claims may dismiss the complaint without prejudice or allow the deficiency to be 'cured by a later disclosure.'"). This remedy is consistent with the Court's rules, which provide that the Court "should freely give leave [to amend] when justice so requires." RCFC 15(a). Absent undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice, or futility, "[t]his mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Te-Moak Bands of W. Shoshone Indians v. United States*, 948 F.2d 1258, 1260-61 (Fed. Cir. 1991).

Here, KBR does not and cannot assert that the Government has subjected it to undue delay: Government counsel first became aware of direct evidence of kickbacks paid by Tamimi to Hall and Holmes in November 2010; and in just four months, the Government substantiated that evidence, developed the case, obtained internal approval to file fraud counterclaims, and filed those counterclaims. KBR makes no allegations of bad faith or dilatory motive in the prosecution of the counterclaims. Nor has the Government repeatedly failed to cure deficiencies by previous amendments. The Government, in fact, has not even amended its counterclaims.

Without explanation, KBR nonetheless declares that "amendment will be futile here" and that "any further delay would result in prejudice." MTD at 40. These conclusory, unsupported assertions are insufficient to justify KBR's draconian and unusual request for a dismissal with prejudice. Likewise, the availability of Contract Disputes Act interest and (were it necessary) the

strong possibility that the Government could amend the counterclaims to provide additional facts directly contradict KBR's non-specific argument.  Even in the *Vavra* case, which KBR describes as "markedly similar to" this case, MTD at 4, the Court dismissed the Government's fraud claims "without prejudice."  *Vavra*, Slip Op. at 26.  Thus, in the event that the Court were to determine that the counterclaims are technically deficient, the Government should have the opportunity to amend or, at a minimum, the counterclaims should be dismissed without prejudice, particularly in light of the clear damage that KBR has caused to the integrity of the procurement system.

<u>CONCLUSION</u>

For the reasons stated herein, the Court should deny KBR's motion to dismiss our counterclaims and affirmative defenses.

Respectfully submitted,

TONY WEST
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

ALEX P. HONTOS
Trial Attorney

s/J. Reid Prouty
J. REID PROUTY
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn:   Classification Unit
          8th Floor
Washington, D.C.  20530
Tele: (202) 305–7586
Fax:  (202) 514-7969

April 21, 2011

Attorneys for Defendant

42