# In the United States Court of Federal Claims

No. 09-351C
(Filed July 6, 2011) 1/

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * Contracts; motion to |
| | * dismiss pursuant to |
| **KELLOGG BROWN & ROOT SERVICES, INC.,** | * RCFC 12(b)(6) for |
| | * failure to state a claim; |
| | * Government affirmative |
| Plaintiff, | * defense and |
| | * counterclaims in fraud; |
| v. | * affirmative defense that |
| | * claim unrecoverable |
| **THE UNITED STATES,** | * because of "taint" of |
| | * kickbacks; counterclaim |
| Defendant. | * for forfeiture under the |
| | * Special Plea in Fraud |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * (the Forfeiture of |
| | Fraudulent Claims Act), |
| | 28 U.S.C. § 2514 (2006); |
| | counterclaim under the |
| | Anti-Kickback Act, 41 |
| | U.S.C. §§ 53, 55 (2006); |
| | counterclaim under the |
| | False Claims Act, 31 |
| | U.S.C. § 3729(a)(1) |
| | (2006); counterclaim for |
| | common-law fraud |
| | (rescission and |
| | disgorgement); motion to |
| | dismiss pursuant to |
| | RCFC 9(b) for failure to |
| | properly plead fraud. |

    Thomas A. Lemmer, Denver, CO, for plaintiff.  Sandra B. Wick Mulvany, McKenna Long & Aldridge LLP, and John M. Faust, Craig D. Margolis, J. Randall Warden, and Tirzah S. Lollar, Vinson & Elkins LLP, of counsel.

---

    1/  This opinion originally was filed under seal on June 24, 2011.  The parties were requested to notify the court of any redactions.  Neither party requested any redactions.

J. Reid Prouty, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant.

**MEMORANDUM OPINION AND ORDER**

**MILLER**, Judge.

This matter is before the court after argument on plaintiff's Motion To Dismiss the Counterclaims of Defendant the United States of America for failure to state claims for which relief can be granted pursuant to RCFC 12(b)(6) and failure to properly plead fraud under RCFC 9(b). Plaintiff's motion calls into question the level of proof required for each of defendant's five counts of fraud, implicating both statutory and common-law remedies, and, specifically, whether receipt of kickbacks from a subcontractor by employees of a prime contractor states a claim under the Special Plea in Fraud or the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 (2006) (the "forfeiture statute") (Count I), the Anti-Kickback Act, 41 U.S.C. §§ 53, 55 (2006) (the "AKA") (Count II), 2/ the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) (the "FCA") (Count III), or the common-law fraud standards that can trigger rescission and disgorgement (Counts IV and V). Defendant presses a novel affirmative defense that would deny enforcement of a claim based on the "taint" of a condemnable fraudulent practice—in this case, a kickback.

**FACTS**

I. Background

This dispute has its genesis in a United States Army (the "Army") Logistics Civil Augmentation Program ("LOGCAP") Contract Number DAAA09-02-D-0007 (the "LOGCAP III contract") with Brown & Root Services. The contract was novated and transferred to Kellogg Brown & Root Services, Inc. ("KBR" or "plaintiff"), on August 1, 2003. LOGCAP III was an umbrella contract to implement logistics support services for the Army in Kuwait and Iraq prior to and during Operation Iraqi Freedom. The logistics support

---

2/ On January 4, 2011, Congress re-codified Title 41 of the United States Code, resulting in a renumbering—with some materially different language—of the provisions of the AKA. See Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, ch. 87, 124 Stat. 3677, 3838-41 (to be codified at 41 U.S.C. §§ 8701-07). The prior §§ 52, 53 and 55 are now §§ 8701, 8702 and 8706, respectively. Id.; see also 41 U.S.C.A. §§ 8701, 8702, 8706 (West 2011). Because defendant's pleadings and plaintiff's motion to dismiss both cite to the 2006 edition of Title 41 and the re-codified provisions of the AKA were not the subject of briefing or argument, the court proceeds to analyze defendant's AKA counterclaim pursuant to 41 U.S.C. §§ 52, 53, 55.

services provided by plaintiff included dining facility ("DFAC"), morale and welfare, laundry, and fuel delivery services. The LOGCAP III contract was a cost-plus-award-fee agreement that incorporated the provisions of 48 C.F.R. (FAR) § 52.216-7 (2000), whereby the Army would reimburse KBR for all costs it incurred in contract performance, including payments to subcontractors, along with a fee determined by subcontract costs.

Beginning in October 2002, Terry Hall was KBR's Regional Food Services Manager for Kuwait and Iraq. Mr. Hall and his staff were responsible for ensuring that subcontractors providing DFAC services were competent, to help craft statements of work for those subcontractors, requisitioning DFAC services—including cost estimates from subcontractors—and overseeing performance of DFAC subcontracts. In early 2003 Luther Holmes became Mr. Hall's deputy.

One of the DFAC subcontractors under Mr. Hall's purview was Tamimi Global Company ("Tamimi"). When Mr. Hall was hired by KBR in 2002, Tamimi already was a KBR subcontractor under the LOGCAP III contract performing DFAC services in Kuwait at Camp Arifjan. In November 2002 Mr. Hall and his superiors at KBR considered terminating Tamimi's subcontract because of an electrical fire at Camp Arifjan for which Tamimi was faulted. However, KBR continued to subcontract with Tamimi.

1.  Tamimi's kickback scheme

For purposes of plaintiff's motion to dismiss, all well-pleaded allegations of defendant's affirmative defense and counterclaims are accepted as true. In November 2002 Tamimi's vice-president and chief of operations, Mohammad Shabbir Khan, offered Mr. Hall a kickback, stating that they could "'make a lot of money together.'" Def.'s Am. Answer & Countercls. filed Mar. 15, 2011, ¶ 114 ("Countercls."). At that time Mr. Hall did not accept money from Mr. Khan, but he also did not report the kickback offer to anyone. However, eventually, both Messrs. Hall and Holmes did accept kickbacks from Mr. Khan.

Beginning in late 2002 through the end of 2003, Messrs. Hall and Holmes received a combined $45,000.00 in cash kickbacks from Mr. Khan. "Mr. Hall understood that the money was being provided so that Tamimi would remain in KBR's good graces and continue to get DFAC contracts from KBR." Id. ¶ 115. In 2003 Messrs. Hall and Holmes each accepted $5,000.00 in cash that Mr. Khan delivered to them at an airport in Kuwait. Mr. Khan also gave Mr. Hall an automated teller machine ("ATM") card to withdraw cash from a bank account into which Mr. Khan had deposited another $5,000.00. Mr. Hall used the ATM card to withdraw $3,500.00 in cash. Mr. Holmes withdrew the remaining $1,500.00. Mr. Holmes accepted an additional $10,000.00 in cash from Mr. Khan, which Mr. Holmes gave to his secretary. Towards the end of 2003, Mr. Hall accepted $20,000.00 from Mr. Khan, which purportedly was to be used as an investment in a "Golden Corral" restaurant.

However, Mr. Hall made no such investment, and Mr. Khan did not request that the money be paid back.

### 2. Award of Master Agreement 3 to Tamimi

KBR awarded "master agreement" subcontracts under the LOGCAP III contract to perform DFAC services.  When a master agreement was awarded to a subcontractor, KBR would order DFAC services by issuing work releases to the subcontractor.  Contractors that were not awarded master agreements by KBR would not be eligible to operate DFACs for KBR.  In June 2003 KBR convened a board to determine which subcontractors would be awarded these master agreements.  The master agreement approval board included Messrs. Hall and Holmes, as well as other KBR employees.  "As Regional Food Services Manager for KBR, had Mr. Hall objected to the award of a master agreement to a contractor, it would have been highly unlikely that such an award would be made."  Id. ¶ 117.  While the board did not award master agreements to every contractor that sought them, KBR did award master agreements to five contractors, including Tamimi, which was awarded "Master Agreement 3."  Id.

In response to Army task orders issued upon the LOGCAP III contract, KBR issued numerous work releases to Tamimi under Master Agreement 3.  These task orders include Task Order 59 issued by the Army on August 2003—effective from June 2003 through April 2005—and Task Order 89—effective from May 2005 through August 2006.  KBR paid Tamimi approximately $466,290,328.00 for all of the work releases issued under Master Agreement 3.  KBR submitted vouchers to the Army for reimbursement of payments made to Tamimi for amounts due under the work releases.  In addition to reimbursement vouchers for these direct costs, KBR received a base fee of one percent of direct costs, an award fee of up to two percent of direct costs, as well as a fee for indirect costs.  Id. ¶ 118.

### 3. Camp Anaconda

In addition to Camp Arifjan, the Army chose KBR to take over performance of DFAC services at Camp Anaconda, Iraq, from Tamimi, the incumbent contractor.  KBR decided to continue to use Tamimi to perform DFAC services at Camp Anaconda.  The decision to subcontract with Tamimi initially was made by Daniel Petsche, KBR's LOGCAP III subcontracts administrator in Iraq.  Although at that time Mr. Petsche did not possess authority to commit KBR to significant contractual expenditures on any one subcontract, he could make provisional agreements with subcontractors and then seek ratification of any such action from his superiors at KBR who did possess the requisite authority.  Notably, Mr. Petsche did not possess the authority to commit KBR to the contractual expenditures required by the Camp Anaconda DFAC contract.  However, Mr. Petsche made the initial decision to award the Camp Anaconda subcontract to Tamimi, and he did so at the urging of Mr. Hall

4

and his direct supervisor, Robert Gatlin. Mr. Petsche had considered awarding the subcontract to another contractor, but "changed his mind based upon the advocacy for Tamimi that he received from Mr. Hall." Id. ¶ 120. Mr. Hall wrote and signed the procurement memorandum for KBR justifying the sole-source Camp Anaconda subcontract award to Tamimi.

Work Release 3 of Master Agreement 3 ("Work Release 3") was the relevant work release through which KBR authorized Tamimi's DFAC services at Camp Anaconda and was effective from August 2003 through December 2005. KBR paid Tamimi approximately $307,630,344.00 under Work Release 3, which KBR sought reimbursement for from the Army, plus its additional fees and indirect costs.

Toward the end of December 2003, KBR fired Mr. Petsche for accepting a gift from another subcontractor—not Tamimi. In February 2004 Mr. Petsche was contacted by David Hadcock, another KBR employee who was reviewing KBR's Camp Anaconda DFAC procurement files for the proper authorization and cost justification for Work Release 3. In an e-mail to Mr. Hadcock, Mr. Petsche characterized the Camp Anaconda DFAC subcontract as "'the mother of all DFAC drug deals'" because of its irregularities and described it as "'predestined and out of control from the start.'" Id. ¶ 124. Because Tamimi's pricing for Camp Anaconda was "'very close to the [amount in the internal KBR] requisition," Mr. Petsche opined that the work release award had been agreed to by other executives at KBR and Tamimi, but he decided not to question it. Id. (alteration in original). Mr. Petsche's e-mail explained that he drafted a work release for Tamimi, but did not sign it because he believed he needed more data justifying Tamimi's costs. Mr. Petsche wrote, "'I did not execute the Work Release. I did not do a Price Reasonableness write-up on it. I could not present it with the data and support [that] I had.'" Id. Mr. Petsche concluded, cryptically, that "'[t]here is a whole lot more to this story.'" Id.

Mr. Hadcock forwarded Mr. Petsche's e-mail to several KBR senior executives, including William Jonas, KBR's head of procurement, and Charlie Carr, the head of KBR's "DFAC team," which exercised oversight over all DFACs in Kuwait and Iraq. Id. ¶ 125. None of these individuals, or any other KBR employee, took any action to inquire about or investigate Mr. Petsche's allegations of irregularities surrounding the Camp Anaconda DFAC subcontract. In March 2004 Mr. Hadcock drafted a price-justification memorandum for Work Release 3. Following Mr. Hadcock's price-justification memorandum, Work Release 3 officially was ratified by KBR executives who possessed the requisite authority.

## II. Procedural history

On June 2, 2009, plaintiff filed its complaint in the United States Court of Federal Claims seeking approximately $41,070,624.00 in unpaid costs incurred under the LOGCAP

III contract for DFAC services at Camp Anaconda from July through December 2004. On July 27, 2009, defendant requested a ninety-day enlargement of time to "evaluate the appropriateness of special pleadings and counterclaims involving fraud, which are currently being considered in this case," Def.'s Mot. filed July 27, 2009, at 1, which the court granted in part with a sixty-day extension, see Order entered Aug. 4, 2009. Defendant filed its first answer on October 5, 2009, and discovery commenced in December 2009. On August 4, 2010, the court ordered discovery closed on November 15, 2010, and set trial to commence on December 13, 2010. See Order entered Aug. 4, 2010, ¶¶ 7, 11.

Defendant, upon learning of the kickbacks Mr. Hall allegedly received, see Def.'s Mot. filed Nov. 9, 2010, at 3 ("[W]e were unaware of the evidence provided by Mr. Hall until late last week, despite our diligent efforts to remain apprized of investigative efforts related to Tamimi and KBR."), requested on November 9, 2010, a 120-day extension of time for discovery in order to pursue a possible fraud counterclaim, see id. at 1. The court expedited briefing, see Order entered Nov. 9, 2010, and plaintiff filed its opposition the next day, see Pl.'s Br. filed Nov. 10, 2010. Defendant replied on November 15, 2010. On November 17, 2010, the court granted defendant's motion, instructing defendant to file promptly any amended answer or counterclaim and limiting any new discovery to defendant's allegations of fraud. See Order entered Nov. 17, 2010, ¶¶ 1-2.

On December 20, 2010, plaintiff filed a motion to compel the production of documents "reflecting any act(s) of fraud, kickbacks, or bribery related to Master Agreement 3 Work Release 3." Pl.'s Mot. filed Dec. 20, 2010, at 2. Defendant had asserted that these documents were protected by the investigative files privilege. See Def.'s Br. filed Jan. 6, 2011, at 2. On January 20, 2011, the court granted plaintiff's motion in part by ordering defendant to file any counterclaim in fraud by March 15, 2011. See Order entered Jan. 20, 2011, at 1-2 (noting that defendant did not seek protective order suspending its obligations to respond to discovery requests relating to fraud and "failed to assert the investigative files privilege timely or adequately"). On March 15, 2011, defendant filed Defendant's Amended Answer and Counterclaims. Plaintiff filed its motion to dismiss the counterclaims on April 6, 2011, and briefing was completed on April 26, 2011.

III. <u>The parties' arguments</u>

Affirmatively defending against plaintiff's claim for breach of the LOGCAP III contract, defendant argues that the contract is unenforceable because it is tainted by kickbacks. See Countercls. ¶ 103. Defendant grounds all its counterclaims on the alleged kickback scheme, primarily the roles of Messrs. Hall and Holmes in the award of Master Agreement 3 to Tamimi, the influence that Mr. Hall exerted on Mr. Petsche to award Work Release 3 to Tamimi while receiving kickbacks from Tamimi, and the innuendo of impropriety contained in the Petsche e-mail.

Defendant argues that the Special Plea in Fraud statute, 28 U.S.C. § 2514, mandates the forfeiture of claims where "fraud is practiced during the performance of the contract." Id. ¶ 129.  Under defendant's theory, fraud "tainted" the contract when Messrs. Hall and Holmes received kickbacks while sitting on the board that awarded Master Agreement 3 and when "they took actions to encourage the issuance of Work Release 3." Id. ¶ 130.

Defendant would also hold plaintiff liable under a theory of respondeat superior for violating the AKA, 41 U.S.C. §§ 53, 55, due to the $45,000.00 in kickbacks paid by Mr. Khan to Messrs. Hall and Holmes.  Specifically, defendant alleges a "knowing violation" of the AKA under 41 U.S.C. § 55(a)(1).  Further, the kickback scheme also constitutes a violation of the FCA, 31 U.S.C. § 3729(a)(1), because "Mr. Hall and Mr. Holmes knew, when they accepted their kickbacks from Mr. Khan, that KBR would file vouchers with the United States seeking reimbursement for any Tamimi subcontracts . . . .  Mr. Hall and Mr. Holmes also knew or had reason to know that the kickbacks that they received would lead to inflated contract prices from Tamimi." Countercls. ¶ 118.  Defendant would impute the "knowledge" possessed by Messrs. Hall and Holmes to KBR to the end that plaintiff knew that "the award of Master Agreement 3 and the work releases upon it, including but not limited to Work Release 3, were tainted by kickbacks." Id. ¶ 137.  Similarly, defendant's common-law fraud claims, which seek rescission and disgorgement of Master Agreement 3 and disgorgement of Task Order 59, are predicated on its theory that the Tamimi subcontract and work releases were "tainted" by the kickback scheme due to the alleged roles of Messrs. Hall and Holmes in the award of Master Agreement 3 and the issuance of Work Release 3. See id. ¶¶ 139-43.

Plaintiff argues that defendant's AKA counterclaim fails to state a violation of the AKA because plaintiff, as a prime contractor, cannot be held vicariously liable for a knowing violation of the AKA based only on the wrongful conduct of its employees under 41 U.S.C. § 55(a)(1), when § 55(a)(2) provides for separate no-fault vicarious liability for contractors whose employees violate the AKA.  Holding plaintiff vicariously liable under § 55(a)(1) thus would render § 55(a)(2) superfluous.

Plaintiff attacks defendant's "taint" theory as insufficient to state a claim for common-law fraud or a violation of the FCA, let alone as the predicate for an affirmative defense.  These counterclaims fail because (1) they do not allege any causal link between the kickbacks and any inflated claim or scheme to defraud the Government; (2) the facts pleaded lack the requisite scienter; (3) the facts do not allege any causal nexis between the award of Master Agreement 3 or Work Release 3 and the kickbacks; and (4) the counterclaims do not support corporate vicarious liability because they do not allege that the kickbacks were accepted with any intent to benefit KBR or that they did benefit KBR.  According to plaintiff, the Special Plea in Fraud does not state a claim for relief in that defendant does not allege that plaintiff possessed the specific intent to defraud the Government.  Further, the forfeiture

statute proscribes fraud in the prosecution of a claim, which defendant does not allege, not fraud in the performance of a contract.

The court resolves plaintiff's motion as to each of defendant's counterclaims in sequential order, but discusses defendant's affirmative defense of "taint" following defendant's common-law fraud theories.  These supply the legal analysis for this novel affirmative defense.

## DISCUSSION

I. Standard of review

    1. Failure to state a claim

Plaintiff moves pursuant to RCFC 12(b)(6) to dismiss defendant's affirmative defense and counterclaims for failure to state claims upon which relief can be granted.  See RCFC 12(b)(6).  "The purpose of [RCFC 12(b)(6)] . . . is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail."  Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326-27 (1989).  The court's task in considering a motion to dismiss for failure to state a claim is not to determine whether a party will ultimately prevail, but "'whether the claimant is entitled to offer evidence to support the claims.'"  Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  "A dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief."  Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995).

In resolving a RCFC 12(b)(6) motion, the court must assess whether defendant's Amended Answer and Counterclaims adequately state a claim for relief under each implicated statute and common-law theory and whether defendant has made "allegations plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (rephrasing Twombly standard as requiring "a claim to relief that is plausible on its face"); accord Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009); McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-57 (Fed. Cir. 2007).  Although defendant's factual allegations need not be "detailed," they "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the [counterclaims] are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (emphasis omitted) (citation omitted).  Defendant "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [plaintiff] fair notice

of what the . . . claim is and the grounds upon which it rests.'"  Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354 (Fed. Cir. 2010) (omission in original) (quoting Twombly, 550 U.S. at 555).  "At the same time, a court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'"  Acceptance Ins. Cos. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting Twombly, 550 U.S. at 555).  The court thus "'accept[s] as true all factual allegations in the [counterclaims], and . . . indulge[s] all reasonable inferences in favor of the non-movant'" to evaluate whether [defendant has] stated a claim upon which relief can be granted.  Chapman Law Firm, 490 F.3d at 938 (omission in original) (quoting Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001)).

### 2.  Failure to plead fraud with specificity

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  RCFC 9(b).  Rule 9(b)'s "heightened pleading standard," Juniper Networks, Inc. v. Shipley, No. 2010-1327, 2011 WL 1601995, at *3 (Fed. Cir. Apr. 29, 2011), applies to "all cases sounding in fraud or mistake," In re BP Lubricants USA Inc., 637 F.3d 1307, 1310 (Fed. Cir. 2011).  In BP Lubricants the United States Court of Appeals for the Federal Circuit explained that Rule 9(b) serves a "gatekeeping function," id. at 1311, in order to "assure that only viable claims alleging fraud or mistake are allowed to proceed to discovery" and adjudication and prevents the use of "discovery as a fishing expedition," id. at 1310.  "Although 'knowledge' and 'intent' may be averred generally," the pleadings must still "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."  Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1327 (Fed. Cir. 2009).  "A pleading that simply avers the substantive elements of [a fraud claim], without setting forth the particularized factual bases for the allegations, does not satisfy Rule 9(b)."  Id. at 1326-27; see also id. at 1329 n.5 ("A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith."); King Auto., Inc. v. Speedy Muffler King, Inc., 667 F.2d 1008, 1010 (CCPA 1981) ("Rule 9(b) requires that the pleadings contain explicit rather than implied expression of the circumstances constituting fraud.").  Pleadings that "do little more than speculate that the [party] engaged in more than negligent action" violate the rule. BP Lubricants, 637 F.3d at 1311.  Therefore, to satisfy Rule 9(b), "the pleading must identify the specific who, what, when, where, and how" of the alleged fraud or mistake.  Exergen, 575 F.3d at 1328.  "Exergen's pleading requirements apply to all claims under Rule 9(b) . . . ."  BP Lubricants, 637 F.3d at 1311.

## II.  Special Plea in Fraud

Count I of defendant's counterclaims pleads a Special Plea in Fraud for the forfeiture of plaintiff's claims.  See Countercls. ¶¶ 127-131.  The forfeiture statute provides, as follows:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.  A predicate for forfeiture under this statute is the establishment of fraud, although the statute itself does not articulate the elements of fraud.

The Federal Circuit has held that to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514 defendant is required to "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"  Daewoo Eng'g & Constr. Co., v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting Commercial Contractors v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); accord Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001); Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994).  "[F]orfeiture under 28 U.S.C. § 2514 requires only part of the claim to be fraudulent."  Daewoo Eng'g, 557 F.3d at 1341.  "The statutory language has been construed as proscribing fraud in the prosecution of claims against the United States, not fraud in the performance of the contract."  Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008) (citing Baird v. United States, 76 Ct. Cl. 599, 610-13 (1933)).  Therefore, to overcome plaintiff's motion to dismiss, defendant's pleadings must show KBR's knowledge that a claim submitted was false and a specific intent on the part of KBR to defraud the Government.

1.  Scope of targeted conduct

Pivotal to defendant's contention for Special Plea in Fraud is the scope of the prohibited conduct targeted by the statute.  Defendant has failed to state a claim under this statute if the conduct alleged does not fall within the regulatory ambit of 28 U.S.C. § 2514, which mandates the forfeiture of an asserted claim by a person "who corruptly practices or attempts to practice fraud against the United States in the proof, statement, establishment, or allowance thereof."

The parties diverge on whether the conduct targeted by the statute includes any and all fraudulent conduct in the performance of the contract, or whether the qualifying phrase—"fraud . . . in the proof, statement, establishment, or allowance thereof"—limits the prohibited activity to the prosecution of a claim.  For the instant case, the issue is decisive because plaintiff contends that defendant has failed to allege fraud in the prosecution of a claim.  See Pl.'s Br. filed Apr. 6, 2011, at 28.  Defendant has not connected the action of

accepting a kickback to the "proof, statement, establishment, or allowance" of a claim, except insofar as the allegation that Messrs. Hall's and Holmes's acceptance of kickbacks "tainted" the entire contract with fraud. Plaintiff asserts that this allegation alone will not implicate the forfeiture statute, which is aimed at punishing fraud in the prosecution of a claim.

Defendant appears to agree with plaintiff's assessment of the facts, while demurring on plaintiff's, and this court's, interpretation of the law. Defendant contends that the statute requires forfeiture when plaintiff engages in any fraudulent activity in the performance of a contract, regardless of its relationship to the presentation of a claim. See Def.'s Br. filed Apr. 21, 2011, at 18-21. Under this theory any fraud "places a stigma upon the contract at issue . . . and on all the claims arising under the contract-in-suit, sufficient to deem [a claim] unenforceable due to public policy considerations." Supermex, Inc. v. United States, 35 Fed. Cl. 29, 42 (1996). Defendant reads this rationale into the forfeiture statute, asserting that the statute should be implicated when "fraud [was] practiced against the Government that was not practiced in the claim that was the basis for the lawsuit, but was practiced in the course of the performance of the contract." Def.'s Br. filed Apr. 21, 2011, at 20-21. Defendant includes within the concept of "course of performance" acceptance of a kickback, even if the acceptance had no bearing on the award of the contract or performance of the claim that plaintiff seeks to recover. Defendant relies on cases from the United States Court of Federal Claims to support his theory, capitalizing upon an overly broad articulation of the law in an effort to fashion a new cause of action under the forfeiture statute.

Several Court of Federal Claims decisions state that "[t]he words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during the contract performance or in the making of a claim." Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 431 (1999) (emphasis added); see, e.g., Anderson v. United States, 47 Fed. Cl. 438, 444 (2000) ("'[T]he mandate of the words employed in 28 U.S.C. § 2514 [is] quite clear and unequivocal. The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during contract performance.'" (quoting Supermex, 35 Fed. Cl. at 39-40) (alteration in original), aff'd on other grounds, 344 F.3d 1343, 1345 (Fed. Cir. 2003) ("We need not reach the merits of the forfeiture determination."); UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 790 (1999) ("The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during the contract performance or in the making of a claim."), aff'd, 249 F.3d 1337 (Fed. Cir. 2001) (affirming trial court's judgment when "evidence supports the trial court's conclusion that UMC knowingly submitted a false claim," but not including significant discussion of scope of forfeiture statute's targeted conduct). This interpretation of the statute divorces fraud in the performance of a contract from the submission of claim and, consequently, would not require the Government to prove that the alleged fraud relates in any way to the submitted claim. However, on its face, the statute is limited to those circumstances where the Government proves fraud "in the proof, statement,

establishment, or allowance" of a claim.  28 U.S.C. § 2514.  These cited Court of Federal Claims decisions thus appear to ignore the qualifying phrase altogether, an interpretation that runs contrary to a basic canon of statutory construction and that the undersigned judge will not adopt without an express direction from the Federal Circuit.  United States v. Menasche, 348 U.S. 528, 538-39 (1955) (stating that courts must "give effect, if possible, to every clause and word of a statute" (internal quotation marks omitted) (citation omitted)).

Although these decisions interpret precedent to expand the obvious contours of the qualifying phrase, at least one Court of Federal Claims case recognizes a disconnect between the limitation in the language of the statute—the suggestion that "fraud will cause a claim to be forfeited only if the fraud is in the very claim for money being brought before the court"—and the application  of the statute to "situations outside [its] strict terms."  Am. Heritage Bancorp v. United States, 61 Fed. Cl. 376, 386 (2004).

The lineage of United States Court of Claims binding precedents relied upon by American Heritage and the other Court of Federal Claims decisions discussed does not stand for the proposition that fraud in the practice of a contract alone constitutes a valid cause of action under the forfeiture statute.  Rather, "[t]he statutory language has been construed [in precedential cases] as proscribing fraud in the prosecution of claims against the United States, not fraud in the performance of the contract."  Veridyne, 83 Fed. Cl. at 586.  A brief recitation of the relevant case law is illuminating.

In 1908 the Court of Claims examined the proof required under the predecessor forfeiture statute.  See N.Y. Mkt. Gardeners, Ass'n v. United States, 43 Ct. Cl. 114 (1908).  The plaintiff brought a claim for the remaining balance on a contract to provide 23 million packets of seeds at a specified quantity per packet.  Id. at 135.  The Government alleged that the plaintiff intentionally filled the seed packets at an incorrect weight and, thus, that the Government had been defrauded.  Id.  In assessing the evidence, the court could not find fraud, and the holding consequently is limited.  See id. at 138.  However, the court notably described the then-forfeiture statute—which, in relevant part, called for the forfeiture of a fraudulent claim "in the proof, statement, establishment, or allowance of any part of any claim against the United States"—as prohibiting fraud "in making up a claim."  Id. at 136.  The fraud touched upon the required performance under the contract; it was the completed action for which the contractor sought reimbursement—in other words, the "establishment" of the claim.

In Kamen Soap Products Co. v. United States, 124 F. Supp. 608 (Ct. Cl. 1954), the court found that fraud had been "practiced in the presentation of [the disputed] claim."  Id. at 622 (emphasis added).  The plaintiff had contracted to provide the Army with a specified amount of laundry soap.  Id. at 609.  Due to an increase in the cost of raw materials, namely tallow, the contractor requested a price increase under the contract.  Id. at 612.  The

contractor claimed that it had been prevented from performing prior to the increase in the cost of raw materials when it could not obtain shipping information from the Army. See id. at 613. The plaintiff's contention was called into question, see id. at 615, and it submitted seven interoffice memoranda in response to the objection, id. at 616. The court determined that these memoranda, offered "for the purpose of overcoming the objections raised to plaintiff's claim," were forgeries. See id. at 620. They demonstrated that the plaintiff's assertions were false, and they served as the basis for the Government's successful Special Plea in Fraud. In Kamen Soap the court found fraud in the "proof" submitted with the claim. See id. at 620-21.

Two of the cases most frequently cited in the Court of Federal Claims opinions that are relied on by defendant are Little v. United States, 152 F. Supp. 84 (Ct. Cl. 1957), and O'Brien Gear & Machine Co. v. United States, 591 F.2d 666 (Ct. Cl. 1979) (per curiam). Neither expands the forfeiture doctrine as far as defendant would purport.

Little involved a claim that included falsified attendance records in a school for veterans in order to justify continued funding. The school contracted to provide qualified veterans with courses, books, supplies, and related equipment. Little, 152 F. Supp. at 85. Facing the withdrawal of its funding after failing an inspection by the Veterans Administration, the plaintiff convinced the State Commissioner of Education to postpone the action. Id. at 86. The plaintiff was advised that continued funding would depend on the results produced at a follow-up inspection. Id. The plaintiff subsequently destroyed the attendance records and produced records that were false and that revealed other irregularities. Id. The contract then was canceled.

The plaintiff brought suit for a payment period for which no fraud was alleged. Id. at 87. However, a previously submitted claim for payment of the period in which the plaintiff had falsified attendance records had been paid, and, accordingly, the Government counterclaimed for recovery of these overpayments. Id. In declaring the claim at bar void, the court stated, as follows:

> It is true that the forfeiture statute quoted above was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other related transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V-241, a contract under which he practiced fraud against the Government, all of his claims under the contract will be forfeited pursuant to 28 U.S.C. § 2514.

Id. at 87-88.

Several decisions have seized upon this language as justification that all claims must be forfeited by a contract that is "tainted" by fraud, without regard to the alleged fraud's connection to a submitted claim.  See, e.g., Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991).  In doing so, these cases overlook Little's predicate factual finding that false proof had been submitted in a related claim under the contract.  The Government's counterclaim in Little sought recovery of claims paid based on the fraudulent "proof" of a claim, those submitted for the earlier time period during which the plaintiff had falsified attendance records.  See Little, 152 F. Supp. at 87 ("However, from a reading of the entire record it becomes manifest that the plaintiff knowingly submitted fraudulent claims against the United States for services rendered during the period from January 1 to April 30, 1949, under contract V3020V-241, as well as services rendered in 1948 under the previous contract.").  Little articulates a rule by which a fraud in the "proof" of a claim, i.e., the falsification of the underlying documents upon which the claim was based, voids each of the claims associated with the contract.  The rule does not expand the reach of the statute so far as to transform every practice of fraudulent activity during the performance of a contract into a cause of action under the forfeiture statute regardless of whether the fraud relates to the "proof, statement, establishment, or allowance" of a claim.  The fraud in the proof of claims represented by falsified vouchers previously paid by the Government enabled the Government to assert a counterclaim in Little for the overpayment of these illegal claims and ultimately led to the forfeiture of all claims under the same contract.  See id. at 87-88.

In O'Brien, 591 F.2d 666, a fraud was perpetrated with false checks and fraudulent company bookkeeping that were presented to the court as supporting evidence in a claim filed by the plaintiff.  The president of the plaintiff company devised a fraudulent scheme whereby another employee and he would authorize checks to be cashed by the bank that then allegedly were paid over to suppliers.  Id. at 669.  In reality, these were "pretend payments." The plaintiff would erase the word "cash" and the endorser's name from each cashed check, type in the name of a supplier on that same check, and stamp an endorsement on the check with a counterfeit stamp.  Id.  False invoices were drawn up that matched the amounts of the checks "paid over" to these "pretend[] payees," while the company president kept the cash for his personal use.  Id.  When the Renegotiation Board determined that the plaintiff's profits were unreasonable and excessive, the plaintiff filed suit in the Court of Claims for redetermination of profits, and submitted its false financial records to the court as justification of the reasonableness of its profits.  Id. at 672-73.  The Court of Claims found that the backup documentation for accounts submitted during pretrial was false and fraudulent and submitted with the intent to "understate the profits of the corporation, to the personal profit of plaintiff's president."  Id. at 672.

The issue before the Court of Claims in O'Brien was whether the suit for redetermination constituted a "claim" under the forfeiture statute. The court ultimately adopted an expansive definition of a "claim," stating that a "'[c]laim' is a word of many meanings, to be determined in the context of the purpose of the statute in which it is found." Id. at 678. This opinion did not dispose of the requirement that the alleged fraud relate to the "proof, statement, establishment, or allowance" of a claim. In fact, much of the language used in O'Brien and the legislative history discussed in O'Brien reaffirm this concept of the forfeiture statute's requirements. See, e.g., id. at 672 ("When these records, shot through with fraud, were presented by plaintiff in support of its case in this court, a further, specific object was added—the proof by fraud of the claim here made." (emphasis added)); id. at 678 n.7 (quoting Cong. Globe, 37th Cong., 2d Sess. 1674 (1862), as follows: "[I]t is very wisely provided that if there be any fraud practiced, or attempted to be practiced, upon the part of any claimant against this Government in the demand or establishment of his claim, such act of fraud upon his part shall forever forfeit his claim, no matter what it may be." (emphasis added)); id. at 678 ("No intention can be surmised that some who committed fraud in the proof of their demand would be exempt from the forfeiture provided in section 11 by reason of some narrow definition of the word 'claim.'" (emphasis added)); id. at 681 (ultimately holding: "The contention that the renegotiation proceeding is not a claim against the United States within the meaning of 28 U.S.C. § 2514 is rejected, and fraud having been found to be practiced in the proof of the claim, the claim is forfeited, and the petition is dismissed." (emphasis added)).

This initial expansion of the forfeiture statute's targeted conduct can be traced back to the later decision in Brown Construction, 23 Cl. Ct. at 216, that has been cited by several Court of Federal Claims decisions. See, e.g., Supermex, 35 Fed. Cl. at 42. In Brown Construction a contractor's vice-president was charged with "bribery and conspiring to bribe and suborn the perjury of the government official responsible for inspection and approval" of the contractor's work. Brown Constr., 23 Ct. Cl. at 215. The contract had been terminated, and, when the plaintiff filed suit for work completed prior to the default termination, the Government moved for summary judgment on its Special Plea in Fraud. Id. at 214-15.

Brown Construction held that the contract was unenforceable because "the case law uniformly states that public policy considerations, in particular, concern for the integrity of the Government procurement process, preclude the enforcement of contracts tainted by bribery, kickbacks or conflicts of interest." Id. at 215 (citations omitted). The court opined that "corruption in the administration of the contract engenders a suspicion about the integrity of the entire course of dealing." Id. In analyzing the applicability of the forfeiture statute, the Brown Construction court expanded the scope of the targeted conduct under the statute, while somehow relying on Little, 152 F. Supp. at 87-88, Kamen Soap, 124 F. Supp. at 620, and New York Market, 43 Ct. Cl. at 114, by stating that "28 U.S.C. § 2514 requires the

15

forfeiture of all claims arising under a contract <u>tainted by fraud</u> against the Government." <u>Id.</u> (emphasis added).  As a consequence, the court effectively read out of the law the requirement that the fraud relate to the "proof, statement, establishment, or allowance" of claim, a hallmark of every precedential Court of Claims case analyzing claims under the forfeiture statute.  <u>See also</u> <u>Ab-Tech Constr., Inc. v. United States</u>, 31 Fed. Cl. 429, 435-36 (1994) (repeating that forfeiture statute requires forfeiture of all claims tainted by fraud without requiring such fraud relate to "proof, statement, establishment, or allowance" of a claim), <u>aff'd</u>, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision) (per curiam).

This expansion has affected a relatively small number of cases, but represents a departure from the law based on incorrect citation to precedent, which has been carried forward in internal citations.  <u>Brown Construction</u>, misinterpreting <u>Kamen Soap</u>, <u>Little</u>, and <u>New York Market</u>, initially expanded the scope of the targeted conduct in 1991.  <u>See</u> <u>Brown Constr.</u>, 23 Cl. Ct. at 216.  <u>Ab-Tech Construction</u>, 31 Fed. Cl. at 435-36, repeated the analysis in 1994, holding that "28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government."  <u>Id.</u> (citing <u>Little</u>, 152 F. Supp. at 87-88).

This interpretation again was cited by <u>Supermex</u>, 35 Fed. Cl. at 39-40, in 1996, concluding: "The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during the contract performance."  <u>Supermex</u>, like <u>Brown Construction</u>, does away with the requirement that the fraud be committed in the presentation or making of the claim.  <u>Supermex</u> cited to, <i>inter alia</i>, <u>New York Market</u>, <u>Ab-Tech Construction</u>, <u>Brown Construction</u>, and the legislative history outlined in <u>O'Brien</u> as support for the proposition that the forfeiture statute requires "the forfeiture of all claims arising under a contract tainted by fraud against the Government."  <u>Id.</u> at 40-41 (citing <u>O'Brien</u>, 591 F.2d at 666; <u>NY Mkt.</u>, 43 Cl. Ct. at 136; <u>Ab-Tech Constr.</u>, 31 Fed. Cl. at 435-36; <u>Brown Constr.</u>, 23 Cl. Ct. at 216).  Both <u>Brown Construction</u> and <u>Supermex</u> held that the respective plaintiffs had violated the forfeiture statute because of bribes.  <u>Id.</u> at 34; <u>Brown Constr.</u>, 23 Cl. Ct. at 215.

<u>Supermex</u> was followed by <u>UMC</u>, 43 Fed. Cl. at 790, which pronounced that "[t]he words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during the contract performance <u>or</u> in the making of a claim."  <u>Id.</u> (emphasis added).  The <u>UMC</u> court concluded that "28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government."  <u>Id.</u> at 791. (citing <u>Kamen Soap</u>, 124 F. Supp. at 620; <u>N.Y. Mkt.</u>, 43 Cl. Ct. at 136; <u>Ab-Tech Constr.</u>, 31 Fed. Cl. at 435-36; <u>Brown Constr.</u>, 23 Cl. Ct. at 216).  In the same year, <u>Crane Helicopter</u> issued, which reiterated the new taint-of-fraud theory, stating that 28 U.S.C. § 2514 "requires the forfeiture of all claims arising under a contract tainted by fraud against the government," citing <u>Little</u>, <u>Kamen Soap</u>, and <u>New York Market</u> as authority.  <u>Crane Helicopter</u>, 45 Fed.

Cl. at 431 (citing <u>Little</u>, 152 F. Supp. at 87-88; <u>Kamen Soap</u>, 124 F. Supp. at 620; <u>NY Mkt.</u>, 43 Ct. Cl. at 136); <u>see also id.</u> at 432 (citing <u>Ab-Tech Constr.</u>, 31 Fed. Cl. at 435-36; <u>Brown Constr.</u>, 23 Cl. Ct. at 216). Citing <u>Supermex</u>, the court in <u>Anderson</u>, 47 Fed. Cl. at 444, proclaimed that "the statute is not confined to the presentment of the claim." <u>Id.</u> (citing <u>Supermex</u>, 35 Fed. Cl. at 39-40); <u>see also</u> <u>First Fed. Sav. Bank of Hegewisch v. United States</u>, 52 Fed. Cl. 774, 789 (2002) (citing <u>Anderson</u>, 47 Fed. Cl. at 444; <u>UMC</u>, 43 Fed. Cl. at 790; <u>Supermex</u>, 35 Fed. Cl. at 39-40).

Most recently, in 2004 <u>American Heritage</u> cited <u>O'Brien</u> and <u>Little</u> as evidence that "the Federal Circuit and this court [have applied] the forfeiture statute to situations outside the strict terms of the statute, as logic has dictated." <u>Am. Heritage</u>, 61 Fed. Cl. at 386 (citing <u>O'Brien</u>, 591 F.2d at 680; <u>Little</u>, 152 F. Supp. at 87-88). <u>American Heritage</u> relied on <u>Supermex</u>, <u>Anderson</u>, and <u>UMC</u> for the proposition that the forfeiture statute calls for forfeiture "'if fraud against the government occurs during contract performance.'" <u>Id.</u> (quoting <u>Anderson</u>, 47 Fed. Cl. at 444) (citing <u>UMC</u>, 43 Fed. Cl. at 791; <u>Supermex</u>, 35 Fed. Cl. at 39-40).

Not only does this expansion depart from Court of Claims precedent, it does not comport with the Federal Circuit's articulation of the legal requirement of the forfeiture statute: to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514, defendant "'is required to establish by clear and convincing evidence that the contractor <u>knew that its submitted claims were false</u>, and that it intended to defraud the government <u>by submitting</u> those claims.'" <u>Glendale Fed. Bank</u>, 239 F.3d at 1379 (emphasis added) (quoting <u>Commercial Contractors</u>, 154 F.3d at 1362). Defendant pushes the boundaries of the forfeiture statute's applicability. A valid cause of action under that statute must be tied to the submission of a claim, whether in producing false proof to support a claim, <u>see, e.g.,</u> <u>Kamen Soap</u>, 124 F. Supp. at 622 (forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, <u>see, e.g.,</u> <u>N.Y. Mkt.</u>, 43 Ct. Cl. at 136 (Government's objection to claim based on contractor's not fulfilling contract specifications, i.e., "establishment" of a false claim).

In relying on a hospitable line of non-binding trial court cases that beg to be distinguished, defendant's theory of the case not only misinterprets binding precedent, but ignores the explicit statutory requirement that "the contractor knew that its submitted claims were false." <u>Glendale Fed. Bank</u>, 239 F.3d at 1379. Mere "taint" is insufficient when defendant must allege that the contractor intended to defraud, specifically, through the submission of its claim.

## 2. <u>Application to defendant's counterclaim</u>

Defendant has not cited any Federal Circuit or Court of Claims precedent to support an expansion of the plain—and limited—language of the forfeiture statute. The forfeiture

statute is aimed at proscribing fraud in the prosecution of claims against the United States, not any and all fraud in the performance of the contract. Defendant's argument that Messrs. Hall and Holmes "tainted" Master Agreement 3 "by the fraud of the kickbacks" when they "sat on upon the board that awarded Master Agreement 3," Countercls. ¶ 130, "[r]egardless of . . . whether Tamimi might have, nevertheless, still been awarded the exact same contracts even without [Messrs. Hall's and Holmes's] advocacy," Def.'s Br. filed Apr. 21, 2011, at 21, circumvents the stated objective of the statute. The mere "taint" of the kickback is insufficient to state a claim under the forfeiture statute when it is not alleged that the kickback is related to the "proof, statement, establishment, or allowance" of a claim. Defendant has not alleged that the kickbacks were in any way related to the required performance under the contract or to the proof of that performance submitted with plaintiff's claim.

The parties should not interpret this ruling as a statement that causes of action involving bribes, kickbacks, and fraud in the performance of the contract are not redressable; they are. The court has examined case law at the trial court level in order to show that each statutory tool is designed to address specific conduct and that the court must not exceed the statutorily expressed boundaries. For example, as discussed *infra*, the AKA prohibits a contractor from offering, soliciting, or accepting a kickback or including the amount of a kickback in its contract price charged to the Government. 41 U.S.C. § 53. The AKA provides specific civil penalties for such conduct. 41 U.S.C. § 55. Conduct that might satisfy the requirements of the AKA automatically does not state a claim for fraud in the "proof, statement, establishment, or allowance" of a claim under 28 U.S.C. § 2514. See Long Island Sav. Bank, FSB v. United States, 503 F.3d 1324, 1244-45 (Fed. Cir. 2007) (emphasizing that common-law fraud and causes of action under forfeiture statute require separate analysis).

More fundamental, however, is the problem that several of the Court of Federal Claims decisions received summary affirmance or were affirmed on other grounds. Although not precedential, loose language can be adopted inadvertently on review. This is detrimental to the integrity of precedent, and plaintiff justifiably is concerned that the Court of Federal Claims could become a preferred forum for government fraud claims. See Transcript of Proceedings, Kellogg Brown & Root Servs. Inc. v. United States, No. 09-351C, at 39-40 (Fed. Cl. May 3, 2011). What should not occur—but be stopped in its tracks—is the exportation of judge-made law, exemplified in Ab-Tech, wherein the court proclaimed that the claim "arises out of the very contract relationship that [the plaintiff's] deceptive dealings . . . helped falsely to maintain," 31 Fed. Cl. at 435, and held broadly that Little, commands "the forfeiture of all claims arising under a contract tainted by fraud," id. at 436 (citing Little, 152 F. Supp. at 87-88). Little stands for no such proposition, but unfortunately Ab Tech's broad invitation to declare forfeited all claims in a contract tainted by fraud fuels defendant's new theory that the taint of fraud is sufficient to warrant forfeiture. While several of these

Court of Federal Claims decisions factually conform with the binding precedent in that fraud was committed in the establishment of a claim, the adopted broader formulation of the law is of concern.   If it were applied in this case, the expansion would be unwarranted.   Therefore, the undersigned judge returns to the forfeiture statute's targeted language, as construed by precedential case law, and rules that the conduct pleaded by defendant is insufficient to state a claim under § 2514.   Defendant has not pleaded that plaintiff's alleged fraudulent conduct related to the "proof, statement, establishment, or allowance" of a claim.

III.  Anti-Kickback Act

Count II of defendant's counterclaims alleges that through the kickback scheme plaintiff violated the AKA.   See Countercls. ¶¶ 132-135.   The AKA's prohibition against kickbacks provides, as follows:

It is prohibited for any person—

(1) to provide, attempt to provide, or offer to provide any kickback;

(2) to solicit, accept, or attempt to accept any kickback; or

(3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

41 U.S.C. § 53. 3/   Section 55(a) of the AKA provides for two separate civil remedies:

(1) The United States may, in a civil action, recover a civil penalty from any person who knowingly engages in conduct prohibited by section 53 of this title.   The amount of such civil penalty shall be—

(A) twice the amount of each kickback involved in the violation; and

(B) not more than $10,000 for each occurrence of prohibited conduct.

(2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor or subcontractor employee violates section 53 of this title by providing, accepting, or charging a kickback. The amount of such civil penalty shall be the amount of that kickback.

---

3/  See supra note 2.

Id. § 55(a). 4/  Although the statute is silent as to the required level of proof, legislative history accompanying Congress's 1986 amendments to the AKA clarifies that the Government has the burden of proving an AKA violation by a preponderance of the evidence.  See 132 Cong. Rec. S16,309 (daily ed. Oct. 15, 1986) (statement of Sen. Carl Levin) ("All of the elements of the civil action authorized by this section of the bill, including proof of knowledge, may be established by a preponderance of the evidence."). 5/

Count II of defendant's counterclaims alleges that, "[b]y virtue of accepting funds from Mr. Khan in return for their favorable treatment of Tamimi and in reward of that treatment, Mr. Holmes and Mr. Hall both violated the Anti-Kickback Act." Countercls. ¶ 134.  The AKA violations by Messrs. Hall and Holmes are attributable to KBR "because the two were acting as KBR's agents at the time they accepted the kickbacks." Id. ¶ 135.  While defendant does not specify which subsection of § 53 plaintiff violated, the court construes Count II as alleging a violation of § 53(2).  Defendant seeks penalties and damages against KBR both for a knowing violation under § 55(a)(1) and under the strict liability provision of § 55(a)(2).  See Def.'s Br. filed Apr. 21, 2011, at 15-16 ("The Government cited section 55, which necessarily encompasses both subsections. . . . [S]eeking double the amount of the kickbacks necessarily includes a request for a single amount of the kickbacks.  The complaint plainly states facts and cites the correct statute to allege violations of both section 55(a)(1) and section 55(a)(2).").

Plaintiff resists the proposition that Count II can state a claim pursuant to RCFC 12(b)(6) because plaintiff defendant has only pleaded a violation of § 55(a)(1).  See Pl.'s Br. filed Apr. 6, 2011, at 36 ("Count II of the Counterclaim seeks damages for a knowing

---

4/  The AKA defines a "kickback" as

any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

41 U.S.C. § 52(2).  "Person" includes "a corporation, partnership, business association of any kind, trust, joint-stock company, or individual."  Id. § 52(3).

5/  Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note (2006), authorizes Executive agency adjustments for inflation of civil fines and penalties.  The Department of Justice, by regulation, has increased the penalties for AKA violations to a maximum of $11,000.00.  See 28 C.F.R. § 85.3(a)(13) (2011).

violation of the AKA."). Plaintiff argues that under the AKA, § 55(a)(2) provides for separate no-fault vicarious liability for contractors whose employees violate the AKA; therefore, a "prime contractor cannot be held liable for a knowing violation based solely on the acts of its employees" under § 55(a)(1). Id. at 36-37. The two provisions do not set forth merely different remedies, but require different elements of proof. "Under [defendant's] approach, every violation of the AKA by a prime contractor's employee would necessarily result in corporate liability under § 55(a)(1) because the individual who accepted the kickback presumably 'knows' he is doing so and, under the Government's theory, that knowledge would then be imputed to the company." Id. at 38-39. Plaintiff submits that such a result renders § 55(a)(2) superfluous.

"In construing a statute, we begin with its literal text, giving it its plain meaning." USA Choice Internet Servs., LLC v. United States, 522 F.3d 1332, 1336 (Fed. Cir. 2008) (citation omitted) (internal quotation marks omitted); see also Novo Nordisk A/S v. Caraco Pharm. Labs. Ltd., 601 F.3d 1359, 1364 (Fed. Cir. 2010) ("Statutory construction 'begins with the language of the statute.'" (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)); Kyocera Wireless Corp. v. Int'l. Trade Comm'n, 545 F.3d 1340, 1355 (Fed. Cir. 2008) ("In order to determine whether [a statute] or any of its amendments has directly spoken to the precise question at issue, [the] court must give the terms of that statute their 'ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'" (quoting Williams v. Taylor, 529 U.S. 420, 431 (2000))). "Beyond the statute's text, ['the traditional tools of statutory construction'] include the statute's structure, canons of statutory construction, and legislative history." Bull v. United States, 479 F.3d 1365, 1376 (Fed. Cir. 2007) (alteration in original) (citation omitted). "Further, 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" Kyocera Wireless, 545 F.3d at 1355 (quoting U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993)). "Correct statutory interpretation is that which is 'most harmonious with [the statutory] scheme and with the general purposes that Congress manifested.'" BlackLight Power, Inc. v. Rogan, 295 F.3d 1269, 1273 (Fed. Cir. 2002) (alteration in original) (quoting Comm'r v. Engle, 464 U.S. 206, 217 (1984)).

The AKA's text leads the court to conclude that § 55(a) incorporates the doctrine of respondeat superior in both civil penalty provisions of § 55(a). Section 55(a)(1) directs that a civil penalty may be recovered from any "person," which term the statute defines as including individuals, corporations, and other business associations. See 41 U.S.C. § 52(3). Moreover, the AKA's definition of a kickback includes "compensation of a kind provided to prime contractor employee, subcontractor, or subcontractor employee." Id. § 52(2). The statute's text thus plainly manifests a congressional intent that employers would be held vicariously liable under § 55(a)(1). However, plaintiffs cite to a contrary determination reached by the district court in United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,

No. 04-cv-42, slip op. at 23 (E.D. Tex. Feb. 8, 2011). In <u>Vavra</u> the court concluded that such an interpretation renders "Congress's reference to fraud committed by an 'employee, subcontractor, or subcontractor employee,' which only appears in § 55(a)(2), superfluous." <u>Id.</u> (emphasis added). The court held that "the plain language of § 55(a) indicates that corporate vicarious liability is subject only to the limited penalty contemplated in § 55(a)(2)." <u>Id.</u> This court disagrees because the statute's text is clear. Section 52(a)(1) necessarily includes the definition of "person" and, in doing so, establishes liability for a "corporation." <u>See</u> 42 U.S.C. § 52(3). To hold otherwise would strip the term "person" of its plainly intended definition.

If an arbiter can be of assistance, the AKA's legislative history manifests Congress's intent that the doctrine of respondeat superior should apply to both sections:

> Section [55(a)(1)] is meant to permit a civil recovery against anyone who knowingly engages in kickback activities . . . . It is intended to subject not only subcontractors and kickback recipients to civil liability, but also prime contractors, independent sales representatives and others who knowingly participate in kickback activities. It is also intended to reach companies whose employees engage in kickbacks, under the doctrine of respondeat superior.

132 Cong. Rec. S16,311. The Senate report accompanying the proposed 1986 amendments also explained that an earlier draft of the amendments provided for double penalties for both §§ 55(a)(1) and 55(a)(2). However, prime contractors complained that "they often unknowingly pass on kickback costs resulting from misconduct between <u>lower tier subcontractors</u>, where <u>no prime contractor employee</u> was involved in the fraud." S. Rep. No. 99-435, at 16 (1986) (emphasis added). "Recognizing that prime contractors can be unwitting participants in lower tier kickback schemes and that the provision for double damages and forfeitures represents a significant civil liability," <u>id.</u> at 16-17, the Senate agreed to restrict the recovery of "double damages and forfeitures only [to] instances of knowing violations of the Act," <u>id.</u> at 16. If § 55(a)(2) contemplates liability in situations where no prime-contractor employees are involved in a kickback scheme, § 55(a)(1), by negative implication, must apply to situations in which prime-contractor employees are involved in such schemes and their wrongful conduct can be imputed to the prime contractor under the doctrine of respondeat superior.

Plaintiff is underinclusive in the remedy that it argues is applicable, but defendant overinclusively argues that it can validly plead a claim for damages under both § 55(a)(1) and § 55(a)(2). "[S]eeking double the amount of the kickbacks *necessarily includes* a request for a single amount of the kickbacks," Def.'s Br. filed Apr. 21, 2011, at 15-16, which plaintiff

aptly characterizes as an "imprecise pleading," Pl.'s Br. filed Apr. 26, 2011, at 22. 6/ The court construes defendant's inartful explanation of its pleading as an argument for a claim to simultaneous entitlement. See Def.'s Br. filed Apr. 21, 2011, at 16 ("The complaint plainly states facts and cites the correct statute to allege violations of both section 55(a)(1) and section 55(a)(2)." (emphasis added)). Other than defendant's conclusory statement that pleading simultaneous claims for both provisions is justified by citing to § 55 in its pleading, "which necessarily includes both subsections," Def.'s Br. filed Apr. 21, 2011, at 15, defendant cites no case law to support entitlement to damages under both subsections. Defendant's claim to simultaneous entitlement is not supported by the structure or purpose of the statute.

A prime contractor can be held vicariously liable under either subsection for an employee's kickback, but it cannot be liable for both simultaneously. A principal is liable for an agent's knowing violation that is imputed to it under principles of respondeat superior pursuant to § 55(a)(1), or, as an alternative, where it cannot be shown that the principal engaged in a knowing violation, the principal is strictly and vicariously liable under § 55(a)(2).

The AKA's legislative history confirms this interpretation, revealing that the purpose of both civil penalty provisions is compensatory. Compare 132 Cong. Rec. S16,310 ("By providing for civil recovery of twice the kickback amount plus $10,000 per instance of wrongdoing, [§ 55(a)(1)] provides a mechanism that will more nearly compensate the Government for all of its damages. For example, the provision will enable the United States to recoup the kickback amount; the amount that the subcontractor inflated its contract price beyond the kickback payment; the costs of detecting and investigating the kickback; the interest lost to the Government during the time of the fraud; and for other excess charges and performance problems that may be caused by a corrupt subcontractor."), with id. at S16,311 (explaining that goal of § 55(a)(2) is to encourage prime contractors to stop kickbacks "within their operations" and to "provide partial compensation to the Government for kickback costs included in Federal contracts"). Senator Levin approvingly cited Peterson v. Richardson, 370 F. Supp. 1259, 1267 (N.D. Tex. 1973), aff'd, 508 F.2d 45 (5th Cir. 1975), as an instance where double damages and forfeitures were upheld in a False Claims Act case "as a mechanism for making the Government whole." Id. at S16,310. Considering that both provisions include compensating the Government by the amount of the kickback, if the remedial purpose of § 55 is satisfied under § 55(a)(1) and the Government is "made whole," no need exists for the Government to re-collect the kickback amount under § 55(a)(2).

_____

6/ Defendant's prayer for relief reads: "As to Count II, under the Anti-Kickback Act, 41 U.S.C. §§ 53, 55, against plaintiff, for damages in the amount of double the amount of the kickbacks given to Mr. Hall and Mr. Holmes, plus civil penalties as are allowable by law of $5,500 to $11,000 per violation." Countercls. at 25.

1.  Application to defendant's counterclaim

The factual predicate of the AKA counterclaim is explicit that from late 2002 through the end of 2003 KBR employees Hall and Holmes received a combined $45,000.00 in cash kickbacks from Mr. Khan, Tamimi's vice-president and chief of operations. See Countercls. ¶ 115.  "Mr. Hall understood that the money was being provided so that Tamimi would remain in KBR's good graces and continue to get DFAC contracts from KBR." Id.  During this period Messrs. Hall and Holmes, in their capacities as employees of KBR, were involved in decisions that benefitted Tamimi, including sitting on a board that awarded Master Agreement 3 to Tamimi. Id. ¶ 117.  "As Regional Food Services Manager for KBR, had Mr. Hall objected to the award of a master agreement to a contractor, it would have been highly unlikely that such an award would be made." Id.  Moreover, Count II of defendant's counterclaims recites:

> By virtue of accepting funds from Mr. Khan in return for their favorable treatment of Tamimi and in reward of that treatment, Mr. Holmes and Mr. Hall both violated the Anti-Kickback Act.

> The violations of the Anti-Kickback Act by Mr. Hall and Mr. Holmes are attributable to KBR because the two were acting as KBR's agents at the time that they accepted the kickbacks.

Id. ¶¶ 134-35.

Because Messrs. Hall and Holmes were KBR employees when they accepted the kickbacks, these allegations are sufficient to state a claim for a violation of § 53(2)—for accepting a kickback—and the civil penalty provisions of § 55(a)(1)—for doing so knowingly—under a theory of respondeat superior.  Construing all inferences in defendant's favor, the court holds that defendant has also stated, alternatively, a claim for a violation of the strict liability provision of § 55(a)(2), should defendant fail to prove KBR's vicarious liability under § 55(a)(1).

2.  Vicarious liability

Plaintiff denies that the counterclaims support holding plaintiff vicariously liable for the misconduct of Messrs. Hall and Holmes because no allegation has been made that the "money provided to Hall and Holmes was accepted with any intent to benefit KBR or did in fact benefit KBR." Pl.'s Br. filed Apr. 6, 2011, at 34 (citing Long Island, 503 F.3d at 1249). Plaintiff argues that defendant alleges, at most, that "Kahn provided the payments for

Tamimi's benefit, not KBR's." Id. at 35.  The payments also were kept hidden from KBR and did not, in fact, benefit KBR.  Id. at 36.

In Long Island the Federal Circuit addressed the issue of imputation of an agent's fraud to the principal, holding that the adverse interest exception to the general common-law rule of agency (that "'a principal is not affected by knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes'") applies only where the agent "'secretly is acting adversely to the principal *and entirely for his own or another's purposes.*'"  Long Island, 503 F.3d at 1249 (quoting Restatement (Second) of Agency § 282 (1958)).  The court imputed to the bank the knowledge of the CEO (of the plaintiff bank) pertaining to his own fraudulent conduct on the ground that the CEO did not "*entirely* abandon[] [the bank's] interest for his own" because the bank benefitted, in part, from the agent's fraudulent misrepresentation by obtaining legal services from the CEO's law firm.  See id. at 1250.

Plaintiff's reliance on Long Island is misplaced, as that case stands for the proposition that Messrs. Hall and Holmes had to engage in fraudulent conduct entirely to benefit Tamimi or themselves in order for the adverse interest exception to apply.  Defendant correctly argues that KBR in fact benefitted by Messrs. Hall and Holmes's selection of Tamimi in that Tamimi "did provide necessary services to KBR — operating DFACs." Def.'s Br. filed Apr. 21, 2011, at 7 ("And whatever other motivations that Hall and Holmes had, this is enough under the Long Island Savings Bank test.").  Defendant has stated a valid claim for imputation of knowledge to KBR.

III.  False Claims Act

Count III of defendant's counterclaims alleges that plaintiff violated the FCA, 31 U.S.C. § 3729(a)(1).  The FCA recognizes a cause of action when any person "knowingly presents, or causes to be presented," to the Government "a false or fraudulent claim for payment or approval." Id.  Such a person "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." Id. 7/ "Knowingly" applies to a person who has "(1) actual knowledge of the information; (2) [who] acts in deliberate ignorance of the truth or falsity of the information; or (3) [who] acts

_____

7/  Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461 note, authorizes Executive agency adjustments for inflation of civil fines and penalties.  The Department of Justice, by regulation, has increased the penalties for FCA violations to a minimum of $5,500.00 and a maximum of $11,000.00.  See 28 C.F.R. § 85.3(9).

in reckless disregard of the truth or falsity of the information." Id. § 3729(b). Critically, "no proof of specific intent to defraud is required" to prove knowledge. Id.

"The government must establish a violation of the False Claims Act by a preponderance of the evidence." Daewoo Eng'g, 557 F.3d at 1340 (citing 31 U.S.C. § 3731(c); Commercial Contractors, 154 F.3d at 1362). To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages. See id. at 1341 ("Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); see also Young-Montenay, 15 F.3d at 1043 (absent proof of harm, Government can recover penalties, but not damages). In Young-Montenay the Federal Circuit set forth the required showing for a damages award:

> In order to recover damages for violation of the False Claims Act, the government must establish that
>
> (1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;
> (2) the claim was false or fraudulent;
> (3) the contractor knew the claim was false or fraudulent; and
> (4) the United States suffered damages as a result of the false or fraudulent claim.

Young-Montenay, 15 F.3d at 1043. Defendant's FCA claim seeks "treble the damages sustained by the United States, plus civil penalties as are allowable by law of $5,500 to $11,000 per violation, post-judgment interest, and costs." Countercls. at 25.

Defendant alleges that KBR's reimbursement vouchers "were false or fraudulent both because they were inflated by kickbacks and because they were submitted upon a kickback-tainted contract." Def.'s Br. filed Apr. 21, 2011, at 25-26. With respect to the first ground, defendant bootstraps onto its FCA claim a legal presumption—that the cost of kickbacks is passed on to the Government—that arises under the AKA, contending that the "law has long presumed that the costs of kickbacks are included in the costs of contracts, and KBR's invoices are therefore facially false." Id. at 26 (citing United States v. Acme Process Equip. Co., 385 U.S. 138, 143 (1967); United States v. Davio, 136 F. Supp. 423, 428 (E.D. Mich. 1955); 132 Cong. Rec. S16,310). Based on this presumption, defendant insists that "there is no requirement to allege that an invoice submitted to the Government in fact included the cost of the kickback or that the kickback inflated the subcontract price because it is legally presumed." Id. at 26-27 ("To establish the falsity of a claim, therefore, it is sufficient to allege that a subcontractor paid kickbacks to the prime contractor.").

26

In support of the second ground, defendant charges that plaintiff "knowingly submitted invoices that were the product of, and tainted by, fraudulent and illegal conduct that struck at the integrity of the procurement system." Id. at 27 (citing United States v. Neifert-White Co., 390 U.S. 228, 232 (1968) (noting that Congress passed original False Claims Act in 1863 with intent that it "reach all types of fraud, without qualification, that might result in financial loss to the Government")). According to defendant, precedent establishes that, even though a claim may be facially accurate, the FCA extends to claims tainted by a variety of fraudulent conduct. Id. at 27-28 (citing, inter alia, United States ex rel. Marcus v. Hess, 317 U.S. 537, 543-45 (1943) (FCA liability for contract obtained by collusive bidding), superceded by statute on other grounds as recognized in Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 130 S. Ct. 1396, 1406 (2010); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999) (FCA liability found although actual claim submitted not false because of "fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder"); United States v. Gen. Dynamics Corp., 19 F.3d 770, 772, 775 (2d Cir. 1994) (FCA liability for inflated cost estimates submitted for government approval)).

Defendant pleads that an illegal conflict of interest existed because Messrs. Hall and Holmes, while taking kickbacks from Tamimi, were involved in the award of Master Agreement 3 and subsequent work releases to Tamimi, as well as in the oversight of Tamimi's performance. See id. at 30. Defendant maintains that the FCA's general intent requirement is satisfied by alleging that KBR is vicariously liable for the "knowledge" of Messrs. Hall and Holmes and, therefore, that KBR knowingly submitted fraudulent invoices for reimbursement to the Government under a cost-reimbursement contract. Id.

Alternatively, defendant contends that the court can infer KBR's knowledge that its reimbursement vouchers were false or fraudulent based on the allegations contained in Mr. Petsche's e-mail. See id. at 32-33. "[T]he FCA's scienter requirement is satisfied by 'ostrich-like conduct which can occur in large corporations' where 'corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates.'" Id. at 33 (quoting United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1274 (D.C. Cir. 2010)).

Plaintiff counters that, as pleaded, defendant's "taint" theory does not establish the necessary causal link between the kickbacks and any false or inflated claim. See Pl.'s Br. filed Apr. 6, 2011, at 18-19 (citing, inter alia, Gen. Dynamics, 19 F.3d at 772; Young-Montenay, 15 F.3d at 1043; Morse Diesel Int'l, Inc. v. United States, 74 Fed. Cl. 601, 625 (2007) ("Morse Diesel II")). The FCA claim does not adequately plead the FCA's scienter element; instead, it provides "'only generalized allegations rather than specific underlying facts from which [the court] can reasonably infer the requisite intent.'" Id. at 26 (quoting BP

<u>Lubricants</u>, 637 F.3d at 1312).  Plaintiff also challenges defendant's FCA claim on the broader ground that defendant has not alleged anything false about KBR's reimbursement vouchers other than that they were "tainted" by the kickbacks.  <u>Id.</u> at 20.

> 1.  <u>Defendant cannot bootstrap a legal presumption applicable to the AKA onto its FCA claim</u>

While the case law is sparse, several decisions hold that the costs of a kickback are presumed to be passed on to the Government under the AKA or at common law.  <u>See, e.g.</u>, <u>Acme</u>, 385 U.S. at 143;  <u>Morse Diesel Int'l, Inc. v. United States</u>, 66 Fed. Cl. 788, 801 (2005) ("<u>Morse Diesel I</u>")); <u>Davio</u>, 136 F. Supp. at 428.  However, <u>Acme</u> and <u>Davio</u> arose under the pre-1986 AKA, which had codified the presumption.  <u>See</u> 41 U.S.C. § 51 (1982) ("Upon a showing that a subcontractor paid fees, commissions, or compensation or granted gifts or gratuities to an . . . agent of a prime contractor . . . in connection with the award of a subcontract . . . it shall be conclusively presumed that the cost of such expense was included in the price of the subcontract or order and ultimately borne by the United States.").

A unanimous Supreme Court ruled in <u>Acme</u> that the United States could cancel its contract with Acme, the prime contractor, because three of Acme's principal employees had accepted kickbacks in the form of negotiated price commissions for awarding related subcontracts in violation of the AKA.  <u>See Acme</u>, 385 U.S. at 138-40.  The procurement at issue was for rifles and contained a price redetermination clause that allowed the parties to renegotiate the price on past or future shipments upward or downward.  <u>See id.</u> at 141.  The Court described the kickback scheme as a "shakedown," whereby the kickback amounts were "charged to Acme through an increase in the subcontract price," <u>id.</u> at 141, which was to be passed on to the Government before the kickbacks were discovered and the contract was terminated, <u>see id.</u> at 143 n.5 ("Acme in 1953 submitted cost data for price redetermination purposes that included the charges of the five subcontractors which had paid kickbacks to Acme's employees.  These subcontracting charges in turn included the amounts paid as kickbacks.").  The Court of Claims concluded that the AKA permitted recovery only of the kickback, not contract termination because Congress could have provided for the remedy of contract termination, but did not.  <u>See id.</u> at 142-43.

The Supreme Court reversed on the basis of the AKA's general policy against kickbacks, explaining that kickbacks, unlike a more intangible conflict of interest, are a form of "commercial bribery" that provides "something specific which the Government can recover."  <u>Id.</u> at 145 ("There is absolutely no indication in the legislative history of the [AKA] that Congress, in providing a civil remedy for a more tangible evil, intended to preclude other civil sanctions <u>necessary to effectuate the purpose of the Act</u>."  (emphasis added)).  The Court also expounded on the possibility that kickbacks invariably are passed on to the Government and, as such, may result in consequential damages that are difficult to

discover and that exceed the amount of the kickbacks, problems that were not addressed by the AKA.  See id. at 143-45. 8/

In Davio the trial court explained that "English courts have conclusively presumed that the prices are loaded in secret commission cases, even if the price paid is the market price. Thus, the Government has a common law right of action for recovery of the kickbacks paid by defendants irrespective of the fact that there was no proof that . . . the Government, as the ultimate beneficiary of the subcontract . . . suffered any pecuniary damages as a result of the kickbacks." Davio, 136 F. Supp. at 428 (citation omitted).  The court held, "as a rule of substantive law," that the pre-1986 AKA's conclusive presumption "is not offensive to due process since it is based on a logical and probable connection with the antecedent facts." Id.  In Morse Diesel I, the Court of Federal Claims made a factual finding that "a higher price for bond services was included in the fixed contract price that [the prime contractor] was awarded." Morse Diesel I, 66 Fed. Cl. at 801.  The court cited "Congress' presumption that a kickback was passed on to the Government" in explaining that the presumption was not a "material issue[] of fact in dispute." Id. (citing 41 U.S.C. § 53; Acme, 385 U.S. at 143).

In its 1986 AKA amendments, Congress literally stripped from the AKA's text the "conclusive presumption," explaining that, "[f]or technical reasons . . . the legislation uses a 'civil penalty' rather than the existing 'conclusive presumption' to achieve the desired result."  132 Cong. Rec. S16,310.  However, Senator Levin was careful to explain that Congress did not intend this change to make any substantive change in the law:

> In practical terms, the bill's use of a civil penalty in place of a conclusive presumption has and is intended to make no substantive change in

---

8/    In its explication on the public policy "hostility" to kickbacks, the Court prognosticated:

> The kickbacks here are passed on to the Government in two stages.  The prime contractor rarely submits his bid until after he has tentatively lined up his subcontractors.  Indeed, as here, the subcontractors frequently participate in negotiation of the prime contract.  The subcontractor's tentative bid will, of course, reflect the amount he contemplates paying as a kickback, and then his inflated bid will be reflected in the prime contractor's bid to the Government.  At the renegotiation stage, where the prime contractor's actual cost experience is the basis for price redetermination, any kickbacks, paid by subcontractors and passed on to the prime contractor after the prime contract is awarded, will be passed on to the Government in the form of price redetermination upward.

Acme, 385 U.S. at 143.

the United States' right to recover civil damages in kickback cases. Contrasting the civil actions authorized by current law and the bill illustrate this point. To recover civilly under the current Anti-Kickback Act, the United States is required to establish the payment of a kickback. Upon making this showing, through the "conclusive presumption," the Government is automatically deemed to have been injured and to be entitled to damages equal to the amount of the kickback. The bill works in a similar way. To recover under the proposed legislation, the United States must prove that a kickback was paid, accepted or included in a contract price. Upon making this showing, the United States is entitled to recover a "civil penalty."

Id. (emphasis added). Thus, the legislative history is clear that Congress intended its incorporation of a "conclusive presumption" to apply to the "United States' right to recover civil damages in kickback cases" arising under the AKA. See id. There is no evidence that Congress intended it to apply to the FCA or any other statute.

The great weight of authorities cited by the parties requires an FCA claimant to plead facts showing that, as a consequence of the fraudulent activity, something false or fraudulent was included in the claim submitted. Not one of these authorities stands for the proposition that an FCA claim can be predicated on a presumption. While dicta in Acme speak to kickbacks being passed on to prime contractors and then to the Government, the language is in the context of explaining that this situation was precisely what occurred. See Acme, 385 U.S. at 141 (noting that kickback amounts were charged to prime contractor). Indeed, the Court's holding was confined to recognizing that the AKA did not preclude contract termination as an additional permitted remedy, where appropriate. See id. at 145. 9/ Acme's entire discussion of kickbacks focused on the policy underlying the AKA, and the case is specific to that statute. Nothing in Acme suggests that the Court intended its discussion about kickbacks to carry over to other statutory schemes. Certainly, Acme cannot be relied upon as authority to relieve the Government of its burden to state a claim under the terms of the FCA. To the extent that defendant points to the non-precedential opinion in Davio, that case was also specific to the AKA, and its discussion of a kickback presumption at common law was confined to the recovery of the kickback amounts and does not speak to the elements required to recover penalties and damages under a successful FCA claim. See Davio, 136 F. Supp. at 428.

---

9/ The court is mindful of the Federal Circuit's guidance that the Supreme Court's analysis does not constitute dicta when it is "necessary to the Court's analysis such that [courts] are bound to follow it." DaimlerChrysler Corp. v. United States, 361 F.3d 1378, 1385 (Fed. Cir. 2004); see also Ins. Co. of the W. v. United States, 243 F.3d 1367, 1372 (Fed. Cir. 2001) (holding that Federal Circuit is obliged to follow Supreme Court interpretation of law "even though that interpretation may be dicta").

No presumption applies to the FCA that would relieve defendant of its burden to plead facts supporting the elements of an FCA claim.  Defendant must claim the threshold requirements under the FCA, i.e., that a false or fraudulent claim was submitted and that plaintiff had knowledge of its falsity.  See Young-Montenay, 15 F.3d at 1043.

    2.  Policy considerations for what constitutes a false or fraudulent claim
        in case law vs. actual holdings of the cases

The court's review of the sufficiency of defendant's FCA claim is guided by both the precedential and non-precedential decisions cited by the parties.  Several cases relied upon by defendant support giving a broad construction of what constitutes a false or fraudulent claim on public policy grounds.  For example, in a particularly thorough review of the law, in Harrison, 176 F.3d at 794, the United States Court of Appeals for the Fourth Circuit held that FCA liability could be based solely on a false statement submitted to gain approval for a contract, even though the claims for payment were not otherwise false.  The "false certification was a pre-requisite to approval of the subcontract.  Each claim for payment under the contract was therefore submitted under a contract which was fraudulently approved."  Id. at 793-94.  Following an analysis of the FCA's legislative history and precedent from the Supreme Court, the court concluded that the phrase "false" or "fraudulent claim" in the FCA "should be construed broadly."  Id. at 788.  The court quoted from the Senate Report that "'each and every claim submitted under a contract, loan guarantee, or other agreement *which was originally obtained* by means of false statements or other corrupt or fraudulent conduct, *or in violation of any statute or applicable regulation*, constitutes a false claim.'"  Id. at 786 (quoting S. Rep. No. 99-345, at 9 (1986)).

The court in Harrison divided the body of case law into two principal categories: false certification cases, wherein liability lies "only if compliance with the statutes or regulations was a *prerequisite* to gaining a benefit, and the defendant affirmatively certified such compliance," id. at 787, and fraud-in-the-inducement cases, wherein liability is found "for each claim submitted to the government under a contract, when the contract or extension of the government benefit was obtained originally through false statements or fraudulent conduct."  Id.  In false certification cases, "the claims that were submitted were not in and of themselves false.  In each of the false certification cases the actual 'claim' submitted was not false. . . .  False Claims Act liability attached, however, because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder."  Id. at 788 ("Thus, any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach." (emphasis added)).

Fraud-in-the-inducement cases include claims involving collusive bidding, bid-rigging; contracts obtained due to false information, fraudulent pricing or inflated cost estimates; or false representations about the ability to perform.  Id. at 787-88.  In Hess the

Supreme Court broadly construed the predecessor statute to the current FCA.  See Hess, 317 U.S. at 543-44.  The Court held the contractors liable under the FCA for claims involving Public Works Administrator ("P.W.A.") contracts made with local governmental units, but that were  financed largely by the United States.  See id. at 539-42.  The defendants engaged in collusive bidding and then "many, if not most" of them certified that their bids were "'genuine and not [a] sham or collusive.'"  Id. at 543.  The appeals court had concluded "that the contracts were obtained by a successfully executed conspiracy to remove all possible competition."  Id.  The Court held that each claim submitted under the contracts constituted a false or fraudulent claim and expounded on the effect of contracts tainted with fraud, as follows:

> The government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive. By their conduct, the respondents thus caused the government to pay claims of the local sponsors in order that they might in turn pay respondents under contracts found to have been executed as the result of the fraudulent bidding. This fraud did not spend itself with the execution of the contract.  Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the P.W.A. into the joint fund for the benefit of respondents.  The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded.

Id. at 543-44.   Importantly, however, while the Court explained that the taint of the fraudulent conduct infected each claim submitted, FCA liability first was predicated on the threshold showing of collusive bidding.  See id. at 543. 10/

---

10/  The court below described the scheme as a

"conspri[acy] to rig the bidding on these projects.  The pattern of the collusion was the informal and private averaging of the prospective bid which might have been submitted by each appellant.  An appellant chosen by the others would then submit a bid for the averaged amount and the others all submitted higher estimates.  The government was thereby completely defrauded in that it was compelled to contribute more for the electric work on the projects than it would have been required to pay had there been free competition in the open market."

Hess, 317 U.S. at 539 n.1 (quoting United States ex rel. Marcus v. Hess, 127 F.2d 233, 234 (3d Cir. 1942), rev'd, 317 U.S. 537 (1943)).

In Neifert-White, 390 U.S. at 230, the Court held that the Government pleaded a valid FCA claim for false certification. FCA liability was predicated on false invoices submitted in support of federal loan applications. See id. The issue was whether the loan applications constituted a "claim" under the FCA. The Court held in the affirmative, explaining that "the False Claims Act should not be given the narrow reading that respondent urges. This remedial statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." Id. at 233.

In General Dynamics, 19 F.3d at 777, the United States Court of Appeals for the Second Circuit held that the AKA did not preempt remedies available to the United States under the FCA with respect to a shipbuilder's construction differential subsidy applications that included cost data inflated by kickback payments. Subcontractors had given General Dynamics employees kickbacks in order to procure shipbuilding subcontracts. Id. at 772. The Government alleged that the prime contractor inflated the price of the contract by passing on the kickback costs in the cost estimates provided to the Government. See id.

At the time the kickbacks in General Dynamics were paid, the pre-1986 amended AKA did not provide for prime-contractor liability, and the district court held that the AKA preempted remedies against the prime contractor under the FCA and common-law fraud. Id. at 772. The court framed the legal question narrowly—"whether a remedial scheme provided by . . . the AKA, precludes remedies potentially available to the government under both a previously enacted federal statute, the FCA, and federal common law." Id. at 773. The court held that it did not, explaining that the AKA's text and legislative history evince a strong public policy against kickbacks. See id. at 774. "[T]his legislative history provides no basis to bar the operation of the FCA in situations where it clearly does provide a remedy, as when a claim that is falsely inflated by kickback payments is directly submitted to the government by a prime contractor . . . ." Id. at 775 (noting available remedies under FCA and common law are not limited to amount of kickbacks, but include consequential damages resulting from payment of kickbacks).

Some courts have underscored the requirement that a false claim must be submitted. In United States v. Southland Management Corp., 326 F.3d 669, 674-75 (5th Cir. 2003) (en banc), the United States Court of Appeals for the Fifth Circuit construed the term "claims" as used in the FCA, holding that it "is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." The court explained that, "[a]lthough § 3729(a)(2) prohibits the submission of a false record or statement, it does so only when the submission of the record or statement was done in an attempt to get a false claim paid," id. at 675 (emphasis added), and noted that the "FCA 'was not intended to impose liability for every false statement made to the government,'" id. at 675 n.17 (quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001)). No false claim was present because property owners who made false certifications that the

property at issue was decent, safe, and sanitary to the Department of Housing and Urban Development ("HUD") in seeking housing assistance payments ("HAP") were entitled to the payments under the terms of the HAP contract during a corrective action period until HUD notified them that they had failed to take necessary corrective action and HAP payments would be abated.  Id. at 675-77.

Similarly, in United States ex rel. Aflatooni v. Kitsap Physicians Serv., 314 F.3d 995, 997 (9th Cir. 2002), the United States Court of Appeals for the Ninth Circuit rejected a *qui tam* plaintiff's argument that the district court erred in granting summary judgment because the plaintiff "demonstrated by implication that the defendants must have submitted false medical bills to the government."  The court stated that the FCA required "evidence of actual false claims made" and not merely evidence from which fraud could be inferred.  Id.  In discussing the FCA, the court clarified the requirement that a false claim be presented:  "It is not enough for Aflatooni 'to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted.'  Instead, Aflatooni must show '*an actual false claim* for payment being made to the Government.'"  Id. at 1002 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002) (first emphasis added)); see also id. ("The False Claims Act, then, focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme."); United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995) ("[T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'").  The Aflatooni court held that no false claim was presented at trial when the documents relied upon as evidence of fraud "do not describe even one, specific false claim" or "show that . . . bills were upcoded, made false, or ever submitted" to the Government and therefore were "generalized, speculative suppositions [that] fail to detail any particular false claim or even to provide sufficiently detailed circumstantial evidence of such a claim." Aflatooni, 314 F.3d at 1002.

3.  Application to defendant's FCA claim

The court acknowledges defendant's emphasis on the public policy against kickbacks and the potential for damage to the procurement system that fraudulent conduct creates that were highlighted in Neifert-White, Hess, Harrison, and General Dynamics.  Nevertheless, however strong the policy concerns may be that are implicated by this fraudulent conduct, they are not a substitute for the specific requirements that defendant allege facts showing the falsity of a claim and plaintiff's knowledge of that falsity under § 3729(a)(1).  Merely alleging a conflict of interest created by the kickback, without more, is not sufficient to state a claim under the FCA.

Plaintiff correctly argues that "[i]n each of [the cases cited by defendant] . . . there was fraudulent conduct causally linked to a government contract, such as price inflation, false certifications, or fraudulent statements that induced the Government to pay out money it would not have paid but for the misrepresentations."  Pl.'s Br. filed Apr. 26, 2011, at 6-7.  In these cases something specifically false was shown to be connected to a claim for payment.  See, e.g., Neifert-White, 390 U.S. at 232 (FCA liability for false certification of loan application); Hess, 317 U.S. at 543-45 (FCA liability for collusive bidding resulting in inflated prices and describing FCA liability as "reach[ing] a person who knowingly assisted causing the government to pay claims which were grounded in fraud"); Harrison, 176 F.3d at 786 (FCA claim for false certification due to false statements submitted to gain approval for contract); Gen. Dynamics, 19 F.3d at 775 (FCA liability for inflated cost estimates).  These cases do not support the proposition that an FCA claim can be based on taint from a kickback alone.

In addition, plaintiff has sound case law in Southland Management and Aflatooni for the statement that "fraudulent schemes are not actionable under the FCA unless a false claim for payment results."  Pl.'s Br. filed Apr. 6, 2011, at 11; cf. Gen. Dynamics, 19 F.3d at 772 (prime contractor passed costs of kickbacks on to Government by actually including kickbacks in cost estimates submitted); Young-Montenay, 15 F.3d at 1043 (court observed that contractor "knew the invoice was false" when he submitted it); Morse Diesel II, 74 Fed. Cl. at 625 (prime contractor's reimbursement requests actually were inflated to include improper "rebate" amount).

Defendant must allege facts showing that the costs actually inflated the contract price.  The facts alleged are too attenuated to show that a false claim was submitted, and defendant has not claimed that plaintiff made a false certification.  No allegation is made that Tamimi's prices to KBR were actually inflated, even by the amount of the kickback.  See Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993) ("Illegal acts by a Government contracting agent do not alone taint a contract and invoke the void ab initio rule.  Rather, the record must demonstrate some causal link between the illegality and the contract provisions.").  In other words, the facts supporting defendant's FCA counterclaim do not indicate anything particularly false about plaintiff's reimbursement vouchers.

Alternatively, even if KBR's reimbursement vouchers were inflated by the amount of the kickbacks, defendant has not alleged facts tending to show that anyone at KBR, including Messrs. Hall and Holmes, knew of that inflation.  Defendant merely recites that Mr. Hall "knew or should have known" that the prices would be passed on through KBR's vouchers, without buttressing this claim with facts that would allow the court to infer such knowledge.  As it stands, this is the sort of conclusory allegation that is not entitled to a presumption of truth.  See BP Lubricants, 637 F.3d at 1312.  Nor can defendant rely on Mr. Petsche's e-mail when it is not alleged that Mr. Petsche had knowledge of the kickbacks received by Mr. Hall

and which provides generalized concerns about pricing irregularities. Accordingly, defendant has not stated a valid FCA claim pursuant to 31 U.S.C. § 3729(a)(1).

## IV. Common-law fraud

Count IV of defendant's counterclaims calls for rescission of Master Agreement 3 and disgorgement of all funds previously paid to Tamimi under this agreement. Countercls. ¶ 140. Similarly, by Count V the Government seeks disgorgement of all fees paid to KBR pursuant to Task Order 59. Id. ¶ 143. These counts articulate the remedies for a general common-law fraud claim.

Common-law fraud is a cause of action separate from the forfeiture statute that must be analyzed apart from defendant's Special Plea in Fraud. See Long Island, 503 F.3d at 1244. Proof of federal common-law fraud generally requires the Government to show: (1) misrepresentation of material fact; (2) intent to deceive; (3) justifiable reliance on the misrepresentation by the party deceived; and (4) injury to the party deceived. First Fed. Sav. Bank, 52 Fed. Cl. at 791. "[A] misrepresentation may prevent the formation of a contract or may make a contract voidable. The difference between the former and the latter is sometimes referred to as the difference between misrepresentations that make a contract 'void' versus 'voidable.'" Long Island, 503 F.3d at 1245 (citing Restatement (Second) of Contracts §§ 7 cmt. a, 163-64, 163 cmt. c (1981)). A contract is void ab initio under the common law if a misrepresentation "as to the character or essential terms" of a proposed contract, "induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract," because there has not been an effective "manifestation of assent." Restatement (Second) of Contracts § 163.

A contract that is "tainted from its inception by fraud is void *ab initio*." J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988) (noting that contract at issue was "procured by and therefore permeated with fraud"). To prove that a contract is void ab initio, defendant must show that plaintiff "(a) obtained the contract by (b) knowingly (c) making a false statement." Long Island, 503 F.3d at 1246. "[T]he record must show some causal link between the fraud and the contract." Id. at 1250 (citing Godley, 5 F.3d at 1476). Similarly, a conflict of interest at the formation of the contract operates like a fraud and warrants nonenforcement. Id. ("The government contracts [were] held void because [they were] similarly tainted by a prohibited conflict of interest." (citing United States v. Miss. Valley Generating Co., 364 U.S. 520 (1961); K&R Eng'g Co. v. United States, 616 F.2d 469 (Ct. Cl. 1980))); see also Veridyne, 83 Fed. Cl. at 583 (interpreting Miss. Valley).

According to plaintiff, defendant's failure to allege common-law fraud is a consequence of its failure to plead a "necessary nexus between kickbacks and the award of

the subcontract." Pl.'s Br. filed Apr. 6, 2011, at 29. In order for a contract to be subject to rescission and disgorgement, "'the record must show some causal link between the fraud and the contract.'" Id. at 13 (quoting Long Island, 503 F.3d at 1250). Defendant's riposte is that the key to its common-law fraud claim is Messrs. Holmes's and Hall's "participation . . . in important contractual decision-making that imbues the contracts with fatal taint, regardless of whether the misconduct directly caused the contractual decision." Def.'s Br. filed Apr. 21, 2011, at 12. The issue is whether the alleged conduct, without more, is sufficient to state a common-law fraud claim.

1. Case law dynamics

The decisional law does not support defendant's assertion that the "taint" of fraud alone, without also alleging a causal connection between the contract award and the fraudulent conduct, is sufficient to render the contract void ab initio. To show that a contract is void ab initio because of a false statement, defendant must show that the "the contractor . . . obtained the contract by . . . knowingly . . . making a false statement." Long Island, 503 F.3d at 1246 (emphasis added). The law necessarily implies a causative link between the fraudulent statement and the proposed contract. See id. at 1246, 1250 (determining whether contract "was procured by and therefore permeated with fraud," such that absent fraudulent activity contract would not have been realized, and looking to record to show "some causal link between the fraud and the contract"); see, e.g., J.E.T.S., 838 F.2d at 1200 (holding that had government contractor "stated the truth . . . it would not have received the contract"). The false statement must have induced the contact so that no mutual assent can be said to have existed. See Restatement (Second) Contracts § 163 cmt. a ("[The] result [of calling a contract void at formation] only follows . . . if the misrepresentation relates to the very nature of the proposed contract itself and not merely one of its nonessential terms.").

In Godley the Federal Circuit emphasized the issue of causation in analyzing a conflict of interest, noting that in Mississippi Valley "the illegality [of violating the Federal conflict of interest statute] permeated the contract. Without the [contracting officer's] illegal participation, the Court stated, 'no contract would have been made.'" Godley, 5 F.3d. at 1475-76 (quoting Miss. Valley, 364 U.S. at 553); see also Miss. Valley, 364 U.S. at 564 (distinguishing Muschany v. United States, 324 U.S. 49 (1945), on grounds that case "did not involve a contract which resulted from an illegal transaction, and it is consequently understandable that the contract there in question was enforced").

Defendant champions K&R Engineering, 616 F.2d 469, a "sordid tale" where the contracting officer entered into an agreement with the contractor to receive a portion of the profits. Id. at 470-71. In K&R Engineering the Court of Claims held that the plaintiff violated the conflict-of-interest statute, see id. at 474, and rejected the plaintiff's argument that such a violation should not preclude contract enforcement when the Government was

not adversely affected by the conflict of interest, id. at 475.  The court held that "it is the potential for injuring the public interest created by a conflict of interest that requires invalidation of the tainted contract.  It therefore is immaterial whether the particular taint has or has not caused the government <u>financial loss or damages</u>."  <u>Id.</u>  (emphasis added).

However, a link between the fraudulent action and the contract, whether a false statement or conflict of interest, still is required, even if financial loss is not shown.  The <u>Godley</u> court noted in <u>Mississippi Valley</u> that "corruption" affected the contract in that the contractor was an officer of and shared the profits of the financing institution.  <u>Godley</u>, 5 F.3d at 1476 n.1 (citing <u>Miss. Valley</u>, 364 U.S. at 555).  This analysis had no bearing on financial gain or loss, but, rather, the issue of whether the contract was formed as a result of the fraud.  The established conflict of interest in <u>K&R Engineering</u> permeated the procurement, where "[t]he contracts themselves were each infected by . . . corruption, and each was void ab initio."  <u>K&R Eng'g</u>, 616 F.2d at 477; <u>see also</u> <u>Crocker v. United States</u>, 240 U.S. 74, 80 (1916) ("The secret arrangement whereby Machen was to share in the profits was most reprehensible.  Its natural effect, as also its purpose, was to secure for the company an inadmissible advantage. . . . [The contracting officer had an interest] and therefore <u>was in a position</u> where the hope of personal gain was likely to exercise a predominant influence and prevent a faithful discharge of his public duties, as in fact it did." (emphasis added)).  Thus, the conflict of interest of a decisionmaker himself disrupts contract formation, creating a causal link between the contract award and the illegal conduct.

While the court departs from defendant's attempt to create a cause of action based on the taint of fraud, untethered to its other common-law elements, in the case *sub judice* the court nevertheless concludes that the facts as pleaded state a claim for common-law fraud.

2. <u>Analysis</u>

Defendant alleges the existence of a conflict of interest during the award of Master Agreement 3 and Work Release 3 that, similar to <u>Mississippi Valley</u> or <u>K&R Engineering</u>, could render KBR's contracts with Tamimi void ab initio.  Defendant alleges that "Mr. Hall understood that the money was being provided so that Tamimi would remain in KBR's good graces and continue to get DFAC contracts from KBR."  Countercls. ¶ 115.  Messrs. Hall and Holmes were part of the board that was convened to determine which contractors to hire.  <u>Id.</u> ¶¶ 116-17.  Although plaintiff's allegation that, "had Mr. Hall objected to the award of a master agreement to a contractor, it would have been highly unlikely that such an award would be made," <u>id.</u> ¶ 117, does not alone state a claim for relief, the fact that kickbacks were made to two alleged decisionmakers who were in the process of awarding Master Agreement 3 suffices for the court to infer fraud above the level of mere speculation.  Similarly, defendant's averments regarding Mr. Petsche allege a conflict of interest in the award of Master Agreement 3, Work Release 3.  Defendant charges that Mr. Petsche

made the decision to acquiesce to the award of the Camp Anaconda subcontract to Tamimi based in large part upon the pressure supporting the award that he received from Mr. Hall.  Indeed, Mr. Petsche had contemplated having the Camp Anaconda DFAC subcontract be awarded to a different subcontractor than Tamimi, but changed his mind based upon the advocacy from Tamimi that he received from Mr. Hall.

Id. ¶ 120.  But for Mr. Hall's advocacy, Mr. Petsche would have chosen a different subcontractor for the contract that he described as "'the mother of all DFAC drug deals.'" Id. ¶ 124.  Accordingly, defendant has pleaded a claim based on common-law fraud for the rescission and disgorgement of Master Agreement 3, Work Release 3 and the disgorgement of Task Order 59 because the kickbacks were made to alleged decisionmakers in the process of awarding Master Agreement 3.  The level of participation by Messrs. Holmes and Hall in each decision, i.e., whether a true conflict of interest existed or whether false statements about Tamimi were proffered to induce the award and whether a disgorgement or rescission remedy is warranted—each requiring a high standard of proof—implicates issues that will be resolved at trial.  Compare Miss. Valley, 364 U.S. at 317 n.22 (leaving open possibility of *quantum meruit* or *quantum valebat* recovery should one party perform), with K&R Eng'g, 616 F.2d at 475 (foreclosing *quantum meruit* or *quantum valebat* recovery in specific instances of fraud).

V.  Defendant's affirmative defense

Defendant contends that "[p]laintiff's claim is unenforceable because of the taint of 'kickbacks.'"  Countercls. ¶ 103.  This claim is redolent of defendant's reliance on the Court of Federal Claims cases that predicate forfeiture on taint.  Defendant does not buttress it with any case law.  The claim merits dismissal, if not a ban from the arsenal of options for charging fraud available to the Government.  Any equitable remedies can be explored sufficiently in the structure of the count for common-law fraud. 11/

## CONCLUSION

Accordingly, based on the foregoing,

---

11/  Defendant challenges that "KBR's motion to dismiss does not address the Government's separately pled affirmative defense."  Def.'s Br. filed Apr. 21, 2011, at 39.  On April 14, 2011, plaintiff clarified that it "believe[d] that it was implicit that its motion to dismiss also served as a motion to strike the Government's affirmative defense under RCFC 12(f)."  Pl.'s Notice filed Apr. 14, 2011, at 1.  This dispute is inconsequential.  The court may strike an insufficient defense or redundant matter on its own.  See RCFC 12(f)(1).

**IT IS ORDERED**, as follows:

1.  Plaintiff's motion to dismiss Count I of defendant's counterclaims for forfeiture of plaintiff's breach of contract claim is granted.

2.  Plaintiff's motion to dismiss Count II, defendant's AKA counterclaim for double the amount of damages of kickbacks given to Messrs. Hall and Holmes, is denied.  Defendant has stated a claim based on an AKA violation of 41 U.S.C. § 53(2) due to the acceptance of the kickbacks and a claim under 41 U.S.C. § 55(a)(1).  Alternatively, defendant has stated a claim under §§ 53(2) and 55(a)(2) for recovery of a civil penalty in the amount of the kickbacks.

3.  Plaintiff's motion to dismiss Count III of defendant's counterclaims for a violation of the FCA is granted.

4.  Plaintiff's motion to dismiss Count IV of defendant's counterclaims for rescission of the portion of the LOGCAP III contract affected by the award of Master Agreement 3 to Tamimi and for disgorgement of all moneys paid to KBR related to any work release upon Master Agreement 3 is denied.

5.  Plaintiff's motion to dismiss Count V of defendant's counterclaims for disgorgement of all moneys paid to plaintiff related to Task Order 59 is denied.

6.  Plaintiff's motion to strike defendant's affirmative defense is granted.

7.  Plaintiff's motion to dismiss for failure to plead fraud with specificity is denied because the remedy would be to allow defendant to amend its affirmative defense and counterclaims.  In ruling on the legal sufficiency of the affirmative defense and counterclaims, the court has construed these in a light that pleads the most fulsome—and, hence, adequately stated, facts.

8.  By July 1, 2011, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.


/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge