# In the United States Court of Federal Claims

No. 09-351C
(Filed May 2, 2012) 1/

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | * | Contracts; Contract Disputes |
| | * | Act, 41 U.S.C.A. §§ 7101-09 |
| **KELLOGG BROWN & ROOT** | * | (2006); equitable adjustment; |
| **SERVICES, INC.,** | * | cost-reasonableness determina- |
| | * | tion; trial; provision of DFAC |
| Plaintiff, | * | (dining facility) services to |
| | * | troops in Iraq; cost-plus award- |
| v. | * | fee for government contract; |
| | * | fixed-price contract for |
| **THE UNITED STATES,** | * | subcontractor-provider; |
| | * | counterclaim under the Anti- |
| Defendant. | * | Kickback Act, 41 U.S.C. §§ 53, |
| | * | 55 (2006); counterclaim for |
| * * * * * * * * * * * * * * * * * * * * * | * | common law fraud (recission |
| | | and disgorgement). |

Craig D. Margolis, Washington, DC, for plaintiff. Tirzah S. Lollar and J. Randall Warden, Vinson & Elkins LLP, of counsel.

J. Reid Prouty, Washington, DC, with whom was Acting Assistant Attorney General Stuart F. Delery, for defendant.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case, the first of the Iraq war contract cases to proceed to trial in the United States Court of Federal Claims, involves a claim for the provision of dining facility ("DFAC") services for the United States Army (the "Army") at Camp Anaconda, one of the largest United States military bases in Iraq during the troop buildup following the March 2003 invasion.

---

1/ This opinion originally was filed under seal on April 26, 2012. The parties were requested to notify the court of any redactions. Neither party requested any redactions.

## FACTS 2/

I. Background 3/

Although this dispute centers around the logistical support provided by Kellogg Brown & Root Services, Inc. ("KBR" or "plaintiff"), during the early years of Operation Iraqi Freedom, the genesis of the issues presented began with the award of the Army Logistics Civil Augmentation Program ("LOGCAP") Contract No. DAAA09-02-D-0007 ("LOGCAP III") to Brown & Root Services on December 14, 2001. 4/ JX 401.

Work to be performed under LOGCAP III would be in support of what is classified as a "contingency operation." As defined by federal regulation:

[c]ontingency operation means a military operation that –

(1) Is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or

(2) Results in the call or order to, or retention on, active duty of members of the uniformed services [under specified sections of the United States Code] . . . during a war or during a national emergency declared by the President or Congress.

---

2/ The facts set forth in the "Facts" and "Discussion" sections of this opinion constitute the court's findings of fact pursuant to RCFC 52(a)(1), (c). Rulings on mixed questions of fact and law also are set forth in the "Discussion" section.

3/ Because of the particular nature of this case, in which the facts pertinent to plaintiff's contract claim and defendant's counterclaims under the Anti-Kickback Act, 41 U.S.C. §§ 53, 55 (2006), and for fraud occurred concurrently, several significant—and pertinent—events happened simultaneously. For the sake of clarity, this court has employed a sectional approach to the germane facts in this case. Thus, some chronological overlap exists among the different sections. This approach to separate out the different factual "strings" present in this controversy affords the most straightforward development of the underlying facts and allows the court to make findings relevant to each party's claims.

4/ The LOGCAP III contract was novated and transferred to KBR on August 1, 2003. Compl. filed June 2, 2009, ¶ 12.

48 C.F.R. (FAR) § 2.101 (2012) (citations omitted).

LOGCAP III was an umbrella Indefinite Delivery/Indefinite Quantity ("IDIQ") contract to implement logistics support services for the U.S. Army in Kuwait and Iraq prior to and during Operation Iraqi Freedom in accordance with task orders ("TOs") issued under the contract. See JX 401; Transcript of Proceedings, Kellogg Brown & Root Servs., Inc. v. United States, No. 09-351C, at 139-40, 161-62 (Fed. Cl. Oct. 11-25, Dec. 1-2, 2011) ("Tr.") (William R. Walter, KBR's former Vice President of Accounting and Finance, Government Infrastructure Division). Plaintiff provided logistics support services that included DFAC, morale and welfare, laundry, and fuel-delivery services. JX 401, at 7646. 5/ LOGCAP III required KBR to be prepared to support a six-month deployment of a maximum of 50,000 troops at no more than eight camps. See id. at 7653; Tr. at 157-58 (Walter). LOGCAP III was a cost-plus-award-fee agreement that incorporated the provisions of 48 C.F.R. § 52.216-7 (2000), whereby the Army would reimburse KBR for all costs that it incurred in contract performance, including payments to subcontractors, along with a fee determined by subcontract costs.

1. Dining facilities in Kuwait and Iraq

Beginning in fall 2002, see Tr. at 2577 (Terry Hall, former Regional Food Service Manager), the Army began staging forces in Kuwait in preparation for the eventual assault into Iraq and called on KBR to provide the logistical services under LOGCAP III, Tr. at 188-89 (Walter). In Kuwait KBR provided, inter alia, laundry, water, building operations and maintenance, fuel delivery, and DFAC services. See Tr. at 168-69 (Walter). As succinctly summarized during trial, a dining facility was "a place where [one] go[es] in-theater and . . . is a cafeteria. They cook the foo[d] there, and they prepare the food there, and they store the food there, and you eat the foo[d] there." Tr. at 184 (Walter). One of the main Army bases in Kuwait at which KBR provided logistics services was Camp Arifjan. KBR performed the DFAC services at Camp Arifjan prior to the Iraq invasion under TO 27 issued under LOGCAP III. See PX 123. Under the Statement of Work (the "SOW") for TO 27, issued October 2, 2002, prior to the formal execution of LOGCAP III, KBR was to serve as the prime contractor for the DFAC services at Camp Arifjan, and the SOW specifically instructed KBR to subcontract with Tamimi Global Company, Ltd. ("Tamimi"), as the prime vendor at the camp. Id. at 2647. Prior to bringing the work in under LOGCAP III, Tamimi had been the prime vendor at Camp Arifjan under a direct contract with the Army. Tr. at 189 (Walter). As explained below, this contractual obligation to use Tamimi at Camp Arifjan

---

5/ For more lengthy documents, citations will include the Bates number(s) corresponding to the specific page(s) referenced. For exhibits that do not carry Bates numbers, but are identified with consecutive numbers, those numbers will be used in place of Bates numbers.

was not one that enjoyed the whole-hearted support of KBR, and the relationship between KBR and Tamimi at Camp Arifjan was not always smooth. 6/

The aerial bombardment of Iraq, christened the "shock and awe" campaign, began on the night of March 19, 2003, and the main contingent of ground troops began the invasion of Iraq from Kuwait on March 20, 2003. By May 2003, the troops had been subsisting primarily on Meals Ready to Eat ("MREs"), and the Army began to focus on establishing dining facilities throughout Iraq to support the burgeoning troop deployment. The provision of food was considered vitally important to troop morale, and DFACs became a top priority. See Tr. at 659 (Betty E. Hayes, KBR's Senior Manager of Procurement and former Acting Procurement Manager at Camp Anaconda). The Army directed KBR to establish the capacity to serve hot food to "many thousands of troops" by July 4 of that year. Tr. at 1991 (Lynn E. DeRoche, supervisory Contract Specialist, TACOM Contracting Command, TACOM Contracting Center, Rock Island, Illinois). After having only MREs for several months, the generals considered that the troops were due "franks and beans" by the fourth of July. See Tr. at 199 (Walter).

2. Task Order 59 and the Master Agreement System

Given the frenetic pace of events occurring in the first half of 2003, this directive was a challenge for KBR. By the end of May 2003, KBR was receiving logistical support requisitions from the Army "continuously [and] at different locations." Tr. at 1729 (David L. Hadcock, KBR's Senior Subcontracts Administrator who served as the Procurement Materials & Property Manager on LOGCAP III). In the month of June, KBR "went from supporting tens of thousands, to supporting hundreds of thousands . . . ." Tr. at 246 (Walter). Although initially KBR had approximately one month to establish over thirty DFACs in Iraq, eventually the Army was calling for more than fifty DFAC sites. See Tr. at 199, 246

_____

6/ In fact, the Army eventually removed DFAC services at Camp Arifjan from the scope of work under LOGCAP III—and by extension, from KBR's purview—when it became clear that KBR wanted to replace Tamimi with another subcontractor. See Tr. at 376-78 (Walter); PX 124. Having removed KBR from the DFAC services at Camp Arifjan, the Army proceeded to contract directly with Tamimi for the provision of those services. Tr. at 376-78 (Walter). Given the Government's fraud allegations against KBR based on kickbacks to KBR personnel initiated by Tamimi's Vice President and Director of Operations, Shabbir Khan, the irony of the Army's continued association with Tamimi was not lost on plaintiff. The court, however, did not give any weight to plaintiff's complaint about an ostensible double standard and, to the extent possible, has not accorded plaintiff any latitude, i.e., the court has not relaxed plaintiff's burden of proof due to its contracting in a foreign commercial environment in which proscribed practices for obtaining and maintaining contracts are not uncommon.

(Walter); Tr. at 1334 (Daniel L. Petsche, KBR's then-Senior Subcontract Administrator on site in Kuwait); Tr. at 1991-92 (DeRoche).  As Ms. DeRoche testified, 7/

> during that time period things were pretty crazy.  The changes that were happening that were being directed from the [SOWs] early on; capacities at different sites, they all changed very quickly.  [The Army had] asked KBR to set up this food service capability in an inordinately short period of time; and so, it seemed reasonable that there were limitations about what they could do during that initial time period.

Tr. at 1992 (DeRoche).  The DFACs that the Army was calling for were to be located all over the country.  One of those sites, in Balad, just north of Baghdad, was known as Camp Anaconda.  See Tr. at 1269 (Petsche).  The DFACs at Camp Anaconda, one of the largest military bases in Iraq, are the centerpiece of this case.

By May 2003 KBR had hired Mr. Petsche to serve as a Senior Subcontract Administrator and sent him to Kuwait to review the existing KBR subcontracts.  Tr. at 1252 (Petsche).  Mr. Petsche was in plaintiff's Procurement Division, which plaintiff attempted to distance from its Operations Division due to the different lines of authority.  Procurement personnel were depicted as the KBR employees who implemented contract requirements; the Operations employees dealt with the companies available to provide services as subcontractors.  By the end of May, Mr. Petsche began focusing on the expanding DFAC effort in Iraq.  See Tr. at 1252-54 (Petsche).  According to Mr. Petsche, the procedure in place contemplated that those members of the KBR team in the Operations Division would inform him of the Army's requirements, and it was his responsibility to "source and manage and administer that requirement after award."  Tr. at 1255 (Petsche).  The principal KBR Operations personnel working on the DFAC contracts in Iraq at this time were Robert (Butch) Gatlin, Regional Project Manager; Terry Hall, Regional Food Service Manager; and Luther Holmes, Deputy Regional Food Service Manager.  See Tr. at 1255-56 (Petsche); JX 102.  The principal Procurement personnel in Kuwait at the time, aside from Mr. Petsche, were Jeff Mazon, Procurement Materials & Property Manager, and Bill Suzuki, Project Manager for Iraq operations.  See Tr. at 1251-52 (Petsche); JX 102.

The first relevant DFAC subcontract involved the DFACs at Camp Cedar 2 and Camp Adder ("Camp Cedar/Adder") in Nazareah, Iraq.  Tr. at 1254, 1259 (Petsche).  KBR had issued a Request for Proposal ("RFP") for a competitive award for work to be performed under TO 57—the TO dealing with the southernmost sites in Iraq, Tr. at 199 (Walter)—and had received proposals from nine potential subcontractors, JX 102.  On June 6, 2003, Mr. Petsche authored a justification memorandum awarding a stand-alone contract for the dining

---

7/  Ms. DeRoche also testified by deposition.

services at Camp Cedar/Adder to Tamimi.  Id.  That memorandum memorialized that a review of all of the proposals was conducted by Messrs. Gatlin, Hall, Holmes, Mazon, Suzuki, and Petsche.  Id.  Tamimi was awarded the contract because it had submitted the lowest-priced bid and had been strongly recommended by the Food Service Operations personnel ("Food Service")—i.e., Messrs. Hall and Holmes.  Id.; Tr. at 1261 (Petsche). According to Food Service, Tamimi was a strong choice "because Tamimi Global Co. is already positioned in the Iraq area."  JX 102.  One location at which Tamimi was operating prior to KBR's being tasked to run the logistical support efforts was Camp Anaconda.  8/  Tr. at 201 (Walter).  Therefore, although Mr. Petsche officially made the decision to award Tamimi the Camp Cedar/Adder contract, the recommendation by the Food Service group was "very important."  Tr. at 1261 (Petsche).

On June 9, 2003, KBR personnel held a meeting to discuss the proposition of establishing a system of "master agreements" with certain subcontractors in order to better meet the Army's growing demands for DFACs.  See JX 103.  Messrs. Gatlin, Hall, Mazon, Suzuki, and Petsche attended.  Id.  A master agreement was, in effect, a Basic Ordering Agreement by which KBR would "qualify a certain number of resources prior to [an Army directive], so that [KBR] had them already established."  Tr. at 1258 (Petsche).  Although not the ideal system of procurement, the size and scope of the Army's requirements outpaced the capacity of any one subcontractor and thus, "it was decided to award multiple agreements such that we may have numerous sites going up simultaneously."  JX 103.  Once the master agreements with particular vetted vendors were in place, work then could proceed through the issuance of "work releases."  See Tr. at 1057-58 (William J. Jonas, KBR's Ordering Vice President for Procurement Materials & Property).  In this way the procedural process could be greatly abbreviated, thereby allowing KBR to perform more quickly.  See Tr. at 212 (Walter).  One effect of this system was that if a subcontractor did not have a master agreement with KBR, it would not be eligible for any of the work that the Army required under TO 59.  See Tr. at 405 (Walter).

As a framework for determining what subcontractors would receive a master agreement, the attendees decided to examine the competitive bidding proposals submitted the previous week for the DFAC work to be performed at Camp Cedar/Adder.  JX 103.  On June 10, 2003, a review of those nine proposals was conducted by "the project manager, procurement (subcontracts) and the food service management team," a group known as the "master agreement board."  JX 103.  The members looked at both the price of the bids and the technical ability of the contractors.  See Tr. at 1266-67 (Petsche).  In order to be considered for a master agreement, the contractor had to be technically qualified by the Food

---

8/  The Army apparently had a high opinion of Tamimi.  Mr. Hall testified that Army officials actually considered awarding all DFAC service contracts in Iraq to Tamimi.  Tr. at 2591, 2626 (Hall).

6

Service group—essentially Messrs. Hall, Holmes, and Gatlin.  Of the nine potential candidates, Food Service found several of the subcontractors to be technically unqualified; none of those subcontractors was considered for a master agreement. Tr. at 2614 (Hall). The reviewing board ultimately decided that five subcontractors would be offered master agreements. JX 103. Those five subcontractors were, "by order of preference": Tamimi, Renaissance Services, La NouVelle-ESS, The Event Source ("TES"), and KCPC Kuwait Company for Process Plant Construction & Contracting. Id. The memorandum reprising this meeting was signed by Messrs. Suzuki, Holmes, and Petsche. Id. At this time it was thought that these five subcontractors would help KBR fulfill the Army's goal to put in place twenty-five DFACs by August 1, 2003. 9/

On June 13, 2003, the Army issued TO 59, JX 143, "the order that provided for all the life support services in Iraq," Tr. at 1983 (DeRoche); see also Tr. at 163 (Walter). Each TO required a SOW, but, because of the scope of the work to be performed under TO 59, the SOW was actually issued with numerous appendices. See JX 403; Tr. at 161-62 (Walter). As an example, all of the work to be performed at Camp Anaconda was listed in the SOW in Appendix A. JX 403; Tr. at 168-69 (Walter). However, between mid-June and July 2003, the Army revised the SOW for TO 59 multiple times, 10/ Tr. at 164-66 (Walter), and the final TO 59 was not signed by the Army and KBR until August 12, 2003, see JX 143.  The effective period for TO 59 ran from June 13, 2003, through April 30, 2005, see id.; JX 414, and eventually was replaced by TO 89 in May 2005.  All told, the scope of KBR's effort under TO 59 consisted of support at fifty-six sites requiring KBR to manage, through its subcontractors, over 25,000 employees. See PX 458.

On June 16, 2003, KBR invited Tamimi to participate in its master-agreement system. See JX 487-1.  Tamimi was officially awarded DFAC Services Master Agreement No.: LOGCAP-KU-MA00003 ("Master Agreement 3" or "MA 3") on June 17, 2003, when Mr.

---

9/  The master agreement structure was decided on and implemented prior to the official release of TO 59.  However, KBR apparently was aware of the pendency of TO 59 and generally what would be required under it and was taking proactive steps to quickly implement the TO as soon as the Army issued it. See Tr. at 212 (Walter) ("And the purpose of this was so that we could get master agreements in place, which are those framework contracts.  So that when [TO] 59 hit, they were already halfway through the procurement process.  That way, they could execute the contracts much quicker.").

10/  As an illustration of just how greatly in flux the logistical situation was at this time, DFAC services at Camp Anaconda, which became the largest DFAC contract in Iraq, were not even included in the initial version of TO 59.  Tr. at 252 (Walter).  The DFAC requirements at Camp Anaconda were added to Change 4 of TO 59 by a Letter of Technical Direction on September 4, 2003.  See JX 238.

Petsche and (Mohammad) Shabbir Khan, 11/ the Vice President and Operations Manager of Tamimi, signed the agreement.  See JX 201.  The effective date for Master Agreement 3 was June 16, 2003.  See JX 201.

## II.  History of kickbacks

Mr. Hall, who previously had worked for KBR for a year as a cook in Bosnia, 12/ was rehired by KBR as a Quality Assurance and Quality Control ("QAQC") supervisor and sent to Kuwait in October 2002.  Tr. at 2569-70, 2575, 2577 (Hall).  Mr. Hall's initial duties upon arriving in Kuwait were to supervise the subcontractor providing the DFAC services at Camp Arifjan—Tamimi.  Tr. at 2578-79 (Hall).  Shortly after arriving in Kuwait, Mr. Hall was promoted to Food Service Manager, and it became his responsibility to "technically qualify subcontractor vendors that provide food service, also to do requisition for upcoming projects in food service, request personnel, equipment and stuff like that . . . [and] to make sure that [SOWs were] implemented."  Tr. at 2579-80 (Hall).  He testified for the United States as a cooperating witness, having bribed government personnel in connection with other contracts after he left KBR's employ.  Although plaintiff attempted to trumpet him as an experienced supervisor, ready to assume the level of responsibility for Food Service Manager and Regional Food Service Manager, the evidence consisted largely of attorney argument.  Mr. Hall fell far short of conveying the background and experience to act as an executive or manager.  He was an easy target for Shabbir Khan, as revealed by Mr. Hall's testimony.  Similar to many of KBR's personnel assigned to Kuwait and Iraq, he was available, willing to work in-theater, and formerly affiliated with the Army.

Mr. Hall's direct supervisor was Mr. Gatlin, with whom Mr. Hall enjoyed a "very good relationship."  Tr. at 2580-81 (Hall).  When the war ignited, both men's area of concern expanded from Kuwait to include Iraq.  Thus, Mr. Gatlin became the Project Manager over Iraq and Kuwait, and Mr. Hall became the Regional Food Service Manager.  Tr. at 2581-82 (Hall).  Mr. Gatlin did not testify in person, but his testimony in another trial, United States v. Mazon, No. 05-cr-40024 (C.D. Ill. Apr. 15, 2008); United States v. Mazon, No. 05-cr-40024 (C.D. Ill. Sept. 30, 2008), was admitted as JX 547 and JX 548, and established that

---

11/ Plaintiff's personnel referred to Shabbir and his brother, Mohammad Ilyas Khan, Vice President and General Manager of Tamimi, simply as Shabbir and Ilyas because the shared the prénom Mohammad.  According to several witnesses, Ilyas was somewhat of an ethical rein on Shabbir.  "Mr. Khan" in this opinion refers to Shabbir.

12/ Plaintiff emphasizes that Mr. Hall was a supervisor and dining service manager during his second tour in the Army, but the court would be hard-pressed to find that KBR retained Mr. Hall, who had worked as a cook for KBR after leaving the Army, based on managerial experience.

he was in the approval chain. Defendant, through the testimony of other witnesses and court documents, attempted to insert him as the lead figure in kickback activity. The court finds that Mr. Gatlin and Shabbir Khan were close and that the latter regularly procured alcohol for the former.

Mr. Hall quickly became acquainted with Shabbir Khan. As the head of operations at Tamimi, Shabbir Khan was responsible for Tamimi's performance at Camp Arifjan. However, by November 2002, KBR was dissatisfied with Tamimi's performance at Camp Arifjan because their "faulty equipment . . . was breaking down [which] could cause a safety violation to the troops." Tr. at 2582 (Hall). Mr. Hall, as Food Service Manager, was in favor of replacing Tamimi with another subcontractor. Tr. at 2582 (Hall). Tamimi was not terminated, and after a heated conversation with Mr. Gatlin, Mr. Khan began correcting the problems at Camp Arifjan. Tr. at 2582-83 (Hall).

In supervising the DFAC operation at Camp Arifjan, Mr. Hall became acquainted with Mr. Holmes. Tr. at 2587 (Hall). At the time Mr. Holmes was a master sergeant in the Army and was serving as the Army's food service master sergeant at Camp Arifjan. Working together on many of the same issues, Messrs. Hall and Holmes developed a personal relationship, which led Mr. Hall to recruit Mr. Holmes to come work for KBR. Tr. at 2587-88 (Hall). Around the beginning of November 2002, Mr. Hall formally offered Mr. Holmes a job with KBR. Tr. at 2588 (Hall). Upon the expiration of his tour of duty, Mr. Holmes returned stateside and retired from the Army and accepted the job at KBR, returning to Kuwait around the end of January 2003. Tr. at 2588-89 (Hall); see also JX 476; JX 501. Mr. Holmes's initial position at KBR was as a supervisor, but because of his military experience, he was promoted to serve as the Deputy Regional Food Service Manager. Tr. at 2589 (Hall). In this position, Mr. Holmes served directly under Mr. Hall and shared the same job responsibilities. Tr. at 2589 (Hall). Mr. Holmes also had the authority to sign documents on Mr. Hall's behalf. Tr. at 2589 (Hall); see JX 101 (example of signature purporting to be of Terry Hall, but not by his hand).

Shortly after the Arifjan DFAC incidents were resolved, Mr. Hall met with Shabbir Khan at the Tamimi office in Kuwait. Tr. at 2583 (Hall). Mr. Khan showed Mr. Hall plans for what was known as a "Red Sea dining facility," which greatly impressed Mr. Hall as being superior to the DFAC plans currently in use. Tr. at 2583-84 (Hall). While discussing the new facility, Shabbir Khan told Mr. Hall that "we can make a lot of money," which Mr. Hall understood to mean Mr. Khan and himself. Tr. at 2584 (Hall). Interpreting this as an offer to enter into an illicit kickback arrangement, Mr. Hall declined, but he did not report the offer to anyone else at KBR. Tr. at 2584 (Hall).

In April 2003 Mr. Hall accompanied Shabbir Khan and two Army contracting officers, holding the rank of colonel, from Camp Doha in Kuwait to Camp Anaconda to

observe the state of affairs at the base. Tr. at 2590-91 (Hall). Because this trip occurred prior to the implementation of TO 59, its purpose was to discuss the logistics of the troop support in Iraq. According to Mr. Hall, the colonels were not enamored with KBR's performance and wished to directly contract all of the work that would become TO 59 to Tamimi. Tr. at 2591 (Hall). Mr. Khan demurred and advised the colonels to include the work under LOGCAP III because Tamimi could not handle work throughout the entire country of Iraq. Tr. at 2591-92 (Hall). Approximately three weeks after this trip to Camp Anaconda, Mr. Hall traveled by air to Dubai to deal with a subcontract issue. Tr. at 2592-93 (Hall). Mr. Hall testified that Mr. Khan informed him that there was a particular vendor in Dubai that could meet KBR's need of pork products to serve in the DFACs (apparently a delicate issue in a Muslim country). Tr. at 2593 (Hall).

After Mr. Hall relayed this information to Mr. Gatlin, the latter refused to authorize Mr. Hall's travel, stating, "Let Tamimi pay for it." Tr. at 2593 (Hall). Mr. Khan agreed to finance Mr. Hall's trip to Dubai. This included not only purchasing his airline ticket, but also giving him an envelope of cash totaling approximately $10,000.00 at the airport. Tr. at 2594 (Hall). Of this money, Mr. Hall took $5,000.00, and he gave the remaining $5,000.00 to his deputy, Mr. Holmes, who had driven him to the airport. Tr. at 2594 (Hall). Mr. Hall testified that, on the four-day Dubai trip, he spent two days with the subcontractor on the precipitating issue of the pork products and the remaining two days "hav[ing] fun" and spending the entire $5,000.00. Tr. at 2595-96 (Hall). Mr. Hall informed Mr. Gatlin that Tamimi was paying for his trip to Dubai, but no objections were raised. Tr. at 2596 (Hall).

Mr. Hall took another Tamimi-paid trip in early-summer 2003, when he, Mr. Khan, and an unnamed third party traveled by air to Jordan. Tr. at 2603 (Hall). According to Mr. Hall, Mr. Khan had some business to conduct with a firm name Daoud & Partners regarding a dining facility, and, as the head of Food Service, Mr. Hall was asked to accompany Tamimi's representatives. Tr. at 2603 (Hall). As with the Dubai trip, Tamimi paid for the airline tickets, and Mr. Khan also gave Mr. Hall some "party money" in the amount of $3,000.00. Tr. at 2604 (Hall). Similar to the Dubai trip, half of the four-day trip was spent on business matters, and the other half on more enjoyable pursuits. Tr. at 2604 (Hall).

Later, in August or September 2003, Mr. Khan provided Mr. Hall with an ATM card with a substantial amount of money on it. Tr. at 2604-05 (Hall). Mr. Hall initially bought Christmas decorations for the dining facilities with the money, but also spent approximately $3,500.00 on himself. Tr. at 2605 (Hall). Having used the card for personal expenditures, Mr. Hall then gave the card to Mr. Holmes for his personal use. Tr. at 2605 (Hall). Mr. Holmes then complained to Mr. Hall that the card had only "about $1500[.00]" left on it, and that it had already run out of money. Tr. at 2606 (Hall). Notes of an investigation from the Department of Defense Office of Inspector General interview with Mr. Holmes on January 8, 2010, reflect that Mr. Holmes, after having been advised that he was a target of the

investigation, stated that Shabbir Khan "gave him a debit card with money on it for [him] to use." JX 476, at G-0397354. While he had received the ATM card and tried to use it, "the debit card did not work" so he returned it to Mr. Khan. Id. Mr. Holmes also told investigators that Mr. Khan had upgraded his airline seats when he vacationed. Id.; Tr. at 1578-79 (Whitney L. Cumpson, Defense Criminal Investigative Service special agent). The court received ample evidence to establish Mr. Holmes's knowing acceptance of a kickback, i.e., he attempted to use the debit card. 13/

Throughout his tenure with KBR in the Middle East, Mr. Hall constantly was thinking ahead to what he would do after leaving KBR. Tr. at 2608-12 (Hall). Around June and July 2003, Mr. Hall began discussing with Mr. Khan his desire to open a Golden Corral restaurant franchise in the United States. Tr. at 2609 (Hall). Given its popularity in the South and his previous professional experience with running dining facilities, Mr. Hall believed that this was a promising avenue for him to pursue. Tr. at 2609 (Hall). In December 2003 Mr. Gatlin left KBR, and, with KBR's assignment of the "Tiger Team"—to be discussed in more detail—charged with imposing order on KBR's avalanche of contract documents involved in implementing TOs, Mr. Hall deemed his role in Food Service to be one of diminishing responsibility and input. Tr. at 2615 (Hall). Mr. Hall requested a new position and was once again assigned as a QAQC in January 2004. Tr. at 2615 (Hall). At the same time in January 2004, Mr. Khan presented Mr. Hall with $20,000.00 in cash for him to use for "exploratory" research on opening a Golden Corral franchise. Tr. at 2610 (Hall).

Mr. Hall made several trips to the United States to try and generate the additional capital necessary to purchase a franchise—roughly $2.3 million—but ultimately his efforts fell short, and he was unable to secure the necessary financing. Tr. at 2611-12 (Hall). After Mr. Hall spent approximately $7,000.00 of the cash on his research for the Golden Corral franchise, he never returned any of the other money to Shabbir Khan. Tr. at 2611 (Hall). In April 2004 Mr. Hall left KBR to set up his own consulting business. Tr. at 2616 (Hall). With his departure from KBR, Mr. Khan's interest in Mr. Hall's Golden Corral franchise dissipated, and Mr. Khan—presumably without irony—informed Mr. Hall that he had to

---

13/   While the court finds that Mr. Holmes accepted the debit card and airplane upgrades, as he admitted to this activity, the court does not find that Mr. Holmes accepted $10,000.00 from Mr. Khan to give to an alleged paramour. See JX 476, at G-0397354. Special Agent Cumpson's interview report was impeached on point based on her conflicting contemporaneous notes; moreover, the court declined to continue trial for the purpose of freighting the lady in question from Iraq to testify based on such a vulnerable initial showing by defendant. The court found the interview report and Ms. Cumpson on the whole credible, although both were weak on certain details (the $10,000.00 payment and any "other" payments from Khan).

respect KBR's policy of not allowing him to invest in or hire anyone formerly in higher management at KBR for at least a year after the employee's departure.  Tr. at 2611 (Hall).

Mr. Hall thereafter ran into legal problems in connection with conspiracy to commit bribery and money laundering.  He pleaded guilty to bribing several Army contracting officer personnel, and his plea agreement required him to testify truthfully in this trial.  This testimony may factor into Mr. Hall's upcoming sentencing for these offenses.  The court found Mr. Hall to be straightforward and only minimally self-serving in his expressed commitment to fulfilling his duty to the troops, lending his utmost to assure that Food Service operated to the troops' benefit, and otherwise attempting to distance the kickbacks from influencing the discharge of his duties.  As will be discussed, the court found no basis to credit defendant's allegations of disingenuousness on Mr. Hall's part when he denied that he acted for Tamimi's benefit during his tenure as Regional Food Service Manager.  14/

III.  Tamimi at Anaconda

1.  Initial work at Anaconda

Once the master agreement system had been implemented, KBR decided that work orders for specific DFACs would be awarded based partly on the geographic location of the DFAC within Iraq; different master agreement holders generally would be  responsible for different areas of the country.  See Tr. at 1058-60 (Jonas); Tr. at 1340-58 (Petsche).  Thus, it was determined early on that TES would be largely responsible for those DFAC contracts in northern Iraq, see Tr. at 1342-43, 1354-58 (Petsche), whereas Tamimi would be assigned those in central Iraq.  Under this system, while pricing for specific contracts was a factor to be considered, it was not the only criterion governing the decisions.  See Tr. at 1275-76 (Petsche).  Not uncommonly, work release awards were made to the master agreement holders that were not actually the lowest bidders for the work.  In those cases the rationale was that geographic and other logistical considerations weighed in favor of the higher-priced vendor thereby making it the "best value" to the Army.  See, e.g., PX 147; PX 148; PX 473; PX 474.

Shortly after the implementation of the master agreement system, the Army issued a requirement for a DFAC at site C-6 in Kirkuk, Iraq, located in the northern region.  Tr. at

_____

14/  Defendant was concerned that the court did not avail itself of the opportunity to receive expert testimony from David L. Cotton to the effect that Tamimi's prices were inflated due to corrupt practices.  See Tr. at 2463 (Cotton); Tr. at 2674-83 (Hall); Def.'s Br. filed Jan. 13, 2012, at 3.  Initially, the court declined to qualify Mr. Cotton as an expert fraud examiner after Mr. Cotton testified that he had never been offered before "expressly as an expert in fraud."  See Tr. at 2477 (Cotton).

1270-71 (Petsche).   KBR issued a "condensed . . . RFP" asking for costs and an implementation schedule.  Tr. at 1271 (Petsche).  On June 18, 2003, based on the responses from its master agreement subcontractors, KBR awarded Master Agreement 4 Work Order 1 to TES over the low bidder, Tamimi.  PX 473.  However, on July 8, 2003, the Defense Contract Management Agency (the "DCMA") sent a letter to Jim Spore, the KBR LOGCAP III Regional Project Manager for Northern Iraq, and later Camp Manager at Anaconda, directing KBR to relocate the DFAC from Site C-6 to Site A, i.e., Anaconda.  See PX 475.  Initially, Mr. Petsche considered simply relocating the TES team that already had mobilized for the work at Kirkuk to Camp Anaconda.  See Tr. at 1273-75 (Petsche).  Although the evidence ultimately showed that the decision to use Tamimi was sound and practically justified, the court found Mr. Petsche's testimony credible that this idea was met with strong resistance by Messrs. Hall and Holmes in Food Service, both of whom advocated retaining Tamimi at Anaconda.  15/  Tr. at 1275-76 (Petsche).  Eventually, Mr. Petsche relented, and on July 20, 2003, he authored a justification memorandum supporting Tamimi's retention as the vendor at Camp Anaconda.  JX 147.  Mr. Petsche's memorandum explained that "[i]t was determined that due to the short notice to proceed and the fact that [Tamimi] was already located in the area with all necessary equipment and supplies, that this firm would best carry out the expectations of the client."  Id.  He continued, "It is also to be noted that this company was presently performing food service functions within the area of operations . . . for the client."  Id.  16/

   2.  Work Release 3

      On July 22, 2003, the Army issued TO 59 SOW Change 4.  See JX 403.  This modification to the TO 59 SOW required KBR to provide DFAC services at Camp Anaconda for 18,700 personnel in four separate DFACs.  Id.  Transitioning from direct Army control

---

   15/  Throughout this time period, a mutual dislike and disrespect characterized the conduct of KBR's Procurement and Operations personnel in Iraq.  In fact, Mr. Jonas, as the senior procurement-side manager, attempted to have Mr. Gatlin fired from KBR because he "believed that he was pushing people [such as Mr. Petsche] to do things . . . [and] using extremely heavy-handed means of getting work done.  And . . . [he was] not following any of the processes or rules associated with the procurement."  Tr. at 1141-42 (Jonas).

   16/  As will be discussed, Mr. Petsche's testimony concerning Messrs. Hall's and Holmes's actions notwithstanding, KBR had reasonable business considerations that supported staying with Tamimi.

to KBR control under TO 59, 17/ Tamimi submitted a pricing proposal for DFACs A1-A3 at Anaconda on August 25, 2003.  See JX 187.  On that same date, KBR issued Master Agreement 3 Work Release 3 ("WR 3") to Tamimi for the A-3 DFAC at Anaconda.  See JX 154.  According to Mr. Jonas, KBR's former Vice President for Procurement Materials & Property, 18/ "because of the danger and the hazards associated with [Anaconda] . . . going with the company who was already there and already performing made the most sense."  Tr. at 1079 (Jonas).  WR 3 provided that KBR would pay Tamimi a fixed per person/per day ("PPPD") price based upon either the actual headcount of troops served at the Anaconda DFAC or the projected headcount provided by the Army, whichever was greater.  See JX 71; JX 154.  On September 1, 2003, Tamimi began providing DFAC services as a KBR subcontractor at facility A-3.  See JX 86, at 14.  On September 15, 2003, Tamimi began serving food as a KBR subcontractor at the A-1 and A-2 facilities at Anaconda.  See id. at 12-13.  However, "[i]n the rush to stand up DFACs, MA 3 WR 3 was awarded to Tamimi without prior KBR 'greensheet' approval."  Pl.'s Br. filed Dec. 22, 2011, at 8.  The practical effect of this circumstance was that, at the time Tamimi began operating the DFACs at Anaconda under KBR supervision, it did so despite the fact that KBR officials had yet to approve the payment of any money to Tamimi for its efforts.

On September 4, 2003, the Army issued a Letter of Technical Direction instructing KBR to plan for and execute DFAC service for 24,900 personnel at four facilities at Anaconda.  See JX 238.  During that same time, Army personnel instructed KBR to replace two of the Anaconda DFAC facilities (A-1 and A-4) with new, more permanent structures.  Tr. at 350-51 (Walter).  As a result, Mr. Spore, the LOGCAP III Regional Project Manager for Northern Iraq, and Laszlo Tibold, Subcontract Administrator at Camp Anaconda, instructed Prime Projects International ("PPI") to begin construction of the new DFAC structures, but PPI did so without a contract or a SOW.  Tr. at 1286 (Petsche).  This contravention of procurement procedures would prove to be a primary cause of the ensuing issues surrounding Camp Anaconda and the root of great frustration over the coming years

---

17/  This transition from Tamimi's contracting directly with the Army to serving as a subcontractor under KBR took place from September 2003 through March 2004.  See JX 86; JX 546.

18/  Based in Arlington, Virginia, Mr. Jonas was hired by KBR in August 2003.  For purposes of this case, he represents the highest ranking member of the procurement side of KBR's DFAC activities in Iraq.  It was his testimony about Mr. Petsche's general probity and attention to his work, coupled with the assessment of Mr. Petsche's demeanor, that led the court to find Mr. Petsche to be a particularly credible fact witness.  Mr. Jonas did not tolerate misfeasance when reported to him and duly terminated Mr. Petsche for accepting a gratuity from another contractor.

for KBR. 19/  Construction on the new A-1 facilities commenced on October 4, 2003, and on the new A-4 facility on October 16, 2003. See JX 86, at 12, 15.

There was, however, a practical problem. Because of the costs of the new facilities, KBR encountered a "color of money" issue in that it could not directly seek reimbursement under LOGCAP III under which it was operating. On October 3, 2003, Administrative Contracting Officer ("ACO") Derek Bonenclark sent an e-mail to Mr. Spore regarding the construction of the new facilities. See JX 50. ACO Bonenclark reminded KBR that

> KBR is not in the business of procuring buildings for the army. KBR is in the business of providing services. Construction of facilities in the pursuit of services provided under LOGCAP should be done with facilities that are temporary in nature and should be done in order to provide the best value to the army.

Id. Because the Army wanted KBR to provide only "turnkey" food service at Anaconda, Tr. at 235, 264, 480-81 (Walter); Tr. at 654-55 (Hayes), and at this stage saw no need to own any facilities in Iraq, an issue arose as to who would pay for—and thus own—the new DFAC facilities. Mr. Spore devised a solution whereby Shabbir Khan and Tamimi would take on PPI as Tamimi's subcontractor and pay PPI for the new DFAC facilities and then work the costs of the buildings into the PPPD rates that Tamimi was charging KBR at Anaconda. See Tr. at 1286-88 (Petsche); JX 381. Tamimi agreed to this process, and KBR understood that Tamimi ultimately paid PPI $5 million for the shells of A-1 and A-4. Tr. at 653-54 (Hayes); JX 48, at 2845; see also JX 85; JX 335. The new facilities eventually were completed, and A-1 served its first meal on February 4, 2004, and A-4, on April 16, 2004. 20/  See JX 86, at 1215. Further complications arose when, as the war dragged on, the Government changed its corporate mind and decided that KBR should own the facilities. The negotiations between KBR and Tamimi regarding the construction costs of these buildings played a significant role in the present dispute.

In the meantime Tamimi continued to operate the DFACs at Anaconda without actually being under contract. As early as October 18, 2003, "serious violations of [KBR's]

---

19/  In fact, this trouble was predicted by Mr. Jonas who considered that the Operations personnel presented a financial risk to KBR "because by making commitments to suppliers and subcontractors[,] should the government come back and decline to approve it . . . KBR would then . . . [be] responsible for the payments to those suppliers." Tr. at 1142 (Jonas).

20/  These new facilities were called "Kirby facilities" based on their prefabricated steel structure.

procurement system" had been identified by KBR Procurement personnel.  JX 327.  KBR procedure at the time was for the Army, through the Contract Administrator, to send a requirement to the KBR Operations personnel.  See Tr. at 1288 (Petsche).  The Operations personnel then would generate what was known as a "requisition," a key instrument that "provides a general outline and description of work to be performed.  It provides the authorization, the signatures.  It provides [the Procurement personnel] an estimate, a rough order of magnitude, price, cost."  Tr. at 1289 (Petsche).  Further, the requisition was a necessary step in the process because, without one, the Procurement personnel were not actually authorized to issue or award a subcontract for the work to be performed.  Tr. at 1289 (Petsche).  Although Tamimi had been operating as a KBR subcontractor since September 1, 2003, at Anaconda, the Operations personnel still had not generated a requisition for the DFAC services by the end of October 2003.

On November 3, 2003, KBR Operations personnel issued a material requisition for WR 3, pricing six months of DFAC services for all four DFACs at $111,650,000.00. 21/ See JX 371, at 2270.  This requisition was not forwarded to Mr. Petsche until November 17, 2003, JX 193, and he did not receive the signed requisition until November 19, see JX 233, at 0432.  On November 18, 2003, Mr. Tibold e-mailed Mr. Petsche to inform him that the requisition for MA 3, WR 3 had been approved and that the budget was for six months.  See JX 192.  Tamimi then submitted its proposal to KBR, which Mr. Petsche received on November 19, 2003, for all of the DFAC work to be performed at Anaconda.  See JX 187.  That proposal indicated a total price of $223,377,120.00 for one year.  Id.  Mr. Petsche testified that the proposal raised his suspicions for two reasons: (1) Tamimi had been asked to provide a proposal only for six months, not for a full year of work; and (2) the dollar value proposed was almost identical to the amount stated in the requisition form from Operations.  See Tr. at 1303-04 (Petsche). 22/

_____

21/  Up to November 2003, KBR had treated the four DFAC facilities as separate.  However, it was at this point that the Operations personnel planned to combine the work at all four Anaconda DFACs into a single work release.  See JX 233.

22/  Mr. Jonas did not find this "coincidence" to be suspect.  Rather than defendant's requested inference that the requisition number had been leaked to Tamimi, the more likely scenario, Mr. Jonas explained, was that the Operations personnel had sought the proposal prior to completing the requisition.  See Tr. at 1115-17 (Jonas).  Although not proper procedure, Mr. Jonas said this practice was not uncommon.  Tr. at 1115 (Jonas).

On November 21, 2003, Mr. Petsche responded via e-mail to inquiries from Mr. Walter about the state of contractual affairs at Anaconda. 23/  See JX 233.  Mr. Petsche informed Mr. Walter, KBR's Vice President of Accounting and Finance, Government and Infrastructure Division, that the work release had not issued yet and that, generally, the procurement situation at Anaconda was "a mess." Id.  In addition, Mr. Petsche related to Mr. Walter that the PPPD rate of the proposal, with food, was $25.43, which multiplied out by a 24,400 headcount yielded a product that was $38,000.00 over the requisition amount.  Id.  Mr. Petsche testified that this was significant because "at this point there was an initiative within KBR to start working towards pushing the prices down.  We were rolling from a contingency into a sustainment type program and so they wanted us to start working on . . . beating the subcontractors down on their price." Tr. at 1310 (Petsche).

On November 26, 2003, the Food Service personnel—Messrs. Gatlin, Hall, 24/ and Spore—signed  a Justification for Other Than Full and Open Competition justifying the sole source-selection of Tamimi for the Anaconda work.  See JX 101.  By December 6, 2003, Mr. Petsche had completed the WR 3 paperwork—superseding the WR 3 issued on August 25—awarding Tamimi the work at all four DFACs at Anaconda.  See JX 558.  By this date WR 3 contemplated a period of performance backdated from September 1, 2003, through March 1, 2004, and it had been signed by Shabbir Khan of Tamimi.  However, Mr. Petsche refused to sign WR 3 without the proper authorization from his superiors.  See Tr. at 1314-15 (Petsche); JX 232.  In a December 8, 2003 e-mail to various KBR personnel, Mr. Petsche stated that, aside from WR 3's being beyond his signature authority, even at this date no SOW existed for WR 3—a responsibility of Food Service—thereby making the finalization of a contract impossible.  See JX 232.  Mr. Petsche later expressed uncertainty about his ability to justify the high cost of this contract at the time, opining that he "could not present it with the data and support [he] had," JX 329; see also Tr. at 1438 (Petsche), and foreshadowed the inevitable examination of this chaotic effort by the Defense Contract Auditing Agency ("DCAA").

---

23/  Mr. Walter became involved in the DFAC contracts situation by virtue of his position as head of the KBR Compliance Group.  It was Mr. Walter's responsibility to respond to inquiries and audits from the Defense Contract Auditing Agency ("DCAA"), and by this time, the "boots through the door" controversy, to be discussed, where DCAA began questioning the PPPD rates at DFACs throughout Iraq and Kuwait, was just beginning.  See Tr. at 220-21, 225-31 (Walter).

24/  Mr. Hall testified that the signature on the memorandum, in fact, was not by his hand, and he supplied the inference that it must have been signed by his deputy, Mr. Holmes.  See Tr. at 2590-91 (Hall).

On December 23, 2003, Mr. Jonas fired Mr. Petsche for requesting that a subcontractor, LaNouVelle, procure an airplane ticked for his cousin—a breach of KBR Procurement's zero-tolerance policy regarding favors from subcontractors. See Tr. at 1319 (Petsche); Tr. at 1065 (Jonas). By that date WR 3 had still not been approved formally by KBR.

3. The Tiger Team

To say that the war in Iraq did not proceed as initially conceived is an understatement, and the constantly changing demands required by the Army's effort were foreseeable to neither the Army nor to KBR. As Mr. Walter colorfully explained, KBR was at the front of a "power curve" to provide support that the Army could not. Tr. at 258, 402-03 (Walter). Within a six-month window, KBR was issued thirty TOs. 25/ This contingency-type operation placed severe demands on KBR and its personnel in-country, and, in attempting to provide adequate services to the troops, the procurement paperwork often was neglected and vendors were not paid immediately. Tr. at 258-59 (Walter). Because of the numerous deficiencies in the subcontract files from the previous year, on January 2, 2004, KBR sent to Iraq a "Tiger Team," led by Charles A. Carr, to begin putting the procurement paperwork in order and bring the files into compliance so KBR could begin paying its subcontractors. 26/ Tr. at 258-63 (Walter); Tr. at 524-25 (Hayes); Tr. at 1100-01 (Jonas); Tr. at 1862-63 (Jill E. Pettibone, then-consultant to KBR who assisted Mr. Carr on the Tiger Team). Among the objectives of the Tiger Team was ensuring that each procurement file also contained the requisite "greensheet approval"—the procurement document that reflected that the expenditure of a particular amount of company funds had been approved at the appropriate level of management—in other words, proof that KBR contractually was bound to pay the subcontractor. 27/ See Tr. at 261-62 (Walter).

---

25/ Ultimately, KBR was issued twenty-seven TOs in Kuwait and fifty in Iraq. See Tr. at 403 (Walter).

26/ Having up-to-date procurement files is imperative to get vendors paid because it is the first part of what is known as a "three-way match." In order for payment to the subcontractor to be approved, an alignment of three instruments must occur: (1) the contract or procurement instrument; (2) proof that something of value was delivered; and (3) an invoice for that thing of value from the supplier. See Tr. at 259-60 (Walter). Thus, if no match-up is established for these three items, payment will not be approved. The Tiger Team's function was to make sure that the first requirement under the three-way match was present, complete, and accessible for review. Id.

27/ Not every employee could bind KBR to pay out any sum of money. The more money that was involved, the higher up the management chain the requirement for obtaining approval.

The unenviable task of reviewing the Anaconda files and attempting to justify the award of WR 3 to Tamimi to secure greensheet approval fell to David L. Hadcock, KBR's Procurement Materials & Property Manager, who was called by defendant. Tr. at 1715-16 (Hadcock). Tamimi still had not been paid at all for its work under MA 3 WR 3. Tr. at 1755-56 (Hadcock). In an effort to better understand the history of the Anaconda DFAC situation, Mr. Hadcock reached out to Mr. Petsche. Mr. Petsche responded in an e-mail statement dated February 16, 2004, that fueled the Government's fraud counterclaims, as will be discussed. See JX 329. Cogent to the work of the Tiger Team, Mr. Petsche discussed his frustrating experience at Anaconda and the travails he endured with the Operations personnel to get an approved contract in place. See id. Based on the information submitted by Mr. Petsche, Mr. Hadcock reported to his supervisor, Mr. Jonas, that in Mr. Hadcock's upcoming meeting with Tamimi, his two immediate goals were to

> (1) Develop a Price Reasonableness Summary so that a proper Green Sheet Package can be sent to [Mr. Jonas] for [his] review and approval.
> (2) Try to secure a complete set of daily headcount records based on actuals [headcounts] which we can use as a basis to pay outstanding invoices. (Note: The headcount records submitted with the invoices are based on projected headcount only (signed by the military)[)].

Id.

Mr. Hadcock—along with Jamal Nasery, KBR Subcontract Administrator, and KBR's Wayne Agness, Project Manager-Food Service —met with Tamimi representatives Shabbir Khan and Ilyas Khan, Tamimi's General Manager, on February 19, 2004, to discuss the new DFAC facilities at Anaconda and the status of WR 3.  See JX 200; JX 335 (Nasery memorandum dated Feb. 19, 2004). 28/ According to Mr. Nasery's memorandum, KBR and Tamimi determined, *inter alia*, the following relevant points: (1) Tamimi was instructed by KBR to make a full payment for the new DFAC facilities at Anaconda directly to PPI, and Tamimi had paid PPI $2,445,763.00 for one structure (the second structure, being identical, was the same price); (2) Tamimi agreed to continue to operate in accordance with the terms of the December 6 WR 3, which was set to expire on March 1, 2004; (3) Tamimi "submitted a meal price per headcount per day that incorporates all of their costs (buildings, kitchen equipment, labor, infrastructure, maintenance, operation[,] etc.) and applied it to all DFACs at Anaconda," and the price structure was accepted by KBR, which obtained the necessary funds under the December 6 WR 3, although Tamimi agreed to provide a complete cost structure for review; (4) Tamimi had submitted invoices that exceeded $50 million for the work performed in September, October, and November and was awaiting payment; (5) KBR

---

28/  Despite Herculean efforts, a few exhibits were admitted twice.

had been the owner of DFAC A-3 as of September 1, 2003; and (6) KBR would become the owner of DFACs A-1 (new), A-2, and A-4 (new) on October 1, 2004, and ownership would include the structure, infrastructure, and equipment.  Id.

On March 1, 2004, KBR and Tamimi executed Change Order 1 to MA 3 WR 3, which extended Tamimi's subcontract performance at Anaconda from March 2 through March 31, 2004.  See JX 406.  On March 3, 2004, Mr. Hadcock sent an e-mail to Tom Quigley, Procurement Materials & Property Manager, summarizing his efforts. JX 546.  According to Mr. Hadcock, the main obstacle to greensheet approval was that the "files do not contain any documentation justifying that the prices submitted by Tamimi for the performance of the services [under WR 3] on a single source basis were fair and reasonable."  Id.  Mr. Hadcock then set forth his method for providing that price justification "after the fact."  Id.  Essentially, Messrs. Hadcock and  Nasery laid out a chart that compared the unit prices at Anaconda with those at Camp Cedar/Adder—a competitively awarded subcontract.  See JX 563.  Messrs. Hadcock and Nasery found that the prices at Anaconda were considerably more expensive than at Cedar/Adder, but they believed that they could justify most of the price elements.  Mr. Hadcock's justifications for the higher costs of services at Anaconda compared to the costs for similar services at Cedar/Adder are, as follows:

> - KBR will assume ownership of four (4) DFAC facilities at Anaconda in September 2004.  Two of which are new Kirby Facilities.  KBR will not own any of the Cedar/Adder facilities.
> - Tamimi incurred higher cost of operation while establishing the Anaconda DFAC, primarily due to increased hazards from September[] 2003 onward. 29/ Little risk was encountered when performing the Cedar/Adder DFACs.
> - There are four (4) DFAC facilities at Anaconda, hence, higher labor and management cost is incurred.  There are two (2) smaller facilities at Cedar/Adder.
> - The menu mandated at Anaconda is of [a] higher price than Cedar/Adder.
> - Mobilizing to Anaconda is a 1200 km distance from Kuwait, versus 200 km to Cedar/Adder.

JX 546, at 9880.

---

29/  Plaintiff presented sufficient testimony and documentary evidence establishing that KBR and its subcontractors endured substantial perils of war both at Camp Anaconda and on the travel routes leading to Anaconda.  See, e.g., Tr. at 547 (Hayes); Tr. at 175-81 (Walter); PX 161 (identifying hostile activity in Iraq by location and type of activity).  Indeed, the danger was so pervasive at Camp Anaconda that the troops stationed at the base referred to it as "Mortaritaville."  Tr. at 549 (Hayes).

However, Mr. Hadcock determined that he was not able to justify all of the price elements at Anaconda.  Id.  Those categories which he deemed lacking were "Garbage[;] Staff Transportation[;] Staff Meals[;] Overhead and Profit[;] [and] Construction Price for Two Kirby Facilities."  Id.  Regarding the new DFACs, Mr. Hadcock was troubled that, while KBR had instructed Tamimi to pay PPI for the structures, it had not instructed Tamimi to manage the PPI SOW, effectively meaning that there was no SOW for PPI.  Id.  The result was that neither KBR nor Tamimi could justify the $5 million cost of the new DFAC structures at Anaconda.  Id.  Nonetheless, Mr. Hadcock requested greensheet approval for WR 3, but only based on the satisfaction of four conditions.  Id.  Mr. Hadcock advised that approval of WR 3 would be appropriate if all of the following conditions were met:

> 1.  Tamimi will not adjust its unit prices for the period 1 Sep[tember] [2003] through 1 March [2004].  Due to the fact that KBR solicited a proposal from Tamimi; Tamimi submitted a proposal which was accepted by KBR; KBR issued a Work Release which was accepted by Tamimi; Tamimi commenced work; Tamimi has been performing the work continuously since 1 Sep[tember] [2003].
>
> 2.  Payments should be made based on current unit prices but extended only against actual head count.  As of 1 March [2004], Tamimi has unpaid invoices totaling over $60,000,000.  Nevertheless, Tamimi has been performing the services in good faith since 1 Sep[tember].  Any future delays in payments will certainly cause disruptions in service.

3.  Direct Tamimi to continue the work from 2 March [2004] through 15 September [2004] with the understanding that unit prices will be subject to review and negotiation.  Mutually agreeable pricing will be established by 31 March [2004].

> 4.  Upon KBR ownership of the DFACs in September, a new [requisition] will be issued on a competitive basis.

Id.  Mr. Hadcock's testimony reaffirmed the unvarnished businesslike approach reflected in this memorandum.  Tr. at 1748-59 (Hadcock).  He was, and is, a conscientious KBR employee; he exhibited candor, and the court accorded due weight to his testimony.

On April 22, 2004, Mr. Jonas communicated to John Townsend, head of KBR Procurement, via e-mail that the greensheet for WR 3 was approved.  See JX 546, at 9879. On April 26, 2004, all required signatures for final greensheet approval had been obtained, and WR 3 officially was sanctioned within KBR.  See JX 109.

4.  Follow-up of the "drug deal" aspersion

As discussed above, Mr. Petsche responded to Mr. Hadcock's inquiries regarding Anaconda via e-mail on February 16, 2004.  See JX 329.  In that e-mail, aside from providing his own personal lamentations regarding his experience trying to get WR 3 approved, Mr. Petsche also made several statements suggesting that criminal improprieties were occurring in the procurement process at Camp Anaconda.  Provocatively, Mr. Petsche began his recollection by labeling Anaconda "the Mother of all DFAC Drug Deals." 30/  Id.  Mr. Petsche explained that "[i]t was predestined and out of control from the start."  Id.  When describing how the Food Service Operations personnel were telling him that the Anaconda work should go to Tamimi, Mr. Petsche cryptically related that "[t]here is more to that story, but it would take me a few hours and a couple of beers to go through all of that."  Id. Regarding the proposal from Tamimi that was so close in amount to the one on the supposedly confidential Food Service requisition, Mr. Petsche commented to Mr. Hadcock that he "thought it odd, but [he] needed to get the issue over with, so [he] did not question it.  It seemed to [him] that the deal had already been worked out . . . ."  Id.  Lastly, in concluding his recollection, Mr. Petsche stated that "[t]here is a whole lot more to this story, and others that can be told, but again, [that] would take more time."  Id.

Mr. Hadcock forwarded Mr. Petsche's e-mail to Messrs. Jonas and Carr because he felt that these revelations might require investigation by KBR.  See id.  Although it appears delay ensued, on September 7, 2004, Mr. Jonas contacted Mr. Petsche by telephone relating to KBR investigations of fraud.  On September 24, 2004, Mr. Jonas followed up with an e-mail to Mr. Petsche, JX 484, who by this time was working in Kuwait and Iraq with a different subcontractor.  Tr. at 1329-30, 1419-20 (Petsche).  Mr. Jonas explained in his e-mail:

> [L]egal is trying to conduct investigations regarding several individuals and
> allegations of kickbacks and fraud.  They believe that you may be able to clear

---

30/  This statement was neutralized by trial testimony, including that of Mr. Petsche. In KBR procurement parlance at the time, a "drug deal" was a contractual situation whereby the proper procurement process was not followed and did not necessarily imply something sinister.  See Tr. at 1323 (Petsche) ("What I mean by 'drug deals,' is . . . the inappropriate contracting practices.  You know, the award of contracts without a contract, without a requisition.  The issuance and instructions to proceed with work without any written instructions or contracts."); Tr. at 1107-08 (Jonas) (stating that "drug deal" was "a term that we used when the operations people went around procurement.  Where they had things out of order. . . . They weren't following process.").  However, without this explanation, the language is dramatic, and it is not surprising that this statement served as the cornerstone of defendant's counterclaims.

the air or provide insight on some of this. You are NOT the subject of this effort. It would be helpful to get the bad eggs out of the group but first we have to know what is happening. We would conduct this interview in some place away from Iraq, such as Amsterdam or London. We will keep your participation quiet. Let me know if you would be willing to talk. I can either be at the meeting or not, at your discretion.

JX 484. On November 10, 2004, Mr. Petsche responded via e-mail, declining to speak with any KBR officials. Id. According to his e-mail, Mr. Petsche could only provide "rumor and speculation" and did not have any relevant information to discuss. Id. Although Mr. Petsche stated that he was willing to discuss the "merits and processes of the contracts that [he] administered," he did not wish to involve himself in "serious rumors" swirling at the time concerning illegal activity. Id. Mr. Petsche informed Mr. Jonas that he wanted to move on with his life post-termination from KBR. Id. Mr. Petsche's testimony confirmed his assessment of the situation in late 2004. See Tr. at 1331-32, 1446 (Petsche).

IV. Tamimi's prices become an issue

    1. The negotiation of Change Order 6

Despite the greensheet approval for WR 3, the prices that Tamimi were invoicing to KBR for DFAC services throughout Iraq came under scrutiny due in large part to the Army's and DCAA's growing objections to the costs. By early to mid-2004, KBR began recompeting many of the DFAC contracts, and awarding new, "SK" contracts at lower prices than the initial round of contracts under TO 59. See Tr. at 1892, 1940-41 (Pettibone). In some of those contracts, KBR was able to secure prices that were up to 40% lower than the original round of contracts. See JX 352. However, this process of recompeting all of the DFAC contracts was a slow one, and, because many of the original subcontracts were beginning to expire at about the same time, KBR had to resort to issuing Change Orders ("COs") to extend the period of performance under the old subcontracts. This, according to Ms. Pettibone's August 8, 2004 e-mail, was "to buy some breathing room to conduct negotiations and competitions." JX 351, at 1148.

One group of subcontracts that had been extended, yet was recognized to need renegotiation, was Tamimi's, including WR 3. See id. at 1148-49. DCAA had taken particular interest in the Tamimi subcontracts because Tamimi was billing on a PPPD based on either projected or actual headcount, whichever was higher. See JX 419. When informed by KBR that the Government was questioning the amounts being billed, rather than attempt to work toward a resolution, Tamimi indicated that it would not sign any new COs or submit new pricing to KBR, instead preferring to continue billing under the old pricing structure, which was highly favorable to Tamimi. Id. KBR then stopped all payments to Tamimi until

KBR would be able to negotiate successfully. Id. Although Tamimi was willing to come to the table, its strategy was to present unreasonable "all or nothing" demands to KBR, presumably in an attempt to continue invoicing under the old pricing structure. See id. (discussing negotiation meeting between KBR and Tamimi officials on July 22, 2004); JX 334 (illustrating KBR's frustrations in attempting to negotiate with Tamimi, which, by constantly shifting its position, appeared not to be acting in good faith). Rather than present a reasonable position, Tamimi threatened KBR that it was willing to take the matter to court or binding arbitration if KBR did not accede to its demands.  JX 334.

Burt Metzler, the Subcontract Administrator involved in awarding and administering contracts for all of KBR's DFACs, was the KBR employee responsible for the last attempt at renegotiating the pricing of the Tamimi DFAC contracts prior to KBR resigning itself to litigation.  See JX 334; Tr. at 434-45 (Walter); Tr. at 1166 (Jonas).  The record of the negotiations can be gleaned only from documents, although some witnesses gave their understanding about what transpired.  Mr. Metzler, who did not testify, began his negotiations with Tamimi in July 2004 with the goals of restructuring the pricing under the Tamimi contracts to align with the structure under the new SK subcontracts, lowering the prices Tamimi was invoicing, and resolving the facilities issues of the two new Anaconda DFACs. See JX 353. However, according to documents authored by Mr. Metzler, Tamimi refused to negotiate the COs for each of the DFAC contracts individually and, instead, would only negotiate regarding a discount to be applied across all nine of its KBR subcontracts. See JX 334, at 6712. During the negotiations Tamimi continued to invoice KBR under the old pricing system.  However, KBR executives continued to refuse to pay Tamimi "because [KBR] could not bill it because we could not certify it to the Gov[ernment] as an appropriate price (because our position was it should be repriced)."  JX 351, at 1149 (Pettibone e-mail chain).

Eventually, KBR and Tamimi were able to come to an agreement, see JX 419, although Mr. Metzler expressed both considerable frustration about dealing with Tamimi and regret at not having achieved more substantial savings for KBR.  See JX 334, at 6711-12 (Metzler e-mail to his supervisor, Tom Donley, Procurement Material & Property Manager, dated July 22, 2004).  As set forth in Mr. Metzler's Justification Memorandum dated August 4, 2004, 31/ for the soon-to-be-signed CO 6 modification to WR 3, Tamimi agreed to an

---

31/  Mr. Metzler gave the "Basis for Change Order to MA[0]0003, WR 3":

This Work Release was issued in September 2003.  Since early 2004 the subcontractor, Tamimi Global has refused to negotiate in good faith on this Work Release as well as at least eight other Work Release contracts or subcontracts.  Due to DCAA reviews and agreements made by KBR to the DCAA as well as directives issued by the DCAA, we have been unable to pay

overall price reduction of $16,560,000.00. <u>See</u> JX 419, at 2950. KBR personnel had analyzed the Tamimi invoices; of the unpaid Tamimi invoices, approximately $137,000,000.00 represented the costs based on actual headcounts at the DFACs through June 30, 2004. <u>Id.</u> Tamimi had invoiced approximately $170,000,000.00 by using the projected headcounts—the amount to which Tamimi considered itself entitled. <u>Id.</u> The final negotiated position was that KBR would allow Tamimi to invoice "actual headcount plus 12%," which amounted to approximately $153,440,000.00 in total accepted invoicing. <u>Id.</u> Thus, $170,000,000.00 less $153,440,000.00 equaled the approximate savings of $16,560,000.00. <u>Id.</u>

When Tamimi would not assist KBR in allocating that reduction over the nine Tamimi subcontracts, that task fell to Mr. Metzler. <u>Id.</u> at 2950-51. Mr. Metzler's goal was to allocate those savings across the nine subcontracts in a way such that each of the separate subcontracts could be justified as fair and reasonable to the DCAA. <u>Id.</u> at 2950. According to Mr. Metzler, in his efforts to justify all of the pricing as fair and reasonable, the discount "was allocated to the contracts on a percentage basis. The contracts which were billed closest to actual headcount versus projected were allocated a smaller percentage of the [savings] discount . . . [and] [t]he contracts that had the biggest variance between actual headcount versus projected headcount were allocated a bigger percentage" because those contracts were likely the ones most difficult to justify as fair and reasonable. <u>Id.</u> Under Mr. Metzler's method, WR 3 at Anaconda received a $4,907,319.00 discount (approximately

---

31/  (Cont'd from page 24.)

the invoices from this company and they have refused to renegotiate in good faith. Until now.

Subsequently, this particular Work Release which operates the largest single DFAC services in the theater (population of over 26,000), has become under funded due to the continued adversarial position taken by our subcontractor, Tamimi Global Co. Ltd.

Tamimi has finally agreed to definitize their invoices in accordance with the Form 1 issued by the DCAA and in order for this to occur procedurally, we must:

a.)  fund the Work Release via a properly executed Material Request, and
b.)  negotiate and execute a Change Order to reflect the agreed upon definitization.

JX 419, at 2946.

30% of the total savings), the second highest invoice offset of the nine Tamimi subcontracts. Id. at 2951.

On August 12, 2004, following the August 4, 2004 Metzler Justification Memorandum, KBR and Tamimi executed CO 6 to WR 3. See JX 411. CO 6 modified the agreement between Tamimi and KBR in several ways. First, CO 6 extended Tamimi's period of performance at Anaconda from June 12 through September 15, 2004. Id. CO 6 also implemented the negotiated price reduction assigned to the Anaconda DFACs. This discount was distributed such that "the invoice values [were reduced] by 5% for invoices . . . from March 2, 2004 through 31 April 2004 . . . [and a] 10% discount toward invoices from May 1, 2004 through June 30, 2004." Id. Mr. Metzler's Justification Memorandum recounted the facts that had led the parties to their current positions, following which Mr. Metzler began his attempt to justify the prices as fair and reasonable, claiming that KBR had "successfully reduced Tamimi's pricing bringing the costs closer to the current market." JX 419, at 2946. Mr. Metzler's 5% discount represented a savings of $1,936,906.00, and the 10% discount equaled a savings of $2,970,413.00. JX 411. In addition, CO 6 incorporated a new contract pricing structure—one more in line with the new "SK" contracts that KBR began implementing in early 2004. 32/ Id. As explained by Mr. Metzler:

> Tamimi agreed to the new definitized pricing moving forward. The original contract was based on a [PPPD] rate. KBR has since changed the pricing to reflect definitive costs and variable costs. The definitive costs are for items such as Power Generation, Reefers [refrigeration units], Facilities costs, and other CLINs ["Contract Line Item Numbers"] that should not vary with the number of troops fed. The variable costs are for CLINS where the cost should increase or decrease with the troop numbers fed. These are items, such as Co[n]sumables and Food. . . . The 10% discount toward invoice values from May 1, 2004 thru [sic] 30 June 2004 . . . is based on the same facts given above. The discount was built into the new pricing structure proposed by Tamimi which will be used from May 1, 2004 until the end of the contract . . . .

JX 419, at 2947.

Under this new contract structure, Tamimi's prices were $38.90 per person with food and $29.26 per person without food, which, when compared with other contracts "awarded

---

32/ A more detailed discussion of KBR's "SK" contract format follows in the Discussion section of this opinion.

in the same period," reflect the high end of the pricing. 33/  Id. at 2948.  Mr. Metzler's attempt to justify the prices, however, was, at best, confused.  Mr. Metzler stated: "Tamimi's new proposal is based off pricing which was originally considered fair and reasonable due to adequate competition and the fact that they were the low bidder.  The new pricing proposed by Tamimi is 10% less than the original pricing and considered fair and reasonable."  Id.  It appears that Mr. Metzler was mistaken regarding the specific circumstances surrounding Anaconda.  The initial award of WR 3 was not competed, thus foreclosing Tamimi from being the "low bidder." 34/  Furthermore, one of the roots of the problem for DCAA was its position that the prices in the initial round of subcontracts were not fair and reasonable, so to use the initial award as an anchor of what was fair and reasonable was a questionable proposition.

Finally came the issues of ownership of the new DFACs at Anaconda.  Mr. Metzler wrote in his Justification Memorandum that the initial idea was that "confirmation of [the] commitment made by Shabb[i]r Khan on behalf of Tamimi that DFAC[]s A1, A4 would become the property of KBR/U[S] Military on 15 September 2004" was to be included in CO 6.  Id. at 2947.  However, Mr. Khan reversed himself on this position, with Mr. Metzler speculating that "[t]his commitment [wa]s being disputed [during negotiations] due to the fact that Tamimi does not want to honor the said agreement in fear of being displaced at th[e] site," id., a real possibility given KBR's collective attitude toward Tamimi at the time, see JX 334 (July 22-25, 2004 inter-KBR e-mail chain).  Thus, because the parties could not agree on the facilities ownership issue, KBR and Tamimi agreed only "to negotiation meetings to discuss and definitize ownership of facilities: DFAC A1 & A4.  KBR and Tamimi agree to negotiation in good faith to accomplish this task by September 15, 2004."  JX 411.

After CO 6 was executed, the record reflects that not all cognizant executives of KBR were satisfied with the CO 6 price reductions.  Two KBR high-level personnel unenthused by CO 6 were Mr. Walter and Ms. Pettibone.  When CO 6 was forwarded to KBR's

---

33/  Ms. Pettibone testified that, subsequent to CO 6, WR 3 for the Anaconda DFAC services was not priced out based on PPPD pricing, but that both KBR and the Government continued to use "imputed" PPPD rates for comparison purposes.  Tr. at 1953-54 (Pettibone).

34/  As explained below, the court is well aware that Tamimi did submit a competitive proposal on July 31, 2004, for the work at Anaconda beginning in September 2004. Although this means that Anaconda was recompeted, as recounted by Ms. Pettibone, Tr. at 1948 (Pettibone), it is unlikely that this is the "adequate competition" to which Mr. Metzler referred on August 4, 2004, particularly in light of Mr. Metzler's insistence that he was looking at "the original pricing" of WR 3 and the fact that Tamimi's July 31 proposal seems to indicate greater than a 10% reduction in price, see JX 138; JX 339.

Arlington, Virginia office for greensheet approval, it was met with resistance. 35/ See JX 353. According to Ms. Pettibone,

> Burt justified all the prices based on them being lower than the past. But when you do the comparison of the renegotiated prices against current competitive prices (from Tamimi, sometimes for the same site), there are vast differences.  2 were OK, and I recommended they be paid, but they are small compared to the others.

> I figured i[f] I could get within the competitive price plus 20%, I could probably justify it.  2 sites - Anaconda and ISG - are 30-35% higher than the competitive price.  I was looking for a way to get those in the competitive range, and am losing it trying to figure it out among other things.

Id.  To meet these mounting concerns, it appears that Mr. Metzler's initial Justification Memorandum was revised in response to dissatisfaction from personnel such as Cheryl C. Ritondale, who ultimately succeeded Mr. Jonas and was the Director of Procurement Compliance and Training in 2004.  See JX 543.  However, the new justification was itself apparently thin on the details of how Tamimi's prices were justifiable. Mr. Donley's e-mail, which refers to the revised justification memorandum that was not presented at trial, conceded that, "[i]f the Memo were to go into more detail, it would only invite more questions whose answers will never be satisfactory due to the nature of this beast." Id. (Aug. 18-27, 2004 inter-KBR e-mail chain).  In response Ms. Ritondale indicated her frustration: "I must be confused because the 'new' price justification memo contains less information than the original . . . . KBR has still not demonstrated that the new pricing structure or the negotiated amount is fair and reasonable."  Id.

By September 20, 2004, Mr. Walter, still unsatisfied with the amount of the invoices compared with the DCAA Form 1s, would not approve any payment to Tamimi, even at reduced rates that better approximated actual headcounts.  Tr. at 436-37 (Walter); JX 354. As Ms. Pettibone wrote also on September 20, 2004, "[n]either he nor Cheryl Ritondale are satisfied with the Anaconda [price justification], and based on that [Mr. Walter] has told us no payments on any of them.  No invoice payments, no partial payments, no payments of any kind on any of the 9." JX 352.  Essentially, KBR believed that the Tamimi prices, including those at Anaconda, were still too high to merit payment on their invoices.  According to Mr. Walter, "[w]e had gotten a 10 percent reduction from Tamimi on their prices, and we felt that we could get some additional price concessions from Tamimi," Tr. at 448 (Walter), most likely because "[u]nder competitive bids . . . Tamimi has reduced prices up to 50%," JX 89.

---

35/ Mr. Jonas gave conditional greensheet approval for CO 6 on August 11, 2004, provided that the Anaconda file be brought "into compliance immediately."  JX 544.

This would eventually lead to the negotiation of CO 9, the prices agreed to therein being a lynchpin to plaintiff's claim that its costs, reflecting the underlying Tamimi prices, were reasonable.

### 2. KBR's failed self-performance

While KBR was attempting to negotiate with Tamimi regarding the structure and pricing of its DFAC contracts, KBR simultaneously was attempting to recompete the work at Anaconda.  On July 15, 2004, KBR issued an RFP for the work at Anaconda to begin around September 15.  JX 356.  On July 19, 2004, Biji Fenn, Tamimi's Operations Manager, sent an unsolicited proposal to the Army Contracting Officer at Anaconda—Michelle Rainey—offering to contract directly with the Army to provide the DFAC services at Anaconda at just $12.64 PPPD.  See JX 357.  Two days later, on July 22, 2004, Mr. Fenn e-mailed Ms. Rainey informing her that Tamimi owned all of the DFAC structures, material, utility systems, and controlled the DFAC employees at Anaconda.  JX 65.  Irked by Mr. Fenn's efforts, that same day Ms. Rainey e-mailed Gerald Warner, the Project Manager at Anaconda, to inform him that Tamimi was soliciting work directly from the Army, an illegal course of conduct while still working under LOGCAP III.  JX 136.  Ms. Rainey instructed Mr. Warner to enlighten Mr. Fenn on "the proper contractual relationship between Prime Contractor, SubContractor, and the customer."  Id.

Duly chastised, Tamimi submitted its competitive proposal to KBR for the Anaconda DFAC services on July 31, 2004.  See JX 168.  KBR also received two competitive proposals from other vendors.  However, while waiting on proposals from the vendors, KBR was assessing whether it would be more beneficial—and less costly—simply to self-perform the DFAC work at Anaconda.  JX 74, at 9865.  The KBR management at Anaconda—evidently frustrated by dealing with Tamimi—was one contingent within KBR that favored a shift to self-performance.  See JX 334.  Several managers did not believe that it would be prudent for KBR to try and take on the work itself and that it should maintain its role as prime contractor only.  See Tr. at 1178-79 (Jonas).  Ultimately, it was predicted that KBR would save the Government approximately $17 million if it self-performed the work, so KBR management approved the plan for KBR to begin self-performance when Tamimi's subcontract at Anaconda expired on September 15, 2004.  JX 74, at 9865.  As a result, KBR solicited proposals from vendors that would provide KBR with the labor pool necessary to implement the self-performance plan, and, of the four proposals that it received, KBR awarded the contract to Eurest Support Services ("ESS") in August 2004.  Id.

ESS quickly encountered logistical problems trying to mobilize the considerable foreign workforce required for the DFAC services at Anaconda.  Id.  ESS found its traditional labor pool to choose from diminished because certain countries were precluding their citizens from entering Iraq.  Id.  It became readily apparent that KBR would not be able

29

to begin self-performance by mid-September, and KBR was forced to extend Tamimi's period of performance on September 10, 2004, via CO 7, through November 30, 2004.  Id.

At the same time, KBR also was cognizant of the growing discord and friction between KBR and Tamimi because of KBR's refusal to make payments on any of Tamimi's invoices.  As reflected in a KBR Memo to File, for which Ms. Pettibone may have been responsible, by October 11, 2004, KBR was reconsidering its position to withhold all payments from Tamimi.  See JX 89.  KBR had backed off its previous position, "recogniz[ing] that Tamimi has provided services at the DFACs for which the invoices were submitted."  Id.  Further, KBR appears to have conceded that "[t]hose services should be compensated in some manner . . . [because] KBR does not wish there to be operational impacts on the clients or financial impacts on the subcontractor and its suppliers."  Id.  As such, KBR adopted the "conservative approach" of "making partial payments to the subcontractor on 7 subcontracts and work releases.  These partial payments were computed using the actual headcounts at the site and the average [PPPD] rate paid by KBR to its subcontractors."  Id.  However, KBR recognized that "[o]n average, these partial payment[s] represent about half of what the subcontractor has requested in payment for the invoices covered."  Id.  In other words, KBR was still holding a substantial amount of money that Tamimi had billed for its services.  According to Mr. Jonas, these "slow rolling payments" were effected in order to give KBR leverage over Tamimi in future negotiations for price reductions.  36/  Tr. at 1177 (Jonas).

Even with the extension of time, ESS was unable to perform under its contract with KBR.  Tr. at 1177 (Jonas).  As documented in an October 29, 2004 Memorandum for Record written by Betty E. Hayes, who on September 23, 2004, became the Acting Procurement Manager at Camp Anaconda, ESS could not provide the requisite number of laborers.  JX 222.  Ms. Hayes records that, on October 28, 2004, Ted Lawrence and another representative of ESS met with Ms. Hayes and Mr. Warner regarding the state of affairs.  See id.  At this point some ESS laborers had arrived at Anaconda, but they were without proper hygiene items; unable to call home to notify their families that they were safe; and, most troubling to

---

36/  Prior to trial the parties stipulated, as follows:

KBR made its first payment to Tamimi on Tamimi invoices for Master Agreement 3 Work Release 3 on March 16, 2004[,] and made partial progress payments to Tamimi thereafter.  As of December 19, 2004, Tamimi had invoiced KBR $241,135,432.71, KBR had paid Tamimi $164,497,679.59, and KBR had withheld payment of $76,637,753.12 from Tamimi on invoices for Master Agreement 3 Work Release 3.

Stipl. filed Oct. 3, 2011, ¶ 2.

KBR, under contract to work twelve-hour shifts for only six days a week. Id. The impediment was that ESS had contracted with KBR to provide workers on twelve hour shifts for seven days a week. Id.

On November 4, 2004, as recorded in Ms. Hayes's Memorandum for Record dated November 4, 2004, Mr. Lawrence had another meeting with KBR at Anaconda. See JX 455. Mr. Lawrence informed KBR that "due to the Sheik of UAE's [(the "United Arab Emirates")] untimely death . . . ESS would not be able to get the remaining personnel into Dubai and on to Iraq until after 20 November 04" because the government offices responsible for issuing the necessary visas were closed in mourning. Id. Moreover, the workweek issue had not been resolved because "most of the personnel do not get a break for a year and . . . 7/12 is too much to ask." Id. As a result, KBR would need more laborers and housing in order to fulfill its obligation to the Army, and at this point ESS had secured less than half of the original number of laborers needed for the job. See JX 455; see also JX 220. By November 8, 2004, ESS informed KBR that because of the logistical standstill in the UAE, ESS could not obtain the visas for the remaining workers in sufficient time to furnish a functional number of laborers trained and ready to begin the DFAC service at Anaconda by the end of November. JX 220. On November 11, 2004, KBR issued a stop-work order to ESS and terminated ESS on November 13, 2004. See JX 218.

As affirmed in Mr. Walter's certified claim from KBR to the Army dated July 17, 2008, JX 74, KBR was left in a vulnerable position. Tamimi once again had been approached about a short-term extension of its contract so that KBR would have time to hold a competition for the Anaconda DFAC services, but Tamimi indicated its willingness to continue performance at Anaconda only if it were given a long-term contract extension. See JX 74, at 9865-66. If no long-term extension were forthcoming, Tamimi would walk off Anaconda when its subcontract expired on November 30, 2004. Id. at 9865. Given the short period of time, it would have been impossible for another vendor to mobilize in time to begin providing DFAC services by December 1, so KBR was forced to accede to Tamimi's demands for a long-term extension or risk breaching its own obligations under TO 59. Id. Although KBR agreed to a long-term extension with Tamimi, the extension was contingent upon the negotiation of two items: (1) a retroactive discount on prices from July through November 2004, and (2) a competitive price for the new period of performance. Id. at 9866. Tamimi agreed to yet another negotiation on this basis and continued providing DFAC services at Anaconda.

3.  The negotiation of CO 9

On November 7, 2004, representatives of KBR and Tamimi met to negotiate a host of disputed issues, including the prices of Tamimi's food stock at Anaconda 37/ and the ownership of the new Anaconda DFAC facilities.  See JX 85.  Ms. Hayes, as Procurement Manager at Anaconda, was asked by Mr. Warner to attend the meeting.  Tr. at 575-77, 582-88 (Hayes).  Ms. Hayes previously had become acquainted with Shabbir Khan and Tamimi from their shared time spent working in Kuwait.  See Tr. at 514, 517 (Hayes).  Hired by KBR in November of 2001 to serve as a Senior Subcontract Administrator, Ms. Hayes first traveled to Kuwait in November 2002 to help with the procurement activities at Camp Arifjan under TO 27.  Tr. at 514-15 (Hayes).  Subsequently, Ms. Hayes worked on the Tiger Team in Kuwait and Iraq before being assigned to work as the Procurement Manager at Anaconda.  Tr. at 524-33 (Hayes).  Prior to attending this meeting, Ms. Hayes had not been involved personally with the DFAC procurement issues and, aside from the food-stock issues, was not personally informed or knowledgeable about the other issues surrounding the work at Anaconda.  Tr. at 577 (Hayes).

After working through the issues with the food-stock prices, see Tr. at 582-86 (Hayes), discussion turned to the DFAC facilities at Anaconda, see Tr. at 582 (Hayes); JX 85.  "Shabbir was still adamant that he owned the buildings, he never got paid for the buildings, and that [KBR] just couldn't take his buildings."  Tr. at 586-87 (Hayes).  Because the Tamimi representatives—Shabbir Khan and Zubir Khan, Tamimi's Operations Manager, Baghdad, a deputy to Shabbir—were becoming agitated discussing the issue, Ms. Hayes tried to calm them down and stated that they would need to come to an understanding.  Tr. at 587-88 (Hayes).  At this point Remo Butler, the KBR Project Manager for LOGCAP III in Iraq, asked if Shabbir Khan would be willing to sit down and negotiate ownership of the buildings, to which Mr. Khan agreed, provided that Ms. Hayes would negotiate for KBR.  Tr. at 588 (Hayes).  Mr. Butler agreed and directed Ms. Hayes to "coordinate with Tamimi to analyze the cost of the [PPPD] Rate with food to ascertain a shared cost association and to formulate a possible 'Buy Out' cost determination regarding the[] [Anaconda DFAC] facilities."  JX 85.  Ms. Hayes conditionally agreed, provided that her supervisor, Mr. Jonas, approved.  Tr. at 589 (Hayes).  Mr. Jonas subsequently approved Ms. Hayes as the KBR representative to negotiate with Tamimi, expressing the opinion at trial that Ms. Hayes was a "very experienced and knowledgeable negotiator . . . who knew what her job was and would do her

---

37/  As explained by Ms. Hayes, when the Army moved to become the prime vendor of food to the Iraq DFACs under the Subsistence Prime Vendor program in the May 2004 time frame, it authorized KBR "to settle prices with the contractors for any food that was already on the site prior to prime vendor.  So all the . . . subcontractors had to do an inventory of what they had . . . [and] give us the price for it."  Tr. at 575, 583 (Hayes).  Perhaps not surprisingly, KBR took issue with Tamimi's food-stock accounting.  Tr. at 582-83 (Hayes).

job straight up." Tr. at 1132-34 (Jonas).  Mr. Jonas "had no concern" about Ms. Hayes's negotiating with Mr. Khan by herself.  Tr. at 1134 (Jonas).

The court found that the enthusiastic endorsement of Ms. Hayes by Mr. Jonas and plaintiff's counsel was borne out by neither her testimony nor the record of her negotiations that she included in her Negotiation Memorandum dated March 29, 2005.  See JX 48.  Her testimony was in the nature of summations on the topics, flavored with anecdotes.  Ms. Hayes's considerable experience with Air Force procurements before her retirement in 2001 at the rank of Master Sergeant after twenty-three-and-one-half years of service, coupled with a decade in contract-management positions with plaintiff, did not inform her testimony.  This was a witness in whom plaintiff reposed enormous confidence and upon whose shoulders plaintiff laid one of its core arguments—that the CO 9 settlement would support the reasonableness of the costs passed on to the Army.  As will be examined further, Ms. Hayes was more general than specific, did not appreciate or use KBR's leverage, fundamentally misunderstood some important facts, and stood up to Shabbir Khan's posturing, but could not explain what she accomplished other than in overall monetary terms.  The court was impressed with this witness as a person, but Ms. Hayes did not convey that she was informed about the history of KBR-Tamimi-Anaconda or savvy about the parties' respective negotiating leverage.  Her Negotiation Memorandum was discounted by defendant's surgical cross-examination, as well as by the key DCAA auditor, George W. Duggan ("the most senior working level auditor in Iraq," PX 478, Deposition of George William Duggan, Nos. 09-351C, 09-428C, 09-578C, Kellog Brown & Root Servs., Inc. v. United States, at 194 (Fed. Cl. Sept. 1, 2010); see also id. at 46, 127, 129, 192-93, 246), who testified by deposition.

Initially, Ms. Hayes's negotiations with Mr. Khan involved only the facilities issue at Anaconda, but, with the contemporary realization that KBR's self-performance effort was an enormity, Ms. Hayes also was given the task of negotiating an overall reduction of Tamimi's DFAC prices and a long-term extension of its Anaconda contract, as well as the negotiation of six other contracts that KBR and Tamimi were disputing. 38/  See Tr. at 591, 595 (Hayes); Tr. at 1179 (Jonas).  Regarding Anaconda, Mr. Jonas instructed Ms. Hayes to negotiate further reductions of the prices that were definitized in CO 6 because he considered that "there was enough leverage" to finally get Tamimi to come down.  Tr. at 1179-80 (Jonas).  Mr. Jonas estimated that KBR had approximately $40,000,000.00 in leverage over Tamimi because of KBR's strategy of slow rolling payments.  As a target goal, Mr. Jonas

---

38/  By way of explanation, the "Tamimi Seven" represented a subset of the "Tamimi Nine," KBR's DFAC subcontracts with Tamimi that were the subject of Mr. Metzler's July 2004 negotiations.  Ms. Hayes testified that by November 2004, two sites of the Tamimi Nine had been resolved, thus leaving the seven sites with continuing disputes over pricing.  Tr. at 599 (Hayes).

instructed Ms. Hayes to get Tamimi down to the rates that it had directly proposed to the Army in its unsolicited proposal sent in July 2004, rates far below what Tamimi was charging KBR.  Tr. at 1180 (Jonas).

Ms. Hayes consulted several sources for information in an attempt to familiarize herself with the situation at Anaconda and to learn what KBR should seek in terms of pricing.  In an effort to educate herself about the DFAC structures at Anaconda, Ms. Hayes conducted Internet searches for similar units to obtain square-footage prices.  Tr. at 592 (Hayes).  Ms. Hayes also attempted several searches pertaining to the prices for other DFAC equipment, but had difficulty finding vendors that published their prices online since most invited potential customers to call to receive an individualized quote for a specific job. Id.  Ms. Hayes reviewed the Anaconda DFAC contract file, the competitive proposals submitted for the Anaconda work in July 2004, KBR's DFAC master agreement files, and pricing sheets from other food service vendors.  Tr. at 607, 626-28, 635-36, 640-45 (Hayes).

Ms. Pettibone assisted Ms. Hayes in preparing for negotiations by sending Ms. Hayes several e-mails with information about the state of contractual affairs at Anaconda.  See JX 138; JX 339.  On November 9, 2004, Ms. Pettibone sent Ms. Hayes an e-mail with an attachment that detailed the history of the pricing situation at Anaconda.  JX 138; see also JX 89 (containing spreadsheet of DFAC prices at several other sites referenced by attachment to JX 138 for comparative purposes).  Ms. Pettibone gave a brief description of the contractual history at Anaconda and, most importantly, tried to chart a history of the prices that Tamimi had been charging.  See JX 138.  She broke down the different contractual periods at Anaconda—original WR 3 period of performance, March-April 2004, May-June 2004—and listed actual and projected headcounts at the site, along with the PPPD that Tamimi charged under the projected headcount billing methodology that it had embraced and the effective price rate resulting to the Government.  See id.  Ms. Pettibone then broke down the Tamimi rates at Anaconda and attempted to give them perspective with a comparison to the imputed PPPD rates at other sites throughout Iraq under the new lower-priced SK contracts in order to afford Ms. Hayes a range to consider when negotiating.  Id.  Lastly, Ms. Pettibone provided a breakdown of the cost allocation in the pricing elements under CO 6—as allocated by Mr. Metzler—and juxtaposed them with the pricing of those elements under Tamimi's July 2004 competitive proposal. 39/  Id.

Ms. Pettibone reiterated in her e-mails that she believed that, if she "could get to within 20% of the competitive cost, [she] could probably make a case" for the price reasonableness and that she was having trouble justifying the prices at Anaconda, particularly

---

39/  Given the import of this information, a more detailed discussion of the content follows in the Discussion section.  It is described in broad terms in this section because it was information that Ms. Hayes had available to her during her preparation for negotiations.

in light of the facilities issue and the manner whereby Mr. Metzler allocated the cost among different items. JX 138; see also JX 339. According to Ms. Pettibone, she did not obtain her benchmark of within 20% of the competitive-bid-pricing from an official source, such as the FAR; rather, it reflected her own personal opinion. Tr. at 1971-72 (Pettibone). With that target in mind, Ms. Pettibone on November 9, 2004, sent Ms. Hayes two additional spreadsheets, titled "Tamimi Pricing Renegotiations." See JX 339. Ms. Pettibone thereby detailed the prices under contract at the nine Tamimi sites, and she compared those prices with the prices that had been proposed in the recompetes for the DFAC services at each of the nine sites. See id. For example, regarding Anaconda, the spreadsheet reflects that the negotiated monthly cost of DFAC services under CO 6 was $13,146,830.94, but that Tamimi's July proposal listed a monthly price of only $9,112,050.00—a price that was roughly 30% lower than what it was charging to KBR. Id.; Tr. at 1964-65 (Pettibone). In order to aid those conducting further negotiations with Tamimi, such as Ms. Hayes, Ms. Pettibone populated the last column of one of the spreadsheets with a "Target Monthly Cost (80%)" that she believed represented the maximum amount that could be justified as reasonable. JX 339; Tr. at 1965-66 (Pettibone). Believing the prices to be justifiable as reasonable if within 20% of the competitive bid, Ms. Pettibone calculated the Target Monthly Cost for Anaconda to be $11,390,062.50. See JX 339.

Ms. Hayes had only a general sense of Ms. Pettibone's analysis, see, e.g., Tr. at 746-47, 758-59 (Hayes). Ms. Hayes could not explain the information that was in her negotiating arsenal other than generalized comments about the type of document she consulted. See, e.g., Tr. at 748 (Hayes) ("Well, the problem was I didn't know how change order 6 was even allocated, how they came about with the numbers that they allocated."). She did not relate that she drew on her experience with the Anaconda DFACs. In these circumstances it was unfortunate for the record and in contravention of KBR's procurement policies, see generally JX 47 (KBR Government Operations Procurement Policy & Practices Manual), that Ms. Hayes did not prepare a pre-negotiation memorandum, although she was sure about her objectives going into the negotiation. Tr. at 646 (Hayes). Ms. Hayes explained that her objectives were to lower the overall price of the Tamimi Seven, with particular emphasis on lowering the price for the work at Anaconda and to resolve the DFAC ownership issue at Anaconda. Tr. at 646-47 (Hayes). 40/

─────────────────────────

40/   As a further inconvenience, Ms. Hayes kept only limited notes from her negotiations with Mr. Khan. Tr. at 676 (Hayes). Thus, the following account of the negotiations, at which she was the only KBR member present, is based on her recollection. Her later Negotiation Memorandum contained erroneous information about the history of the contract, although the court credits its recitation of her involvement in the negotiations. But see Tr. at 751 (Hayes) (testifying that her Negotiation Memorandum does not reflect the actual progress of negotiations, such as from where she started).

The negotiations between Ms. Hayes and Mr. Khan, which took place in Kuwait, spanned from approximately mid-December 2004 to the third week of January 2005. See Tr. 592, 641, 659, 675 (Hayes). Ms. Hayes conducted the negotiation sessions alone and did not ask for analytic support from any other KBR officer or employee. Tr. at 726-27 (Hayes). Regarding the overall tenor of the negotiations with Mr. Khan, Ms. Hayes testified that "[s]ometimes they were amicable, and then there were other times where [Mr. Khan] wouldn't be amicable." Tr. at 651 (Hayes). Completely unaware of how much money that KBR was withholding from Tamimi, Tr. at 655 (Hayes), Ms. Hayes believed that KBR's negotiating position was "weak"because Tamimi had a valid contract (the definitized CO 6) with KBR under which KBR was withholding payments—thereby risking a lawsuit—and that Tamimi currently was operating at Anaconda without a contract and could walk off at any time to the detriment of the troops who depended on the dining services, Tr. at 657-58 (Hayes). Ms. Hayes stated that she firmly believed that "food is one of the most important things [at] any site . . . and the most important thing to the soldiers." Tr. at 659 (Hayes). Ms. Hayes continued, "[o]ne of my concerns was that Shabbir kept saying that they would walk out, and not provide food services." Tr. at 660 (Hayes). In addition, Ms. Hayes was also wary that Mr. Khan already had cut KBR out of the procurement chain at Camp Arifjan, going around KBR and securing a direct contract with the Army when KBR tried to shift to another vendor; she was concerned that he would attempt the same tactic at Anaconda, thus depriving KBR of the business. Tr. at 660 (Hayes). In sum, Ms. Hayes approached the negotiations with a view that KBR would have to make some concessions to Tamimi.

Relevant to the case at bar, the Hayes-Tamimi negotiations can be separated into three distinct phases, which will be discussed in sequential order, despite the likelihood that the negotiations themselves were not so structured: (1) the contract extension for Tamimi at Anaconda going forward; (2) the DFAC ownership issue at Anaconda; and (3) the retroactive price discounts on the Tamimi invoices submitted through November 2004. Beginning with the contract extension, Mr. Khan initially had declined a short-term extension when CO 7 expired on November 30, 2004, although prior to the start of the negotiations he had been receptive to the idea of a three-month extension with a six-month option. Tr. at 665-66 (Hayes). However, when negotiations began, Mr. Khan withdrew his support for this idea, manifesting a fear that KBR would never utilize the option if it could complete a recompete for Anaconda during the three-month period. Tr. at 666 (Hayes). Eventually, Ms. Hayes offered him a December 2004-December 2005 extension with the pricing from his July 2004 proposal—or lower for certain line items—in exchange for his continuing to negotiate retroactive price discounts and facilities ownership, and Mr. Khan accepted. Tr. at 667-68, 690, 735 (Hayes); JX 48, at 2848-49 (Negotiation Memorandum dated Mar. 29, 2005). Ms. Hayes was comfortable offering these prices to Mr. Khan "[b]ecause at the time when he proposed, he knew that he was in a competitive environment, and generally a contractor will use their best price when they know that they are being competed against." Tr. at 668 (Hayes). Ms. Hayes chose not to draw on any of the other proposals that were submitted by

Tamimi's competitors in response to KBR's RFP because they included mobilization costs and thus were not "apples to apples" with what Tamimi proposed. Tr. at 668-69 (Hayes).

Concerning the DFAC ownership issue, Mr. Khan's negotiating position was that KBR had instructed him to pay PPI for the shell of the building, which cost $5 million, but that Tamimi also was required to foot the additional expense of building the kitchens, walls, and other interior amenities. Tr. at 653-54 (Hayes). Mr. Khan insisted that Tamimi had not been paid anything from KBR on Tamimi's expenses incurred and paid because, up to that point, Tamimi was only under contract to provide the turnkey service, not ownership of the buildings. Tr. at 654 (Hayes). According to Mr. Khan, Tamimi was owed more than $40 million for the DFACs and the subsequent, necessary costs associated with outfitting them. JX 48, at 2847. Ms. Hayes stated that this explanation resonated with her "[b]ecause that [was] actually what we were trying to do. We went out and we ordered services, and we didn't put in a construction plan. We pretty much told the contractor that you will operate DFACs, and everything that it takes to operate a DFAC." Tr. at 655 (Hayes). Initially, given that Mr. Khan was able to show her a check in the amount of $5 million, Ms. Hayes offered $3.5 million for the DFACs, amortized from March through September 2004, but Mr. Khan balked at this proposal. Tr. at 663-64 (Hayes). When confronted with the statements in CO 6 that he would negotiate KBR ownership of the buildings by September 2004, Mr. Khan stated that he only agreed to negotiate by September, not to convey ownership by then. Tr. at 665 (Hayes).

Regarding the DFAC pricing, Ms. Hayes initiated the negotiations by asking for a 45% decrease across all invoices, simply as a starting point, and, predictably, Mr. Khan rejected this request. Tr. at 662-63 (Hayes). Ms. Hayes began the back-and-forth negotiations using Tamimi's July 2004 proposal, but made little headway in terms of concessions from Mr. Khan. Tr. at 663-64 (Hayes). 41/ Mr. Khan objected to using Tamimi's July 2004 proposal as a baseline for reductions in the March-to-November invoices because the July 2004 proposal was not inclusive of the costs that Tamimi had incurred for the facilities at Anaconda. Tr. at 672 (Hayes). According to Ms. Hayes, the RFP issued by the KBR DFAC team did not include a line item for facilities cost—presumably because the team assumed KBR's ownership of the facilities—but did include line items for refrigeration,

---

41/ At one point in the negotiations, Ms. Hayes asked Mr. Khan for his cost data, but Mr. Khan refused, stating that "his cost data was none of [Ms. Hayes's] business." Tr. at 637 (Hayes). This rebuff was not a surprise to Ms. Hayes, who knew that she could not demand Mr. Khan's cost data for two reasons: (1) the subcontract was a fixed-price contract, not a cost contract; and (2) dining-facility services were a commercial acquisition—meaning that they were freely available on a commercial marketplace to consumers other than the Government—and therefore Tamimi was not required to provide cost data under the FAR. Tr. at 638-39 (Hayes); Tr. at 148-49 (Walter).

power generation, waste water, and the like.  Tr. at 670-71 (Hayes).  Thus, Tamimi had not included any facilities costs in its July 2004 proposal, and the line items relevant to the DFACs were only for maintenance and upkeep, not the initial purchase price.  Tr. at 670-72 (Hayes).  Ms. Hayes responded that she searched for comparable sites to which she could anchor her downward price negotiations; however, "there was nothing similar to Anaconda that was out there at the time."  Tr. at 672-73 (Hayes).  Anaconda was the largest DFAC site in Iraq, and also had four separate DFACs, meaning that four sets of fixed costs were involved, rather than just one.  Tr. at 674 (Hayes).

Eventually, Ms. Hayes and Mr. Khan were able to come to an agreement on the facilities and discount issues.  Although Mr. Khan was more agreeable regarding the discounts at some of the Tamimi Seven sites, he was intractable on the Anaconda pricing. Tr. at 675 (Hayes).  However, by mid-January 2005, Ilyas Khan, the General Manager of Tamimi, came to Kuwait in order to speak with Ms. Hayes concerning the negotiations.  Tr. at 675 (Hayes).  When Ms. Hayes pressed her case to Ilyas Khan, Ilyas instructed Shabbir that what Ms. Hayes was offering was beneficial enough for Tamimi and that he should accept the deal.  Tr. at 675-76 (Hayes).  Despite reaching their agreement in January, what became CO 9 under WR 3 for Anaconda was not signed until April 2, 2005.  See JX 414 (CO 9 to WR 3).  When questioned about this delay, Ms. Hayes said that, subsequent to the negotiations, Tamimi was asked to submit credit memoranda to KBR reflecting the discounts that Ms. Hayes had negotiated.  However, Tamimi began submitting credit memoranda with further caveats to the effect that Tamimi would not agree to any further decrements in payment.  Tr. at 677-78 (Hayes).  When Ms. Hayes questioned Mr. Khan on point, Mr. Khan stated that a government representative had warned him that KBR was contemplating further decrements in payment.  Tr. at 678 (Hayes).

In January 2005 Ms. Hayes began drafting her Negotiation Memorandum pertaining to WR 3 at Anaconda, Tr. at 686 (Hayes), which was not completed until March 29, 2005, almost three months after the negotiations had concluded, JX 48; PX 286 (Feb. 11, 2005, to Mar. 19, 2005 inter-KBR e-mail chain).  This Negotiation Memorandum served as both a record of Ms. Hayes's negotiations with Mr. Khan and a price-justification memorandum supporting the prices at Anaconda as fair and reasonable.  Tr. at 729-30, 737-38 (Hayes).  On March 31, 2005, Mr. Jonas approved CO 9.  JX 7, at 3685.  As noted above, CO 9 was executed by Ms. Hayes and Shabbir Khan on April 2, 2005.  See JX 414.  CO 9 officially extended Tamimi's period of performance at Anaconda until December 31, 2005, incorporating Tamimi's competitive proposal pricing structure as of January 1, 2005.  Id. at 0174-75.  CO 9 reflects that the DFAC ownership issue was finally resolved, with Tamimi agreeing that ownership of DFAC 1 and DFAC 4 transferred to KBR as of November 30,

2004.  Id. at 0175.  Finally, CO 9 lists the pricing discounts that Ms. Hayes negotiated. 42/
Id. at 0174.  The discounts officially included those discounts that Tamimi conceded under
CO 6 (approximately $4,907,319.00) and added another $22,721,827.54, to the end that the
original WR 3 pricing had been reduced by a total of $27,629,146.50 from March 2004
through December 2004.  Id. at 0174-75.

V.  The "boots through the door" controversy

Beginning in October 2003, DCAA began questioning the costs incurred at the DFAC
facilities under at least fifteen TOs in Iraq and Kuwait.  See JX 74, at 9863; Tr. at 193
(Walter) ("The questions on the DFAC pricing began in Kuwait, and the DCAA auditors
were looking at headcount, or boots through the door, and making those types of comparisons
against the bills that were coming in.").  As explained by Mr. Walter, the head of the KBR
team addressing DCAA's concerns:

> DCAA's position on the boots through the door was that there were fewer
> people coming through the door than the company was being billed for.  They
> looked at the subcontract because KBR used a [PPPD] . . . tool to get the
> fixed-price contract amount.  We had a [PPPD] [which was] multipl[ied] . . .
> [by] the statement of work quantity of soldiers at each one of the dining
> facilities [and multiplied again by the length of the subcontract]. . . . That's the
> cost for that service . . . .

> As the DCAA came in, they found that there were fewer people coming
> through the door than the government estimated in the statement of work for
> [TO] 59.  So, DCAA began questioning the difference between the amounts.

---

42/  As per CO 9, Tamimi agreed to the following invoice amounts from March
through December 2004:

| March 2004 | $17,062,621.37 | August 2004 | $11,839,168.60 |
| April 2004 | $17,070,364.23 | September 2004 | $11,722,522.57 |
| May 2004 | $11,604,646.78 | October 2004 | $11,843,324.53 |
| June 2004 | $11,613,139.81 | November 2004 | $11,682,396.16 |
| July 2004 | $11,806,568.98 | December 2004 | $6,085,825.43 |

JX 414, at 0174.  By way of explanation, March and April 2004 are higher because Tamimi
still was providing food to the Anaconda DFACs at that time.  Tr. at 681-82 (Hayes).

Tr. at 234-35 (Walter).

Testimony established that the genesis of this controversy was a misunderstanding about the services to be provided at the DFACs. KBR worked from the standpoint that these were fixed-price contracts that provided the Army with a turnkey service; it would retain a subcontractor to establish a DFAC wherever the Army requested one—a fixed cost—and that subcontractor would be prepared to serve the number of troops that eventually were present at that location, regardless of the number of troops that actually utilized the facility. See Tr. at 235-36 (Walter). DCAA, however, viewed the DFACs as variable-priced contracts where the costs were based on the number of soldiers actually coming through the DFAC doors. Tr. at 235-36 (Walter).

The court also gleaned from the testimony and documentary evidence that political considerations intruded when Congress learned that the Army was paying KBR and other prime contractors for paying subcontractors like Tamimi on the basis of the Army's estimates, not actual DFAC utilization. Irrespective of whether DCAA's concerns bore any causative relationship to congressional interests, the record contained ample evidence that both the Army and DCAA were responsive.

Because of DCAA's interest in the DFAC contracts, Mr. Walter began investigating the DFAC contract situation beginning in November 2003. Tr. at 127, 202-04 (Walter). He met with Mr. Petsche to discuss the master agreement plan and the contractual situation at Camp Anaconda. Tr. at 204, 216 (Walter); see also JX 233 (Nov. 15-21, 2003 e-mail chain between DCAA personnel and KBR personnel). In response to the DCAA investigations, KBR in early 2004 began implementing a new "SK"-type format for its DFAC contracts in order to move from the PPPD pricing structure toward a more transparent pricing structure that KBR hoped would drive down the cost of the subcontracts. See Tr. at 346-50 (Walter). Rather than pricing all of the services under the PPPD system, KBR moved under the SK contracts to a line-item pricing methodology that captured the fixed costs in discrete categories. See Tr. at 349 (Walter). For example, the SK contracts included separate line items for labor, power generation, refrigeration, and the like. See Tr. at 349 (Walter). The variable pricing items, such as consumables—paper plates, plastic utensils, and so forth—were priced separately. Thus, each cost element of the DFAC services became transparent, which helped to eliminate DCAA's concern that too many variable costs were being priced as fixed costs. However, this contractual modification came too late to satisfy DCAA, and on February 14, 2004, DCAA issued its first Form 1 against all prior DFAC payments, claiming that KBR was owed only what was spent on meals actually served. Tr. at 1873 (Pettibone). Other Form 1s followed, and at the height of the controversy, DCAA was withholding over $200 million from KBR for DFAC services. Tr. at 195 (Walter); Order

entered May 23, 2011, ¶ 10 ("May 23 Order"). 43/  This amount included costs withheld from the invoices billed by Tamimi for MA 3 WR 3.  Id. ¶ 11.

According to the Price Negotiation Memorandum dated July 8, 2005 (the "PNM"), JX 94, in mid-2004, the Army formed the Special Cost Analysis Team (the "SCAT") to definitize TO 59.  JX 94, at 7594.  This process was to include "an in depth study of DFAC costs and issues."  Id.  The leader of the SCAT effort was Ms. DeRoche, an official with the U.S. Army Tactical Command ("TACOM"), with whom KBR began working in order to come to a resolution of the issues raised by DCAA.  May 23 Order, ¶¶ 16-20.  By then the mantra was that the Government "could not pay for people we didn't need."  Tr. at 1987 (DeRoche).  Ms. DeRoche explained that the accuracy of the invoicing and cost information between KBR and its subcontractors was not "the substantial question"—the reasonableness was.  PX 360, Deposition of Lynn E. DeRoche, Paul Morrell, Inc. v. Kellogg Brown & Root Servs., Inc., No. 1:08cv072, at 91 (E.D. Va. Jan. 15, 2009) ("DeRoche Dep. I"). 44/  Thus, although the SCAT "looked at the [actual PPPD] prices and used them in [its] analysis, [they were not] the major focus."  Tr. at 1987 (DeRoche).

The SCAT began its mission by enlisting the services of a consultant—RCI—to provide analytical support to come up with a "should-cost analysis" whereby the team would pull together the available data to attempt to devise an independent model of what the costs should have been at various DFACs.  Tr. at 1988 (DeRoche); Tr. at 237-38 (Walter).  However, the SCAT abandoned this effort given the complexity and the number of different variables involved.  Tr. at 238-39 (Walter).  One reason in particular for moving away from the should-cost analysis was that it relied on the SCAT's having access to particular data for each DFAC facility, and, for some of the relevant sites and periods of performance, no records were kept on the actual number of troops that had eaten at each DFAC site.  Tr. at 1988-89 (DeRoche).  Without knowing the exact number of troops at each DFAC site, the should-cost analysis was not going to be particularly useful.

The SCAT then begin working on a "parametric estimate" to address the boots-through-the-door issue.  Ms. DeRoche explained that the parametric model, a statistical technique for estimating, utilized the immense amount of data that the SCAT did have, thereby allowing the SCAT to produce estimates for those areas for which actual data were lacking.  See PX 360, DeRoche Dep. I, at 90, 102-03, 132.  According to Ms. DeRoche, the model "compared the capacity of a given DFAC to the numbers of people that ate there at any given day and developed a ratio.  And when you developed that ratio against a large

---

43/  This order listed facts that are not in dispute.

44/  DeRoche Dep. II is the continuation of Ms. DeRoche's January 15, 2009 deposition and was admitted as PX 361.

number of data points, then it was statistically valid to interpolate data to fill in the gaps." Tr. at 1990 (DeRoche). The results of this model would be used to judge the overall reasonableness of KBR's DFAC costs. The negotiations on the parametric model took place from the end of 2004 through March 2005. Tr. at 239 (Walter). KBR, largely through Ms. Pettibone, and the SCAT, then negotiated on the basis of the information and factors that would be included in the parametric model. See May 23 Order, ¶¶ 18-20. KBR's main objective was to persuade the SCAT to modify the model so as to best represent conditions on the ground; in particular, KBR took the position that the model should account for the recovery of fixed costs that had been expended in order to provide DFAC services. Id. ¶ 19. MA 3 WR 3 was one of the contracts that was included in the parametric model. See id. ¶¶ 11, 22.

However, the parametric model was developed to address the costs of all of the DFACs in Iraq; thus, according to Ms. DeRoche, it was not statistically valid for any particular DFAC. Tr. at 1990 (DeRoche). Ms. DeRoche testified that "[o]ne of the limitations of the model was that while [SCAT] felt very comfortable that it would give us a good result in the aggregate, as [one] drills down to individual sites and the more specific [one] got[,] the less . . . reliable the data was for any given individual situation." Tr. at 1990 (DeRoche).

On March 31, 2005, KBR and the United States entered into the Global DFAC Settlement (the "Settlement") to resolve the boots-through-the-door controversy. See JX 94, at Atts. 19, 23; Tr. at 1995-97 (DeRoche). 45/ Based on the results of the model, the Government offered KBR an overall decrement of $55 million on costs invoiced under TO 59 from September 2003 through February 2004, which KBR accepted. May 23 Order, ¶¶ 22, 42. According to the model, the site-specific reasonable amount for Camp Anaconda was calculated to be $106,565,119.00, which happened to be greater than the $105,623,149.00 that KBR had invoiced in subcontract costs at the site. Id. ¶ 22. Thus, none of the $55 million decrement was allocated to the subcontract agreement for DFAC services at Anaconda.

In order to effectuate the DFAC Settlement, KBR and the Government agreed to a firm-fixed-price contract modification to TO 59, which avoided potential future audits of the same work. The SCAT team initially had only been tasked to definitize TO 59, but the amount of work put into the parametric model convinced the Government that it was advantageous to use the model to settle as much of the DFAC issue as it could. See Tr. at 1991 (DeRoche). It became the SCAT's goal to cover the period of most concern to DCAA—that period before KBR switched to the SK-type subcontract, which could be left

---

45/ The Global DFAC Settlement covered DFAC services for fifteen different TOs under LOGCAP III. Tr. at 1996 (DeRoche).

to proceed under the normal machinations of LOGCAP III and its TOs.  Tr. at 1993-94 (DeRoche).  KBR and the Government agreed to engage in a reconciliation process to identify specific DFAC subcontractor invoices to be included under the Settlement.  May 23 Order, ¶ 45.  The original "billing universe" of DFAC subcontract costs incurred by KBR was set in the initial version of the DFAC Settlement as $1.179 billion.  However, the SCAT was aware at the time that KBR actively was trying to negotiate price reductions with Tamimi—through CO 6 and CO 9—and it was agreed that any credits that KBR received from Tamimi would be included in the final settlement.  See id. ¶¶ 25-26.  To that end, the SCAT was kept apprised of the progress with negotiations. 46/

On April 5, 2005, DCAA forwarded the CO 9 documentation and Ms. Hayes's Negotiation Memorandum to Alan Maynard, another member of the Army SCAT.  JX 204 (Apr. 4-5, 2005 e-mail chain).  Then on April 23, 2005, Ms. Pettibone forwarded the credit notes from Anaconda that KBR had received from Tamimi to Ms. DeRoche and other members of the SCAT.  See JX 276.  Because these credit memos related to the Tamimi invoices that had been submitted through June 2004, the overall Global DFAC Settlement, at least regarding MA 3 WR 3, would run through June 2004.  May 23 Order, ¶ 50.  Based on this information, on April 29, 2005, the parties adopted Addendum #1 to the Settlement, which redefined the billing universe down to $1.166 billion, but the overall decrement and allocation were not affected.  Id. ¶ 51.

Ms. DeRoche authored the Government's PNM dated July 8, 2005, which was signed by Major General Jerome Johnson, Head of Contracting Activity for the Army.  Tr. at 1996-97 (DeRoche); JX 94, at 7593-7620.  The PNM summarized the negotiations between KBR and the Army and the Government's position on the DFAC Settlement.  The main focus of this lengthy exhibit at trial was paragraph 26, which begins: "The settlement price is considered fair and reasonable and in the best interests of the government.  The parametric model parameters and resulting calculations, as well as the invoiced costs accepted for the credit memo period, are reasonable."  JX 94, at 7612.  Ms. DeRoche reiterated at trial that "[t]he major issue for us was the overall reasonableness of the settlement; and while . . . [SCAT] consider[ed] individual elements within that, it was the overall price that [SCAT] w[as] justifying."  Tr. at 1999 (DeRoche).

Then, under part "f," the PNM recites:

The reduced costs reflected for the credit memo period are the result of KBR's protracted negotiation with Tamimi, and are considered reasonable.  When the associated credits are applied to the original invoices, the resulting costs are equivalent to KBR's new subcontract rate structure.  The new

---

46/  This was known as the "Credit Memo Period."  Tr. at 1995 (DeRoche).

Tamimi subcontract costs were viewed as reasonable by the SCAT, and are not subject to the application of decrements or suspension by DCAA as were the initial subcontracts that are the basis for this settlement.

JX 94, at 7613.  According to Ms. DeRoche, this language referred to the judgment made by the SCAT to include the negotiations with Tamimi under the Global DFAC Settlement, and she opined that it was reasonable to do so.  See Tr. at 2005 (DeRoche).  However, she also stated that nothing in the PNM referred to the reasonableness of the PPPD rates negotiated by KBR with Tamimi.  See Tr. at 2007 (DeRoche).

On July 26, 2005, KBR and the Army executed Modification 38 to TO 59. Modification 38 implemented the Global DFAC Settlement and converted KBR's DFAC subcontract effort—less the $55 million decrement—into a firm-fixed-price contract, thereby establishing the adjusted billing as a reasonable amount immune from future audits.

## VI.   The DCAA audit process

Even after the DFAC Settlement, the accounting travails at Camp Anaconda continued to plague KBR.  While the DCMA had expressed support for KBR and the job that it was performing in Iraq, see JX 71 (Oct. 28, 2005 letter to Todd W. Bishop, then-KBR Director of Government Compliance, from DCMA granting continued approval of KBR's purchasing system); JX 72 (Oct. 3, 2006 letter to Mr. Bishop of KBR from DCMA expressing same), DCAA still was not satisfied that the prices that KBR had obtained from Tamimi at Anaconda were fair and reasonable.  On July 19, 2006, DCAA issued a preliminary findings report regarding DFAC services at Anaconda that questioned $44.8 million in KBR costs. See JX 8 (DCAA Preliminary Findings Report).  DCAA compared the average PPPD CO 9 prices for the months July 2004 through December 2004 at Anaconda with the average PPPD prices of twelve "competed subcontracts," the price information for which was available prior to July 2004.  JX 8, at 6326.  DCAA found that its sample of twelve subcontracts represented an average PPPD rate of $7.07, whereas the PPPD rate at Anaconda ranged from $13.07 (in December 2004 after the DFAC facilities allegedly had been fully amortized) to as high as $24.85 in November 2004.  See JX 8, at 6327.  Assuming that the average PPPD calculated price represented what was fair and reasonable, DCAA determined that the difference between the fair and reasonable cost and KBR's submitted cost was approximately $44.8 million.  Id.

On August 24, 2006, KBR's Director of Government Compliance, Mr. Bishop, sent KBR's response to the DCAA.  JX 7 (KBR's Response to DCAA Preliminary Finding Report); JX 88 (Mr. Bishop's contemporaneous price analysis).  Based on Mr. Bishop's analysis, the comparison that DCAA was attempting to draw between its selected sample of twelve DFACs and Anaconda contained several flaws.  First, Mr. Bishop pointed out that

DCAA had used the projected headcount figures for its sample set to determine the PPPD rate, but the actual headcount figures when calculating the PPPD rate at Anaconda. JX 7, at 3653. Second, one of the DFACs used in DCAA's sample was not even operational until February 2005, so it had not incurred any actual costs during the time frame that DCAA was examining. Id. Third, seven of the sample DFACs originally were constructed under a contract beginning in 2003, thereby allowing for the recovery of any construction costs in the period of performance prior to the relevant period of performance that DCAA was using to calculate its average PPPD rate, whereas Anaconda's rate was amortized over only nine months, five months of which were encompassed by the questioned time frame. Id. KBR submitted its own comparison, having obtained the actual headcounts for the remaining four facilities within DCAA's original twelve and normalized the construction costs at those four facilities over a nine-month period to coincide with the amortization time frame at Anaconda. Id. at 3654. Mr. Bishop's analysis yielded a difference between the remaining sample and the amount KBR invoiced at Anaconda of approximately $876,000.00. Id.

In addition, Mr. Bishop challenged the notion that any other DFACs were comparable to Anaconda, asserting that "[t]o accurately compare the contracts all factors need to be taken into consideration." Id. at 3656. Mr. Bishop listed a number of considerations that rendered Anaconda unique, yet that DCAA had not considered. Mr. Bishop pointed to the type of DFAC structure used at Anaconda, as well as its huge square footage. Id. at 3655. He also noted that, due to its location in Iraq, resupplying Anaconda was more difficult than other bases, particularly in light of the ever-present hostilities both at Anaconda and on the re-supply route to and from the base. Id. at 3655-56. Anaconda came under regular enemy fire, and KBR convoys resupplying the base were attacked and the truck drivers at times had been captured and even killed. Id. at 3655. He urged that all of these factors served to increase the PPPD rate at Anaconda, whereas they might not have been present at the other DFAC facilities—circumstances peculiar to Anaconda that DCAA should recognize in determining a fair and reasonable price. Id. at 3656.

DCAA did not respond to KBR for almost a year, but during that period its own internal position on the amount of costs that should be questioned varied significantly. By January 2007 David M. Fisher, a DCAA auditor, whose deposition was admitted into evidence as PX 477 (Deposition of David M. Fisher, Kellogg Brown & Root Servs., Inc. v. United States, Nos. 09-351C, 09-508C, 09-578C (Fed. Cl. Aug. 24, 2010), adjusted the calculation method, which lowered the amount of questioned costs to $39.2 million. JX 10 (Mr. Fisher's working papers) (text box at E10). However, by January 19, 2007, Mr. Fisher had further adjusted this figure downward to $28.6 million, JX 10 (cell AM25), and by February 2, 2007, Mr. Fisher had arrived at calculations questioning only $5.1 and $1.6 million, JX 10 (cells BA82, AV82). On February 19, 2007, DCAA held a meeting at which one of the topics discussed was the ongoing progress of Mr. Fisher's questioned costs at Anaconda. Mr. Duggan recorded this meeting in a memorandum reflecting the supervisory

guidance that he received. See JX 30 (Mr. Duggan's Feb. 19, 2007 memorandum discussing interim guidance); PX 478, Duggan Dep., at 72-75). Of all the witnesses who testified by deposition (Ms. DeRoche also testified in person), Mr. Duggan's resonated with clarity, authority, balance, and common sense. He confirmed the documentary record. According to Mr. Duggan, Branch Manager Sylvia Wofford briefed him on the DFAC audits and the progress that Mr. Fisher had made. See JX 30; PX 478, Duggan Dep., at 73. However, considering the methodology employed by Mr. Fisher, including using Ms. Hayes's "poorly drafted [Negotiation Memorandum] as the starting point for his findings" and not considering "unique site requirements and variables," Ms. Wofford stated to Mr. Duggan that "management felt that [Mr. Fisher's] findings could not be sustained based on reasonableness." JX 30; see also PX 478, Duggan Dep., at 72-77. From there, Mr. Duggan received his instructions on how to proceed. See JX 30.

By April 7, 2007, responding to questions about DFACs generally, Mr. Duggan said "yes" when asked if his questioned costs included instances of "clear overbilling of headcount bands" and, by that point, he estimated a 20% overbilling. JX 17, at 6521 (Mr. Duggan's Apr. 7-14, 2007 memorandum reflecting supervisory guidance). Mr. Duggan also realized that issues were present with the Government's change in stance on whether the Army wanted to own the DFAC facilities at the sites, noting that some of the "lease to own assets we paid twice for." Id. Although implicating the "color of money" issue, members of DCAA still deemed this posture was "unreasonable and should be pointed out." Id. On April 10, 2007, Mr. Duggan's supervisor queried him specifically about the issues regarding Tamimi. Id. at 6523. Mr. Duggan suggested that DCAA modify Mr. Fisher's report prior to issuing anything "to address KBR's concerns," but, when discussing what modifications would be necessary, Ed Nelson, a DCAA Regional Director, interjected that "[auditors] can over think these things" and that "the audit has been going on for a year and we need to put something out on the street so that KBR would be forced to reply to [DCAA's] findings." Id. By this point Mr. Duggan's supervisors were instructing him to go with Mr. Fisher's findings, despite being told to abandon them approximately one month before. Id. The reason? DCAA was having "some success." PX 478, Duggan Dep., at 103-04.

On May 22, 2007, Mr. Duggan attended a meeting with Regional Audit Manager Dan Altemus and Supervisor Doug Black during which he presented an argument that KBR did meet the requirement that the prices it claimed as costs were reasonable. JX 19 (Mr. Duggan's May 22, 2007 memorandum reflecting supervisory guidance); see also PX 478, Duggan Dep., at 113-14. Mr. Altemus was not persuaded by this argument. Id. Mr. Duggan also argued that KBR had a persuasive argument that it was difficult to justify the "comparative method," given that DFACs at different locations would have different reasonable prices. See JX 19. However, the group was of the opinion that, even if DCAA utilized KBR's method of calculating prices—an option that Mr. Altemus was opposed to pursuing—justification was present to question $23 million of KBR's costs and that this

would be a sensible "fall-back position" in the final report released by DCAA.  See id.  By May 25, 2007, two draft Audit Reports on the Anaconda DFAC costs were prepared utilizing different methodologies; one report questioned $37.2 million of unreasonable subcontract costs, JX 27, at 6358, whereas the second questioned $23.6 million of unreasonable costs, JX 35, at 6319.

After presumably more internal deliberations, DCAA finally responded to Mr. Bishop and KBR on August 9, 2007, and notified KBR of its revised findings.  See JX 39 (Aug. 9, 2007 DCAA letter).  DCAA did acknowledge that KBR had made some worthwhile suggestions in its initial response, which convinced DCAA to modify its initial approach.  In relevant part, the letter stated:

> We agree, in part, with [KBR]'s objection to using those subcontracts that [KBR] identified in our comparative analysis that had lower fixed costs (because of longer amortization periods) compared to those subcontracts used in the [CO 9] procurement.  Therefore, to make this analysis as comparable as possible, we (i) reduced the subcontracts in our comparative baseline from twelve (12) to eight (8) by eliminating the four (4) subcontracts [KBR] considered most incomparable, and (ii) adjusted the amortization period to nine (9) months for the remaining 8 subcontracts.  This resulted in reducing questioned costs from our original amount of $44 million to the $37 million that we now question . . . .

JX 39, at 6345.  However, DCAA was not acquiescing in the other factors unique to Anaconda that Mr. Bishop cited as skewing the prices and, hence, the claimed costs.  According to DCAA,

> none of these factors were quantified.  By stating that DCAA failed to consider these assertions[,] you are implying that [KBR] did recognize those factors in [its] pricing of the subcontracts.  Notwithstanding, [KBR] provided no basis for any quantification, nor any convincing rationale to demonstrate that the qualitative factors would result in higher, or lower, costs, when comparing the eight DFACs to the Tamimi DFACs.

Id.

DCAA offered KBR the opportunity to submit additional information that DCAA could use to further revise its comparative model.  Id. at 6345-47.  However, DCAA reiterated that KBR should provide or demonstrate by "actual cost data" or provide DCAA with the actual costs of the qualitative factors.  Id. at 6346-47.  This was an odd posture because even DCAA realized that these were commercial procurements, and, as Mr. Duggan

47

had reminded his supervisors, "the FAR was written by contractors who want every procurement to be commercial to avoid the audit of cost or pricing data." JX 19; see also PX 478, Duggan Dep., at 119-20. The effect of this anomaly was that KBR was not required to provide—and thus likely did not possess—cost data.

On September 29, 2007, KBR submitted its letter response to DCAA. See JX 126. Mr. Bishop stated that KBR already had submitted "all available procurement and payment data," but that, in the brief period allotted by DCAA for a response, it would be impossible to generate the additional data that DCAA was requesting—information that KBR did not possess at the time. Id. Mr. Bishop also expressed frustration over the process, stating that KBR had concluded that "DCAA's position will not change regardless of what this created information will show . . . [because] KBR and DCAA have a fundamental disagreement regarding how KBR was entitled to price its subcontracts under the terms of its prime contract and further information will not resolve this disagreement." Id. In concluding, Mr. Bishop notified DCAA that, while KBR continued to disagree with DCAA "that any appropriate basis exists to support the issuance of a Form 1, KBR believes that the time has come to resolve this issue in another forum." Id.

On December 7, 2007, DCAA issued its final audit report, JX 1, a report that was not actually received by KBR until April 2008. Summarizing its findings, DCAA related that the rate KBR negotiated with Tamimi "equated to $24.15" PPPD and that "[s]imilar subcontracts were negotiated at much lower prices (the average for eight similar DFACS was $8.83 PPPD)." JX 1, at 6211. DCAA thus found that "unreasonable costs of $39.9 million were charged to the government . . . [and were being questioned] as unreasonable as defined by FAR 31.201-3." Id. On January 29, 2008, DCAA issued a Form 1 suspending a total of $41.1 million—inclusive of the fee collected by KBR on the questioned amount—for amounts billed to the Government for DFAC services provided at Camp Anaconda. See JX 68.

KBR submitted a certified claim for the suspended $41 million on July 17, 2008, see JX 74, which the parties agree was received by the contracting officer on July 18, 2008, see Pl.'s Br. filed Dec. 22, 2011, at 33. No contracting officer's decision was forthcoming, and KBR commenced suit in the United States Court of Federal Claims on June 2, 2009.

VII.  Procedural history

On June 2, 2009, plaintiff filed its complaint in the Court of Federal Claims seeking approximately $41,070,624.00 in unpaid costs, plus fee, incurred under LOGCAP III for DFAC services at Camp Anaconda from July through December 2004. On July 27, 2009, defendant requested a ninety-day enlargement of time to "evaluate the appropriateness of special pleadings and counterclaims involving fraud, which are currently being considered

in this case," Def.'s Mot. filed July 27, 2009, at 1, which the court granted in part with a sixty-day extension, <u>see</u> Order entered Aug. 4, 2009. Defendant filed its first answer on October 5, 2009, and discovery commenced in December.

Defendant, upon learning of the kickbacks Mr. Hall allegedly received, <u>see</u> Def.'s Mot. filed Nov. 9, 2010, at 3 ("[W]e were unaware of the evidence provided by Mr. Hall until late last week, despite our diligent efforts to remain apprised of investigative efforts related to Tamimi and KBR."), requested on November 9, 2010, a 120-day extension of time for discovery in order to pursue a possible fraud counterclaim, <u>see id.</u> at 1.  On November 17, 2010, the court granted defendant's motion, instructing defendant to file promptly any amended answer or counterclaim and limiting any new discovery to defendant's allegations of fraud.  <u>See</u> Order entered Nov. 17, 2010, ¶¶ 1-2.

On December 20, 2010, plaintiff filed a motion to compel the production of documents "reflecting any act(s) of fraud, kickbacks, or bribery related to Master Agreement 3 Work Release 3." Pl.'s Mot. filed Dec. 20, 2010, at 2.  Defendant had asserted that these documents were protected by the investigative files privilege.  <u>See</u> Def.'s Br. filed Jan. 6, 2011, at 2.  On January 20, 2011, the court granted plaintiff's motion in part by ordering defendant to file any counterclaim in fraud by March 15, 2011.  <u>See</u> Order entered Jan. 20, 2011, at 1-2 (noting that defendant did not seek protective order suspending its obligations to respond to discovery requests relating to fraud and "failed to assert the investigative files privilege timely or adequately").  On March 15, 2011, defendant filed Defendant's Amended Answer and Counterclaims.

On April 6, 2011, plaintiff moved to dismiss all five of defendant's counterclaims and its affirmative defense under RCFC 12(b)(6) and RCFC 9(b), and on April 15, 2011, plaintiff moved for summary judgment on its affirmative claim.  Oral arguments on plaintiff's motions were held on May 3 and May 23, 2011, respectively.  The court denied from the bench plaintiff's motion for summary judgment on May 23, 2011, with the unremarkable ruling that genuine issues of material fact existed as to the reasonableness of plaintiff's costs.  <u>See</u> Order entered May 23, 2011, at 1.  On June 24, 2011, the court granted in part and denied in part plaintiff's motion to dismiss the counterclaims.  <u>See</u> <u>Kellogg Brown & Root Servs., Inc. v. United States</u>, 99 Fed. Cl. 488, 516-17 (Fed. Cl. 2011) ("<u>KBR I</u>") (dismissing defendant's counterclaims under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 (2006), and the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and striking defendant's affirmative defense, but refusing to dismiss defendant's Anti-Kickback Act claims, 41 U.S.C. §§ 53, 55 (2006), or common law fraud claims for rescission and disgorgement).

After an extension of discovery on defendant's counterclaims, the parties made their pretrial filings on September 21, 2011.  On that same day, defendant moved to file designated depositions as substantive evidence and plaintiff moved to file transcripts.  <u>See</u> ECF Nos.

117, 122.  Plaintiff then filed four motions *in limine* on September 26, 2011, seeking to: (1) exclude the testimony of Paul Szafranski, ECF No. 129; (2) admit deposition testimony under Fed. R. Evid. 801(d)(2), ECF No. 130; (3) exclude evidence, ECF No. 131; and (4) strike untimely amendment of expert report and exclude cumulative expert witness, ECF No. 132. The final pretrial conference was held on October 5, 2011.  On October 6, 2011, the court ruled on the outstanding pretrial motions, granting in full only the parties' September 21, 2011 motions and plaintiff's motion *in limine* to admit deposition testimony.  See Order entered October 6, 2011.  Additionally, owing to injuries sustained by Mr. Hall in a recent motor vehicle accident, the court granted plaintiff's request to resume trial on a date subsequent to October 26, 2011, to allow for Mr. Hall's recovery.  Id.

Trial commenced on October 11, 2011, and proceeded for nine days through October 25, 2011.  Trial resumed on December 1, 2011, when Mr. Hall was able to testify.  The parties presented closing arguments the following day on December 2, 2011.  Plaintiff submitted its initial post-trial brief on December 22, 2011, and the final post-trial brief was filed on February 3, 2012.

## DISCUSSION

The parties concur on the standard for recovery, which is defined by the Federal Acquisition Regulation ("FAR").  LOGCAP III incorporates FAR 52.216-7, which permits reimbursement of costs paid to Tamimi, the subcontractor, by plaintiff, the prime contractor, only to the extent that the contracting officer determines them to be allowable in accordance with FAR subpart 31.2.  See FAR 52.216-7(a)(1) (2000) 47/ ("The Government shall make payments to the Contractor . . . in amounts determined to be allowable by the Contracting Officer in accordance with Subpart 31.2 of the Federal Acquisition Regulation (FAR) . . . .").  Costs are allowable pursuant to FAR subpart 31.2 if they meet the standard for reasonableness. 48/  See FAR 31.201-2 (2000) ("The factors to be considered in determining

---

47/  The court is unsure whether the parties are citing the current version of the FAR or the version that was in effect when LOGCAP III was awarded to plaintiff.  Other than defendant's citation to FAR 52.216-7, see Def.'s Br. filed Jan. 13, 2012, at 22, the parties' citations to the FAR do not include dates.  The court's review of the current and 2000 versions of the cited regulations revealed that, although minor formatting changes were made and a misplaced modifier was corrected, the regulations are almost identical.  As such, the version cited is inconsequential.

48/  Defendant's expert in government contract auditing and accounting, Sandra Ann ("Sam") Hadley, testified that plaintiff had a responsibility to justify the reasonableness of its prices upon award in accordance with FAR 15.404, see Tr. at 2339 (Hadley).  Ms. Hadley explained that FAR 15.404 sets forth various proposal-analysis techniques that may assist a

whether a cost is allowable include the following: (1) Reasonableness."). FAR 31.201-3 provides the standard for determining reasonableness, as follows:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

> (b) *What is reasonable depends upon a variety of considerations and circumstances,* including—

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

> (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;

---

48/ (Cont'd from page 50.)

contractor in justifying its prices. Tr. at 2339-40 (Hadley). When a contractor or subcontractor is not required to submit certified cost data, FAR 15.404 instructs that price analysis should be used to evaluate the reasonableness of a price. See FAR 15.404(a)(2) (2012). Ms. Hadley expressed the opinion that FAR 15.404 imposes a duty on contractors engaging in price analysis to obtain other-than-certified cost data in order to ascertain the reasonableness of their prices. Tr. at 2340 (Hadley). Despite Ms. Hadley's testimony, neither plaintiff nor defendant cited FAR 15.404 in their post-trial briefs or otherwise argued in favor or against its application to the matter *sub judice*. It appears that the regulation deals with analysis of a price proposal. As Ms. Hadley noted, "[when] you need to justify the reasonableness of the prices, then you can use price techniques. However, *price techniques do not justify the reasonableness of the prices*." Tr. at 2340 (Hadley) (emphasis added). Thus, while price analysis was an option available to plaintiff to assist it in demonstrating the reasonableness of its prices, failure to utilize a technique set forth in FAR 15.404 does not render plaintiff's prices unreasonable; rather, FAR 31.201-3 contemplates other means of establishing the reasonableness of prices.

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

FAR 31.201-3 (2000) (emphasis added).

Previously, a contractor's incurred costs were entitled to a presumption of reasonableness, and the Government bore the burden of proving that the costs were unreasonable. See Bruce Constr. Corp. v. United States, 324 F.2d 516, 519 (Ct. Cl. 1963). This presumption, however, was superseded in 1987 by an amendment to FAR 31.201-3. See 52 Fed. Reg. 19,800, 19,804 (May 27, 1987) (codified at FAR 31.201-3); see Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 275 (2006); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 245 (2005). The current version of FAR 31.201-3 squarely acknowledges the lack of that presumption and imposes on the contractor the burden of proof of reasonableness. See FAR 31.201-3(a) ("No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. . . . [T]he burden of proof shall be upon the contractor to establish that such cost is reasonable."); see also Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 767 (Fed. Cir. 1987) ("The government was under no obligation to present evidence attacking an item if [the contractor] did not prove *prima facie* that it was properly included."); Thermalon Indus., Ltd. v. United States, 51 Fed. Cl. 464, 472 (2002); McDonnell Douglas Corp. v. United States, 40 Fed. Cl. 529, 536 (1998), rev'd on other grounds, 182 F.3d 1319 (Fed. Cir. 1999); Fiber Materials, Inc., ASBCA No. 53616, 07-1 BCA ¶ 33,563, 2007 WL 1252481 (Apr. 17, 2007). Thus the court holds that plaintiff's burden was to prove by a preponderance of evidence the reasonableness of its claimed costs.

FAR 31.201-3 affords the court significant discretion in determining whether or not claimed costs are reasonable and sets forth a non-exhaustive list of circumstances to be considered. See FAR 31.201-3(b)(1)-(4). Despite this guidance, case law in which a court or the Armed Services Board of Contract Appeals ("ASBCA") has exercised its discretion and evaluated the reasonableness of a claimed cost in similar circumstances is limited. 49/

_____

49/ Most of the cases addressing the reasonableness of claimed costs involve challenges to the amount of employee compensation. See Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 97-98 (1992) (citing FAR 31.201-3(b) and stating that "the reasonableness of compensation is a question of fact that is determined in light of all the relevant facts of a particular case" (citation omitted)); Boeing Aerospace Operations, Inc., ASBCA Nos. 46274, 46275, 94-2 BCA ¶ 26,802, 1994 WL 96970 (Mar. 21, 1994) (determining reasonableness of employee compensation by considering "all of the relevant circumstances existing at the time of the incurrence of the costs" (citation omitted)), aff'd on recons., ASBCA Nos. 46274, 46275, 94-3 BCA ¶ 27,281, 1994 WL 651887 (Nov. 9, 1994).

Plaintiff relies on <u>Lockheed Martin Tactical Aircraft Systems</u>, ASBCA No. 49530, 00-1 BCA ¶ 30,852, 2000 WL 307741 (Mar. 22, 2000), to support its argument that its costs were reasonable. <u>See</u> Pl.'s Br. filed Dec. 22, 2011, at 2-3. <u>Lockheed</u> involved the production and sale of military aircraft for the Government of Turkey through the Department of Defense's Foreign Military Sales program (the "FMSP"). <u>Lockheed</u>, 2000 WL 307741, at *7. Pursuant to the FMSP, the United States Government enters an agreement with a foreign country—the customer—to serve as the customer's agent and contracts with a United States contractor for the production of specified goods. <u>Id.</u> at *2. The United States, as an agent for Turkey, contracted with Lockheed for the production of military aircraft. <u>Id.</u> at *4-5. In conjunction with Turkey's purchase through the FMSP, the United States Government brokered a counter-trade military agreement between the Governments of Egypt and Turkey whereby co-production of the aircraft would be performed by a subcontractor in Egypt. <u>Id.</u> The United States Government was aware that Turkey would incur significant co-production premiums on account of this arrangement. <u>Id.</u> at *27.

When Lockheed sought reimbursement of costs incurred in connection with co-production efforts, the United States Government, contending that the costs were unreasonable, disallowed them. <u>Id.</u> The ASBCA disagreed. <u>Id.</u> at *28. Explaining that FAR 31.201-3 provides for an evaluation of reasonableness on the basis of the specific circumstances presented, the ASBCA discussed the "unique facts at work . . . specifically, the period of political and military turmoil which formed the backdrop of th[e] case." <u>Id.</u> at *27-28. The ASBCA recognized that such circumstances will alter the costs of services and stated that "[u]nusually high costs may be necessary where urgency is present or where no alternative sources are available." <u>Id.</u> at *28 (citation omitted) (internal quotation marks omitted). Moreover, the ASBCA noted that the United States Government, aware of the high estimate for the co-production premium, encouraged Turkey to proceed with the contract, thereby implying that the co-production costs were reasonable. <u>See id.</u> at *27, *29. When it later disallowed those costs, the United States Government failed to explain why costs previously deemed reasonable had since become unreasonable. <u>Id.</u> at *27. Accordingly, the ASBCA ruled that Lockheed reasonably incurred the total amount of co-production costs claimed and was entitled to recover them in full. <u>See id.</u> at *29.

Plaintiff cites <u>Lockheed</u> to emphasize FAR 31.201-3's instruction that reasonableness "depends upon a variety of considerations and circumstances." FAR 31.201-3(b). Although the ASBCA acknowledged that Lockheed's claimed co-production costs were significant, it recognized that production was occurring in the midst of "political and military turmoil," likely resulting in elevated prices for services rendered. <u>Lockheed</u>, 2000 WL 307741, at *27. Plaintiff thus urges that, in evaluating the reasonableness of plaintiff's claimed subcontractor costs, the court should consider the wartime environment in which plaintiff was operating. <u>See</u> Pl.'s Br. filed Dec. 22, 2011, at 2. Considered in context, plaintiff's actions were "prudent" and, therefore, reasonable. <u>See id.</u>

Defendant has neither cited <u>Lockheed</u> nor argued that it is not persuasive authority. Rather, defendant simply advances the argument that plaintiff has failed to meet its burden to demonstrate that Tamimi's prices were reasonable.  <u>See</u> Def.'s Br. filed Jan. 31, 2012, at 9.

An additional step toward resolution is the parties' agreement that the court can determine cost reasonableness.  <u>See</u> Pl.'s Br. filed Feb. 3, 2012, at 4 ("[T]he Court may rely on any evidence demonstrating price reasonableness that was presented at trial."); Pl.'s Br. filed Jan. 24, 2012, at 15 ("[T]he court has the ultimate say in determining price reasonableness . . . ." (citations omitted)); Def.'s Br. filed Jan. 13, 2012, at 33-34 ("[T]here is no reason to give the few conclusory sentences in [Ms. Hayes's Mar. 29, 2005 Negotiation Memorandum] any weight, especially given the fact that the Court is far better placed to evaluate just how reasonable the negotiations undertaken by Ms. Hayes really were."); Def.'s Br. filed Jan. 31, 2012, at 13   ("[T]he Court is far better positioned to judge the reasonableness of the CO 9 prices than Ms. DeRoche, who had far more concerns in writing her PNM than just the reasonableness of two months of CO 9 pricing." (citation omitted)).

I.  <u>Reasonableness of costs claimed by plaintiff</u>

The court begins by noting plaintiff's emphasis on the fact that the costs need to be reasonable, not in a vacuum, but in the context of the events in which they arose.  <u>See</u> Pl.'s Br. filed, Dec. 22, 2011, at 2-3.  Plaintiff consistently advocates that it acted in a "prudent manner" in negotiating prices with Tamimi and that, when the realities of the situation KBR faced at Anaconda are taken into consideration—the various environmental factors such as the threat to supply lines and personnel, along with the need to fulfill the demands of the Government in performing under LOGCAP III—the court should find that the outcome with Tamimi, although perhaps not ideal from a "conference room" perspective, was reasonable. <u>See, e.g.</u>, <u>id.</u> at 2 ("Viewed in the totality of the circumstances, KBR's actions may not have been perfect but were prudent, and are not properly subject to Government second-guessing . . . ."); <u>id.</u> at 1 ("The standards the Court must apply do not, as suggested by the Government, relate to 'conference-room' contracting . . . but rather are those from the crucible of a war . . . .").  The court concurs with plaintiff's point, with the following caveat: while plaintiff's decisions must be viewed in the context in which they were made, and thus must take into account the realities that KBR personnel and its subcontractor were facing at the time, this willingness to expand "reasonable" beyond the "conference room" is confined to circumstances when KBR was dealing with realities over which it had no control.

As an illustration of this limitation, the court concurs with plaintiff and Ms. DeRoche, <u>see</u> Tr. at 1992 (DeRoche), that the Army placed great demands on KBR at the outset of the war and that KBR strove to comply with its normal procurement procedures in the face of

the urgent need to provide many services in many locations for the Army.  The court also concurs that perhaps the relationship with Tamimi at Anaconda was not ideal and that KBR heavily depended on a subcontractor that the Army favored in order to provide food service and laborers.  However, KBR receives no latitude from the court for the extent of the weakness of its bargaining position when negotiating CO 9 because it was KBR's decision, and no one else's, to attempt to self-perform the work at Anaconda.  It is true that the disastrous self-performance effort left KBR in a vulnerable position, as Ms. Hayes herself recognized.  See Tr. at 657-58 (Hayes).  But KBR cannot now point to a deficit in bargaining power and contend that its weakened state entitles it to greater latitude when the court makes a reasonableness determination on the product of those negotiations.  A contractor may not itself manufacture—or in this case exacerbate—a situation that leads to higher costs for the Government and then attempt to pass the ultimate financial responsibility for that situation on to the Government.  Because it was KBR, and not the Government, that contributed to its weakened negotiation position, it is KBR, and not the Government, that bears the financial risk of whatever fiscal concessions Shabbir Khan was able to wrangle out of KBR due to Tamimi's greater bargaining power on this issue.  The Government agreed to compensate KBR for costs reasonably incurred under LOGCAP III; it did not agree to be an insurer of any business decision that KBR attempted to implement and will not be held to such a standard.

Plaintiff elected to prove the reasonableness of the claimed costs, which represent amounts actually paid to Tamimi, plus additurs, by what the court will term "circumstantial evidence": the CO 9 Hayes negotiations; the Global DFAC Settlement; and the scattershot DCAA audits and Mr. Bishop's analysis in response thereto.  See Pl.'s Br. filed Dec. 22, 2011, at 1-2.  Plaintiff did not proffer an independent 50/ analysis to substantiate the amounts of any given type of questioned costs, although plaintiff appears to have been following the lead of DCAA's Form 1 that listed only an aggregate amount.  Instead, plaintiff looked to on-the-ground evidence that approximated contemporaneous events: contemporaneous negotiations between KBR and Tamimi regarding prices at Anaconda, temporally proximate negotiations between the Government and DFAC contractors concerning all DFAC facilities, and two years of DCAA audits that attempted to quantify reasonable costs.  While plaintiff did not argue for a presumption of reasonableness, plaintiff did attempt to show that the Government's challenge to the reasonableness of its costs, as reflected by the DCAA audit

---

50/ As noted in the court's findings of fact, several witnesses testified by deposition and/or in person; moreover, plaintiff did not call one expert that had been listed largely to support the CO 9 Hayes negotiations.  The court draws no adverse inferences in favor of live versus deposition testimony or against plaintiff for electing not to call witnesses.  The court makes the observation that plaintiff did not present an independent analysis of cost reasonableness only to distinguish what the trial record did not contain, not how plaintiff might have proceeded.

efforts, was indefensible. 51/ Defendant colorfully equated plaintiff's approach to a "three-legged stool" that collapsed leg by leg because none was probative of reasonableness.  See Tr. at 2834, 2841 (counsel for defendant).

The court makes several comprehensive findings pertinent to the entire factual record. Plaintiff seeks costs that were incurred during the six-month period from July to December 2004 emanating from a war initially conducted as a contingency operation beginning in March 2003 that became a sustained effort; costs that were impacted by fluctuating projections for the number of troops on the ground; costs that were driven by the singular goal of putting DFAC facilities in place to offer warm meals to the troops by July 4, 2003; costs that were the product of first-generation contracts that lacked certain formalities required by plaintiff's customary procurement policies because the subcontractor undertook to provide DFAC services while its subcontract was being finalized; costs that flowed from fixed-price contracts with a subsidiary in a foreign contractual environment for which the record amply supports the politically infelicitous label of tolerating questionable practices for securing and maintaining business relationships; and costs that were the subject for hand-wringing and finger-pointing once those in authority became aware of the asymmetry, i.e., that the taxpayer was footing the humongous bill for DFAC services that were not utilized.  See, e.g., PX 361, Deposition of Lynn E. DeRoche, Paul Morrell, Inc. v. Kellogg Brown & Root Servs., Inc., No. 1:08cv072, at 261 (E.D. Va. Jan. 16, 2009) ("[I]t's the issue that was the most visible to [C]ongress, public taxpayers at the time, the impression that the Army was paying for service that it wasn't getting.") ("DeRoche Dep. II").

Correspondingly, the court finds that the Army did not foist upon plaintiff the fixed-price subcontract arrangement with vendors such as Tamimi.  Indeed, John R. Murphy, the Team Leader Cost Price Analyst for the Army Sustainment Command on the DFAC cost-price analysis, PX 362, Deposition of John R. Murphy, Paul Morrell, Inc. v. Kellogg Brown & Root Servs., Inc., No. 1:08cv072, at 10-11 (E.D. Va. Jan. 14, 2009), who was detailed to work with Ms. DeRoche on the definitization of TO 59, and whose deposition testimony resonated a grasp of the mechanics, opined:

> What we have is a cost per person/per day, and we do not know anything about what made that cost per person/per day.

---

51/ Defendant, however, did not rely on the DCAA audit "'to make its case,'" see Pl.'s Br. filed Jan. 24, 2012, at 14 n.13, and it disclaims any significance that purports to attach to the different iterations of the audit before it was finalized, see Def's Br. filed Jan. 31, 2012, at 13-14 n.9 ("[I]t is just not relevant at this point in the case, having already served its purpose of raising questions to the contracting officer regarding the Camp Anaconda prices.").

> KBR requested a turnkey operation, that turnkey operation in terms of a cost per person/per day, and we had zero knowledge from an initial estimate point of view what made any of that up, and certainly not from an actual incurred cost point of view, because it was a firm fixed price contract, and nobody needs to know that once you have an agreement on cost.

PX 362, Murphy Dep., at 88.

Plaintiff wanted the work, got on the ground early, and took on the risk under its cost-plus contracts that it would not be able to pass on to the Government its subcontractors' prices negotiated in a challenging environment when the prime contractor had few options.  No one should be heard to play the violin tune of we-couldn't-abandon-our-commitment-to-feeding-the-troops. 52/ Sincere as plaintiff's commitment was to providing for the troops, this is no proxy for proof of reasonable costs.

Having presented these overall findings, the court thus proceeds to examine plaintiff's justifications for establishing the reasonableness of its costs, evaluating each of plaintiff's three major arguments in turn.

1.  Ms. Hayes's CO 9 negotiations

Plaintiff's primary argument is that it has proved the reasonableness of its costs by demonstrating that the negotiations conducted by Ms. Hayes, which resulted in a cumulative $27 million credit to KBR, were reasonable, thereby justifying the product of the negotiations as reasonable.  See Pl.'s Br. filed Dec. 22, 2011, at 1-2, 17-20.  It is abundantly clear that KBR was aware that the prices under WR 3 were far too high and that no one within KBR had ever been able to justify the prices at Anaconda.  See JX 546 (Mr. Hadcock's attempt); JX 353 (Ms. Pettibone's frustrations).  According to plaintiff, it was Ms. Hayes who ultimately allayed these concerns.  Plaintiff presents Ms. Hayes as the prudent negotiator, one who diligently prepared for these negotiations by examining information prepared for her by Ms. Pettibone.  See Pl.'s Br. filed Dec. 22, 2011, at 14-17.  According to plaintiff, Ms. Hayes's

---

52/ Several witnesses voiced this sentiment.  See Tr. at 659-60 (Hayes).  Mr. Hall testified that "[f]or me it's a passionate thing that these soldiers may not even live to see another day, at least they get the proper food that they're supposed to get, and my main concern was let's just feed the troops as best we can."  Tr. at 2633 (Hall).  Because of this personal commitment, Mr. Hall testified that at no time did any of Shabbir Khan's monetary gifts ever influence his duties as KBR's Regional Food Service Manager.  See Tr. at 2633-34 (Hall).  The court is not prepared to draw such a fine line.  The court does not doubt the commitment in general of plaintiff's personnel who testified, among whom, surprisingly enough, Mr. Petsche was the most persuasive in this regard.

negotiation of CO 9 was a great success because the product of her efforts "met each of the key objectives, including the 'conditions' set out by Mr. Hadcock in the initial greensheet approval[.]" Id. at 17. Ms. Hayes successfully resolved the ownership issues of the facilities at Anaconda, negotiated retroactive price discounts, and extended Tamimi's performance at Anaconda for another year, ensuring that KBR would not default on its food service obligations under LOGCAP III. Id. at 17-18.

Beginning with facilities, plaintiff argues that ownership of the DFACs at Anaconda was still an open issue with Tamimi in December when Ms. Hayes began her negotiations. Id. at 18. As such, Ms. Hayes accepted Shabbir Khan's lament that Tamimi still was owed more than $40 million for the DFAC facilities. Id. (citing Tr. at 653-54 (Hayes)). In an effort to meet Mr. Hadcock's initial conditions, Ms. Hayes attempted to negotiate a transfer of ownership by September 2004, but was unable to convince Shabbir Khan to agree, presumably because of KBR's weak negotiating position. See id. at 17 n.17, 19. However, plaintiff argues that, in a skillful twist, Ms. Hayes was able to meet two objectives at once and agreed to a one-year contract extension at rates below Tamimi's July 2004 competitive bid in exchange for a transfer of ownership by November 30, 2004. Id. at 17, 19. Thus, because of Ms. Hayes, KBR took possession of the DFACs and ensured continued food service at a much lower price for another year.

Regarding the retroactive discounts, plaintiff contends that Ms. Hayes was similarly successful, especially considering that Ms. Hayes's "task was complicated by the fact that there were no other contracts with four DFAC facilities feeding as many people as at Anaconda that she could use as a comparison." Pl.'s Br. filed Jan. 24, 2012, at 12 (citing Tr. at 662-65, 673-74 (Hayes)). Entering negotiations with an ultimate goal of lowering the prices at Anaconda, Ms. Hayes focused on the bottom line and succeeded in convincing Mr. Khan to accept a $27 million discount—inclusive of the credits negotiated in CO 6. Pl.'s Br. filed Dec. 22, 2011, at 19. Plaintiff presents three pieces of evidence to show that this was a solid result for Ms. Hayes: (1) the average monthly imputed PPPD price achieved by Ms. Hayes in July through December 2004 was lower than the competitive bid plus 20% figure that Ms. Pettibone had forwarded Ms. Hayes, see JX 339, and which, in Ms. Pettibone's opinion, was possible to justify as reasonable; (2) the resulting average monthly imputed PPPD price was "well within the range of imputed PPPD prices for the 'SK' DFAC subcontracts," id. at 19 (citing JX 89); and (3) Shabbir Khan had been reluctant to accept the discounts offered by Ms. Hayes, and it was only when Ilyas Khan instructed him to take the deal that Shabbir acquiesced—this being "powerful evidence that the negotiations were done at arms-length and that KBR did achieve a good result," id. at 20 (citing Tr. at 675-76 (Hayes)).

Unlike KBR, defendant argues that the court should evaluate Ms. Hayes's negotiations and conclude that "the conduct of those negotiations was unimpressive and contrary to KBR

policy, and the memorandum purporting to justify the results is both inaccurate and unpersuasive." Def.'s Br. filed Jan. 13, 2012, at 28. Defendant would summarize the negotiations with the pithy "Ms. Hayes simply asked for a price reduction; Mr. Khan told her what he was willing to give; and, after some back and forth, she accepted it." Id. Even the contract extension should be viewed with skepticism as not being the product of tough negotiation because Ms. Hayes testified that Tamimi received a contract extension only so that Shabbir Khan would negotiate ownership of the facilities. As defendant expressed it, "[t]his is not negotiation on the prices so much as it is acquiescence." Id. at 29. Defendant notes that Ms. Hayes, despite being portrayed as a tough negotiator, "paid little attention to the amount of money that KBR had withheld from Tamimi [approximately $76 million] and made no effort to capitalize on it." Id. at 32 (citing Tr. at 655 (Hayes)). Even conceding weaknesses in KBR's negotiating position, defendant argues that failure to utilize its leverage placed Ms. Hayes at a disadvantage in the negotiations and casts doubt on the result obtained. Id.

Defendant's first line of argument deals with Ms. Hayes's apparent failure to follow many of KBR's established policies and procedures for this type of negotiation. See id. at 28-29. Citing to KBR's applicable policy manual, JX 47 (KBR Government Operations Procurement Policy and Practices Manual dated June 25, 2004), defendant proceeds to list Ms. Hayes's departures from procedure: (1) Ms. Hayes "did not establish a negotiation team from which she could obtain analytic support . . . but merely tasked the DFAC team to photocopy certain documents for her," Def.'s Br. filed Jan. 13, 2012, at 29 (citing Tr. at 726 (Hayes)); (2) aside from one spreadsheet provided to Mr. Khan after the negotiations began, Ms. Hayes "formulated no particular objectives for the negotiations . . . notwithstanding the requirement to do so under KBR's procurement policies," id. (citations omitted); (3) Ms. Hayes failed to keep any contemporaneous "minutes or notes" of the negotiations with Mr. Khan; the only record of what transpired being her Negotiation Memorandum, JX 48, Def.'s Br. filed Jan.13, 2012, at 29; and (4) Ms. Hayes failed to provide an explanation of Tamimi's non-competed extension of performance, id.

Defendant's next line of attack hones in on Ms. Hayes's negotiation objectives. See id. at 30. Referencing plaintiff's argument that Ms. Hayes negotiated with Ms. Pettibone's information in mind and as a target, defendant points out that this is "an after-the-fact justification that even Ms. Hayes did not attempt until led through it at trial[.]" Id. Defendant notes that, although this information would have been useful to Ms. Hayes, she makes no mention of it in the Negotiation Memorandum, and does not include it as a rationale for her negotiated prices. Id. (citing JX 48; Tr. at 758-59 (Hayes)). Defendant similarly states that, during cross-examination, Ms. Hayes testified that, up to the point of her deposition in September 2010, she did not know where or how Ms. Pettibone calculated the figures upon which plaintiff is now relying. Id. (citing Tr. at 759 (Hayes)).

Defendant then levels its attention on Ms. Hayes's Negotiation Memorandum, which is the only record of the negotiations, and argues that there were both deficiencies and inaccuracies throughout the document.  Id. at 30-31.  First, defendant argues that the Negotiation Memorandum "justified the prices through December 2004 based upon their being lower than the previous prices, not based upon their being reasonable in and of themselves."  Def.'s Br. filed Jan. 31, 2012, at 11 (citing Tr. at 773 (Hayes)).  In fact, defendant urges that the explanations that Ms. Hayes did offer on those prices are stronger evidence for questioning the CO 9 prices than accepting them.  "Ms. Hayes blithely stated that the original MA3, WR3 prices were reasonable, based upon a review of other prices during the initial period of performance."  Def.'s Br. filed Jan. 13, 2012, at 30 (citing Tr. at 773 (Hayes)); see also JX 48, at 2844 ("Fair and reasonable price was based on . . . comparable bids received from other Master Agreement for Food Services in Iraq[.]").  Observing that Mr. Hadcock would certainly disagree with this statement, defendant argues that using this as the starting position for the justification of the CO 9 prices casts further doubt on any conclusion that what Ms. Hayes negotiated was, in fact, fair and reasonable.  See Def.'s Br. filed Jan. 13, 2012, at 30 n.14.  Defendant also takes issue with Ms. Hayes's portrayal of the risk of troops not being fed at Anaconda and Ms. Hayes's conclusion that Tamimi was likely to have received the contract award from the July competitive solicitation despite being the highest-priced bidder.  Id. at 30-31.

Finally, defendant challenges Ms. Hayes's representations in the Negotiation Memorandum regarding the DFAC structures at Anaconda.  The Negotiation Memorandum conveys the position, advocated by Shabbir Khan, that KBR had no right to the facilities prior to CO 9, and therefore should pay the full purchase price for them.  Id. at 31 (citing JX 48, at 2844-46).  Defendant notes that the Negotiation Memorandum contains no mention of any internal analyses or correspondence that relate to KBR's ownership of the DFAC structures in September 2004.  Id.  It did not escape defendant that an inconsistency existed between Ms. Hayes's knowledge that the accepted position within KBR was that it would own the facilities by September 2004, Tr. at 741-42 (Hayes), and her complete and total acceptance of Tamimi's assertions that it was owed approximately $42 million for the facilities as of December 2004.  Id.  Defendant thus implies that this acquiescence to such a significant sum was completely unreasonable.

The issue before the court is whether, in conducting the CO 9 negotiations, plaintiff—through Ms. Hayes—acted reasonably, such that the product of those negotiations can be determined to be reasonable.  Beginning with Mr. Hadcock's valiant attempts to justify the original WR 3, see JX 546, the court initially notes that KBR was aware of the problems surrounding the reasonableness of the WR 3 prices as early as March 2004.  In his failure to come up with a satisfactory rationale justifying the WR 3 prices, Mr. Hadcock focused particularly on the overall high prices that Tamimi was charging, stemming from both the new DFACs constructed at Anaconda—a result of both the sloppy procurement practices of KBR

associated with construction of the new buildings and the Government's initial balking at procurement of physical structures—and also from Tamimi's pricing of the services provided. See id. Plaintiff has argued that Ms. Hayes achieved the greensheet approval conditions laid out by Mr. Hadcock, but this is not the case. See id. Of the conditions that Mr. Hadcock established that were necessary for the original WR 3 prices to justify greensheet approval, the last two leap out to the court. Mr. Hadcock requested greensheet approval on the condition that KBR would own the buildings by September 2004—the implication being that the high prices under WR 3 could be justified by pointing to the facts that the facilities were expensive and that Tamimi's rates reflected amortization for one year only. See id. Ms. Hayes did not achieve this result. In fact, as discussed below, Ms. Hayes either did not acknowledge/avail herself of or ignored the implication that KBR was paying for the facilities beginning in September 2003, and, obviously, KBR continued paying for the facilities through November 2004.

Mr. Hadcock also conditioned greensheet approval on directing Tamimi to continue working at Anaconda through September 2004—at which point KBR would own the buildings and could recompete the contract—but with a new pricing structure and rate to be established by March 31, 2004, essentially immediately. See id. This, too, did not transpire. KBR stresses the difficulty of negotiating prices retroactively, see, e.g., Pl.'s Br. filed Dec. 22, 2011, at 2, 17 n.17, and proffers this as a circumstance that the court should consider in determining reasonableness. Mr. Hadcock acknowledged this difficulty, which is why he conditioned greensheet approval on the negotiation of new prices immediately. Because this was exactly the situation that Mr. Hadcock addressed, KBR's argument that it complied with Mr. Hadcock's conditions—albeit not until January 2005 when the CO 9 negotiations concluded—does not resonate. Had KBR followed Mr. Hadcock's recommendations, the nature of plaintiff's proofs would be radically different.

Having examined what KBR did not do, the court now turns to what plaintiff did do, which was to approve the actions of its "second-best negotiator," Tr. at 1133 (Jonas), in conducting one-on-one negotiations with Shabbir Khan in December 2004 through January 2005. Having heard the testimony of Ms. Hayes and considered the other evidence presented at trial, the court does agree that Ms. Hayes seemed like a no-nonsense negotiator. Ms. Hayes was more than capable of handling herself in a negotiation and was not likely to be intimidated by Mr. Khan. See Tr. at 652 (Hayes). Defendant asks the court to draw adverse inferences from Shabbir Khan's request to deal with Ms. Hayes, and her alone, see Def.'s Br. filed Jan. 13, 2012, at 29, but the court thoroughly rejects any implication of impropriety in this regard. The anecdote offered about a rug that Shabbir Khan offered to Ms. Hayes was not persuasive, and Ms. Hayes's honesty and integrity were securely established through Ms. Hayes's own testimony and that of Mr. Jonas. Further, the fact that Ms. Hayes did have a previous—apparently cordial—relationship with Mr. Khan from their shared time in Kuwait seems like a reasonable justification for Mr. Khan to have asked to negotiate with her.

However, the weight of the evidence demonstrates that Ms. Hayes's negotiations were not conducted reasonably. Although the court does not agree with defendant that Ms. Hayes should have complied with all of KBR's procurement policies and procedures to yield a reasonable negotiation, the dearth of any contemporaneous notes is disconcerting, not only because of the complexity of the matters dealt with in the negotiations, but also because the only record evidence available to the court is the Negotiation Memorandum with its errors and omissions and Ms. Hayes's broad-brush testimony. Ms. Hayes did not set any particular target goals for the negotiation, other than obtaining some decrease in price, ownership of the facilities, and a contract extension. It thus becomes difficult to say how successful the negotiations were because the court is unaware of how much KBR wanted to achieve. Except for the initial request for a 45% discount across the board, see Tr. at 662-63 (Hayes), which was on the order of an opening salvo, the court has no evidence as to how the negotiations actually were conducted. The only other source for this information would be the Negotiation Memorandum, wherein Ms. Hayes purported to document Tamimi's initial position, KBR's initial position, and the negotiated outcome. See JX 48, at 2846. However, Ms. Hayes stated that the figure listed for KBR was not her initial position—or even her second or third position for that matter—but the last position she took before she and Mr. Khan reached an agreement. See Tr. at 750-51 (Hayes).

Those limited evidentiary sources also reveal that, while Ms. Hayes might have been a capable negotiator, she was not knowledgeable about the situation that existed at the time. When she was selected to negotiate with Tamimi, Ms Hayes was not particularly informed about the contractual situation concerning Anaconda. See Tr. at 577 (Hayes). Although she prepared herself for the negotiations over the intervening month, it does not appear that she gained much insight into the circumstances of the situation that she was tasked to negotiate. Her casual attitude in approaching the negotiations—such that, even as Ms. Pettibone was telling her how complex the situation was, Ms. Hayes felt confident that, with "my baseball bat," JX 138 (Ms. Hayes's Nov. 9, 2004 e-mail), she could coerce Mr. Khan into a favorable position—reveals a lack of appreciation of the nuances present in this situation with which every other party to this dispute, including this court, has struggled. The issues at hand were complex and the facts surrounding the dispute went back more than a year, yet during the negotiations, Ms. Hayes did not ask a single KBR employee for analytical support. 53/ These observations and, as argued by defendant, the several serious errors reflected in the Negotiation Memorandum regarding the contractual situation at the time—the most notable being that Ms. Hayes seems to have been under the impression that the original prices at

---

53/    At one point KBR claimed that Raymond J. Pollard, KBR's Director of Procurement, oversaw and supported her efforts. See JX 74, at 9866. The court recognizes that JX 74 was plaintiff's claim and that this proceeding is de novo. However, Ms. Hayes acknowledged at trial that, when deposed in September 2010, she had stated that she had "not really" asked for analytical support from anybody. Tr. at 726-27 (Hayes).

Anaconda were fair and reasonable, see JX 48, at 2847—do not support plaintiff's argument for reasonableness.

Further, while it is true that Ms. Pettibone sent Ms. Hayes all of the preparatory material that plaintiff introduced to justify Ms. Hayes's result, it is obvious both from the Negotiation Memorandum and Ms. Hayes's testimony that Ms. Hayes did not avail herself of that information. Plaintiff seems to equate Ms. Hayes's possession of this information, which the court agrees provided useful baselines for the negotiation, with understanding and implementing the information in her possession. The lack of any reference in the Negotiation Memorandum to any of the figures or preparation material sent by Ms. Pettibone has been established. See Tr. at 758-59 (Hayes). When combined with a lack of a pre-negotiation memorandum setting out specific goals for the negotiation, and the Negotiation Memorandum's inclusion of an amount that represented the last number that she presented, see JX 48, at 2846, the court cannot find that she had articulated a goal. This is not a reasonable position or one that would have been adopted by the prudent business person in the circumstances. As reflected in Ms. Pettibone's criticism of Mr. Metzler's CO 6 justification, JX 353, to say that one achieved a lower price than a universally acknowledged unreasonably high figure is not sufficient to demonstrate reasonableness. While Ms. Hayes might have achieved her simplified and generalized goal of lowering prices, she made no effort to actually justify any of those prices in and of themselves. Ms. Pettibone's analysis at least would have provided a starting point, and the comparison of the CO 9 results to Ms. Pettibone's figures represents plaintiff's last toe-hold on its position that the prices were reasonable. Yet, Ms. Hayes did not deploy this knowledge to justify her own results. Therefore, although Ms. Hayes's results come within Ms. Pettibone's target, it appears that this was merely a coincidence.

The court also finds troubling Ms. Hayes's lack of knowledge about the one piece of leverage that she did have at the outset of the negotiations. KBR did find itself in a weak position. See Pl.'s Br. filed Dec. 22, 2011, at 17 n.17. KBR was responsible for much of that weakness because it failed to negotiate prices prospectively, as directed by Mr. Hadcock, and its attempt to self-perform the DFAC services at Anaconda was disastrous. This self-inflicted position does not mitigate any result that could be said to stem from the general, exigent circumstances of wartime contracting. But, even in this position, the court finds that the prudent business person would have seized any available advantage, which for KBR was the withheld funds. Its negotiator, however, was unaware of how much was being withheld. Mr. Jonas, Ms. Hayes's supervisor, testified that KBR was purposefully "slow rolling" payments to Tamimi in order to gain leverage in future negotiation, Tr. at 1177 (Jonas), and that even $40 million was a lot of money to any company. 54/ KBR was withholding nearly twice that

_____

54/ This point is reinforced by KBR's vigorous prosecution of this case, which seeks approximately $40 million.

amount—$76 million—in anticipation of the negotiations that Ms. Hayes was conducting, yet she did not know this fact or attempt to use it to her advantage.

Lastly, and most egregiously, was Ms. Hayes's acceptance of Shabbir Khan's position that Tamimi was still owed more than $42 million for the facilities at Anaconda. The decision by anyone to take anything that Shabbir Khan said at face value was, by this point in time, astounding, given that his proclivity for saying one thing at one moment and something completely contrary the next was known throughout KBR. In fact, at the time Mr. Metzler was reviewing CO 6, it was even suggested within KBR that Shabbir Khan and Tamimi were not—nor would not—negotiate in good faith. See, e.g., JX 334, at G-1056709. What is more troubling is that Ms. Hayes admitted on the witness stand that she had direct knowledge of Mr. Khan's mendacious tendencies. See Tr. at 735 (Hayes). Combined with this personal insight into her negotiating counterpart, Ms. Hayes, despite proclaiming diligent review of the Anaconda contract file, seemingly took no notice of the numerous references that suggested that KBR had been paying for the facilities at Anaconda, through Tamimi's PPPD prices, by as early as September 2004. See, e.g., JX 335 (Nasery minutes from KBR's meeting with Tamimi regarding DFACs at Anaconda); JX 546 (Hadcock's cost allocation); JX 419, at 2947 (Metzler CO 6 allocation). Ms. Hayes admitted that, at the time, KBR personnel were of one mind that they should have owned the buildings beginning in September 2004. How Ms. Hayes could assume that such a universally accepted opinion, supported by procurement documentation, could exist despite KBR's supposedly not having paid Shabbir Khan and Tamimi anything by December 2004 is mystifying. Accepting at face value the word of a business adversary—one known to overstate or misrepresent Tamimi's positions and one who was actively trying to subvert KBR's efforts by directly proposing to the Army—cannot be reasonable.

Further, based on the evidence presented, KBR lacks any basis for paying Tamimi an amount approaching the $42 million that Mr. Khan demanded. The only evidence presented of expenses on the facilities at Anaconda was for construction of the two DFAC structures, each costing approximately $2.5 million. See JX 335. Ms. Hayes testified that Mr. Khan "showed me a $5 million check of the return check receipt [sic]." Tr. at 767 (Hayes). However, the documents confirming this payment to PPI must not have ever been presented to KBR, whose institutional knowledge was limited to a copy of a single check—which should have been part of the procurement file Ms. Hayes reviewed—for $2.45 million. JX 334, at G-1056709 to G-1056710. 55/ Sandra Ann ("Sam") Hadley, qualified as defendant's

─────────────

55/ This check was apparently necessary for PPI to proceed with the construction work. Mr. Donley, KBR's Procurement Material & Property Manager, sent an e-mail to Mr. Metzler prior to the execution of CO 6, that related, as follows:

expert in government contract auditing and accounting, testified that, in her comprehensive review of the KBR procurement file, she found evidence only of a single check for $2.45 million. Tr. at 2413 (Hadley). It would appear that Mr. Khan again was attempting to mislead Ms. Hayes because, had he shown her a valid check for $5 million, Tamimi would have actually paid PPI $7.45 million, rather than the $5 million cost of the structures that the record otherwise supports.

This court does accept that the other components needed to outfit and operate a DFAC cost money, and it appears as though Tamimi was the entity responsible for making the DFACs operational.  Further, the court agrees with KBR that Tamimi's cost data were unavailable, and that KBR should not be required to produce cost data to justify the prices claimed as KBR's costs.  However, the record has scant evidence indicating what a reasonable price would be for those components that made the DFACs operational.  Other than the price allocations attempted by Mr. Hadcock, JX 546, who was trying to contort his analysis to account for the relative size of Camp Cedar/Adder, and Mr. Metzler, JX 419, at 2949-50, who admitted to having no assistance from Tamimi in allocating costs, Ms. Hayes seems to have had no information upon which to base the facilities costs that Mr. Khan was claiming.  In

---

55/  (Cont'd from page 64.)

Here is the way I currently see the building situation:  We have a copy of a check paid to PPI by Tamimi in the amount of $2,450,000.00.  If anyone holds the title to these buildings, it is PPI as they built the buildings and have only received half of their money.  Tamimi, as we all know, is a competitor and does not negotiate in good faith. . . . The Tamimi contract for Anaconda ends on September 15, 2004.  We should be prepared to either begin self performance (which site management wants to do) at Anaconda at that time and presume that Tamimi will not facilitate a smooth, professional and orderly transition, or, we should be prepared to award the subcontract to a caterer selected from the RFP based upon a complete evaluation . . . .

At that time, if Tamimi still resists and does not cooperate, instead of paying the delta mentioned earlier, we can instead, pay PPI the balance owed to them and back charge Tamimi the amount that we have already paid to them towards the buildings.  PPI can then turn over the buildings legally to KBR.

JX 334, at G-1056710.

these circumstances it was neither reasonable nor prudent for Ms. Hayes to have accepted the $42 million in facilities costs based on the assertions of Mr. Khan. 56/

## 2. The Global DFAC Settlement

As the second leg of its proof of reasonableness, plaintiff argues that the Government's determination on CO 9 prices through June 30, 2004, represented in the SCAT PNM, is further evidence of the reasonableness of the CO 9 prices in July 2004. See Pl.'s Br. filed Dec. 22, 2011, at 20. Ms. DeRoche's PNM states, in part, "[t]he reduced costs reflected for the credit memo period are the result of KBR's protracted negotiation with Tamimi, and are considered reasonable." JX 94, at 7613. According to plaintiff, the SCAT's parametric model, which, proceeding site-by-site, yielded an output for the time between September 2003 and February 2004 that was $1 million more than the amount actually invoiced by Tamimi at Anaconda during that time period. Pl.'s Br. filed Dec. 22, 2011, at 21. Thus, from the overall decrement of $55 million for the boots-through-the-door controversy, none of the decrement was taken from the billings at Anaconda. Id. at 22. Moreover, with knowledge of Ms. Hayes's negotiations and in possession of her Negotiation Memorandum justifying the CO 9 prices, the SCAT decided to include the reduced costs at Anaconda through June 2004 so that the Government would share in the "'windfalls [resulting from] negotiating a lower price,'" and, in the process, concluded that Ms. Hayes's reduced prices were fair and reasonable. See Pl.'s Br. filed Jan. 24, 2012, at 14 (quoting Tr. at 2042 (DeRoche)). "As part of the overall 2005 DFAC Settlement, the Government determined conclusively that the CO 9 prices from March 2, 2004[,] through June 30, 2004[,] were fair and reasonable." Pl.'s Br. filed Dec. 22, 2011, at 20. Thus, because the prices on June 30, 2004, were reasonable in the eyes of the Government, the prices beginning in July 2004, which were lower than the June prices, must also be considered reasonable by the Government. Id.

---

56/  The record reflects KBR's action on Ms. Hayes's results, as follows:

Subsequent to the conclusion of these price negotiations in January 2005, KBR management reviewed and then approved the negotiation results in accordance with KBR's Procurement Review Board procedure . . . . The objective of a KBR Procurement Review Board review and approval is to ensure compliance with KBR and United States procurement policy. In accordance with this procedure, CO 9 was reviewed and approved by: (1) Raymond Pollard, KBR Director of Management Organization; (2) Mary Mayer, Deputy Vice President, Global Procurement and Supply Management Organization . . .; and (3) William Jonas, Vice President of Procurement . . . .

JX 74, at 9866.

Defendant has countered that the probative value of the Global DFAC Settlement and Ms. DeRoche's PNM are marginal because the SCAT had a different goal than to examine costs at a specific site and, thus, did not scrutinize the specific costs incurred at Anaconda for reasonableness.  See Def.'s Br. filed Jan. 13, 2012, at 32-33.  Defendant argues that "[t]he purpose of the Global DFAC settlement in 2005 was to permit the definitization of Task Order 59 . . . by resolving the numerous pending audits of DFACs."  Id. (citing Tr. at 1983-86 (DeRoche)).    Because the Government acknowledged the difficulties that KBR had confronted at the outset of the war, it was willing to accept the price reasonableness of the first-generation DFAC contracts (expiring in February 2004), less some decrement for the boots-through-the-door controversy—"charging the taxpayers for meals not actually served to soldiers."  Id. at 33.  According to defendant, Ms. DeRoche "recognized that the billing for March through June 2004 [at Anaconda] was invoiced as a first generation DFAC, even though CO 6 would later change the pricing structure" and thus decided to include these months in the settlement.  Id. at 33 (citing Tr. at 1995 (DeRoche)); see also Tr. at 1996 (DeRoche). 57/  However, defendant contends that, while the pricing of these months was

---

57/  The credit-memo period included "some portion of the impact of" CO 9, Tr. at 2058 (DeRoche), but the parametric model had nothing to do with the credit memo, Tr. at 2058-59 (DeRoche).  The pertinence of the credit memo became clear when Ms. DeRoche explained why the SCAT included invoices from March through June:

> Later activity with Tamimi under that subcontract[] reflected the new subcontract structure that had been put into place.  And so we felt that appropriately that should remain under the cost-type contract structure and get into a normal method of operation of invoicing and review and all of those things have happened.

> The credit memo period itself was different because there had already been some invoices submitted under the old subcontract structure.  So our decision to include them in the firm fixed-price settlement was because we thought that to leave them under the cost-type structure would create confusion at a latter date, two years down the road, when someone was doing a post-performance contract audit, because the structure wasn't the same as – it wasn't what DCAA wanted, and it wasn't the same as the [approved] contract structure that had been put in place by KBR.

> So we knew what [we] were looking at.  We had an old style invoice with a credit applied.  It gave us the benefits of the price that was as good as what they were getting going forward.  And we pulled it into the firm fixed price settlement so that there would be no question later as to what that was.

Tr. at 2059-60 (DeRoche).

included in the settlement, "Ms. DeRoche had no particular insight into the CO 9 negotiations, nor did she report any particular analysis of the prices." Id. (citation omitted). Because the focus of this trial is the reasonableness of costs at Anaconda, a subject that Ms. DeRoche neither investigated nor with which she was particularly involved, this court has been exposed to a far greater level of detail regarding the situation. "[T]here is no reason to give the few conclusory sentences in the PNM any weight, especially given the fact that the Court is far better placed to evaluate just how reasonable the negotiations undertaken by Ms. Hayes really were." Id. at 33-34.

Having considered the parties' arguments and the evidence of record, the court has determined that plaintiff is attempting to place more weight on the one paragraph in Ms. DeRoche's PNM than it fairly can bear. While Ms. DeRoche was a highly credentialed government employee, the sheer scope of the effort she and the SCAT led—detailed by plaintiff in its brief, see Pl.'s Br. filed Jan. 24, 2012, at 15 (noting that SCAT's efforts included "negotiating a dispute over nearly $1.2 billion in DFAC invoices" (citations omitted))—colors any argument that price reasonableness at any one particular DFAC was considered. Indeed, the parametric model technique utilized by the SCAT itself reveals the probativeness of the SCAT's findings in this case. Precisely because it was impossible to build up a should-cost analysis utilizing cost and pricing information from each site and because of the sheer size of the effort of examining the costs at numerous DFACs, the SCAT model did not comprehend the cost reasonableness at any one site looked at singularly.

Ms. DeRoche commented that KBR and the SCAT did not negotiate site-by-site—except that KBR argued for a modification to the model insofar that Anaconda unfairly was grouped into one site instead of four, see Tr. at 2031-32 (DeRoche)—and that the parties did not particularly focus on how to treat Anaconda in the model. Tr. at 2032 (DeRoche). The model was an estimating device that was used only to judge the reasonableness of all DFAC costs. See PX 360, DeRoche Dep. I, at 90, 102-03, 132. Ms. DeRoche specifically stated that "[o]ne of the limitations of the model was that while [the SCAT] felt very comfortable that it would give us a good result in the aggregate, as [one] drills down to individual sites and the more specific [one] got[,] the less . . . reliable the data was for any given individual situation." Tr. at 1990 (DeRoche). Mr. Murphy who was the number cruncher, concurred. See PX 362, Murphy Dep., at 30, 63.

It is inarguable that Ms. DeRoche's PNM states that "[t]he reduced costs reflected for the credit memo period are the result of KBR's protracted negotiation with Tamimi, and are considered reasonable." JX 94, at 7613. The parametric model did proceed on a "site-by-site" methodology, see PX 361, DeRoche Dep. II, at 315, although no agreement was reached on a site-by-site basis and an overall decrement was applied, id. at 314. Plaintiff places great reliance on the fact that the total billings at Anaconda were less than the amount allocated to the site by the parametric model. See Pl.'s Br. filed Dec. 22, 2011, at 22; Pl.'s Br. filed Jan.

24, 2012, at 14.  However, given that the amount allocated to Camp Anaconda derived from calculations designed with the express purpose of determining "the overall 'fair and reasonable' price for DFAC services subject to [TO 59]," Pl.'s Br. filed Dec. 22, 2011, at 21, the court cannot find that this amount was the amount that the SCAT determined to be a reasonable price for Anaconda because "[t]he major issue for [SCAT] was the overall reasonableness of the settlement; and while . . . [SCAT] consider[ed] individual elements within that[,] it was the overall price that [it] w[as] justifying." Tr. at 1999 (DeRoche); see also Tr. at 2046-47 (DeRoche) ("The government made a determination that the price of the DFAC Settlement overall was fair and reasonable.").  It is also difficult for plaintiff to overcome the hurdle posed by the author of the PNM, and the above-quoted language, stating that she simply did not pass judgment on the reasonableness of prices at Anaconda and that the reasonableness determination made in this regard was only that it was reasonable to include the reduced costs in the Global DFAC Settlement.  Tr. at 2005-07 (DeRoche). Plaintiff has not shown otherwise.

Aside from the fact that the Global DFAC Settlement did not pass on the reasonableness of the prices at any particular DFAC site, the court cannot accept plaintiff's argument that "[p]rices that were reasonable on June 30 did not become magically unreasonable at midnight on July 1." Pl.'s Br. filed Dec. 22, 2011, at 20.  Receptive to rational explanations, the court does concede that this process does not happen by magic. However, the "reasonableness" determination made regarding KBR's costs at Anaconda through June 30, 2004, has no bearing on what then happened on July 1, 2004.  First, many factors are considered by parties when deciding what amount would represent a reasonable settlement, and not all of those factors are based on the merits of the controversy.  The effort that the SCAT undertook was immense, and the Government did not want to duplicate the effort.  This is a valid concern when judging the reasonableness of a settlement, but one that does not apply in this case when the court must consider what was a reasonable price for DFAC services at a particular site.  Nor was the Government concerned with particular DFACs when negotiating the Global DFAC Settlement.  In response to questioning during her deposition, Ms. DeRoche explained:

Q.  Paragraph d, I quote, the global settlement leaves to KBR the decisions on allocating the settlement results among their subcontractors, thus avoiding placing the government in the role of determining payments to individual KBR subcontractors.  This appropriately maintains KBR's responsibility for management of their vendor base.  Can you explain what that – what you were intending to communicate with that?

A.  In general the reason we hired KBR was to manage the DFAC and other service providing in theater, and so part of that responsibility is to manage their subcontractors.  The government has no privity of contract with the subs, and

so we I guess attempt to be careful not to get in a position where we're directing how that should happen.  We have no desire to get into the business of trying to determine on a fixed price basis anyway how much each one of those subs should be paid.  If we wanted to do that, then the cost plus contract process with the disallowance of cost and that administration procedure would be how we would approach it.

Q.  And was that an option for KBR to have gone through?

A.  Yes.

Q.  What would it take for them to have gone that route rather than setting on a firm fixed price basis?

A.  Well, had we not been able to achieve a settlement on the firm fixed price basis, then the contract would have reverted to its typical costs plus award fee form.  We would have included a cost baseline for the DFAC portion, calculated a fee, and then the DCAA positions that some of those costs should not be paid should be suspended or disallowed would need to have been resolved.

PX 361, DeRoche Dep. II, at 205-07.

Second, the Global DFAC Settlement was an acknowledgment from the Government that much had been asked of KBR in the early stages of the war, and, because it had delivered admirably, the Government was willing to "clear[] the slate," see Def.'s Br. filed Jan. 13, 2012, at 33, on the first-generation DFAC contracts that primarily ran through February 2004. While the Government demanded a $55 million decrement in billings, a large number, the parties agreed that this was to be applied to the universe of DFAC billings of $1.166 billion, a substantially larger sum.  As Ms. DeRoche testified, however, this leeway on what the Government would accept in terms of procurement practices and costs had its limits.  See Tr. at 1992 (DeRoche) ("[A]t some point there was a need to move on to and improve contract structure; and [the Government] did that . . . roughly in the mid-2004 time frame."). Subsequently, the Government would be expecting a higher level of compliance with standard procurement practices because the rapid expansion into Iraq had ceased.  Rather than require immediate compliance with these higher expectations, the SCAT chose to extend the Global DFAC Settlement to include costs incurred by KBR at Anaconda through June 2004 rather than cut the settlement off after February when most of the first-generation contracts expired. See Pl.'s Br. filed Dec. 22, 2011, at 20 (noting that CO 9 took effect in March 2004, a point from which the Government could have begun questioning costs).  The cut-off date for the Global DFAC Settlement had to be drawn somewhere; no matter when that deadline, on one

side would be costs that were excused, and on the other would be costs that could be questioned, even if they were the exact same amount. Thus, regardless of KBR's costs billed through June 30, 2004, on July 1, 2004, KBR was responsible for justifying its costs at Anaconda as reasonable—a task it had admitted would be difficult since December 2003. See JX 232; JX 329.

Based on the foregoing, the court finds that the evidence did not preponderate that the Global DFAC Settlement serves to justify the reasonableness of the Anaconda costs from July through December 2004. Not only did the Global DFAC Settlement not examine cost reasonableness on a site-by-site level separate from an overall reasonableness determination, but also the factors that led the SCAT to conclude that the CO 9 prices in the Settlement were reasonable were not the barometer of reasonableness after July 1, 2004.

3. The continuing iterations of the DCAA audit and Mr. Bishop's response

As the last indication of the reasonableness of the costs claimed, plaintiff argues that the court should look to "DCAA's flawed audit and KBR's response thereto." Pl.'s Br. filed Dec. 22, 2011, at 23. Plaintiff proceeds in two steps—first, using the analysis that Mr. Bishop prepared in response to DCAA's initial inquiry as evidence of DCAA's misguided approach and as independent proof of the reasonableness of KBR's costs at Anaconda and, second, attacking the process whereby DCAA arrived at the questioned amount as unreasonable and unsupported. See id. at 23-27. 58/

Beginning with Mr. Bishop's analysis, the court has outlined above the general approach that Mr. Bishop adopted in his response to DCAA. See JX 7 (KBR's response to DCAA's Preliminary Finding Report regarding MA 3 WR 3, dated Aug. 24, 2006). Mr. Bishop testified that he did not agree with the approach adopted by DCAA of selecting a sample of DFACs and generating an average comparison PPPD rate to compare to the PPPD rate at Anaconda. See Tr. at 911-12 (Bishop). Although Mr. Bishop adopted this

_____

58/   Because plaintiff is not contending that the contracting officer proceeded improperly in issuing the Form 1 in December 2007, defendant agreed to limit the testimony of David L. Cotton—qualified as an expert, *inter alia*, in government contract accounting and auditing and government contract claims analysis—to the general opinion that the contracting officer was justified in challenging plaintiff's incurred costs. See Tr. at 2480 (Cotton); Tr. at 2494 (counsel for defendant); Tr. at 2489-90 (counsel for plaintiff). Plaintiff took issue with the way the audit was conducted. Tr. at 2490 (counsel for plaintiff) ("We take the form 1 as a given. It's what brought us to the case . . . there's been no attack that KBR has made as to whether [the contracting officer] . . . acted properly - improperly - and . . . moving forward and essentially agreeing to form 1 that was issued by DCAA in withholding the costs.").

methodology in order to best rebut the initial estimate of questioned costs, he "fix[ed] some of the flaws in DCAA's methodology so that the analysis was on a 'level playing field, apples-to-apples.'" Pl.'s Br. filed Dec. 22, 2011, at 23-24 (quoting Tr. at 830-831 (Bishop)). The flaws identified were that DCAA did not account for the different conditions present at each DFAC and that DCAA had used actual headcounts from Anaconda, but projected headcounts only from the comparison DFAC sample. See Tr. at 830-38 (Bishop). Due to plaintiff's emphasis on Mr. Bishop's analysis, his response warrants a detailed examination.

Because DCAA had used actual headcounts and prices to calculate Tamimi's PPPD rate at Anaconda—ranging from a high of $24.85 in November 2004 to a low of $13.07 in December 2004, see JX 88—Mr. Bishop first collected actual headcount and price data from the twelve comparison sites, as well as any construction costs incurred at those sites, including not only facilities costs, but also power generation and refrigeration and storage costs. See Tr. at 852-60 (Bishop). The construction costs then were amortized over nine months to align with the time frame of CO 9. Tr. at 858-59 (Bishop). Using this data, Mr. Bishop recalculated the average PPPD and determined that the average PPPD rate at the twelve comparison sites was not $7.07, but $14.77. This had the effect of lowering the questioned costs under DCAA's method to $22.8 million. JX 88; Tr. at 860-62 (Bishop).

In order to account for site differences, Mr. Bishop attempted to cull the sample of twelve DFACs, such that only those most similar to Anaconda remained in the representative DFAC sample. One DFAC was eliminated because it actually did not begin incurring costs until February 2005, after the relevant time period. Tr. at 860-61 (Bishop). Next, he eliminated seven DFACs that he determined had begun amortizing the facilities costs beginning in 2003 under the first-generation DFAC contracts. Tr. at 862-63 (Bishop). Four DFACs remained in the comparison sample, all of which still were amortizing the construction costs under new SK subcontracts. Tr. at 865 (Bishop). In arriving at this sample of four DFACs, plaintiff argues that Mr. Bishop did not "cherry-pick" the highest priced DFACs to include in the average PPPD price simply to make KBR's costs at Anaconda seem more reasonable. See Pl.'s Br. filed Dec. 22, 2011, at 24-25; see also Pl.'s Br. filed Feb. 3, 2012, at 5 n.3. Mr. Bishop actually excluded one of the highest PPPD priced sites from the sample. Pl.'s Br. filed Feb. 3, 2012, at 5 n.5; Tr. at 863-64 (Bishop). After calculating an average PPPD price of $17.85 from this sample of four DFACs, Tr. at 866-67 (Bishop), Mr. Bishop adjusted the amortization periods of the construction costs at the four DFACs to extend over nine months, which resulted in an average comparable PPPD price of $22.45, Tr. at 867-71 (Bishop); JX 88. Thus, by this analysis, the questioned costs dropped to $867,429.21. Tr. at 871-72 (Bishop). When this amount was evaluated in light of numerous qualitative differences that made the Anaconda site unique among DFACs, see JX 7, plaintiff contends that "CO 9 prices—based on a comparison of actuals to actual—were in line with

other DFACs that also incurred facilities construction costs during the same time period." Pl.'s Br. filed Dec. 22, 2011, at 25. 59/

Defendant rejoins that Mr. Bishop's analysis was flawed and cannot demonstrate the reasonableness of KBR's costs. See Def.'s Br. filed Jan. 13, 2012, at 34. Defendant advances three charges against Mr. Bishop's analysis. First, defendant argues that Mr. Bishop "cherry pick[ed]" the DFACs to include in the comparable sample, so as to produce a result most favorable to KBR. Def.'s Br. filed Jan. 31, 2012, at 13; see also Def.'s Br. filed Jan. 13, 2012, at 34-36. According to defendant, DCAA selected as its comparables DFACs that "had been subjected to competitive pricing, because competitive prices [we]re deemed to be reasonable." Def.'s Br. filed Jan. 13, 2012, at 34 (citing Tr. at 2088-90, 2118 (Stanley J. Moskal, DCAA's Technical Specialist for the field audit office in Syracuse, New York, from 2003-2007 and in Iraq from 2007-2008)). Mr. Bishop, on the other hand, pared down the twelve DFACs to four "in which change orders had significantly changed the numbers of persons to be served compared to what had been competitively bid." Id. (citing Tr. at 989-91 (Bishop)). Thus, the prices at Mr. Bishop's four DFACs were not ones that had been competitively bid, which, while making them similar to Anaconda, also removed them as a reasonableness anchor. Id. at 34-35. Defendant also notes that the four DFACs that he selected happened to be ones "in which the capacity (and thus the fixed prices) was far higher than the actual numbers of people served." Id. at 35. Again, this decision rendered the selections more comparable to Anaconda, but also less comparable to an average PPPD price from the comparable DFACs.

Second, defendant questions Mr. Bishop's decision to amortize the construction costs at his four DFACs over a nine-month period. Id. at 35. Mr. Bishop had explained that he undertook this adjustment to assure that the comparables were amortizing their costs over the same length of time that CO 9 was in effect at Anaconda. See Tr. at 867-68 (Bishop). Defendant posits that this adjustment "was inappropriate for the simple reason that the notion of a 9-month amortization period at Camp Anaconda was a fiction . . . ." Def.'s Br. filed Jan. 13, 2012, at 35. As detailed above, amortization of the facilities at Anaconda did not begin

_____

59/  DCAA's response to KBR in August 2007 requested that KBR quantify the qualitative factors that Mr. Bishop had listed with cost data. See JX 39, at 6345. Of course, given the nature of the procurement, KBR could not access Tamimi's cost data and was not required to possess it under the FAR. See Tr. at 809-10 (Bishop). Nonetheless, Mr. Bishop did not attempt any quantification of the qualitative elements that he had noted in his initial August 2006 response. See JX 126. DCAA also had notified KBR of a computational error in Mr. Bishop's analysis—unidentified in the response, but revealed later to be that DCAA simultaneously was questioning the costs at two of the comparison DFACs—which resulted in questioned costs of $11 million under Mr. Bishop's analysis. See Tr. at 946-50 (Bishop). DCAA did not utilize this additional analysis in its final audit analysis because the final audit report indicated that DCAA was questioning $39.6 million in costs. See JX 1, at G0016211.

in March 2004 when CO 9 became operative, but had been proceeding since September 2003, see JX 546. Facilities at Anaconda thus were amortized over a period of fourteen months, not nine.

Third, defendant argues that DCAA's approach of comparing the projected headcounts and prices at the comparables to the actual headcounts and prices at Anaconda was actually "more of an 'apples to apples' comparison" than the approach adopted by Mr. Bishop. Def.'s Br. filed Jan. 13, 2012, at 35. Mr. Moskal, the DCAA official who testified as to DCAA's audit process and final audit results, explained that DCAA was interested in comparing the "expectations" of the parties. Id. Defendant summarizes that, attempting to "level the expectations playing field," DCAA proceeded, as follows:

> At Camp Anaconda, the parties had already fed the troops during the months in question, so Tamimi's expectations during the CO 9 negotiations were what the actual troop numbers were; at the other DFACs used as comparables, the negotiations took place before the troops were fed, thus, the expectations of the subcontractors were the projected troop numbers.

Def.'s Br. filed Jan. 31, 2012, at 14 (citing Tr. at 2092-96 (Moskal)).

Plaintiff next argues as further evidence of the reasonableness of KBR's position that DCAA was unable to agree on a consistent methodology in the year following receipt of Mr. Bishop's response, and as such, could not internally agree on what amount of KBR's costs should be questioned. See Pl.'s Br. filed Dec. 22, 2011, at 25-27. Plaintiff points out that, after receiving Mr. Bishop's response a mere month after DCAA issued its preliminary findings, DCAA took approximately a year before responding to KBR. Id. at 25. During that time frame, DCAA's internal position on how much of KBR's costs to question varied wildly, from as low $1.6 million to as high as $39.9 million, the amount questioned in the final audit. See id. at 25-26. Plaintiff cites the testimony of Mr. Moskal to demonstrate that, even as a DCAA supervisor, he could not internally agree on the numerous positions that DCAA occupied. See Pl.'s Br. filed Dec. 22, 2011, at 26-27 (citing Tr. at 2216-20 (Moskal)). Illustrative of what plaintiff characterized as DCAA's "moving target," PX 479, Mr. Moskal could not explain the path from the initial $44.8 million in 2006 to Mr. Fisher's questioned costs ranging from $39.2 million to $28.7 million, to $5.1 million, to $1.6 million, to Mr. Duggan's $37.1 million in questioned costs (as well as his $12.2 million and $13.9 million), culminating in November 2007 in the Form 1 that questioned $39.9 million. Tr. at 2216-20 (Moskal). Mr. Moskal found no need to support intermediate steps: "We're supporting the final conclusion which is $39.9 million." Tr. at 2223 (Moskal). Plaintiff concludes that "DCAA was simply unable to justify the unjustifiable . . . [and that] [i]ts process . . . was corrupted by a drive for results over reasonableness." Pl.'s Br. filed Dec. 22, 2011, at 27. Further, plaintiff notes that "[t]he

Government in litigation has abandoned the DCAA's flawed audit, which is the best evidence of its lack of merit." Id.

While plaintiff contends that defendant "abandoned" the DCAA audit, defendant dismisses the issue as not probative as evidence of reasonableness. See Def.'s Br. filed Jan. 31, 2012, at 13. Defendant concedes that "the DCAA auditors engaged in a number of provisional analyses that yielded difference conclusions." Def.'s Br. filed Jan. 13, 2012, at 36. Defendant dismisses plaintiff's focus on the DCAA audit analysis as "primarily a distraction because the Government case does not rely upon the DCAA audit report to defeat KBR's claim, but rather upon KBR's failure to meet its burden of proof in response to the costs challenged by the audit report." Def.'s Br. filed Jan. 31, 2012, at 13. Defendant contends that the DCAA audit report "is just not relevant at this point in the case, having already served its purpose of raising questions to the contracting officer regarding the Camp Anaconda prices." Id. at 13-14 n.9. Thus, defendant concludes that, "[w]hatever flaws there might have been in the audit report, they do not advance KBR's case." Id. at 13.

Having considered all the evidence, the court determines that the facts reflecting what happened during the DCAA audit process lie to the center of the respective positions presented by the parties. The court is not distracted by plaintiff's offering Mr. Bishop's analysis as proof of reasonableness despite advocating that DCAA's approach—to which Mr. Bishop was responding—was improper. See Pl.'s Br. filed Dec. 22, 2011, at 23; Tr. at 912 (Bishop). Mr. Bishop's analysis cannot be probative of reasonableness when the party offering it disavows the propriety of the auditor's approach to which it responds. While the court understands that circumstances forced plaintiff to disagree with DCAA's approach, and DCAA's approach was to question, not establish, the reasonableness of KBR's costs, it is less than persuasive to present a rebuttal to an approach argued to be unreasonable as proof itself of reasonableness. By plaintiff's logic, successfully rebutting DCAA's unreasonable approach, to be detailed further, would establish the reasonableness of KBR's costs. Successfully rebutting DCAA's approach could warrant only a finding that plaintiff has fended off that particular avenue of attack, not that it has presented evidence for reasonableness.

Given that the precise issue is not the reasonableness of DCAA's audit, the court concurs with plaintiff that DCAA's approach was deficient by failing to take into account, and appropriately adjust for, some of the factors that made Anaconda unique among DFACs in Iraq. It fell ultimately to Mr. Moskal to defend the audit process, and he did not persuade the court that DCAA made appropriate latitude for KBR's inability to provide cost data quantifying all the factors unique to Anaconda that Mr. Bishop had addressed. Several of these factors make a straight comparison of "average" prices from DFACs in Iraq less than a valid judgment. For example, Anaconda was—by far—the largest DFAC site in Iraq, was centrally located in Iraq thereby isolating it from supply points, and was under constant attack.

These factors, not present at all other DFACs, would impact the prices at Anaconda. The court found Mr. Bishop to be competent and straightforward in his approach of using an actuals-to-actuals comparison, which was more persuasive than DCAA's rationale, presented by Mr. Moskal, that it was more reasonable to compare actual headcounts and prices at Anaconda with projected headcounts at other DFACs.

At the same time, the court also agrees with defendant that problems beset Mr. Bishop's analysis. He was not qualified as an expert and did not purport to present a comprehensive analysis to justify the reasonableness of costs from a defensible model, assumption, or baseline other than the fixed prices in Tamimi's subcontract that became plaintiff's incurred costs. As demonstrated above, the facilities at Anaconda were amortized over a period longer than nine months. Mr. Bishop's assumption that amortization occurred only during the time period covered by CO 9 has been refuted thoroughly, even to the point that plaintiff itself has acknowledged facilities payments being included under the original WR 3. See, e.g., Tr. at 2787 (counsel for plaintiff); Pl.'s Br. filed Dec. 22, 2011, at 27 (arguing that plaintiff did not double pay for the facilities "notwithstanding the fact that Tamimi's earlier pricing included elements that amortized facilities cost"). Thus, Mr. Bishop's attempt to normalize all facility amortization to a nine-month period would have distorted the calculation of the comparable average price.

Next, the manner in which Mr. Bishop selected his four sample DFACs is problematic. One strength of the DCAA approach was that it looked for competitively bid prices as a measure of what could be considered reasonable. See Def.'s Br. filed Jan. 13, 2012, at 34 (citing Tr. at 2088-90, 2118 (Moskal)). This constituted at least an attempt to anchor the comparison to a fixed number that could be considered reasonable. One challenge confronting the court is that plaintiff chose to present its case of reasonableness primarily based on the fact that Ms. Hayes was able to negotiate a discount with CO 9. While discounts are desirable, and the magnitude might be large, lowering a price that was—universally, it appears—considered unreasonable, does not support a finding that the resulting lower price is reasonable. Some fixed point must be offered upon which to base a reasonableness determination because the inquiry is always "reasonable as compared to what?" DCAA attempted to provide this anchor point with an average of competitively bid prices, but KBR did not provide such a similar basis upon which the court can ground a reasonableness determination. To that extent, Mr. Bishop's selection of four DFACs that were subject to non-competitive change orders inspires little confidence that the comparison could inform reasonableness, particularly in light of the fact that DCAA similarly challenged the prices at two of Mr. Bishop's four DFACS as also being unreasonable.

Because amortization payments did begin at Anaconda under the first-generation DFAC subcontracts, it was also not reasonable for Mr. Bishop to exclude all DFACs but those currently amortizing construction costs under the SK format. Anaconda's amortization period

spanned the two subcontract types, so it would be reasonable to include prices from both first- and second-generation DFAC subcontracts when trying to create a comparison PPPD price.

The court acknowledges the hurdles that the DCAA audit process posed to KBR.  Mr. Moskal had to concede that competition is not the only way to establish price reasonableness, see Tr. at 2171-72 (Moskal); other means are cost data and a price analysis determination, Tr. at 2172-73 (Moskal). 60/ Plaintiff's counsel punctured the bubble of what KBR could have produced in the circumstances to justify the reasonableness of its costs.  KBR did not have the contractual right to inspect and audit Tamimi's records.  See Tr. at 2176-79 (Moskal).  Paragraph 19.2 of MA 3 limited KBR's audit rights to "records as relate to performance of labor provisions."  JX 201, at 6787; see also Tr. at 2178 (Moskal discussing ¶ 9.4, General Conditions, Records and Accounts; Audit (right to inspect and audit such records as relate to cost reimbursement or performance of labor provisions, JX 201, at 6806)).  Tamimi's was a fixed-price contract, not a cost-reimbursement contract.  KBR  requested and occasionally received cost data from Tamimi.  Ms. Hayes, for example, did request and obtain some cost data from Tamimi. 61/ The court finds that plaintiff sufficiently sought to procure cost data based on the evidence of those requests to Tamimi.  The court finds that Tamimi was not obliged to supply KBR with cost data, whether certified or other-than-certified cost and pricing data.  Mr. Moskal's and Ms. Hadley's preferences notwithstanding, in the circumstances it would be unfair to find that Tamimi would compromise the shield of its fixed-price contract in order to cooperate with KBR.

The court further acknowledges that DCAA was unable to agree on a methodology to apply to this case, and its "intermediate steps," Tr. at 2223 (Moskal), or widely fluctuating proposed questioned costs, were erratic.  Based on the evidence, primarily deposition testimony of DCAA auditors, both competency and pragmatic objections arose concerning any attempt proposed by the auditor then responsible for reviewing this file.  See, e.g., JX 10; JX 17; JX 19; JX 39.  However, rather than illustrate that DCAA was unreasonable in questioning KBR's costs, the finding that the court can derive from the erratic audit process is that, because of the facts on the ground, it is a difficult task to attempt to unravel and quantify the costs that KBR incurred at Anaconda.  The court agrees with defendant that "the final [audit] opinion . . . reflected DCAA's best estimate of the overcharging by KBR."  Def.'s

---

60/ Of the auditors that testified, the court found Mr. Duggan to be the most knowledgeable.  He stated the obvious: This was a commercial fixed-price contract; DCAA wanted cost data "but we were stuck . . . with price data."  PX 478, Duggan Dep., at 68-69. Mr. Duggan saw that it was necessary to find some other barometer of reasonableness.  See id. at 68.

61/ This is not to say that Ms. Hayes could not have obtained more cost data had she capitalized on KBR's leverage in the negotiations.

Br. filed Jan. 13, 2012, at 36.  Given this court's attempt to examine the evidence concerning DCAA's audit trail, which includes the parsing of the parties' deposition extracts from two auditors, the court does not find relevant the disjointed path that DCAA took at arriving at the amount that it ultimately questioned.  As defendant argues, once the contracting officer issues a Form 1 questioning costs, the onus to prove the reasonableness of that amount shifts to the plaintiff.  It is not the Government's task to show that the costs were unreasonable for other reasons until plaintiff has been able to establish the *prima facie* reasonableness of its costs.

Regardless of how DCAA arrived at its final amount, the issuance of the Form 1 charged plaintiff with the burden to prove the reasonableness of its costs and establish its entitlement to the sum that the Government was questioning.  As a matter of logic, plaintiff's showing that the Government entertained higher and lower amounts in arriving at the questioned amount does not lead to a finding that KBR's costs were, in fact, reasonable.  That finding becomes sound only if one adds the additional premise that, in the absence of a showing of unreasonableness, a contractor's costs are reasonable.  This substituted default presumption, however, is not the law; plaintiff is not entitled to claim a presumption of reasonableness simply because the Government has not demonstrated persuasively why the questioned costs are unreasonable.

Based on the foregoing, plaintiff has not shown that Mr. Bishop's analysis proves the reasonableness of the costs at Anaconda, and its evidence of DCAA's "moving target" shows only that DCAA had difficulties controlling the internal compass of its own process.  It does not substitute for the proof required of plaintiff that the costs incurred at Anaconda were reasonable. 62/

---

62/  The court gives little weight to the DCMA's approval of plaintiff's purchasing system during the relevant time period.  See JX 72.  Defendant's expert in government contracts and auditing, Mr. Cotton, testified on the subject of DCMA's cost purchasing system review.  See Tr. at 2502 (Cotton).  As Mr. Cotton explained, in the context of LOGCAP III, the Army effectively delegated its authority to the prime contractor, KBR.  To do so the Army had to show that the contractor's purchasing system was as "robust" as that required under the FAR.  Tr. at 2503-04 (Cotton).  The Army has delegated to DCMA the role of the administrative contracting officer.  Tr. at 2504 (Cotton).  DCMA undertakes periodic review of the contractor's purchasing system.  The Contract Purchasing System Review (the "CPSR"), in which DCMA and DCAA collaborate, was comprehensive and included a sampling of the full gamut of price ranges of the contracts issued under LOGCAP III.  See generally Tr. at 2503-06, 2535-36 (Cotton); JX 45.  The CPSR found KBR's level of compliance to be adequate.  See Tr. at 2537 (Cotton).  On April 7, 2005, LOGCAP III was modified to effect an administrative change, JX 518, to wit, that the purchasing system approval was withdrawn, to use Mr. Cotton's phraseology.  See Tr. at 2523, 2553 (Cotton).

4. Other evidence of reasonableness

The findings recited lead to the conclusion that plaintiff's three-legged stool approach is insufficient to justify the reasonableness of KBR's costs at Anaconda. However, in its final post-trial brief, plaintiff began to remove its emphasis on Ms. Hayes's negotiation and argued that the court should, aside from Ms. Hayes's subjective position, consider the outcome of CO 9 from an objective point of view and compare the prices in CO 9 to Ms. Pettibone's analysis in JX 339. See Pl.'s Br. filed Feb. 3, 2012, at 3-4. According to plaintiff, and not disputed by defendant, "the [c]ourt may rely on *any* evidence demonstrating price reasonableness that was presented at trial." Id. at 4. The court thus analyzes the evidence and arguments presented at trial and concludes that plaintiff has demonstrated the reasonableness of some of the prices at Anaconda that were passed on to the Government as plaintiff's costs and subsequently questioned.

The court does recognize the value of Ms. Pettibone's analysis. Ms. Pettibone persuasively argued that, given the uniqueness of the situation at Anaconda, it was difficult to attempt to justify the prices at that base by taking an average of the prices at other DFACs. Tr. at 1960 (Pettibone). Given the size and geographical location of Anaconda, no other DFAC sites were truly comparable, as Ms. Hayes herself discussed. Tr. at 673 (Hayes). Thus, in the analysis presented in JX 339, Ms. Pettibone wisely chose to draw price comparisons not with other DFACs in Iraq, but with the competitive bid submitted by Tamimi in July 2004 for the work at Anaconda. It is a generally accepted maxim that competitive prices are given a presumption of reasonableness, the logic being that competitors will price their services at the lowest price possible in order to increase their chance of winning the contract award. One of the Government's main issues with the work at Anaconda is that there never was a competitively awarded contract during the relevant time period. Instead, because the work was sole-sourced to Tamimi from the beginning at extremely high prices, no competitive check was applied to Tamimi, thus inviting the implication that Tamimi was inflating the prices that it was charging KBR.

---

62/  (Cont'd from page 78.)

Plaintiff's counsel drew the court's and Mr. Cotton's attention to the not coincidental timing of the Global DFAC Settlement on March 5, 2005, and the CO 9 modification on April 2, 2005, with the April 7, 2005 notice. See Tr. at 2552-53 (Cotton). The relevance of the foregoing is that, until the large settlement was made public, DCMA had approved of plaintiff's purchasing system whereby KBR contracted with its subcontractors on the basis of fixed-price contracts. DCMA approval, however, did not signify approval of KBR's vehicle for DFAC contracts in Iraq, either the PPPD or fixed and variable. Tr. at 2517-18 (Cotton).

Given the difficulty in justifying prices without cost data and without a suitable comparable with which to compare price data, KBR personnel consistently have tried to justify the prices by arguing that, with each modification to WR 3, the prices went down. See JX 419, at 2946 (CO 6 justification); JX 48, at 2848 (Ms. Hayes's Negotiation Memorandum); Pl.'s Br. filed Dec. 22, 2011, at 1-2, 19. A theoretical issue arises when examining this "top-down" approach to justifying prices. As explained above, reasonableness of a price can only be judged in terms of some other price figure. It is from this other figure, the conceptual anchor point, that one determines if the questioned price is reasonable. Given that WR 3 was never justified to be reasonable, see JX 546, and was essentially acknowledged to be unreasonable by both the Government and KBR, see JX 419, at 2946, the only "anchor point" in the record was the impenetrable Tamimi fixed-price contract. Conceptually, if the starting figure is unreasonably high, some discount to that figure makes the result reasonable. However, simply arguing that the resulting prices—in this case the CO 9 figures—were lower than the original WR 3 prices cannot, by itself, demonstrate the reasonableness of the prices. As an illustration, if the original prices were actually 100% higher than a demonstrably reasonable price, the resulting prices do not become reasonable because they were lower than the original amount. Confronting plaintiff is the ineluctable quandary that it was unable to show how much higher than reasonable the original WR 3 prices were in order to argue persuasively that the discounts achieved in CO 9 represent reasonableness.

Ms. Pettibone seemed to understand the dilemma with this "top-down" approach, see JX 353, and thus, attempted to present Ms. Hayes with a different perspective, the "bottom-up" approach, see JX 339. Although Ms. Hayes did not seem to understand the significance of what Ms. Pettibone was attempting, the point is not lost on the court. Rather than starting with the unreasonably high prices of the original WR 3, Ms. Pettibone utilized a figure that can be considered in-and-of-itself reasonable—Tamimi's competitive bid submitted in July 2004. With this figure, approximately $9.1 million, as a starting point, Ms. Pettibone considered that she "could probably justify [the prices]," see JX 353, if the pass-through costs that KBR submitted from Tamimi at Anaconda could be brought within 20%, or approximately $11,390,062.50, of that competitive bid, see JX 339. While plaintiff implicitly has argued that Ms. Pettibone's position should be definitive on reasonableness, the court cannot accept that position. The record does not reflect the basis on which Ms. Pettibone considered that the competitive bid plus 20% would be reasonable, and no analysis was offered to support this figure as reasonable. However, what Ms. Pettibone did provide was an anchor point of $9,112,050.00. Id. This figure was represented to be Tamimi's competitive bid that did not include any facilities costs. Although this was not the lowest of the bids to be received in response to the July 2004 solicitation, and subsequent events would suggest that this bid was itself inflated, it is still an anchor point that this court can use to judge the outcome of CO 9.

As explained above, the only facilities cost that could possibly be supported as reasonable was the $5 million cost of the two DFAC Kirby shells at Anaconda. See JX 335; Tr. at 767 (Hayes). Beyond that, plaintiff has not substantiated any of the facilities costs that were included in CO 9. Simply no evidence has been presented to compare what Ms. Hayes negotiated with Shabbir Khan. Although both Messrs. Hadcock and Metzler made allocations for facilities costs, no evidence was presented to show on what they based their allocations. In fact, the evidence suggests that the allocations were not accurate in the first instance, given that Mr. Hadcock was trying to contort his figures to align them with those from Camp Cedar/Adder—DFACs less than half the size of those at Anaconda, see JX 546—and Mr. Metzler made the allocations on his own, with no assistance from Tamimi, see JX 419, at 2946. Thus, the evidence is insufficient to associate these allocations to the costs of the additional equipment that was needed to make the DFACs at Anaconda operational.

On this record the court cannot find that the facilities costs paid by Ms. Hayes were reasonable. The blame for this dearth of evidence does not fall on the Government's color-of-money regulations or the Government's initial position that it would not own the facilities. As feared by Mr. Jonas, it was the rash actions of the KBR Operations personnel in the field at Anaconda that led to the haphazard procurement of the two new facilities in the first place. See Tr. at 1142 (Jonas). Further, the solution devised by Mr. Spore was inadequate, as lamented by Mr. Hadcock. While KBR directed Tamimi to pay PPI for the structures, it did not also require Tamimi to manage the work, see JX 546, and thus, no SOW was drafted for these structures. While the court acknowledges that they certainly were not free, KBR must bear at least part of the responsibility for the procurement chaos its personnel created. The court is confident of the evidence indicating that most of the expense of the facilities was already paid off by the time period at issue in this case. Tamimi was charging artificially inflated prices at Anaconda in the first instance, and, because amortization began in September 2003, see id., Shabbir Khan likely had recouped for Tamimi any expenses that he had paid out. It is not reasonable to require the Government to pay more for the facilities than what was rightfully owed, and reliance on only Shabbir Khan's patently misleading statements to the contrary is insufficient to demonstrate that KBR has justified the costs as reasonable.

The court thus turns to the costs from December 2004—the first month that Ms. Hayes negotiated that did not, facially, include any facilities amortization. Ms. Hayes achieved a monthly rate of $6,085,825.43. JX 48, at 2852; JX 74. Not only does this figure fall within Ms. Pettibone's target goal of competitive bid plus 20%, this sum is also roughly 33% lower than the competitive bid that Tamimi submitted for the work in July 2004. Even if Tamimi's competitive bid was the highest by a purported 8%, JX 48, at 2848, such a substantial discount on Tamimi's competitive bid supports the reasonableness of the December 2004 price. By

the court's calculation, 63/ these costs represent an imputed PPPD price of $9.11, which appears to be reasonable even by comparison to the other DFACs as shown in JX 89. But, as further evidence of the reasonableness of this price, the direct proposal Tamimi submitted to the Army quoted a price of $12.64 PPPD. See JX 357 (quoting Army a per meal price). While the court is unaware of the headcount that Tamimi was using for this bid—it does not appear on the face of the exhibit—the fact that the CO 9 price for the month of December 2004 is lower than the direct bid is strong support for the reasonableness of this price, particularly in light of the fact that in its direct proposal to the Army Tamimi was competing directly with KBR for the work. Thus, the court finds that plaintiff has justified as reasonable a monthly pass-through cost of $6,085,825.43.

KBR paid the prices negotiated by Ms. Hayes in CO 9 and attempted to pass the entire amount on to the Government. See JX 74, at 9867, 9870 (plaintiff's Contract Disputes Act claim); see also JX 68 (DCAA Form 1). Thus, by the court's calculation, for July 2004 through December 2004, KBR invoiced the Government $64,959,806.27. 64/ DCAA questioned $39,905,794.00 as being unreasonable DFAC costs, see JX 68, at 9522, which KBR subsequently remitted to the Government. KBR already has been paid $25,054,012.27 for the period 65/ despite reasonably incurring costs of $36,514,952.58. 66/ Given that KBR has proved a reasonable monthly cost of $6,085,825.43, the court finds that plaintiff is entitled to an additional $11,460,940.31, plus the agreed percentages for overhead, G&A, cost of facilities, and base fee. 67/

---

63/ The court agrees with plaintiff that an appropriate measure for the PPPD rate is the projected headcounts for the proposed period. Requiring a subcontractor to be prepared to serve a specific number of people involves at least some certain fixed costs. Should the subcontractor adequately have prepared to meet the projected goal, it falls to the Government to pay for its efforts, regardless of how many personnel actually utilized the facility during the period, especially when it is the Army that was responsible for the initial projection. Mr. Bishop testified that the Army's projected headcount for the period of July 2004 through December 2004 was 22,270. See Tr. at 1022 (Bishop); JX 88, at 4. Therefore, the court adopts this measure when calculating the PPPD rate for comparison purposes. Thus, the court's calculation is, as follows: $6,085,825.43 / 22,270 / 30 = $9.11.

64/ The court calculated, based on the figures represented for the relevant months in JX 48, as follows: $11,806,568.98 + $11,839,168.60 + $11,722,522.57 + $11,843,324.53 + $11,662,396.16 + $6,085,825.43 = $64,959,806.27.

65/ $64,959,806.27 - $39,905,794.00 = $25,054,012.27

66/ $6,085,825.43 x 6 = $36,514,952.58

67/ $6,085,825.43 x 6 = $36,514,952.58 - $25,054,012.27 = $11,460,940.31.

II. Defendant's claims

Complementing the wartime environment in which the claim gestated was defendant's relentless effort to shoehorn plaintiff's proofs into the context of fraud. The discussion of defendant's counterclaims will bear out that the serious concerns raised by the Government have been examined, and, as expeditious as plaintiff's hiring and training practices were in order to stand up DFAC operations in a war theater, the kickbacks to Messrs. Hall and Holmes and the close relationship of their superior, Mr. Gatlin, with Tamimi did not smooth the path for the award to Tamimi for the DFAC work at Anaconda or contribute to the post-incurrence-of-costs difficulties that plaintiff experienced in justifying the award. As defense counsel remarked on day two of trial, "We have never said that there was no way that [Tamimi] would have gotten these contracts except for the fraud. We are saying, however, that the fraud certainly would have influenced the possibility of the award of the contracts." Tr. at 385 (counsel for defendant). The court makes the following general findings. An atmosphere of corruption was present when plaintiff arrived on scene; it seduced some of plaintiff's Operations personnel; although plaintiff engaged in good-faith efforts to instill in its employees and monitor them for sound business practices, the tension between KBR's by-the-books Procurement personnel and the renegade Operations personnel in the field (evidenced, for example, by Mr. Jonas's unsuccessful effort to have Mr. Gatlin fired) does not relieve plaintiff from the fact that three of its supervisory personnel received kickbacks from Tamimi; and the exigencies of war can lead to the retention of less-than-model civilian employees who are willing to work in a fractious, hot, dangerous environment.

1. Anti-Kickback Act claim

Defendant seeks to hold KBR liable under the Anti-Kickback Act, 41 U.S.C. §§ 53, 55 (2006) (the "AKA") 68/ for the kickbacks accepted by its employees, Messrs. Hall and Holmes. Plaintiff appropriately has conceded liability for the kickbacks accepted by these employees. See Pl.'s Br. filed Dec. 22, 2011, at 38 n.28. Plaintiff states that "KBR is (and always was) prepared to reimburse the Government for the proper amount of any payments

_____

68/   As noted in this court's previous opinion, see KBR I, 99 Fed. Cl. at 490 n.2, Congress has recodified Title 41 of the United States Code with the effect of renumbering the AKA and altering some of its language. See Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, ch. 87, 124 Stat. 3677, 3838-41 (to be codified at 41 U.S.C. §§ 8701-07). However, because both parties continue to refer to the 2006 edition of the United States Code, the court uses the language of 41 U.S.C. §§ 52, 53, 55, as the basis for its findings.

its employees improperly accepted." Id. at 3.  Thus, the court's task regarding the AKA claim is to determine the extent of plaintiff's liability. 69/

The AKA prohibits kickbacks, as follows:

It is prohibited for any person—

(1)  to provide, attempt to provide, or offer to provide any kickback;

(2)  to solicit, accept, or attempt to accept any kickback; or

(3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

41 U.S.C. § 53.  This provision is supported by 41 U.S.C. § 55(a), which sets forth two separate civil remedies, as follows:

(1) The United States may, in a civil action, recover a civil penalty from any person who knowingly engages in conduct prohibited by section 53 of this title.  The amount of such civil penalty shall be—

(A) twice the amount of each kickback involved in the violation; and

(B) not more than $10,000 for each occurrence of prohibited conduct. 70/

(2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor or subcontractor employee violates

---

69/  The court has already discussed, in depth, the legal issues raised by the parties in its earlier opinion.  See KBR I, 99 Fed. Cl. at 488.  The court, adhering to its earlier rulings, finds it unnecessary to repeat much of that discussion or to readdress comprehensively the parties' statutory construction arguments.

70/  Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (2006), authorizes inflation adjustments to civil fines and penalties.  The Department of Justice, by regulation, has increased the penalties for AKA violations to a maximum of $11,000.00.  See 28 C.F.R. § 85.3(a)(13) (2011).

section 53 of this title by providing, accepting, or charging a kickback.  The
amount of such civil penalty shall be the amount of that kickback.

Id. § 55(a).  Under this statutory scheme, a "kickback" is defined, in relevant part, as

> any money, fee, commission, credit, gift, gratuity, thing of value, or
> compensation of any kind which is provided, directly or indirectly, to any prime
> contractor, prime contractor employee . . . for the purpose of improperly
> obtaining or rewarding favorable treatment in connection with a prime contract
> or . . . a subcontract relating to a prime contract.

Id. § 52(2).  A "person" is defined to include "a corporation, partnership, business association
of any kind, trust, joint-stock company, or individual."  Id. § 52(3).  The Government must
prove violations of the AKA by a preponderance of the evidence.  See KBR I, 99 Fed. Cl. at
502-03 (opinion granting in part plaintiff's motion to dismiss fraud-related counterclaims).

This case proceeds under a violation of 41 U.S.C. § 53(2) in that Messrs. Hall and
Holmes (although plaintiff appears to contest that Mr. Holmes violated the AKA), as KBR
employees and operating under LOGCAP III, accepted kickbacks—money and things of value
in an effort to influence their beliefs about, and conduct toward, Tamimi—from a
subcontractor, Tamimi.  Defendant argues that the violations were knowing, under 41 U.S.C.
§ 55(a)(1), and thus seeks to exact from plaintiff not only the value of the kickbacks, but also
a civil penalty for each violation.  See Def.'s Br. filed Jan. 13, 2012, at 9-12.  Citing this
court's earlier opinion in which it found that § 55(a) incorporates the doctrine of *respondeat
superior*—vicarious liability for employers—defendant contends that the violations were
"knowing" because "Messrs. Hall's and Holmes's conduct can be imputed to KBR."  Id. at
10 (citation omitted).  Defendant argues that Messrs. Hall's and Holmes's conduct can be
imputed to plaintiff because of their managerial positions, which placed them in positions of
some import in that they administered contracts worth hundreds of millions of dollars.  Id.
Defendant further argues that Mr. Gatlin, Messrs. Hall and Holmes's supervisor, and others
higher up the corporate hierarchy, were aware that Tamimi was providing things of value to
Mr. Hall, thereby making imputation to KBR appropriate and providing the basis for an award
of penalties under § 55(a)(1).  Id.

Plaintiff presses that the evidence cannot support a finding that plaintiff knew of
Messrs. Hall's and Holmes's activities.  See Pl.'s Br. filed Jan. 24, 2012, at 8-9.  Mr. Hall
testified that he never told anyone of Mr. Khan's kickbacks to him, Tr. at 2596 (Hall), and that
plaintiff required employees to have training in professional responsibility and to sign
agreements signifying that they would comply with KBR policies, which prohibited the
acceptance of kickbacks.  Pl.'s Br. filed Jan. 24, 2012, at 8-9 (citations omitted).  Indeed, at
trial, plaintiff introduced, as exhibit JX 309, Mr. Hall's signature page, whereby Mr. Hall had

acknowledged that he had read, and would abide by, Halliburton's Company Code of Business Conduct Summary 2001. Although Mr. Gatlin knew that Mr. Hall was going to Dubai on a business trip paid for by Tamimi, plaintiff notes that Mr. Hall did not tell Mr. Gatlin about the cash payments that were provided to him on the trip, thus rendering overbroad defendant's imputation argument through Mr. Gatlin. Pl.'s Br. filed Jan. 24, 2012, at 9 n.5. Plaintiff finishes by disputing defendant's reading of the statute, which would encompass all instances where any prime contractor's employee received a kickback, would render portions of § 55(a)(2) redundant, and thus would violate principles of statutory construction. Id. at 9 (citation omitted).

The court rules that, based on the evidence presented at trial, it would be inappropriate to find liability under § 55(a)(1) in this case under a vicarious liability theory centered on Mr. Gatlin's knowledge. First, while Mr. Gatlin's own potential indiscretions and inappropriate conduct provided a source of ammunition for defendant—all while disclaiming officially pursuing liability for them—this court does not find that, however unsavory Mr. Gatlin may have been, he had direct knowledge of—and thus acquiesced in—Messrs. Hall's and Holmes's behavior. While Mr. Hall did receive permission to fly to Dubai from Mr. Gatlin, that was the only action that Mr. Gatlin approved, and Mr. Hall had a sound business purpose supporting the trip, other than the "fun." See Tr. at 2596 (Hall).

A more nuanced issue is whether or not Messrs. Hall and Holmes themselves possessed sufficient authority for their actions to be imputed to plaintiff. Plaintiff legitimately faults the AKA insofar as several situations do seem to be covered by both remedial sections simultaneously. However, this court can see how the AKA targets situations where an employee's accepting kickbacks would call for the remedies established under § 55(a)(1). The specific language of the statute applies to "any person who knowingly engages in conduct prohibited" by the AKA. 41 U.S.C. § 55(a)(1). The statute defines "person" to include corporations such as plaintiff, see id. § 52(3), and, because a corporation can only act through its principals, agents, and employees, a situation can be contemplated where a prime contractor has actual knowledge of the employee's unlawful conduct or knowledge is imputed by virtue of the employee's position. This interpretation of § 55(a)(1) does not render § 55(a)(2) redundant or superfluous because it establishes a narrower category of liability than the catch-all provision of § 55(a)(2). It is entirely consistent for the statute to punish knowing violations more severely than those of which the corporation was unaware. Therefore, while an employee's mere acceptance of kickbacks is not, by itself, sufficient to establish an employer's knowing liability under § 55(a)(1), a prime contractor's employee's acceptance of a kickback can be a predicate for liability under the stricter remedy.

The court now considers whether Messrs. Hall and Holmes possessed the requisite authority themselves for their knowledge and conduct to be imputed to plaintiff vicariously. The court finds that, in this situation, they did not. It is true that Messrs. Hall and Holmes did

possess managerial titles and job responsibilities seemingly disproportionate in difficulty and scope to their respective abilities.  Plaintiff must accept that it hired Messrs. Hall and Holmes and elevated them to the positions that they held, whether out of necessity or misplaced faith, and that those positions involved the management of—judging from the universe of the Global DFAC Settlement—a billion dollars of services.   However, Messrs. Hall's and Holmes's positions, specifically restricted to food service in Iraq and Kuwait, were not commensurate with the level of authority necessary to impute their actions to KBR.   The record contains a litany of KBR titles and positions showing that Messrs. Hall and Holmes were mid-level management.   Section 55(a)(2) anticipates circumstances where a prime contractor's employees are accepting kickbacks for which the prime contractor should be held responsible, yet they are doing so without corporate knowledge of their activities or they occupy positions of diminished or low authority, such that an imputation of knowledge to the prime contractor would be inappropriate.  Although facts in this case approach the dividing line, the court rules that strict liability under § 55(a)(2) is the appropriate and sole remedy in this case.

The court turns to the dollar amount of the penalty that plaintiff is required to remit under § 55(a)(2).  Plaintiff, in brief, has conceded penalties of $18,000.00 for three kickbacks, as follows: (1) $10,000.00 for the cash that Mr. Hall received at the airport prior to his trip to Dubai, (2) $3,000.00 for the cash Mr. Hall received prior to his trip to Jordan, and (3) $5,000.00 for the value of money on the debit card that Mr. Hall received from Mr. Khan.  Pl.'s Br. filed Jan. 24, 2012, at 7.  Because § 55(a)(1) is not applicable, the court need not pass on whether Mr. Hall's dividing the spoils—the cash delivered prior to the Dubai trip or the debit card—with Mr. Holmes was a single kickback or two as no additional liability is incurred under § 55(a)(2) for each kickback occurrence. 71/  Although Mr. Hall's receipt of the airline tickets to Dubai and Jordan and Mr. Holmes's acceptance of upgraded airline

---

71/ While "[a] payment from one KBR employee to another is not a violation of the AKA," see Pl.'s Br. filed Jan. 24, 2012, at 7, the facts surrounding the delivery of money to the second employee are relevant to determining the number of kickback occurrences because the AKA defines a kickback as any "thing of value . . . which is provided, *directly or indirectly*, to any prime contractor [or] prime contractor employee," 41 U.S.C. § 52(2) (emphasis added).  Defendant made a persuasive showing that Mr. Holmes knew from whom the money had come, given that he was present at the airport when the Tamimi representative presented Mr. Hall with the cash.  Further, Mr. Holmes stated that Mr. Khan presented him directly with the debit card and that he returned the card directly to Mr. Khan.  See JX 476, at G-0397354.

tickets would constitute additional kickback occurrences, 72/ no value for these items was proved at trial, thus relieving plaintiff of liability for these kickbacks.

This leaves two remaining incidents, the classification of which is disputed. The court turns first to Mr. Hall's acceptance of $20,000.00 from Shabbir Khan as "seed money" to explore the potential of his acquiring a Golden Corral restaurant franchise. See Tr. at 2610 (Hall). Plaintiff contends that, "[u]nlike previous payments, Mr. Hall did not understand this money to be connected in any way to his work at KBR." Pl.'s Br. filed Jan. 24, 2012, at 7. Plaintiff instead focuses on Mr. Hall's characterization of the money as in pursuit of "a serious investment," Tr. at 2612 (Hall), to demonstrate that defendant failed to prove that the money was "'for the purpose of improperly obtaining or rewarding favorable treatment,'" Pl.'s Br. filed Jan. 24, 2012, at 8 (quoting 41 U.S.C. § 52(2)), and thus not a "kickback" under the AKA.

Defendant takes the opposite position and argues that Mr. Hall's acceptance of this investment money does constitute a kickback. See Def.'s Br. filed Jan. 13, 2012, at 11. Although Mr. Hall stated that, in his opinion, the money was for "a serious investment," Tr. at 2612 (Hall), defendant argues that the determination whether the money constituted a kickback is an objective one for the court to make, not a subjective one dependent on Mr. Hall's interpretation. Def.'s Br. filed Jan. 31, 2012, at 3. Defendant continues that plaintiff has conceded Mr. Hall's receipt of kickbacks around the same time period, that this event violated KBR's Code of Business Conduct, and that Mr. Khan's interest in this "investment" opportunity rapidly diminished after Mr. Hall moved on from his position as KBR's Regional Food Service Manager in Iraq. Id. Defendant also notes that Mr. Hall never opened a Golden Corral restaurant and never returned any of the money to Mr. Khan. Def.'s Br. filed Jan. 13, 2012, at 9 (citing Tr. at 2611 (Hall)). Defendant concludes, "In a nutshell, the money given by Mr. Khan to [Mr.] Hall . . . regardless of its rationalizations, was intended to make [Mr. Hall] happy with Tamimi." Def.'s Br. filed Jan. 31, 2012, at 4.

The payment of $20,000.00 in cash to Mr. Hall, Tr. at 2611 (Hall), constitutes a kickback for which plaintiff should be held strictly liable. Regardless of Mr. Hall's view of the money, sufficient circumstantial evidence supports the finding that this money represented

---

72/ Plaintiff attempts to argue that the airplane tickets to Dubai and Jordan were provided to Mr. Hall for "legitimate business reasons." Pl.'s Br. filed Jan. 24, 2012, at 8. The court rejects this characterization. While Mr. Hall might have spent some time conducting business on the trips, the witness admitted that half of the time was spent in "recreational" pursuit. Added to this is the fact that on each trip, Mr. Khan simultaneously provided Mr. Hall with sizeable amounts of cash that Mr. Hall used to entertain himself. The evidence sufficiently demonstrates that each trip was more than routine business travel and constituted a kickback.

a kickback from Shabbir Khan to Mr. Hall for the purpose of continuing to keep Tamimi—and Mr. Khan—in Mr. Hall's good graces. This money was provided to Mr. Hall at a time when he was still an employee at KBR, yet no more money was forthcoming immediately upon Mr. Hall's departure from KBR, see Tr. at 2611 (Hall), which demonstrates that it was given based upon his status as a KBR employee. As noted above, following Mr. Hall's departure from KBR, Mr. Khan explained to Mr. Hall that he had to respect KBR's policy prohibiting his investing in or hiring anyone formerly in higher management at KBR for at least a year after the employee's departure. Id. It was a direct violation of KBR policies for Mr. Khan to provide Mr. Hall with money while he was employed by KBR in the first place. The only changed circumstance was that Mr. Hall was no longer working for KBR and thus of no further use to Mr. Khan. Similarly, although Mr. Hall did use some of the money for research into the franchise, that represented less than half. Tr. at 2611 (Hall) (estimating that he spent about $7,000.00 for research purposes). Mr. Hall kept the rest of the money for his personal use rather than return it to his "investor." This conduct does not comport with a customary business relationship. Finally, when combined with the other circumstances of this transfer, the court finds it significant that the money was delivered in cash. Tr. at 2611 (Hall). Twenty-thousand dollars is a substantial sum of money and to deliver it entirely in cash—thus in a manner least likely to be traceable by any authorities—renders it suspect. The court therefore concludes that plaintiff is strictly liable for the $20,000.00 in addition to the $18,000.00 that it has already conceded.

The second disputed incident is Mr. Holmes's alleged acceptance of $10,000.00 from Mr. Khan, which allegedly was passed along to his secretary/potential paramour. Defendant argues that this amount is supported via two pieces of evidence: the limited testimony on the subject by Mr. Hall, see Tr. at 2597-2601 (Hall), and the interview notes of Special Agent Cumpson, Defense Criminal Investigative Service, admitted as JX 296. Def.'s Br. filed Jan. 13, 2012, at 8. Defendant further asks the court to "draw adverse inferences against Mr. Holmes" based on his invocation of his Fifth Amendment right against self-incrimination when asked about kickbacks in his deposition. Id. at 8 n.4. Plaintiff has argued that Mr. Hall's testimony, by itself, is insufficient to establish liability because it was hearsay testimony. See Pl.'s Br. filed Jan. 24, 2012, at 8. Plaintiff further urges that Ms. Cumpson's testimony on cross-examination casts sufficient doubt on the reliability of her investigative report such that it, too, cannot serve as a basis for liability because Ms. Cumpson "admitted that her hand-written notes did not match her interview report and that what she wrote would only make sense 'from an agent's point of view.'" Id. (quoting Tr. at 1626-27 (Cumpson)). 73/ As a third point, plaintiff contends that, although defendant is requesting

_____

73/  Defendant has argued that, because JX 296 was admitted as a joint exhibit, plaintiff should not now be allowed "to challenge consideration of this evidence." Def.'s Br. filed Jan. 31, 2012, at 4. Plaintiff rejoins that "the Government confuses the *admissibility* of Special Agent Cumpson's interview report with its *reliability* or probative value in

that an adverse inference be drawn against Mr. Holmes, it is actually seeking "an adverse inference against a third party—KBR." Id. at 8 n.4. Plaintiff contends that this would be improper. Id.

In LiButti v. United States, 107 F.3d 110 (2d Cir. 1997), the United States Court of Appeals for the Second Circuit recognized that it is permissible for courts to draw adverse inferences against a party in a civil case from a non-party's invocation of the Fifth Amendment privilege, see id. at 121. A number of non-exclusive factors should guide trial courts: 1) the nature of the relevant relationships; 2) the degree of control of the party over the non-party witness; 3) the compatibility of the interests of the party and the non-party witness in the outcome of the litigation; and 4) the role of the non-party witness in the litigation. See id. at 123-24. Defendant's cases cited in support apply the LiButti factors, see SEC v. Monterosso, 746 F. Supp. 2d 1253, 1263-64 (S.D. Fla. 2010); John Paul Mitchell Sys. v. Quality King Distribs., Inc., 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000), and this court follows suit. "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all the circumstances and will advance the search for the truth." LiButti, 107 F.3d at 124. The court declines to draw the requested inference. It is true that Mr. Holmes is no longer in KBR's employ, KBR exercises no control over him, and both KBR and Mr. Holmes share similar aspirations relative to the outcome of the Government's allegations. The fourth factor, however, weighs heavily in plaintiff's favor. The only evidence of Mr. Holmes's taking money for his alleged girlfriend consists of hearsay testimony and the discredited portion of Ms. Cumpson's report.

The court finds that defendant has not carried its burden of proof as to this alleged incident. Mr. Hall's testimony on this point was hearsay, and the court has entered findings that limit the probativeness of Ms. Cumpson's record of the Holmes interview. No adverse inferences should be drawn against plaintiff based on Mr. Holmes's invocation of his Fifth Amendment privilege because the other evidence of this fraud is unreliable. Nor is the court prepared to draw the requested inference because it has found that Mr. Holmes accepted other kickbacks.

For the reasons discussed, the court finds and concludes that plaintiff is strictly liable under 41 U.S.C. § 55(a)(2) for the kickbacks taken by its employees, Messrs. Hall and Holmes, in the total amount of $38,000.00.

-------------------------

73/ (Cont'd from page 89.)

establishing that Mr. Holmes actually accepted $10,000." Pl.'s Br. filed Feb. 3, 2012, at 3. Plaintiff's distinction is apt.

2.  Common law fraud claim

Defendant's second claim is that plaintiff is liable under a theory of federal common law fraud because of the kickbacks accepted by Messrs. Hall and Holmes.  See Def.'s Br. filed Jan. 13, 2012, at 18-19.  Defendant begins with a citation to J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988), in which the United States Court of Appeals for the Federal Circuit stated that a contract "'tainted from its inception by fraud is void *ab initio*.'"  Def.'s Br. filed Jan. 13, 2012, at 12 (quoting J.E.T.S., 838 F.2d at 1200).  Before trial defendant's "taint" theory of fraud was rejected on plaintiff's motion to dismiss.  See KBR I, 99 Fed. Cl. at 514-15.  If the legal discussion failed to persuade defendant, Mr. Cotton gave eloquent testimony that the "taint" defendant seeks to impart to the history of MA 3 WR 3 was integral to his testimony that the CO 9 negotiations did not yield reasonable costs:

> Q    Now, on the third opinion with respect to fraud, and sir, not to sort of leap ahead too much here, but is it fair to say that your conclusion at least stated in your report was that it was not possible to calculate an amount to overpricing for any particular contract that's been impacted by fraud?
>
> A    I think it's very difficult to come up with an estimate.  It's probably impossible to come up with an exact dollar amount.  The presumption is that where a contract has been affected by fraud in its formation that at some point in time prices under the contract will be higher than they should be in order to compensate the participants in the fraud.
>
> Q    That's essentially the sum and substance on your opinion, right?  Fraud?
>
> A    I think I have more to say on the issues, but that's one of my opinions with respect to fraud.

Tr. at 2482 (Cotton).  Because Mr. Cotton was not prepared to quantify any fraud and in view of the quoted statement, the court excluded the witness's opinion on the ground that it would confuse the record.  See Fed. R. Evid. 403; Tr. at 2497, 2681-83 (Cotton).

This court allowed this claim to proceed only on defendant's conflict-of-interest theory of liability similar to that involved in United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961).  In KBR I this court stated that "[t]he level of participation by Messrs. Holmes and Hall in each decision, i.e., whether a true conflict of interest existed or whether false statements about Tamimi were proffered to induce the award . . . implicate[] issues that will be resolved at trial."  KBR I, 99 Fed. Cl. at 516.  In effect, this claim was tried to give defendant an opportunity to establish proof, by clear and convincing evidence, of a direct

causal link whereby Messrs. Hall and Holmes took affirmative action to assist Tamimi in obtaining the award of MA 3 or WR 3.  Regarding the element of causation in cases such as this, the court determined

> [i]n [Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993)] the Federal Circuit emphasized the issue of causation in analyzing a conflict of interest, noting that in Mississippi Valley "the illegality [of violating the Federal conflict of interest statute] permeated the contract.  Without the [contracting officer's] illegal participation, the Court stated, 'no contract would have been made.'"

Id. at 515 (second and third modifications in original) (quoting Godley, 5 F.3d at 1475-76 (quoting Miss. Valley, 364 U.S. at 553)).  The court thus evaluates the parties' arguments in this light. 74/

Defendant contends that it has established that the acceptance of kickbacks by Messrs. Hall and Holmes did create a conflict of interest in that "KBR's managers' private pecuniary gain clashed with the public's interest in arms-length negotiations, procurement integrity, and fair-and-objective consideration of subcontractors." Def.'s Br. filed Jan. 13, 2012, at 13.  It is undisputed that Mr. Hall received kickbacks, and the court concurs that Mr. Holmes, too, was "on the take."  Defendant then contends that it has met its burden of "prov[ing] a causal link between the fraudulent conduct . . . and the contract(s)," though troublingly begins its case by citing precedents to the effect that the court must stoke its sense of paranoia and maintain vigilance or "'the suspicion of frauds gone undetected.'"  See id. at 14 (quoting Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. 214, 215-16 (1991)).  But see KBR I, 99 Fed. Cl. at 497-501 (showing that Brown's taint is tainted by the lack of sound case law).  Defendant argues that Messrs. Hall and Holmes "wielded significant authority with respect

---

74/  The court incorporates its discussion rejecting defendant's arguments that the fraudulent acts charged render MA 3 WR 3 void in KBR I, 99 Fed. Cl. at 514-15.  The United States Court of Appeals for the District of Columbia Circuit in United States ex rel. Siewick v. Jamieson Science & Engineering, Inc., 214 F.3d 1372 (D.C. Cir. 2000), applied the same analysis employed by this court in KBR I, concluding that the taint of fraud did not necessarily void an affected contract ab initio, KBR I, 99 Fed. Cl. at 515.  The appeals court commented that Godley, 5 F.3d at 1475-76, and J.E.T.S., 838 F.2d at 1200, did not fully appreciate the import of Mississippi Valley, 364 U.S. 520, in which the United States Supreme Court held that a contract tainted by a conflict of interest was voidable—not void, Jamieson, 214 F.3d at 1376-77.  Citing Godley and J.E.T.S., the D.C. Circuit explained that the Federal Circuit "disregarded the language of Mississippi Valley Generating that supports voidability and pointed to none supporting voidness.  Read for all their worth, [Godley and J.E.T.S.] would vastly expand the normally minute group of contracts treated as void." Jamieson, 214 F.3d at 1377.

to the award and administration of DFAC contracts," and lists the various tasks that they, as managerial Operations personnel, performed.  Def.'s Br. filed Jan. 13, 2012, at 14-15. Defendant then points out that Messrs. Hall and Holmes, and their unsavory supervisor Mr. Gatlin, participated in the meetings that resulted in the award of the five Master Agreements, one of which went to Tamimi.  Id. at 15.  Within this process defendant stresses that Mr. Hall was the effective gatekeeper to award of a Master Agreement because "[n]ot one of the contractors Mr. Hall found technically unqualified received a Master Agreement from KBR." Id. at 16.  Defendant thus concludes that, because Mr. Hall did not challenge Tamimi's technical qualification, "MA3 was tainted from its inception."  Id.

Further, defendant contends that WR 3 was similarly "compromised by conflicts of interest."  Id.  Defendant argues that this conflict is evident from the fact that, although Mr. Petsche wanted to move the displaced C-6 awardee, TES, to Anaconda to fill that need, he was prevented from doing so by the forceful intervention of Messrs. Hall and Holmes, both of whom favored allowing Tamimi to continue the work at Anaconda.  See id. at 16-17 (citing Tr. at 1276-77 (Petsche) to explain that Mr. Petsche was "baffled" by their opposition and that they informed him, conspiratorially, that they "had other plans for Anaconda").  Defendant insinuates that this was to protect the valuable "business opportunity" that the work at Anaconda presented for Tamimi.  Id. at 17.  Defendant concludes that the evidence "showed that high-level KBR employees accepted kickbacks from Tamimi around the same time that those employees were directly involved in actions that benefitted Tamimi."  Id. at 18-19.

Plaintiff is vehement that "[t]his is no more than a kickback case."  Pl.'s Br. filed Dec. 22, 2011, at 3.  Plaintiff proceeds immediately to the heart of the matter, contending that the Government "has not shown that Tamimi was awarded a master agreement or work release because of the payment of kickbacks, or even that the kickbacks affected the award."  Pl.'s Br. filed Jan. 24, 2012, at 1.  Further, plaintiff argues that defendant "continues to pursue the 'taint' theory of fraud, bootstrapping a kickback violation into a disgorgement claim.  Its theory, already once rejected . . . would largely, if not entirely, dispense with proof of causation . . . [but] [n]owhere in the law is this permitted."  Id. (footnote omitted).  Rather than limiting the element to "the mere possibility of influence," plaintiff argues that defendant must make a showing that the contract was "actually tainted by the illegality."  Id. at 3 (citation omitted) (internal quotation marks omitted).  Further, according to plaintiff, when the court looks beyond this "taint" theory, it will find that there has been no proof of causation actually offered.  Id. at 4-5.  To support its position that defendant cannot show causation, plaintiff lists multiple citations to the record demonstrating that Messrs. Hall's and Holmes's actual roles in the awarding of MA 3 and WR 3 were not as significant as defendant

contends and that KBR employees not corrupted by kickbacks from Tamimi supported the decision to make those contract awards to Tamimi.  See id. at 4-6. 75/

The court concurs with plaintiff that defendant's case falls well short of a clear and convincing showing of a causal link between Messrs. Hall's and Holmes's acceptance of kickbacks and the award of MA 3 and WR 3 to Tamimi.  The obstacle that defendant cannot overcome in this case is best summarized by defendant itself, when, in asking whether or not Messrs. Hall and Holmes might have supported Tamimi in the event they were not simultaneously receiving kickbacks, answered "[p]erhaps yes, perhaps no." Def.'s Br. filed Jan. 13, 2012, at 18.  The record lacks sufficient evidence for the court to find a causal link between the "improper, though incidental, acceptance of kickbacks by Terry Hall and Luther Holmes," Pl.'s Br. filed Jan. 24, 2012, at 1, and the award of the contracts.

The evidence supports the finding that Tamimi would have received a Master Agreement and WR 3 absent any participation by Messrs. Hall and Holmes.  Although the court agrees with defendant that, regardless of what Mr. Hall himself believed, he did have "veto power" while sitting on the Master Agreement Board, the circumstances surrounding the award would not support a finding that, had any other individual been in Mr. Hall's place, Tamimi would not have received the award of MA 3.  Defendant leans on Mr. Hall's not objecting to Tamimi's technical qualifications.  However, Tamimi was technically qualified to provide DFAC services in Iraq.  It was already doing so—at Anaconda no less—under a direct contract with the Army and apparently was so qualified that the Army considered awarding every DFAC contract to Tamimi in the first instance, Tr. at 2591, 2626 (Hall).  Mr. Hall's withholding use of his veto power in this instance is not indicative of any causal link between kickbacks and his "support" of Tamimi.  Therefore, defendant has not carried its burden of proof on common law fraud liability regarding the award of MA 3.

Similarly with WR 3, ample evidence supports a finding that Tamimi would have received the award of the work at Anaconda regardless of Mr. Hall's actions.  See Tr. at 1109 (Jonas) (testifying that the award of WR 3 to Tamimi "just made sense").  Tamimi already was providing the services at Anaconda, and given the aggressive pace of service demands from the Army at the time WR 3 was awarded, Mr. Jonas testified that it "would have been irresponsible on the part of KBR at that time" to attempt to use another subcontractor at

---

75/   Plaintiff also offers the testimony of Mr. Hall in which he stated that the kickbacks that he received from Shabbir Khan did not influence his official role.  See Pl.'s Br. filed Jan. 24, 2012, at 5 (citing Tr. at 2633 (Hall)).  The court agrees with plaintiff's observation that, because of his plea agreement with the Government, Mr. Hall had no reason to minimize his role in this matter.  Id. at 6.  However, the court discounts this testimony from Mr. Hall as self-serving, if not delusional.  He presented himself as someone who had no difficulty in appearing contrite.

Anaconda. Tr. at 1110 (Jonas). The notion of awarding the work at all four DFACs at Anaconda did not originate with Mr. Hall, but with Mr. Spore. See JX 381 (e-mail from Mr. Spore date Nov. 3, 2003); Tr. at 2639-40 (Hall). Defendant's reliance on Mr. Petsche's sobriquet "the Mother of all Drug deals," JX 329, was misplaced, in that a "drug deal" referred to a deviation from procurement practices, see Tr. at 1323 (Petsche); Tr. at 1107-08 (Jonas). Clear and convincing evidence does not establish a causal link between the kickbacks and the award of WR 3 to Tamimi.

Although defendant has cited Mississippi Valley for the proposition that courts should "be vigilant for . . . actual corruption . . . [as well as] 'corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction,'" Def.'s Br. filed Jan. 13, 2012, at 14 (quoting Miss. Valley, 364 U.S. at 565), the court concludes that the evidence shows that the corruption—the kickbacks—has been detected and does not pertain to the award of MA 3 or WR 3. No "tainted transaction" was involved in this case; rather, two unsophisticated, unscrupulous employees took advantage of a chaotic wartime situation by accepting money on the side. Congress enacted the AKA to deal with the situation of kickbacks in the chain of command that do not constitute common law fraud. Even if the court were to accept defendant's contention that but-for causation is not necessary and that "the focus must be on the responsibilities, role, and participation of a conflicted party," Def.'s Br. filed Jan. 31, 2012, at 7, the facts adduced do not prove that Messrs. Hall and Holmes had the effective responsibilities, role, and participation that caused the award of the contracts at issue. Therefore, the court finds that defendant has failed to establish the requisite causation element of common law fraud.

## CONCLUSION 76/

---

76/ The parties did not present linear cases, to understate the complexity of the record. The court has endeavored to discuss the witnesses, depositions, and documentary testimony that was probative. The court did not discuss all the testimony of every witness or document. The court did not mention Paul M. Szafranski, a former Tamimi employee, who testified cumulatively about the close relationship between Shabbir Khan and Messrs. Hall and Holmes. Little mention was made of Ms. Hadley, defendant's expert, because her opinions on the shortcomings in Ms. Hayes's negotiations and Negotiation Memorandum were cumulative of direct evidence; Ms. Hadley seized on a FAR clause that defendant could not place in MA 3 WA 3, and cross-examination undermined a key premise, tainting her approach:

> I believe that our opinions about the fact that Change Order 9 prices are not justified include any allowance for a wartime environment. For instance, if the price – if the single-source justification memorandum was done a couple days late or you lost it and you had to recreate it, I think that that's a contingency situation which should be taken into account, and I believe that

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment, as follows:

1.  Judgment shall enter for plaintiff in the amount of $11,792,505.31, plus interest, representing:

> 1) Direct Costs - $11,460,940.31
> 2) Overhead @ .5% - $57,304.70
> 3) G&A Costs @ 1.39% - $159,307.07
> 4) Cost of Facilities @ .003% - $343.83
> 5) Base Fee @ 1% - $114,609.40

2.  Interest shall be computed from July 18, 2008, pursuant to 41 U.S.C. § 7109.

3.  Judgment shall enter for defendant on Count II of its counterclaims in the amount of $38,000.00.

4.  Judgment shall enter dismissing Count III of defendant's counterclaims. See KBR I, 99 Fed. Cl. at 517.

5.  Judgment shall enter for plaintiff on Counts IV and V of defendant's counterclaims. See id.

---

76/ (Cont'd from page 95.)

I do in other audits, as well as this evaluation.  However, the fact that the Work Release 3 prices have never been justified and that attempts have been made to justify the price and failed, I believe is not affected by the wartime environment.  I think the prices still need to be justified.

Tr. at 2393-94 (Hadley).

6.   By May 4, 2012, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.  The parties shall include a cover sheet that identifies the pages on which requested redactions appear.

**IT IS SO ORDERED.**

No costs.

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge